UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * *
                                  *
LEE HUTCHINS, SR.                 *
                                  *
          Plaintiff,              *      CIVIL ACTION NO. 16-cv-30008
                                  *
     v.                           *
                                  *
DANIEL J. MCKAY, FELIX M.         *
ROMERO, THOMAS HERVIEUX, and      *
THE CITY OF SPRINGFIELD           *
                                  *
          Defendants              *
                                  *
* * * * * * * * * * * * * * * * *
```

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT ONE

*Factual Background*

A.   *51-53 Daytona Street*

On January 19, 2013, Plaintiff Lee Hutchins (Plaintiff) was the owner of a two-family home at 51-53 Daytona Street in the City of Springfield. (Pl.'s Statement of Facts in Supp. of Mot. for Summary Judgment ¶ 1.) Upon ascending the steps to the front porch to Plaintiff's property, an individual would encounter two separate entrances. (*Id.* ¶ 2.) The entrance to the left was 51 Daytona Street, the home of Pablo Torres (Torres). (*Id.* ¶ 3.) Torres was Plaintiff's tenant; he lived in the unit on the first floor of the property. (*Id.* ¶ 4.)

1

The entrance on the right side of the porch had a storm door and a second interior door. (*Id.* ¶ 5.) This was the entrance to 53 Daytona Street, where Plaintiff resided with several family members. (*Id.* ¶ 6.) Upon entering 53 Daytona Street, an individual would step onto a landing below a flight of stairs. (*Id.* ¶ 7.) Upon ascending this interior flight of stairs, an individual would encounter another door. (*Id.* ¶ 8.) On the other side of that door was Plaintiff's kitchen. (*Id.* ¶ 9.)

In addition to the kitchen, the second floor had a living room, two bedrooms, and a bathroom. (*Id.* ¶ 10.) One set of stairs in the back of the residence connected the basement to the kitchen on the second floor. (*Id.* ¶ 11.) A second set of stairs in the back of the residence connected the second floor to the third floor. (*Id.* ¶ 12.) Plaintiff's son Keith Hutchins (Keith) had a bedroom in the basement. (*Id.* ¶ 13.) The basement did not have a bathroom or kitchen so Keith used the bathroom and kitchen on the second floor. (*Id.* ¶ 14.)

The third floor had three bedrooms and one full bath. (*Id.* ¶ 15.) On January 19, 2013, Plaintiff's son Lee Hutchins (Lee)[1] lived in one of these third floor bedrooms. (*Id.* ¶ 16.)

B.   *The Police Entry into 53 Daytona Street*

Lee and Vanessa Montero (Vanessa) had a child named Ivan Montero (Ivan). (*Id.* ¶ 17.) Ivan was four years old at the time. (*Id.* ¶ 18.) On January 19, 2013, Lee and Vanessa maintained separate residences. (*Id.* ¶ 19.) That afternoon, Vanessa dropped Ivan off at 53 Daytona Street. (*Id.* ¶ 20.) Later that evening, Lee and Vanessa began arguing via texts and phone calls. (*Id.* ¶ 21.) At some point during this exchange,

---

[1] Plaintiff's son shares his name but is not a "Junior." For purposes of this pleading, he will be referred to as "Lee" and his father will be referred to as "Plaintiff."

2

Vanessa said she was going to come to 53 Daytona Street to pick Ivan up. (*Id.* ¶ 22.) Lee eventually responded by saying: "If you are coming, just come with the cops because you're not taking him out of the house at this time." (*Id.* ¶ 23.) After communicating this message to Vanessa, Lee took Ivan upstairs to his third-floor bedroom and went to sleep. (*Id.* ¶ 24.)

Just before midnight, Defendants Daniel McKay (McKay) and Felix Romero (Romero) received a dispatch instructing them "to assist a female in getting her child." (*Id.* ¶ 25.) McKay and Romero met with Vanessa outside a nearby Dunkin Donuts and ended up following Vanessa's vehicle to Daytona Street. (*Id.* ¶ 26.) After parking their cruiser, McKay and Romero knocked on the door to 53 Daytona Street and waited for someone to open it. (*Id.* ¶ 27.) When one of the occupants of 53 Daytona Street answered the door, McKay and Romero explained they were there to retrieve Ivan. (*Id.* ¶ 28.)

Neither McKay nor Romero could recall whether it was a male or female occupant who answered the door. (*Id.* ¶ 29.) At his deposition, McKay testified that the occupant was "very civil" and "said they'd be right down with the child." (*Id.* ¶ 30.) Romero's memory of this exchange was less clear; he believed it was communicated to McKay and him that "the child would be brought down." (*Id.* ¶ 31.)

Plaintiff was asleep in his bedroom when the police arrived at the residence. (*Id.* ¶ 32.) Plaintiff's step-son Tyshon woke him up and told him the police were at the door. (*Id.* ¶ 33.) Meanwhile, McKay and Romero "did not wait for the child to be brought downstairs." (*Id.* ¶ 34.) After waiting outside for "approximately ten minutes," they

3

entered the residence "went to the top of the stairwell and knocked on the door there." (*Id.* ¶ 35.)

McKay and Romero were standing outside the kitchen door when Plaintiff opened it. (*Id.* ¶ 36.) After they "indicated they were there to get Ivan," Plaintiff said he would get the child and "be right back." (*Id.* ¶ 37.) Plaintiff was very "surprised that the police were at [his] house to get Ivan." (*Id.* ¶ 38.) As he went up to the third floor to get his grandson, Keith came up the back set of stairs from his basement; upon seeing McKay and Romero, he expressed "hostility about [their] presence." (*Id.* ¶ 39.) Keith was upset at the officers because in his view, "you're already in my house once you're up those stairs." (*Id.* ¶ 40.) He "was telling them, What are you all doing here? You're all inside my house. You have no warrant. You got to go outside." (*Id.* ¶ 41.)

*Pertinent Legal Principles*

"Summary judgment is warranted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir. 2005) (quoting Fed. R. Civ. Pro. 56(c)). "An issue is genuine for purposes of summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a material fact is one which might affect the outcome of the suit under the governing law." *Cacieri v. Norton*, 398 F.3d 22, 29 (1st Cir. 2005).

The standard for granting summary judgment mirrors the standard for a judgment as a matter of law under Federal Rules of Civil Procedure 50(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Judges are not required to submit a question to a jury

merely because some evidence has been introduced by the party having the burden of proof, unless the evidence is of such a character that it would warrant the jury in finding a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (U.S. 1986).

> 42 U.S.C. § 1983 states, in relevant part,
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must demonstrate a deprivation of a federally protected right and a causal connection between the deprivation and a state actor. *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009).

"It is common ground that a man's home is his castle and, as such, the home is shielded by the highest level of Fourth Amendment protection." *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015) (citing *United States v. Martins*, 413 F.3d 139, 146 (1st Cir. 2005)). Consequently, "[a] warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well-delineated exceptions to the Fourth Amendment's warrant requirement." *Id.* (quotation marks and citation omitted).

"[T]he State's intrusion into a particular area . . . cannot result in a Fourth Amendment violation unless the area is one in which there is a constitutionally protected reasonable expectation of privacy." *New York v. Class*, 475 U.S. 106, 112 (1986) (quotation marks and citation omitted). Determining whether there has been an intrusion into such an area is a fact-specific inquiry. *See United States v. Beaudoin,* 362 F.3d 60,

70 (1st Cir. 2004) ("Fourth Amendment analysis is renownedly fact specific . . . ."), *vacated on other grounds by Champagne v. United States,* 543 U.S. 1102 (2005).

*Argument*

Recently, the First Circuit observed that an occupant's "privacy interest in the foyer" of a building was "linked to the proper characterization of the building itself." *United States v. Werra,* 638 F.3d 326, 331 (1st Cir. 2011) (quotation marks and citation omitted). A "resident of a dwelling that is akin to a traditional home . . . possesses a reasonable expectation of privacy throughout the interior of the premises." *Id.* (citing *Payton,* 445 U.S. 573, 590 (1980), for the proposition that "the Fourth Amendment has drawn a firm line at the entrance to the house"). In contrast, the inhabitant of "a multi-unit apartment building . . . with [d]istinct, complete living spaces" does not have a "privacy interest" in "common areas such as the foyer." *Id.* (quotation marks and citations omitted).

In *Werra,* the property in question did not "fit squarely into the paradigm for either a traditional family home or a multi-unit apartment building." *Id.* at 332. While it was "a single-family structure, the residents were not a traditional single family occupying the house together." *Id.* Under the circumstances, the court had to undertake "a broader examination" of the occupants' "living arrangements." *Id.*

> If they lived separately—like apartment dwellers—they could not claim the common areas of the house, including the foyer, as their private space vis-a-vis outsiders. However, if they did not live in individualized "residences" within the house—and were thus more like the occupants of a single-family home—their right to privacy vis-a-vis outsiders would begin at [the] front door.

*Id.*[2]

---

[2] In the course of conducting this inquiry, the First Circuit observed that "[t]he inability to exclude cohabitants from shared spaces within a traditional home does not on its own

6

In this case, a *Werra*-type undertaking is unnecessary. It is undisputed that the residents of 53 Daytona Street were a traditional single family occupying the house together. The "entryway" McKay and Romero took it upon themselves to enter "was not common to anyone" other than Plaintiff and his family. *United States v. Drummond*, 98 F.Supp.2d 44, 48 (D.D.C. 2000), *cited with approval by United States v. Rheault*, 561 F.3d 55, 61 (1st Cir. 2009). "[N]o one else would be in that entryway without their permission—not mail carriers or meter readers, not other tenants or their guests . . . not anyone." *Drummond*, 98 F.Supp.2d at 49.

In sum, the facts of record, when taken in the light most favorable to the defendants, establish that Plaintiff had a reasonable expectation of privacy in the entryway to 53 Daytona Street "or, more specifically, that he believed the entire house, and not just the [second floor living space], served as his home and, hence, that he could prevent the entry of anyone whom he and his housemates wished to keep out." *Werra*, 638 F.3d at 336. "A resident of a single-family structure who shares living arrangements as did the [residents] of [53 Daytona Street] could reasonably expect that his right to privacy begins at the front door." *Id.* (citation omitted).

### *Conclusion*

Based on the foregoing, the defendant respectfully requests that this Honorable Court allow his Motion for Summary Judgment on Count One.

---

eliminate a resident's privacy interest in keeping outsiders from barging through the front door." *Id.* at 336.

Respectfully Submitted,
THE PLAINTIFF,

By   /s/ Luke Ryan
LUKE RYAN, BBO#664999
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street, Third Floor
Northampton, MA 01060
(413) 586-4800

## CERTIFICATE OF SERVICE

I, LUKE RYAN, hereby state that Plaintiffs' Memorandum of Law in Support of His Motion for Summary Judgement on Count One was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 10, 2017.

/s/ Luke Ryan, Esq.
BBO#664999
Sasson, Turnbull, Ryan & Hoose
100 Main Street, 3rd floor
Northampton, MA 01060
(413) 586-4800
Fax: (413) 582-6419