UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LEE HUTCHINS, SR.,           )
        Plaintiff,           )
                             )
v.                           )
                             )
                             ) C.A. No. 3:16-cv-30008-MAP
DANIEL J. MCKAY, FELIX       )
M. ROMERO, THOMAS            )
HERVIEUX, and THE CITY       )
OF SPRINGFIELD,              )
        Defendants.          )


<u>MEMORANDUM AND ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND
DEFENDANT CITY'S MOTION TO BIFURCATE</u>
(Dkt. Nos. 29, 31, & 32)

January 16, 2018

PONSOR, U.S.D.J.

I.    INTRODUCTION

This lawsuit asserts claims under the federal civil
rights statute, 42 U.S.C. § 1983, and Massachusetts common
law against three Springfield police officers and the City
of Springfield.  In Counts 1 through 3, Plaintiff alleges
that the individual Defendant officers violated his federal
civil rights by unlawfully entering his home, falsely
arresting him, and using excessive force.  In Count 4,
Plaintiff alleges that Defendant City of Springfield

maintained policies or customs that were deliberately indifferent to the rights of civilians by failing to train and discipline its police officers and that these policies or customs proximately caused his injuries.  In Counts 5 through 8, Plaintiff asserts common law claims of assault and battery, false arrest, malicious prosecution, and abuse of process against the individual Defendant officers.

Plaintiff has filed a motion for summary judgment on Count 1, contending that the undisputed facts confirm that two of the individual Defendant officers violated his rights under the Fourth Amendment by unlawfully entering his home. Defendants have moved for summary judgment on all eight counts of the complaint.  To the extent that some counts survive their motion, Defendants have also moved for bifurcation of the sole claim against the City of Springfield, Count 4, from the counts against the individual officers.

For the reasons set forth below, Plaintiff's motion for summary judgment on Count 1 will be denied.  Defendants' motion for summary judgment will be denied as to Counts 1, 3, 4, 5, 7, and 8, and will be allowed as to Counts 2 and 6.

Defendant City's motion to bifurcate will be allowed, but on the understanding that trial on Count 4 against the City will proceed first, with the trial against the individual officers to follow.

## II.  BACKGROUND

The facts are drawn from the full summary judgment record.  They are recited in the light most favorable to the non-moving party, and all justifiable inferences are drawn in that party's favor.  <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1863 (2014).  Where, as here, both parties have moved for summary judgment, the standard is the same.  The court must rule on each party's motion on an individual and separate basis.  <u>Bienkowski v. Ne. Univ.</u>, 285 F.3d 138, 140 (1st Cir. 2002).  For each claim, summary judgment is warranted if the record, viewed in the light most favorable to the non-moving party, discloses no genuine issue of material fact.  <u>Kunelius v. Town of Stow</u>, 588 F.3d 1, 8-9 (1st Cir. 2009).

On the day of the precipitating incident, January 20, 2013, Plaintiff Lee Hutchins, Sr., owned a three-story, two-family home at 51-53 Daytona Street in Springfield.  There were two entrances at the front of the house.  The left

entrance, 51 Daytona Street, belonged to Plaintiff's tenant.
The right entrance was for 53 Daytona Street, where
Plaintiff lived with his family.

Upon passing through the doorway on the ground level, a
person entering 53 Daytona Street would go up an interior
flight of stairs to a landing on the second floor.  That
door opened directly into Plaintiff's kitchen.  The street-
level entrance to 53 Daytona Street provided no access to
any other living unit; the interior staircase was part of
Plaintiff's residence, not a common passage.  In other
words, when someone entered the ground floor entrance of 53
Daytona Street, he or she was facing a staircase but inside
Plaintiff's home.

At the back of 53 Daytona Street, another set of stairs
connected the basement to the second-floor kitchen.  A third
set of stairs, also in the back, connected the second floor
to the third floor.  Plaintiff's son, Keith Hutchins, had a
bedroom in the basement.  Plaintiff's son, Lee Hutchins,
lived in one of the third-floor bedrooms.  For ease of
reference, Lee Hutchins, Sr., will be referred to in this
memorandum as "Plaintiff," and his son as "Lee Hutchins" or

"Lee."

Around midnight on January 20, 2013, Defendants Daniel McKay and Felix Romero, Springfield police officers, were dispatched to assist Vanessa Romero in retrieving her two-year-old son Ivan from the boy's father, Lee Hutchins. Defendants followed Vanessa's vehicle to 53 Daytona Street. They either knocked on the ground-floor door or rang the doorbell, waking up Plaintiff as well as other occupants of the residence. According to Plaintiff, his stepson, Tyshon Faust, answered the door. The officers did not recall the name of the person at the door, but Defendant McKay testified that he was "very civil" and "said they'd be right down with the child." (McKay Dep., Dkt. No. 31-5 at 8-9.) The ground-floor front door was left open while Tyshon went upstairs to alert the household. (Romero Dep., Dkt. No. 31-4 at 4.) Tyshon did not invite the officers to enter.

Tyshon went to Plaintiff's second-floor bedroom and told him the police were at the door. Meanwhile, after waiting outside for approximately ten minutes, Defendants McKay and Romero entered 53 Daytona Street through the ground-floor door, climbed the stairs to the second floor,

and knocked on the interior door there.

Exactly why Defendant officers entered the premises is unclear, and what their assumptions were in doing so is disputed. In his deposition, Defendant McKay stated that, during their ten-minute wait outside, the officers "tried re-establishing contact from the base of the stairwell. When we received no response, we went to the top of the stairwell and knocked on the door there." (McKay Dep., Dkt. No. 31-5 at 9.)

Accepting the officers' testimony, it is possible to conclude that they mistakenly, but reasonably, believed that the interior stairwell leading from the street entry to the second floor was a common area outside Plaintiff's home. Defendant Romero stated at his deposition that when they reached the second-floor landing they "decided to knock on the apartment door," (Romero Dep., Dkt. 31-4 at 5) and that the two officers remained outside the "apartment" through the interchange. (Id.) This testimony suggests that Defendant Romero did not believe he was entering Plaintiff's living area by going up the stairs. Similarly, Defendant

McKay stated in his affidavit in opposition to Plaintiff's motion for summary judgment that a common layout of buildings like 51/53 Daytona Street included one downstairs apartment and two second-floor apartments served by a common staircase. (McKay Aff. ¶ 6, Dkt. No. 51-1 at 2-3.) He stated explicitly that "[a]t the time that we went up the stairs and had our conversation with the Plaintiff, we believed we were in a common area of the building, not within an individual apartment." (Id. at ¶ 7.)

At any rate, Defendants McKay and Romero were standing on the second-floor landing outside the interior door when Plaintiff opened it and asked, "Can I help you?" When told the officers were there to collect the child Ivan, Plaintiff said that he would "be right back" with the child. (Pl.'s Statement of Undisputed Facts, ¶ 37, Dkt. No. 33-1 at 46-47.)

What happened next is disputed. The testimony of Romero and McKay was that they never entered into the apartment area from the second-floor landing. (Romero Dep., Dkt. No. 31-4 at 5; McKay Aff. ¶ 7, Dkt. No. 51-1 at 3.) Plaintiff's version, on the other hand, is that when

Plaintiff's son Keith came up the back stairs from his basement bedroom, he found McKay and Romero standing "at the door frame which is in the kitchen." (Keith Hutchins Dep., Dkt. No. 33, Ex. C at 36.) He became angry, telling them, "You have no warrant. You got to go outside." (Id. at 38.)

Plaintiff himself, when he returned with Ivan, found that the two officers "were in the kitchen and they were arguing with my son Keith." (Pl.'s Dep., Dkt. No. 31-9 at 16.) Confusion on this point is worse confounded by Defendants' submission, citing Plaintiff's deposition, which seems to concede that "McKay and Romero were already in the kitchen when Plaintiff returned from the 3rd floor with Ivan." (Dkt. No. 31-1 at 4.) For purposes of Plaintiff's motion for summary judgment on Count 1, this memorandum assumes the officers stayed on the second-floor landing outside the kitchen, per Romero's deposition and the McKay affidavit.

When Plaintiff's son Lee woke up and learned that his son's mother, Vanessa Montero, was at the residence with two police officers to collect their son Ivan, he became upset. Defendants McKay and Romero heard Lee say he was going to

"fuck that bitch up" before running out the back door.
(McKay Dep., Dkt. No. 31-5 at 9.)  Lee ran down the back
stairs to confront Montero, who had been left unattended on
the porch.  Plaintiff's other son, Keith, then ran down the
front stairs to the outside.

Defendants McKay and Romero followed and came upon Lee
and Keith engaged in a verbal confrontation with Montero.
Whether this involved physical contact is disputed.  (Pl.'s
Response to Defs.' Statement of Undisputed Material Facts ¶
32-33, Dkt. No. 43 at 4-5.)  Defendant Romero told Lee that
if he continued, he would be placed under arrest.  Defendant
Romero then grabbed Lee, attempting to take him into
custody, and a struggle ensued.  Plaintiff emerged onto the
porch at this time and tried, without success, to calm his
sons down.  Keith entered the fray on Lee's side in the
struggle with Romero, and Lee eventually broke free and fled
the scene.

During the ensuing fracas, Defendant McKay began
striking Keith with his baton.  Plaintiff approached the
struggling men and, by his own admission, grabbed the end,
or tip, of McKay's baton.  (Pl.'s Dep., Dkt. No. 33-1 at

86.) Plaintiff contends that, in grabbing the baton, he was attempting to stop Defendant McKay from errantly striking Defendant Romero and to assist in bringing Keith under control.

In response to Plaintiff grabbing the end of his baton, Defendant McKay maced Plaintiff. Plaintiff stumbled back. He was then struck twice in the back by Defendant Springfield police officers Hervieux and his partner Christopher Goodrow, who had just arrived on the scene. Plaintiff was subsequently handcuffed and transported to the police station.

In his police report, Defendant McKay described Plaintiff as engaging in disorderly conduct, committing two counts of assault and battery on a police officer, and resisting arrest. The report served as the basis for the eventual criminal charges leveled against Plaintiff. On September 10, 2014, a jury acquitted Plaintiff of all charges against him.

This lawsuit followed. On March 10, 2017, Plaintiff and Defendants filed their motions for summary judgment, Plaintiff as to Count 1 and Defendants as to all eight

counts. (Dkt. Nos. 29 and 31.) Defendant City of

Springfield also filed a Motion to Bifurcate. (Dkt. No.

32.)

### III. <u>DISCUSSION</u>

A motion for summary judgment can only be allowed if

"the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).

42 U.S.C. § 1983 states, in relevant part,

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State …
> subjects, or causes to be subjected, any citizen of the
> United States . . . to the deprivation of any rights,
> privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper
> proceeding for redress. ...

To establish a § 1983 violation, a plaintiff must

demonstrate a deprivation of a federally protected right

perpetrated by a person acting under color of law.  <u>Sanchez</u>

<u>v. Pereira-Castillo</u>, 590 F.3d 31, 51-2 (1st Cir. 2009).

The discussion below will begin with Plaintiff's motion

for summary judgment, then move to Defendants' motion for summary judgment, and finally to Defendant City's motion for bifurcation.

A.  <u>Plaintiff's Motion for Summary Judgment on Count 1</u>

Plaintiff contends that the undisputed facts, even viewed in the light most favorable to Defendants, entitle him to summary judgment on his claim for violation of his rights pursuant to the Fourth Amendment.  His argument is straightforward: the officers had no legal authorization to enter his home when they stepped through the ground-floor entrance and proceeded up the staircase to the second floor.

Plaintiff's motion is anchored on the well-established principle that an unauthorized intrusion by police officers into a home is "the chief evil against which ... the Fourth Amendment is directed."  <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980) (internal quotation omitted).  It is undisputed that the street-level door marked the perimeter of Plaintiff's home.  Since it is also undisputed that McKay and Romero passed through that door without a warrant or other legal justification, their action, Plaintiff argues, constituted a violation of the Fourth Amendment as a matter

of law.

This is a powerful argument.  The First Circuit has noted that an occupant's "privacy interest in the foyer" of a building is "linked to the proper characterization of the building itself."  United States v. Werra, 638 F.3d 326, 331 (1st Cir. 2011) (quotation marks and citation omitted).  See also United States v. Rheault, 561 F.3d 55 (1st Cir. 2009)(finding that plaintiff had a reasonable expectation of privacy in a small entryway because "no one else would be in that entryway without their permission").

Plaintiff's argument has force and may well carry the day at trial, but it falls short of justifying entry of summary judgment when the facts are viewed in the light most favorable to McKay and Romero.  The text of the Fourth Amendment confirms that it forbids only "unreasonable" searches and seizures.  Thus, in some circumstances, where an officer makes a reasonable mistake of fact, no violation of the Fourth Amendment will result.  Heien v. North Carolina, 135 S. Ct. 530, 534 (2014)(stating that a search or seizure "may be permissible even though the justification for the action includes a reasonable factual mistake");

United States v. Salimonu, 182 F.3d 63, 76 (1st Cir. 1999)
(Lipez, dissenting)(recognizing that the Fourth Amendment is
not violated by a warrantless search "if the police
mistakenly, but reasonably, believed that the consenting
party had actual legal authority to consent to the search"
(citation omitted)).

Under this standard, the test is not whether officers
coming into a building correctly concluded that they were in
a common area and not entering an individual's home, but
rather whether they were reasonable in making this
assumption. Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)
("Because many situations which confront officers in the
course of executing their duties are more or less ambiguous,
room must be allowed for some mistakes on their part. But
the mistakes must be those of reasonable men [sic], acting
on facts leading sensibly to their conclusions of
probability."(internal quotation omitted)).

Resolution of whether McKay and Romero made a
reasonable mistake of fact when they entered the street-
level door to 53 Daytona Street -- like assessments of
reasonableness generally -- must await development at trial

and resolution by the jury, or possibly the court.  A
factfinder may conclude that the officers' mistake was <u>not</u>
reasonable, or that the officers, contrary to their
testimony, entered the kitchen from the second-floor landing
without authorization, an act that could not be dismissed as
a mistake.  These issues must await further proceedings.

It is worth pausing to note that other arguments
offered by Defendants in opposition to Plaintiff's motion
have little traction.

The fact that the officers were not actively
investigating a crime would not justify an unreasonable
intrusion onto Plaintiff's property if it occurred.  Such a
rule would create a gaping hole in Fourth Amendment
protections, and no authority supports it.

Nor will the record support any argument that the
officers received the level of explicit, voluntary consent
to enter the premises that the Fourth Amendment requires.
<u>United States v. Diaz</u>, 494 F.3d 221, 225 (1st Cir. 2007).

Defendants' contention that the officers, to the extent
that they violated Plaintiff's constitutional rights,

enjoyed the protection of qualified immunity will not wash, for two reasons.[1]

First, if the officers merely made a reasonable mistake of fact -- and this question must await trial -- they have no need of qualified immunity. They committed no violation of the Fourth Amendment, period. On the other hand, if their mistake is found to be <u>not</u> reasonable, then their entry through the street-level door into Plaintiff's dwelling constituted a violation of clearly established Fourth Amendment law. No principle of qualified immunity will protect them.

Second, the undisputed facts of record will not support an invocation of qualified immunity based on the "community caretaking" exception to the Fourth Amendment. This exception exempts from Fourth Amendment liability

---

[1] Plaintiff has moved to strike Defendant City's Opposition on this point. (Dkt. No. 54). Plaintiff points out that the City is not named in Count 1 and that Defendants McKay and Romero "are perfectly capable of defending themselves." (<u>Id.</u> at 2-3.) It is true that the City's counsel is, perhaps, doing the work of counsel for the individual Defendant officers, who, unlike the City, are entitled to assert a qualified immunity defense. But, the argument deserves to be addressed, regardless of who raised it.

warrantless searches undertaken while engaging in functions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995)(quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)).

The most helpful recent case on this exception is MacDonald v. Town of Eastham, 745 F.3d 8 (1st Cir. 2014). There, the court confronted a situation where the police were responding to a call from a party concerned that a neighbor's door had been standing open for some time, and no one was home.  The police arrived and announced themselves outside the home.  When no one responded, they entered through the open door to see if there was some problem. Judge Selya noted that, even in this compelling situation, the law was unclear as to whether the entry was justified under the "community caretaker" exception.  Nevertheless, he concluded that, given the "nebulous" boundaries of the exception, the officers had qualified immunity, as a reasonable officer would not have known, in that factual context, that he was violating a clearly established

constitutional right.  $\underline{Id}$. at 14.

The undisputed record in this case, however, presents a factual landscape dramatically beyond the boundaries of the "community caretaking" doctrine, however nebulous the doctrine might be at its edges.  Even assuming that the doctrine is invokable in the First Circuit outside the context of automobile searches (which, as Judge Selya noted in <u>MacDonald</u>, is uncertain), the scenarios where the doctrine has been successfully applied to a home feature several typical elements: first, a reasonably perceived duty on the part of the officer to approach the residence in the name of safety (<u>e.g.,</u> responding to a call from a concerned neighbor and finding the door to the house standing wide open); second, an attempt by officers to announce themselves prior to entering; and third, the absence of occupants to grant or deny officers permission to enter.  <u>See</u> <u>id.</u> at 14-15.

Here, the officers were not confronting any mysteriously open door.  The officers had no "reasonable belief" of wrongdoing or imminent danger that required their involvement.  <u>U.S. v. Pena</u>, 924 F. Supp 1239, 1247 (D. Mass.

1996) (quoting <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990)).
A civil and cooperative occupant of the house promptly
answered their knock, but gave no invitation to enter, or
consent to an entry.  No evidence presented itself of any
problem whatsoever requiring a non-investigative inquiry.
Nevertheless, the officers simply walked in.  To hold in
these circumstances that the officers did not violate any
clearly established constitutional rule would be a betrayal
of the bedrock principle at the foundation of the Fourth
Amendment, the protection of the home.

For the foregoing reasons, the court will deny
Plaintiff's Motion for Summary Judgment on Count 1, on the
narrow ground that a reasonable factfinder could conclude,
viewing the facts in the light most favorable to Defendants,
that McKay and Romero reasonably believed that the interior
staircase was a common area outside Plaintiff's home and
that neither of them entered the kitchen.

B.    <u>Defendants' Motions for Summary Judgment</u>

1. <u>Count 1: § 1983 Unlawful Entry</u>

As the analysis above makes clear, the facts viewed in
the light most favorable to Plaintiff, rather than

Defendants, require denial of Defendants' motion on this count.  A reasonable factfinder could conclude that the officers did not make a reasonable mistake when they entered the street-level door of Plaintiff's residence, or that they unjustifiably entered Plaintiff's kitchen without legal authorization.

    2. <u>Counts 2 and 6: § 1983 False Arrest and Common Law False Arrest and False Imprisonment</u>

    Under Massachusetts law, a police officer may arrest without a warrant for a misdemeanor which: "(1) involves a breach of the peace[,] (2) is committed in the presence or view of the officer, and (3) is still continuing at the time of the arrest."  <u>Commonwealth v. Gorman</u>, 288 Mass. 294, 297 (1934) (citations omitted)).  Under Mass. Gen. Laws ch. 265, § 13D, a person commits the offense of assault and battery on a police officer if he engages in "purposeful and unwelcomed contact with a person the defendant knows to be a law enforcement officer actually engaged in the performance of official duties."  <u>United States v. Santos</u>, 363 F.3d 19, 23 (1st Cir. 2004) (internal quotation omitted)).

    Defendants argue that they are entitled to summary

judgment as the events that occurred outside Plaintiff's
home gave them probable cause to arrest Plaintiff on January
20, 2013.

Applying these standards to the undisputed facts, the
court must conclude that, since the officers had probable
cause to arrest Plaintiff, Defendants are entitled to
summary judgment on Counts 2 and 6.  Plaintiff does not
contest that he grabbed Defendant Officer McKay's baton.
(Dkt. No. 45 at 6.)  His argument that he was entitled to
use reasonable force to help his son, or protect himself,
against excessive force by the officers assists him (as will
be seen below) in regard to his claims of excessive force,
but his decision to intervene and seize the officer's baton
gave the officers probable cause, both under the federal
constitution and the common law, to place him under arrest.
The court will therefore allow Defendants' motion as to
Counts 2 and 6.

3. Counts 3 and 5: § 1983 Excessive Force and Common
Law Assault and Battery

"Excessive force civil rights claims are properly
analyzed under the Fourth Amendment's 'objective

reasonableness' standard, rather than under a substantive due process standard." <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989).  The First Circuit has made clear that the issue of reasonableness in this context generally cannot be resolved "in advance of trial."  <u>Morelli v. Webster</u>, 552 F.3d 12, 25 (1st Cir. 2009); <u>see</u> <u>also</u> <u>Jennings v. Jones</u>, 499 F.3d 2, 11 (1st Cir. 2007)(holding that any disputed evidence on the question of the reasonableness of the force under the circumstances is a question for the jury).

The court will therefore deny Defendant's motion for summary judgment as to the § 1983 excessive force and common law assault and battery claims.

4. <u>Count 4: § 1983 Unconstitutional Custom or Policy</u>

To establish municipal liability under 42 U.S.C. § 1983, in addition to establishing a constitutional deprivation, a plaintiff must prove that: "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  <u>Haley v. City of Boston</u>, 657 F.3d 39, 51 (1st Cir. 2011) (internal quotation omitted). The plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  <u>Id</u>. at 51.

Plaintiff alleges a pattern of failures by the City of Springfield to adequately train and discipline its police officers, which directly resulted in the harms allegedly caused here.  (Dkt. No. 1 at 8.)  Plaintiff cites to a Report and Recommendation recently adopted by this court, which concluded that the City of Springfield has evinced "what appears to be a consistent pattern of rejecting civilian complaints against police officers."  <u>Douglas v. Springfield</u>, 14-cv-30210-MAP, 2017 WL 123422 at *18 (D. Mass. Jan. 12, 2017).  Plaintiff contends that the present case features a similar pattern and points to evidence that the City did not abide by its own internal policies on training and disciplining officers.

In further support of his claim, Plaintiff notes that one of the officers named in this lawsuit has been the subject of fourteen internal complaints.  Another has been subject to seven such complaints, one of which was not brought before the Community Police Hearing Board (CPHB), notwithstanding stated policy to the contrary.  In one instance, when one Defendant was found responsible for using inappropriate force to prevent an onlooker from documenting

police brutality, the written reprimand he was supposed to receive did not appear in his file.  In a previous case against Defendant City, this court denied a motion for summary judgment on this basis alone.  See Ververis v. Kent, No. 13-cv-30175-MAP (D. Mass. 2015).

Defendant City of Springfield asserts that it is entitled to summary judgment as the record (1) does not support an underlying claim of a civil rights violation and (2) does not support a claim connecting a custom or policy of the City to the particular civil rights violations alleged by Plaintiff.  (Dkt. No. 31-1 at 14.)  In support of its argument, Defendant City points to the existence of "ongoing training, discipline and investigative policies."  (Dkt. No. 31-1 at 17.)  But, as Plaintiff notes, in order to defeat a Monell claim, "It is not enough that an investigative process be in place. ... The investigative process must be real.  It must have some teeth."  Douglas, 2017 WL 123422 at *18 (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 974 (3d Cir. 1996)).  Although a jury may ultimately determine otherwise, the record contains evidence that, if believed, would be sufficient to demonstrate a pattern of failures to

train and discipline officers whose conduct falls short of appropriate standards. Moreover, a jury could find that these lapses had a direct causal connection to the injuries suffered by Plaintiff. Put differently, a reasonable jury could, based on the facts adduced by Plaintiff, conclude that the City was deliberately indifferent to the use of unnecessary and excessive force by officers on its police force and that such indifference was the moving force that led to the deprivation of Plaintiff's constitutional rights. Given this, Defendant City's motion for summary judgment on this count must be denied.

     5.   <u>Counts 7 and 8: Common Law Malicious Prosecution and Abuse of Process</u>

Plaintiff contends that the officers pursued baseless charges against him to cover up for their errors on the scene. Specifically, Plaintiff claims that Defendant McKay drafted a police report that deliberately falsified the allegations that served as the basis for a criminal complaint application against Plaintiff for disorderly conduct, assault and battery of a police officer, and resisting arrest. (Dkt. No. 1 at 5.) Defendants contend that where there was

probable cause to arrest, a plaintiff cannot make a claim for malicious prosecution.  As will be seen, this argument lacks force.

Ordinarily, to state a cause of action for malicious prosecution, a plaintiff must allege that criminal proceedings were initiated against him without probable cause and for an improper purpose and that they were terminated in his favor.  Meehan v. Town of Plymouth, 167 F.3d 85, 88-9 (1st Cir. 1999).  The law is clear that, even where probable cause exists to arrest, an abuse of process claim may still survive where there is evidence that "the officers' reports intentionally exaggerated the gravity of the situation so that the prosecutor would be more likely to press charges." Gutierrez v. Mass. Bay. Transp. Auth., 437 Mass 396, 407 (2002).

Comparing Defendant McKay's report of the events surrounding Plaintiff's arrest with Plaintiff's version of the same event, the court must conclude that, if a jury credited Plaintiff's testimony, it might well find that the police report was substantially exaggerated.  Defendant McKay's version is as follows:

[During the skirmish involving Plaintiff's two sons and
Defendant officers, Plaintiff] came out into the street
yelling, grabbing at our batons and swinging at both
officers, [Plaintiff] was then advised that he was under
arrest, however he continued his assault toward
Officers.  [Plaintiff] was then sprayed using my
department issued OC spray, which caused [Plaintiff] to
back away from the officers struggling on the ground.
At this point Officers Hervieux and Goodrow arrived to
assist, and placed [Plaintiff] into handcuffs and into
the rear of their marked cruiser for transport.

(Dkt. No. 31-3.)

Several points stand out.  First, Defendant McKay does

not mention Defendant Hervieux's use of force on Plaintiff.

Second, he claims Plaintiff engaged in a "continued"

"assault" against officers, whereas Plaintiff alleges that he

was trying to prevent Defendant McKay from hitting his fellow

officer, Defendant Romero, with the baton.  Third, in

general, this rendition of the incident identifies Plaintiff

as an instigator of violence, whereas Plaintiff's version was

that he was trying to calm his sons down.

It is impossible at this stage to know which of these

dramatically different descriptions of the arrest scene will

be found by the jury to be credible.  Because a reasonable

jury could find that Defendant McKay "exaggerated the gravity

of the situation so that the prosecutor would be more likely to press charges," Defendants' motion for summary judgment as to Count 7, charging malicious prosecution will be denied.

The analysis for the abuse of process claim is substantially similar. "The elements of an abuse of process claim are that: "(1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." Gutierrez, 437 Mass. at 407 (internal quotation omitted). In the context of a criminal complaint sought by a police officer, an abuse of process claim may properly stand even if the officer had probable cause to place the plaintiff under arrest. Id.(citing Quaranto v. Silverman, 345 Mass. 423, 426 (1963)). Again, it appears that Plaintiff can point to sufficient facts in the record to support an abuse of process claim.

Defendants' motion for summary judgment as to the count alleging abuse of process will be denied.

## C. Defendant City's Motion to Bifurcate

Defendant City contends that the Monell claim against the City of Springfield for its unconstitutional policy or

custom should be tried separately from the claims against the individual officers.  See Monell v. Dept. Soc. Svcs. of the City of N.Y, 436 U.S. 658 (1978).  Defendant argues that the factors of convenience, prejudice, and economy support bifurcation.  The City points out that, in a joint trial, Defendant officers may suffer undue prejudice, since evidence admissible on the issues relating to the City might contaminate the jury in weighing the issues relating to the officers.

Plaintiff counters that bifurcation will result in even greater prejudice to him.  He argues that, if the trial against the officers goes first, a verdict in his favor and an award of damages will have the practical effect of deterring him from pursuing his claim against the City, thereby allowing an unconstitutional custom or policy to operate unchecked.  Further, Plaintiff is concerned about being under-compensated for his injuries if damages are sought from individual officers and not the City.

Defendant's concern about the potential prejudice faced by individual police officers where claims against them and

the City are tried jointly is reasonable.  It is likely that evidence of "prior bad acts" by the individual officers may be relevant to the <u>Monell</u> claim but excluded entirely in a separate trial against the officers.

On the other hand, Plaintiff's concerns are also legitimate.  Where a plaintiff does not prevail in his suit against the named officers, the <u>Monell</u> claim falls away. <u>Lund v. Henderson</u>, 807 F.3d 6, 10 (1st Cir. 2015)(citing <u>City of L.A. v. Heller</u>, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam)).  But even where a plaintiff does prevail in the first suit, and receives a full and fair measure of damages, that plaintiff has little incentive to pursue his claim against the City in a second trial.  <u>See</u> Douglas Colbert, *Bifurcation in Civil Rights Cases: Undermining <u>Monell</u> in Police Brutality Cases*, 44 HASTINGS L.J. 499, 575 (1992-93) ("Most litigants lack the resources, fortitude, and commitment necessary to proceed to a second trial on the <u>Monell</u> claim."); Matthew J. Cron et al, *Municipal Liability: Strategies, Critiques, and a Pathway toward Effective Enforcement of Civil Rights*, 91 DENV. U. L.R. 583, 585 (2014) ("The result of bifurcation is to make

the task of proving municipal liability even more onerous.")
The reality is that allowance of a motion for bifurcation,
where the trial against the officers proceeds first, can in
effect mean that a <u>Monell</u> claim disappears irrespective of
its merits.

The solution to all these concerns is to allow the
motion to bifurcate, but proceed with trial of the <u>Monell</u>
claim first.  Relevant evidence of prior bad acts may be
weighed by the jury in the trial against the City, without
risk of prejudice to Defendant officers.  Of course,
Plaintiff will bear the burden of proving at this trial both
the existence of a custom or policy, and a causal connection
between the custom or policy and his injuries.  Put
differently, even if Plaintiff can prove an unconstitutional
custom or policy, he will not be entitled to recover unless
he can prove a violation of his constitutional rights by the
officers stemming from that policy.

Admittedly, some considerations of economy may weigh in
favor of trying the claims against the individual officers
first.  If, for example, Plaintiff fails to prove the

existence of an unconstitutional custom or police, or a causal link between that policy and his injury, then the jury will return a verdict for the City on the Monell claim. A trial against the individual officers will thereafter be necessary, with much of the same evidence regarding the January 20, 2013, incident. This, however, is a bearable (and not inevitable) imposition, in order to permit Plaintiff to have his day in court on his Monell claim and to protect the important policy considerations underlying such a claim.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment as to Count 1 is hereby DENIED. Defendants' motion for summary judgment is DENIED as to Counts 1, 3, 4, 5, 7 and 8 and is ALLOWED as to Counts 2 and 6. Defendant City's motion to bifurcate is ALLOWED, but with the understanding that the Monell claim will go first. The clerk will set the case for a final pre-trial conference.

It is So Ordered.

 /s/ Michael A. Ponsor
MICHAEL A. PONSOR
U.S. DISTRICT JUDGE