# Exhibit A

**William Fitchet**
**January 15, 2019**

Page 1

1          U.S. DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3

4            No. 16-CV-30008

5

6

7    ******************************************

8    LEE HUTCHINS, SR.,

9            Plaintiff

10      vs.

11

12    DANIEL J. McKAY, et als,

13            Defendants

14    ******************************************

15

16

17    VIDEOTAPED DEPOSITION OF:  WILLIAM J. FITCHET

18              SPRINGFIELD CITY HALL

19              36 Court Street

20            Springfield, Massachusetts

21          January 15, 2019  10:05 a.m.

22

23            LISA A. REGENSBURGER

24              COURT REPORTER

**William Fitchet**
**January 15, 2019**

Page 2

```
 1   APPEARANCES:

 2

 3   Representing the Plaintiff:

 4       BY:  LUKE RYAN, ESQ.

 5       SAMANTHA J. LeBOEUF, ESQ.

 6       SASSON, TURNBULL, RYAN & HOOSE

 7       100 Main Street

 8       Northampton, MA 01060

 9       413-586-4800     FAX:  413-582-6419

10       lryan@strhlaw.com

11

12   Representing the Defendants:

13       BY:  LISA C. deSOUSA, ESQ.

14       DEPUTY CITY SOLICITOR

15       CITY OF SPRINGFIELD

16       1600 East Columbus Avenue

17       Springfield, MA 01103

18       413-886-5205

19       ldesousa@springfieldcityhall.com

20

21   Also present:  Dan Lohaus, videographer

22

23

24
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**William Fitchet**
**January 15, 2019**

```
                                                           Page 3

 1                        I N D E X

 2

 3    WITNESS:                    WILLIAM J. FITCHET

 4

 5    EXAMINATION BY:            PAGE:

 6    Mr. Ryan                   5/141

 7    Ms. deSousa                111/145

 8

 9

10

11

12

13    EXHIBIT:                   PAGE:

14     (None offered)

15

16

17

18

19

20

21

22

23

24
```

**William Fitchet**
**January 15, 2019**

Page 4

1          THE VIDEOGRAPHER:  We are now on

2     the record.  We are now on the record.

3     My name is Dan Lohaus and I am the legal

4     video specialist for Catuogno Court

5     Reporting.  Our business address is 1414

6     Main Street, Springfield, Mass.  Today

7     is January 15, 2019 and the time is

8     10:05 a.m.

9          This is the deposition of William

10    Fitchet in the matter of Lee Hutchins,

11    Sr. versus Daniel J. McKay, et al, in

12    the United States District Court,

13    District of Massachusetts, Case

14    No. 16CV3008NM -- sorry -- excuse me.

15    This is Case No. 16CV3008NMG.

16         This deposition is being taken at

17    39 [sic] Court Street, Springfield,

18    Mass, Suite 210 on behalf of the

19    plaintiff.  The court reporter is Lisa

20    Regensburger of Catuogno Court

21    Reporting.  Counsel will state their

22    appearances and the court reporter will

23    administer the oath.

24         MR. RYAN:  Luke Ryan for the

William Fitchet
January 15, 2019

Page 5

```
 1      plaintiff, Lee Hutchins.

 2             MS. deSOUSA:  Lisa deSousa for

 3      the defendant City of Springfield and

 4      Felix Romero.

 5

 6     WILLIAM J. FITCHET, Deponent, having first

 7  been satisfactorily identified and duly sworn,

 8  deposes and states as follows:

 9

10  EXAMINATION BY MR. RYAN:

11

12      Q.      Good morning, Mr. Fitchet.

13      A.      Good morning, sir.

14      Q.      Can you state your name and spell

15  your last name for the record?

16      A.      William Fitchet, F-I-T-C-H-E-T.

17      Q.      So today we're here to preserve your

18  testimony pursuant to Federal Rules of Civil

19  Procedure No. 32.  We've been advised by counsel

20  for the City that when this trial begins on

21  January 22nd, you will be out of the country

22  more than 100 miles away from the courthouse in

23  Boston; is that correct?

24      A.      Actually, on the 23rd I'm leaving,
```

William Fitchet
January 15, 2019

Page 6

1   yes.

2       Q.     Okay.   Under the circumstances it

3   would appear to be undisputed that you are

4   unavailable to testify at trial.

5              MR. RYAN:  Is that correct,

6       Ms. deSousa?

7              MS. deSOUSA:  Yes.

8              BY MR. RYAN:

9       Q.     Now, I understand that the City

10  objects to the introduction of evidence

11  pertaining to the disciplinary hearings of

12  Officers Hervieux and McKay and has filed a

13  motion in limine to preclude such evidence.

14             The record should reflect that by

15  participating in the preservation of your

16  testimony on this subject, the City is not

17  waiving it's right to challenge the admission of

18  this evidence.  The same goes for evidence

19  pertaining to Officer Hervieux's medical

20  condition and any testimony related to cases not

21  involving the individual defendants.

22             MS. RYAN:  Do you have anything

23       to add at this juncture, Ms. deSousa?

24             MS. deSOUSA:  No.

William Fitchet
January 15, 2019

Page 7

1          MR. RYAN:  Okay.

2          BY MR. RYAN:

3     Q.    Now, Mr. Fitchet -- can I call you

4    Commissioner Fitchet?

5     A.    That's fine.

6     Q.    Okay.  Right before you there's a

7    binder that contains some documents that

8    throughout the morning I may refer to.  So I

9    just want to orient you to what that object is

10   in front of you.

11         Am I correct that you retired in May

12   of 2014?

13    A.    Yes, sir.

14    Q.    And before you retired you were the

15   commissioner of the Springfield Police

16   Department?

17    A.    Yes, sir.

18    Q.    And that's a position that you held

19   continuously from April 2008 until your

20   retirement?

21    A.    Yes, sir.

22    Q.    And before becoming commissioner, you

23   actually did a couple stints as acting

24   commissioner; is that correct?

**William Fitchet**
**January 15, 2019**

Page 8

```
 1      A.      That's correct.

 2      Q.      The first one was from July 2005 to

 3  March 2006?

 4      A.      Yes, sir.

 5      Q.      And the second time was from January

 6  to April 2008?

 7      A.      Yes, sir.

 8      Q.      And the commissioner is the highest

 9  ranking position in the department, correct?

10      A.      That's correct.

11      Q.      I'd like to talk about the

12  disciplinary system that existed during your

13  tenure as commissioner.  And I'd like to start

14  by focussing on the department's policies and

15  procedures.

16              Now, am I correct that you joined the

17  force as a patrol officer in 1973?

18      A.      Yes, sir.

19      Q.      And at that time the highest ranking

20  member of the department was the chief of

21  police, correct?

22      A.      Yes, sir.

23      Q.      And through the years various chiefs

24  published certain rules and general orders; is
```

William Fitchet
January 15, 2019

Page 9

1    that correct?

2        A.    Yes, sir.

3        Q.    And when we talk about the policies

4    and procedures of the Springfield Police

5    Department, we're talking about those written

6    rules and general orders, correct?

7        A.    There are rules and regulations and

8    then there are policies and procedures.  They're

9    somewhat different, but along the same lines of

10   organizing the police department.

11       Q.    Understood.  Now, if an officer

12   violated a rule or general order or policy of

13   procedure, he or she could face discipline; is

14   that correct?

15       A.    Yes, sir.

16       Q.    And during your tenure as

17   commissioner, one of your responsibilities was

18   disciplining officers who violated the policies

19   and procedures of the Springfield Police

20   Department?

21       A.    Yes, sir.

22       Q.    Now, during your tenure as

23   commissioner, was there a police unit that was

24   tasked with investigating allegations of police

William Fitchet
January 15, 2019

Page 10

1    misconduct?

2         A.    Yes, sir.

3         Q.    Direct your attention to the Tab A in

4    the booklet before you.  Showing you what's

5    previously been marked as Plaintiff's Exhibit

6    No. 70, is this the rule establishing the

7    internal investigations unit?

8         A.    Yes, sir.

9         Q.    And throughout the morning I may

10   refer to that unit as the IIU.  Is that how you

11   think of that unit?

12        A.    Yes, sir.

13        Q.    Now, is it the job of the IIU at the

14   Springfield Police Department to investigate

15   citizen complaints?

16        A.    Yes, sir.

17        Q.    Do IIU officers also conduct

18   investigations based on referrals by other

19   officers?

20        A.    They could.  Yes, sir.

21        Q.    When the IIU starts an investigation,

22   is there a rule that requires that investigation

23   to be completed within 90 days?

24        A.    If it involves a patrol officer's

William Fitchet
January 15, 2019

1   misconduct, there is a 90-day requirement that

2   it be completed within 90 days.

3       Q.     And is that a rule that is part of a

4   collective bargaining agreement between the City

5   and the patrol officers or the union that

6   represents the patrol officers?

7       A.     Yes, sir, it is.

8       Q.     Now, during an investigation, do IIU

9   officers attempt to interview and obtain

10  statements from every person involved in an

11  incident?

12      A.     Generally, they try to.  Yes.

13      Q.     And that would include a citizen

14  making a complaint if it's a citizen complaint?

15      A.     Yes, sir.

16      Q.     And it would also include any

17  officers accused of wrongdoing?

18      A.     Yes, sir.

19      Q.     And any other officers or civilians

20  who might have witnessed the incident; is that

21  correct?

22      A.     That's correct.

23      Q.     Does it often happen or did it often

24  happen during your tenure that civilians who

William Fitchet
January 15, 2019

Page 12

1    made complaints and the officers accused of

2    wrongdoing would provide different accounts as

3    to what happened?

4        A.     Very often.

5        Q.     And so would IIU investigators

6    attempt to resolve these discrepancies for

7    searching for things like video evidence?

8        A.     That among others, yes.

9        Q.     Were you aware when you were

10   commissioner that there were some police

11   departments that had cruisers equipped with

12   video cameras?

13       A.     Across the country, yes, sir.

14       Q.     Were you aware there were some

15   departments across the country that had patrol

16   officers who wore body cameras?

17       A.     Yes, sir.

18       Q.     During your tenure as commissioner,

19   did the Springfield Police Department install

20   cameras on any cruisers?

21              MS. deSOUSA:  Objection.

22              You can answer.

23              THE WITNESS:  We had a test run

24      of one cruiser predicated on some

**William Fitchet**
**January 15, 2019**

Page 13

```
1       collective bargaining language where we

2       would attempt to test out some video

3       equipment.

4              BY MR. RYAN:

5       Q.      Do you recall when approximately that

6    was that that test was done?

7       A.     I'm going to have to guess.  I'm not

8    precisely sure, but I would guess around 2012.

9       Q.      And were there any patrol officers

10   during your tenure who were equipped with body

11   cameras?

12             MS. deSOUSA:  Objection.

13             THE WITNESS:  No, sir.

14             BY MR. RYAN:

15      Q.      Okay.  Now, I'd like to discuss the

16   possible outcomes of an investigation into

17   allegations of officer misconduct.

18             Would you agree that one possibility

19   would be a finding of unfounded?

20      A.     Yes, sir.

21      Q.      Is this a finding that's appropriate

22   for a case where the investigation determined no

23   facts to support that the incident complained of

24   actually occurred?
```

**William Fitchet**
**January 15, 2019**

Page 14

1     A.     Yes.

2     Q.     Is there a second possibility that

3   would be a finding of sustained?

4     A.     Yes.  That's another possibility.

5     Q.     Would this be an appropriate finding

6   when the complainant's allegation is supported

7   by sufficient evidence to determine that the

8   incident occurred and the actions of the officer

9   were improper?

10     A.     Yes.

11     Q.     Is there a third possibility of a

12   finding of not sustained?

13     A.     Yes, sir.

14     Q.     Does this cover cases that cannot be

15   resolved by investigation either because

16   sufficient evidence is not available or because

17   of material conflicts in the evidence and are

18   resolved without further disposition or action?

19     A.     Yes, sir.

20     Q.     And would a final possible outcome of

21   misconduct in an investigation be exonerated?

22     A.     Yes, sir.

23     Q.     And would this be appropriate in

24   cases where a preponderance of the evidence

William Fitchet
January 15, 2019

Page 15

1    showed that the alleged conduct did occur but

2    did not violate the policies, procedures,

3    practices, or orders or training of the

4    Springfield Police Department?

5        A.    That's correct.

6        Q.    Now, I direct your attention to

7    what's behind Tab B.  Showing you a special

8    report dated June 13, 2008.

9              Is that a report that was addressed

10   to you?

11       A.    Yes, it was.

12       Q.    And by June of 2008, had you been

13   sworn in as commissioner?

14       A.    Yes, I had.

15       Q.    And was this report -- go to the last

16   page -- submitted by an IIU sergeant named

17   Richard Pelchar?

18       A.    I'd have to go to the last page to

19   look.  Yes, sir.

20       Q.    And is this report the results of

21   Sergeant Pelchar's investigation?

22       A.    Yes, sir.

23       Q.    Now, on the first paragraph of

24   Sergeant Pelchar's report, does it reference two

William Fitchet
January 15, 2019

Page 16

```
 1    special order numbers?  Right there at the very
 2    top.
 3         A.     Yes, it does.
 4         Q.     And were those 08-072 and 08-072A?
 5         A.     Yes, sir.
 6         Q.     Does this mean these were orders to
 7    investigate separate but related allegations of
 8    officer misconduct?
 9         A.     It would appear so.  Yes, sir.
10         Q.     Now, if I could draw your attention
11    to the first two paragraphs of the summary
12    section on Page 1.  Did this investigation begin
13    when a female prisoner with visible injuries
14    told two corrections officers that the cops beat
15    her up?
16              MS. deSOUSA:  Objection.  And for
17         the record, I will object to all lines
18         of questioning relative to this IIU
19         report.
20              You can answer.
21              THE WITNESS:  Yes.
22              BY MR. RYAN:
23         Q.     And the female prisoner in Sergeant
24    Pelchar's report is referred to as Ms. NT or
```

**William Fitchet**
**January 15, 2019**

Page 17

1      Ms. T; is that correct?

2          A.    Yes, sir.

3          Q.    I'm going to represent to you that

4      this female's name is Nicole Tosoni, and I'm

5      going to refer to her as Ms. Tosoni every time

6      the report refers to her as Ms. T.  Is that okay

7      with you?

8          A.    Yes, sir, it is.

9          Q.    Now, at the bottom of Page 1, does it

10     contain a summary of what Ms. Tosoni told

11     Sergeant Pelchar?

12         A.    Yes, it does.

13         Q.    Did Ms. Tosoni say she was at a party

14     when the police showed up?

15         A.    Yes, sir.

16         Q.    Did Ms. Tosoni claim that she saw two

17     police officers hitting her friend?

18               MS. deSOUSA:  Objection.

19               THE WITNESS:  Yes, it does.

20               BY MR. RYAN:

21         Q.    A man referred to in the report as

22     Mr. JL or Mr. L.

23         A.    Yes, sir.

24         Q.    I'm going to represent to you that

**William Fitchet**
**January 15, 2019**

Page 18

1    this man's name is Jose Lopez and I'm going to

2    refer to Mr. Lopez every time we see Mr. L or

3    Mr. JL.  Is that okay?

4         A.     Yes, sir.

5         Q.     Now, did Ms. Tosoni say officers were

6    hitting Mr. Lopez with their nightsticks?

7         A.     Yes, sir.

8         Q.     Did Ms. Tosoni say that she grabbed

9    an officer's nightstick, which I know I

10   shouldn't have?

11        A.     Yes, it does say that.

12        Q.     Did Ms. Tosoni say that Officer

13   Thomas Hervieux then grabbed her and placed her

14   in handcuffs?

15             MS. deSOUSA:  Objection.

16             THE WITNESS:  Yes, sir.

17             BY MR. RYAN:

18        Q.     And as a result of her consumption of

19   alcohol, did Ms. Tosoni acknowledge that she

20   didn't remember everything that happened next?

21        A.     She does say that.  "I don't remember

22   a lot," yes, sir.

23        Q.     Did she recall that Officer Hervieux

24   threw her down some stairs?

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**William Fitchet**
**January 15, 2019**

Page 19

1     A.     Yes, it does say "I remember getting

2   thrown down the stairs."  Yes, sir.

3     Q.     **Now, if I could direct your attention**

4   **to the third paragraph on Page 2 of Sergeant**

5   **Pelchar's report.**

6     A.     Page 2.

7     Q.     **Page 2.**

8     A.     Yup.

9     Q.     **Did Sergeant Pelchar interview**

10  **Mr. Lopez?**

11    A.     Yes, he did.  Yes.

12    Q.     **And did Mr. Lopez say that his**

13  **encounter with the police occurred in the**

14  **hallway of the third floor of an apartment**

15  **building?**

16    A.     Yes.  Third floor steps, yes.

17    Q.     **Did Mr. Lopez accuse officers of**

18  **jumping on him in an attempt to arrest him?**

19    A.     Yes, sir.

20    Q.     **Did he explain that he resisted**

21  **officers because he was trying to protect his**

22  **broken ankle from further injury?**

23    A.     Yes, sir.

24    Q.     **Did Mr. Lopez state that officers**

William Fitchet
January 15, 2019

Page 20

1    punched him in the ribs and face with their

2    fists and also hit him with their flashlights

3    but he was facing down so he couldn't see the

4    officers' faces?

5        A.    Yes, sir.

6        Q.    According to Mr. Lopez, did a female

7    object to the way he was being treated and grab

8    one of the officer's nightstick?

9        A.    Yes, sir.

10       Q.    Did Mr. Lopez say this prompted the

11   officer to punch the female in the face and

12   handcuff her?

13       A.    It says that he began to punch the

14   female in the face and handcuffed her, yes.

15       Q.    And at this point did Mr. Lopez claim

16   that he was maced?

17       A.    Yes, sir.

18       Q.    Now, if I could draw your attention

19   to the section from the middle of Page 2 to the

20   top of Page 3.  Does it appear that Sergeant

21   Pelchar interviewed one of Mr. Lopez's friends?

22       A.    Which paragraph are you referring to,

23   sir?

24       Q.    It's the middle of Page 2 to the top

**William Fitchet**
**January 15, 2019**

Page 21

```
 1    of Page 3.  There's a second person with the
 2    initials JL, I'll represent to you.
 3        A.     Yes.  Yes, that does appear.  Yes.
 4        Q.     Can we agree to call this person the
 5    friend as opposed to JL?
 6        A.     Yes, sir.
 7        Q.     Did the friend tell Sergeant Pelchar
 8    that he was present in the hallway when the
 9    police arrived?
10             MS. deSOUSA:  So for the record,
11        please note my continuing objection and
12        an additional objection that the record
13        speaks for itself.
14             You may answer.
15             THE WITNESS:  He stated that two
16        police officers arrived and asked Mr. L
17        to leave.
18             BY MR. RYAN:
19        Q.     Did he say that Mr. Lopez initially
20    refused to leave?
21        A.     Yes.
22        Q.     Did he say that officers eventually
23    took Mr. Lopez to the ground and were using
24    their nightsticks in an attempt to take him into
```

**William Fitchet**
**January 15, 2019**

Page 22

1    custody?

2        A.     That the officers were using their

3    nightsticks to hold Mr. L down and to try to

4    position his arms, because they were having

5    difficulty handcuffing him, yes.

6        **Q.     And did the friend say a very**

7    **intoxicated female grabbed the smaller officer's**

8    **stick?**

9        A.     Yes, sir.

10       **Q.     Did the friend say that after**

11   **handcuffing the female, the smaller officer**

12   **returned to Mr. Lopez, pepper sprayed him in the**

13   **face, and kicked him in the head?**

14       A.     Yes, sir.

15       **Q.     And at the top of Page 3 is there an**

16   **allegation by the friend that the intoxicated**

17   **female was thrown down the stairs?**

18       A.     Yes.

19       **Q.     Further down on Page 3, does it**

20   **appear that Sergeant Pelchar spoke with a woman**

21   **identified as Ms. C?**

22       A.     Yes, sir.

23       **Q.     Did Ms. C say she was a resident of**

24   **the apartment building where this altercation**

**William Fitchet**
**January 15, 2019**

Page 23

1    took place?

2         A.    Yes.  She states she lives on the --

3    at the street, third floor apartment.  Is

4    that --

5         Q.    **That's correct, yes.**

6         A.    Okay.

7         Q.    **Can we agree to call Ms. C "the**

8    **neighbor"?**

9         A.    Yes.

10        Q.    **Can you read the short highlighted**

11   **section on Page 3 that begins with the words,**

12   **Ms. C stated that after the police arrested the**

13   **man and the woman.**

14              MS. deSOUSA:  Objection.

15              THE WITNESS:  [As read]  Ms. C

16        stated that after the police arrested

17        the man and woman, she looked out her

18        window and saw the police throw the

19        female from the top of the building

20        front steps to the sidewalk.  Ms. C

21        stated that the woman landed on her face

22        and the police picked her up and dragged

23        her by the arm to the police car.  Ms. C

24        stated that as the officers were putting

William Fitchet
January 15, 2019

Page 24

```
1        the woman in the police car, they called

2        her a bitch and whore and were laughing

3        at her.

4             BY MR. RYAN:

5        Q.      And can you read the first two

6   sentences of the next paragraph?

7        A.      Ms. C stated --

8                MS. deSOUSA:  Objection.

9                I'm sorry.  Go ahead.

10               Objection, but go ahead.

11               THE WITNESS:  [As read]  Ms. C

12       stated that she saw the police drag the

13       male subject under arrest by his pants

14       causing his head to hit the ground.

15       Ms. C stated that the man had a cast on

16       his leg and was screaming in pain while

17       being dragged.

18               BY MR. RYAN:

19       Q.      Now, if I could direct your attention

20   to the last page of the report.  Does this page

21   contain a copy of the report Officer Hervieux

22   wrote in connection with this incident?

23       A.      Yes, sir.

24       Q.      In the first paragraph of this report
```

William Fitchet
January 15, 2019

Page 25

1    did Officer Hervieux acknowledge pepper spraying

2    Mr. Lopez?

3         A.     He stated he was pepper sprayed.

4         Q.     Did he acknowledge striking Mr. Lopez

5    with his baton?

6         A.     Yes, he does say that.

7         Q.     In his statement did Officer Hervieux

8    deny kicking Mr. Lopez?

9         A.     He does deny kicking him, yes.

10        Q.     Did he acknowledge how it could have

11   looked like he was kicking Mr. Lopez?

12        A.     Yes, sir.

13        Q.     In the second paragraph, did Officer

14   Hervieux acknowledge placing Ms. Tosoni in

15   handcuffs?

16        A.     The second -- the bottommost

17   paragraph?

18        Q.     Yes.

19        A.     Yes.  He placed in him in handcuffs,

20   yes.

21        Q.     Did Officer Hervieux acknowledge that

22   while in handcuffs, Ms. Tosoni ended up striking

23   her head on the ground causing a minor

24   laceration and swelling?

**William Fitchet**
**January 15, 2019**

1      A.      State -- you're talking about Tosoni?

2      **Q.      Tosoni, yes.**

3      A.      [As read]  Stated tripped over

4   Officer Guard's foot.  And since Officer Walter

5   did not have full control over her, she fell and

6   struck her head causing a minor laceration and

7   swelling.

8           Yes, sir.

9      **Q.      So that was Officer Hervieux's**

10  **explanation for how Ms. Tosoni ended up falling**

11  **down the stairs; is that correct?**

12          MS. deSOUSA:  Objection.

13          THE WITNESS:  Yes.

14          BY MR. RYAN:

15     **Q.      Now, when you received Sergeant**

16  **Pelchar's report, is it fair to say there was a**

17  **material conflict in the evidence?**

18     A.      There was a conflict, yes.

19     **Q.      Ms. Tosoni, Mr. Lopez, the friend,**

20  **and the neighbor all said that Mr. Lopez was**

21  **subjected to excessive force; is that fair to**

22  **say?**

23     A.      Yes.

24     **Q.      And Ms. Tosoni, the friend, and the**

William Fitchet
January 15, 2019

Page 27

1    neighbor all said that the police threw

2    Ms. Tosoni down the flight of stairs; is that

3    correct?

4         A.    Yes.

5         Q.    Officer Hervieux and other officers

6    at the scene said that Mr. Lopez was assaultive

7    and the force used against him was necessary to

8    affect his arrest; is that correct?

9         A.    Yes, sir.

10        Q.    And they claim that Ms. Tosoni

11   tripped and fell down the flight of stairs; is

12   that accurate?

13        A.    Yes, sir.

14        Q.    Now, if it turned out that

15   Ms. Tosoni, Mr. Lopez, the friend, and neighbor

16   were telling the truth, would these have been

17   violations of the Springfield Police

18   Department's policies and procedures?

19             MS. deSOUSA:  Objection.

20             THE WITNESS:  If it happened

21        exactly as she said, it would appear

22        that it would be a violation, yes.

23             BY MR. RYAN:

24        Q.    An officer found responsible for

William Fitchet
January 15, 2019

Page 28

```
 1    throwing a handcuffed prisoner down a flight of

 2    stairs could face serious repercussions at the

 3    department, correct?

 4        A.    Yes.

 5        Q.    An officer found responsible for that

 6    sort of misconduct could be suspended, correct?

 7        A.    Yes, sir.

 8        Q.    Or even terminated?

 9        A.    Yes, sir.

10        Q.    And the same would go for an officer

11    who kicked a handcuffed prisoner in the face,

12    correct?

13        A.    Yes, sir.

14        Q.    And the same would go for any officer

15    caught lying to cover up the use of excessive

16    force, correct?

17        A.    Yes, sir.

18        Q.    After receiving Sergeant Pelchar's

19    report, as the commissioner, you had to decide

20    what to do, correct?

21        A.    Yes, sir.

22        Q.    And one option available to you would

23    be to order a hearing, correct?

24        A.    Yes, sir.
```

William Fitchet
January 15, 2019

Page 29

1        Q.      This would have afforded Officer

2    Hervieux the right to be represented by counsel,

3    go in front of a hearings board, present

4    evidence in his defense or his side of the story

5    and also hear the testimony against him; is that

6    correct?

7        A.      Yes, sir.

8        Q.      And a purpose of a hearing like this

9    is to determine the exact truth, correct?

10       A.      Yes, sir.

11       Q.      In this case you chose not to order a

12   hearing, correct?

13       A.      I don't specifically recall, sir.

14   But --

15              MS. deSOUSA:  That's --

16              BY MR. RYAN:

17       Q.      After reviewing this special report

18   from Sergeant Pelchar, you decided that the

19   charges against Officer Hervieux were not

20   sustained, correct?

21       A.      I'd have to review my comments and

22   I'd have to review the citizens review board

23   comments.

24       Q.      If I can direct your attention to

William Fitchet
January 15, 2019

Page 30

1  what's been marked as Tab T.

2      A.    Tab T?

3      Q.    T as in --

4            MS. deSOUSA:  T as in Thomas.

5            So for the record I object to the

6      admission of this document.

7            BY MR. RYAN:

8      Q.    Look at what's behind Tab T.  Is this

9  a synopsis of IIU investigations against Officer

10 Thomas Hervieux?

11     A.    Yes, sir.

12     Q.    If you look at the very top, we

13 mentioned earlier these were special reports

14 08-072 and 08-072A.  Does it appear that both of

15 these special orders of these allegations of

16 misconduct concluded with the finding of not

17 sustained?

18     A.    Yes, sir.

19     Q.    And you would have been ultimately

20 the -- as the commissioner, the person who

21 decided that that was an appropriate finding in

22 the case; is that correct?

23     A.    I would have referred this case to

24 the citizens review board, which was instituted

**William Fitchet**
**January 15, 2019**

Page 31

 1   by Mayor Sarno in order to review cases of this

 2   nature.  Predicated on what their recommendation

 3   was, I would follow that recommendation.  In

 4   fact, as I recall, followed it almost in all

 5   instances.  Would I be the final arbitrator,

 6   yes, I would be.

 7        **Q.    And that community police hearing**

 8   **board that Mayor Sarno created, that was in**

 9   **2010, correct?**

10        A.    I believe Mayor Ryan had created the

11   board, but it evolved.  And the authority of it

12   and the powers of it evolved over time.  But I

13   believe it was initially instituted by

14   Mayor Ryan during his tenure as mayor.

15        **Q.    So that board that existed in one**

16   **form and then evolved under Mayor Sarno, that**

17   **was a board that could hold hearings in order to**

18   **resolve material conflicts in the evidence,**

19   **correct?**

20        A.    Yes, sir.

21        **Q.    To your knowledge did a hearing take**

22   **place prior to these findings of not sustained?**

23        A.    I'd have to check the records to be

24   sure.  I can't honestly say.  I can read the not

William Fitchet
January 15, 2019

Page 32

1    sustained, but I don't know if a hearing took

2    place.  It would probably indicate in the file.

3         Q.      Is it possible that a hearing did not

4    take place before the finding of not sustained?

5         A.      Yes.  That's possible.  Yes, sir.

6         Q.      Just to be clear, when a finding is

7    not sustained, it doesn't mean that in this case

8    Officer Hervieux was found be innocent, correct?

9         A.      That's correct.

10        Q.      It doesn't mean that he was

11   necessarily falsely accused, correct?

12        A.      That's correct.

13        Q.      It means he wasn't found responsible

14   for the allegations against him, correct?

15        A.      Yes.

16        Q.      A not sustained finding means that

17   although there may be some facts that are true,

18   that the charge is not upheld and as a

19   consequence no discipline will be meted out to

20   the officer; is that correct?

21        A.      Yes, sir.

22        Q.      Now, before you became commissioner,

23   I think you testified you served as acting

24   commissioner.  And before that did you also

William Fitchet
January 15, 2019

Page 33

1  serve as deputy chief?

2      A.    Yes, sir.

3      Q.    And was that a position you held for

4  approximately 14 years?

5      A.    Yes, sir.

6      Q.    Now, during almost all of that

7  14-year period, is it fair to say that you had

8  input or oversight with respect to IIU

9  investigations?

10     A.    If there was a police commission,

11  which there probably was during almost my entire

12  tenure, I didn't have control over the

13  disciplinary process.  I might have reviewed

14  certain cases, but the police commission had the

15  authority for discipline, I did not.

16     Q.    Right.  You did not until you became

17  acting commissioner or commissioner have the

18  final decision-making authority.

19          But in your capacity as deputy chief,

20  up until then, you had input and oversight over

21  the IIU investigative process; is that correct?

22     A.    At times I did, because the chief

23  would alternate deputy chiefs who would be in

24  charge of the IIU.  I think at one time every

**William Fitchet**
**January 15, 2019**

Page 34

```
1   six months it rotated.  So at times you would

2   review cases and basically run a captain's

3   review board meeting in which the captains would

4   convene a meeting and look at the allegations so

5   that they became aware of allegations against

6   officers that were working for them.

7           So, I mean, just to be clear, I don't

8   know if "oversight" is the correct word.  It

9   sounds a little strong to me.

10      Q.    I'm just going to show you -- do you

11  recall being deposed before in a case brought by

12  a man named Melvin Jones?

13      A.    Yes.

14          MS. deSOUSA:  Objection.  And I'm

15      going to object to any introduction

16      relative to any case and specifically

17      the Melvin Jones case.

18          BY MR. RYAN:

19      Q.    Now, drawing your attention to were

20  you deposed in that case on October 19, 2011;

21  does that sound about right?

22      A.    I -- I was deposed.  I'm not

23  absolutely sure the date.

24      Q.    If I show you this, does this appear
```

**William Fitchet**
**January 15, 2019**

Page 35

1  to be a transcript of your deposition?

2          MS. deSOUSA:  Oh, thank you.

3     What page?

4          MR. RYAN:  It's going to be on

5     Page 25.  That's an excerpt for you.

6          MS. deSOUSA:  Oh, thank you.

7          THE WITNESS:  Yes.

8          BY MR. RYAN:

9     Q.     Now, showing you Page 25, Lines 14 to

10 Page 26, Line 1.

11    A.     Yes, sir.

12    Q.     Did you previously testify during

13 your 14-year period as deputy chief that for

14 almost all that time you had input or oversight

15 with respect to IIU investigations?

16    A.     Yes, I did.

17    Q.     Now, the case we just discussed

18 involving Ms. Tosoni and Mr. Lopez, was that the

19 first case that you had with Officer Hervieux

20 after becoming commissioner where he was accused

21 of misconduct?

22    A.     I don't know.

23    Q.     Let me ask you this, were you aware

24 when you -- in 2008, when you had this case

**William Fitchet**
**January 15, 2019**

Page 36

1    involving Ms. Tosoni and Mr. Lopez that Officer

2    Hervieux had previously been accused of using

3    excessive force as a police officer?

4            MS. deSOUSA:  Objection.

5            THE WITNESS:  I don't know.  I'm

6        not sure.

7            BY MR. RYAN:

8        Q.    Was it customary when you would get

9    one of these special reports to look up whether

10   or not officers who had been accused in the case

11   before you had prior conduct histories?

12       A.    At some point probably look at their

13   record, yes.

14       Q.    If you can turn your attention to

15   what's been marked as Tab D.  Is this an

16   evaluation that was conducted of Officer

17   Hervieux during his probationary period as a

18   police officer?

19       A.    Yes, sir.

20       Q.    Does it indicate that Officer

21   Hervieux began his employment on June 29, 2001?

22       A.    Yes, sir.

23       Q.    And is it customary for officers,

24   after they complete the police academy, to do

**William Fitchet**
**January 15, 2019**

Page 37

```
 1    basically a one-year probationary term as a

 2    police officer?

 3         A.     Yes, sir.

 4         Q.     And at the end of that one year,

 5    would the department then decide whether or not

 6    they wanted to keep the officer on?

 7         A.     Yes, sir.

 8         Q.     If I could direct your attention now

 9    to what's previously been marked as Plaintiff's

10    Exhibit 50 at Tab E.

11              Is this a special report to Chief

12    Paula Meara dated July 12, 2002?

13              MS. deSOUSA:  Note my continuing

14         objection to this line of questioning.

15              THE WITNESS:  Yes.

16              BY MR. RYAN:

17         Q.     If I could direct your attention to

18    the bottom of Page 2 of that report.  I'm sorry.

19    The bottom of Page 2.  Does this indicate that

20    this investigation began when a police officer

21    with the initials PC filed a lawsuit against the

22    City and five of its officers?

23         A.     Well, it does state that, yes, sir.

24         Q.     And I'm going to represent to you
```

William Fitchet
January 15, 2019

Page 38

```
 1    that this plaintiff's name was Pablo Cotto.  Can

 2    we agree to call him Mr. Cotto instead of Mr. C?

 3        A.    Yes, sir.

 4        Q.    If I could draw your attention to the

 5    third paragraph on Page 3.  Does this report in

 6    that spot contain a summary of the allegations

 7    made by Mr. Cotto in his lawsuit?

 8        A.    Yes, sir.

 9        Q.    And does it appear that Mr. Cotto was

10    in a holding cell at the police station when the

11    incident giving rise to the lawsuit happened?

12            MS. deSOUSA:  Objection.

13            THE WITNESS:  Yes, sir.

14            BY MR. RYAN:

15        Q.    Did Mr. Cotto accuse five police

16    officers of doing things like punching and

17    kicking him and dragging him across the floor?

18        A.    Yes, sir.

19        Q.    Now, if I could draw your attention

20    to the bottom of Page 6 and the top of Page 7.

21    Did Officer Hervieux admit that he and another

22    officer named with the last name of Mendes had

23    hands-on contact with Mr. Cotto?

24        A.    Yes.
```

**William Fitchet**
**January 15, 2019**

Page 39

```
 1        Q.      Did Officer Hervieux admit that he
 2   held Mr. Cotto down in his cell?
 3        A.      I'm looking for that section, sir.
 4        Q.      Sure.
 5        A.      Yes, sir, it does say that.  Yes.
 6        Q.      Did Officer Hervieux admit that
 7   Officer Mendes punched Mr. Cotto while Officer
 8   Hervieux held him down?
 9        A.      Yes.
10        Q.      Did Officer Hervieux admit that
11   Mr. Cotto's head ended up striking the floor and
12   the toilet?
13        A.      Yes.
14        Q.      Did Officer Hervieux claim that this
15   happened because Mr. Cotto kept banging his own
16   head?
17        A.      Well, he says, Mendes was forced to
18   punch Mr. Cotto because the subject was biting
19   the officer's pants and leg.  Mr. C kept banging
20   his head on the floor and toilet.  He was
21   bleeding.  He kept blowing blood as it dripped
22   down his face.
23        Q.      So fair to say this was another case
24   where there was a material conflict in the
```

William Fitchet
January 15, 2019

Page 40

1   evidence?

2        A.     Yes, sir.

3        Q.     **Mr. Cotto claimed that he had been a**

4   **victim of a savage beating; is that fair to say?**

5        A.     Yes, sir.

6        Q.     **And Officer Hervieux and other**

7   **officers once again claimed their use of force**

8   **was justified and most of Mr. Cotto's injuries**

9   **were self-inflicted, correct?**

10       A.     In some manner, yes.

11       Q.     **In your capacity as a deputy chief,**

12   **did you recommend that the chief order a hearing**

13   **in this case?**

14       A.     I'd have to look for a document for

15   that.  It's possible that I did, but I --

16       Q.     **To your knowledge was a hearing held**

17   **in this case?**

18       A.     I'm not certain.  Sorry.  It could

19   have been.

20       Q.     **And this would have been another case**

21   **where the allegations against Officer Hervieux**

22   **were not sustained; is that correct?**

23              **Just to refresh your recollection, if**

24   **you want, the first page, can we agree this is**

**William Fitchet**
**January 15, 2019**

Page 41

1    administrative order 02169?

2       A.     The first page under the Tab of E?

3       Q.     Right.  Just so we can then go to Tab

4    T and see how this case was ultimately resolved.

5       A.     02169.

6       Q.     Okay.  And if you go to Tab T.

7       A.     It indicates not sustained.

8       Q.     Now, with respect to Mr. Cotto's

9    lawsuit, that actually settled; is that correct?

10         MS. deSOUSA:  Objection.

11         THE WITNESS:  Sir, I'm not aware

12    if it was or not.

13         BY MR. RYAN:

14       Q.     Showing you a civil document and a

15    copy for you, Counsel, is in this clip over

16    there, for Case No. 02CV30074, Cotto versus City

17    of Springfield.  Direct your attention to the

18    last page on March 28, 2005, docket entry 45,

19    does it appear that this case, civil case

20    against the City of Springfield and Officer

21    Hervieux settled?

22         MS. deSOUSA:  Objection.  He has

23    no knowledge of this case.

24         THE WITNESS:  I mean, I can read

**William Fitchet**
**January 15, 2019**

Page 42

1      this document, sir.  It seems to

2      indicate civil case terminated and

3      there's transaction receipt.  I'm not

4      sure what that is.

5           BY MR. RYAN:

6      **Q.     If I could just draw your attention,**

7  **does it indicate notified by Attorney Resnic**

8  **this case has settled?**

9           MS. deSOUSA:  Objection.

10          THE WITNESS:  That's what it

11     says.  Yes, sir.

12          BY MR. RYAN:

13     **Q.     So when a lawsuit settles, does that**

14 **mean that the City, essentially, agrees to pay**

15 **the plaintiff some sum of money in exchange for**

16 **his agreement not to go forward?**

17          MS. deSOUSA:  Objection.

18          BY MR. RYAN:

19     **Q.     Is that your understanding of what a**

20 **settlement of a civil rights lawsuit is?**

21     A.     Generally, there's no admission of

22 wrongdoing is part of the agreement that the

23 City has with the attorney.

24     **Q.     Right.**

William Fitchet
January 15, 2019

Page 43

1      A.      But, yes, some monetary agreement is

2   reached with the attorney and the plaintiff so

3   that it doesn't go forward in front of a civil

4   jury.

5      **Q.      Now, returning to this 2008 incident**

6   **involving Ms. Tosoni and Mr. Lopez, when you**

7   **were ultimately deciding what to do in that**

8   **case, did you take into consideration the fact**

9   **that Officer Hervieux had previously been**

10  **accused of using excessive force?**

11     A.      There might have been a lot of things

12  that were taken into consideration.  I can't

13  specifically remember that.  I can say that it's

14  likely that I looked at that.  It's possible

15  that the plaintiffs didn't want to go forward.

16  I don't know.  But there's a lot of reasons why

17  a hearing might not go forward.  And you're

18  asking me to recollect something that was, I

19  don't know, several years ago, and I'm trying to

20  be honest with you that I just don't honestly

21  recollect what I did.  But I know I most likely

22  relied on the citizens review board and what

23  their recommendation was.

24     **Q.      Now, I'd like to actually jump ahead**

William Fitchet
January 15, 2019

Page 44

1    and talk more about the citizens review board or

2    what became known as the community police

3    hearing board.

4         A.     Uh-huh.

5         Q.     I may use at times the initials CPHB,

6    is that an acronym or the initials for that

7    body?

8         A.     Yes, sir.

9         Q.     If I could have you look at what

10   previously was marked as Plaintiff's Exhibit

11   No. 71 behind Tab F.  Is this an order that you

12   issued on March 4, 2010, stating that all future

13   IIU cases would be reviewed by the CPHB?

14        A.     Yes, sir.

15        Q.     And if I could show you what's

16   previously marked as Plaintiff's Exhibit No. 72

17   behind Tab G.  Is this another general order you

18   issued?

19        A.     I'm looking for my signature.  It

20   would appear so, yes, sir.

21        Q.     And maybe you got a copy there that

22   only has the first page.  If that's the case, I

23   apologize.

24        A.     Yes.

William Fitchet
January 15, 2019

Page 45

1      Q.    Does it appear at the beginning to be
2    from you to commanding officers?
3      A.    Yes.  Yes, it does.
4            MS. deSOUSA:  Mine only has one
5      page as well.
6            THE WITNESS:  The only thing I'm
7      lacking is the second page.
8            BY MR. RYAN:
9      Q.    Sure.  Sure.  Let me ask you this,
10   did this general order -- back in 2010 you would
11   have been the commissioner, correct?
12     A.    Yes, sir.
13     Q.    And you would have been the person at
14   the department entrusted with the authority to
15   issue general orders, correct?
16     A.    Yes, sir.
17     Q.    Would anybody else have been able to
18   issue a general order at the department?
19     A.    Deputy chief could issue an order in
20   my absence.
21     Q.    Okay.  Was this directed or cc'd to
22   all the deputy chiefs at the time?
23     A.    Yes, sir.
24     Q.    So in any event, in March 2010, did

**William Fitchet**
**January 15, 2019**

Page 46

1    the IIU start presenting cases to the community

2    police hearing board at regularly-scheduled

3    meetings?

4        A.    They did.  The meetings might not

5    have been regularly scheduled.  They were

6    somewhat random.  But, yes.

7        Q.    Fair to say as needed?

8        A.    Yes.

9        Q.    If there weren't allegations, there

10   wouldn't be any reason to hold a meeting,

11   correct?

12       A.    That's correct, sir.  Yes.

13       Q.    When these meetings took place -- did

14   you ever attend any of these meetings?

15       A.    Generally, I did not, as a rule,

16   attend these meetings.  The community police

17   hearings would generally meet privately.  There

18   might be the need for an internal affairs

19   officer to be there to assist them.  But I

20   generally did not attend those meetings.

21       Q.    And when presentations were made to

22   hearing board members, these would consist of

23   passing along these special reports that once

24   you became commissioner were directed to you,

William Fitchet
January 15, 2019

1    correct?

2        A.      The special reports and the

3    investigative process by the IIU.

4        Q.      **And the special reports contained**

5    **that investigative process, don't they?**

6        A.      Yes.

7        Q.      **So a special report will,**

8    **essentially, collect all the evidence, but it**

9    **will indicate the steps that the investigator**

10   **took to find that evidence, correct?**

11       A.      Yes, sir.

12       Q.      **At these meetings for the civilian**

13   **police review board, they would -- it would**

14   **often be that one member would be there to**

15   **review these special reports that they received,**

16   **correct?**

17       A.      Yes.

18       Q.      **And these were not hearings; these**

19   **were presentations, correct?**

20       A.      Reviews.

21       Q.      **And CPHB members would take turns**

22   **conducting these reviews, correct?**

23       A.      Yes.

24       Q.      **And their primary job after reviewing**

**William Fitchet**
**January 15, 2019**

Page 48

1    an IIU special report was to recommend whether

2    an actual hearing should take place, correct?

3         A.    That and also if they wanted any

4    additional inquiries made by the IIU officers.

5         Q.    In other words, they could look at

6    the special report and form the opinion that the

7    investigation was not complete, a further

8    investigation would be warranted, correct?

9         A.    Or they wanted a witness pursued that

10   had not been able to be contacted, they wanted

11   another attempt made.  But anything of that

12   nature, yes, they could make a recommendation.

13        Q.    And when they would receive the

14   special report, they would get with it a form

15   that would ask them to make one of these four

16   findings that we talked about, correct?

17        A.    Yes.  And also the ability to make

18   some comments also if they chose to.

19        Q.    Right.  And those four findings would

20   be unfounded, sustained, not sustained, and

21   exonerated, correct?

22        A.    Or they could request a hearing.

23        Q.    Right.  They would also have the

24   ability to -- maybe it would be easier if I

William Fitchet
January 15, 2019

Page 49

1   showed you an example, a copy of one of these

2   forms.  This is in the packet there.

3           Is this, what I'm showing you now,

4   this document, an example of the form?

5       A.    Yes.

6       Q.    And after a section on the form where

7   it talks about the request for the unfounded,

8   sustained, not sustained, or exonerated finding,

9   are there other -- three other recommendations

10  that CPHB board members were asked to make?

11      A.    Yes.  Under No. 8, is that what

12  you're referring to, sir?

13      Q.    Yes.  And could you say what those

14  three choices they had were?

15      A.    A charge letter be issued and the

16  commissioner disposed of without the need for a

17  hearing, a charge letter be issued and a hearing

18  be held for consideration of the charges, the

19  commissioner dispose of the matter in good

20  exercise of his discretion.

21      Q.    And after a CPHB board member filled

22  out this series of recommendations, this is

23  something you would eventually receive in your

24  capacity as commissioner, correct?

William Fitchet
January 15, 2019

Page 50

1       A.      Yes, sir.

2       Q.      **And these recommendations were not**

3  **binding on you in any way, correct?**

4       A.      I felt that I was duty bound to take

5  these recommendations seriously.  Could I

6  override them, I could.  But I think in every

7  instance I tried to abide by what the hearings

8  board's recommendations were unless I saw some

9  gross miscarriage of justice.

10      Q.      **Is it fair to say that at the end of**

11 **the day, you were the ultimate decision maker**

12 **though, correct?**

13      A.      Yes.

14      Q.      **Okay.  Let me take that back from**

15 **you.**

16              **Now, during your tenure as**

17 **commissioner, how many officers served on the**

18 **force from year to year?**

19      A.      It varied somewhat.  But there were

20 approximately 65 to 70 supervisory personnel:

21 sergeant, lieutenant, captains, deputy chief.

22 And then the number would vary considerably

23 depending on vacancies and if we were allowed to

24 have an academy.  I would say it varied between

William Fitchet
January 15, 2019

Page 51

1    300 and maybe 80 and 425 ballpark.  That could

2    vary because if you had an academy that was a

3    large academy, that could jump up from there.

4        Q.      Okay.  Now, a number of officers

5    throughout your time as commissioner were

6    military veterans, correct?

7        A.      Yes.

8        Q.      And some of them were in the

9    reserves; is that correct?

10       A.      Yes.  Some were, yes.

11       Q.      And did some of them have their

12   careers as police officers interrupted when they

13   were activated and deployed to serve in combat

14   zones?

15       A.      Yes, sir.

16       Q.      Was Officer Hervieux one of these

17   officers?

18       A.      I don't recall, sir.  It's possible

19   he was, but I don't specifically recall.

20       Q.      If I could draw your attention to

21   what has previously been marked as Plaintiff's

22   Exhibit 59 in Tab H in your book.

23               Is this a memo that was sent to you

24   from Officer Hervieux?

**William Fitchet**
**January 15, 2019**

```
                                                    Page 52

 1       A.      Yes, sir.

 2       Q.      It's dated February 8, 2010?

 3       A.      Yes, sir.

 4       Q.      And in this memo did Officer Hervieux

 5   tell you that he'd been ordered to go to

 6   Afghanistan?

 7       A.      Yes, sir.

 8       Q.      Now, later on did you learn that

 9   Officer Hervieux had been seriously injured in

10   Afghanistan?

11            MS. deSOUSA:  Objection.  And for

12       the record, I object to any and all

13       inquiry regarding Officer's Hervieux's

14       medical conditions or any injuries he

15       sustained during his time as an officer

16       in the U.S. Army.

17            THE WITNESS:  It's possible, sir.

18       I don't recall it right off the top of

19       my head, but it's certainly possible.

20            BY MR. RYAN:

21       Q.      Now, if I could direct your attention

22   to Plaintiff's Exhibit 60, Tab I, the next.  Is

23   this an order -- does this appear to be an order

24   from the Army to Officer Hervieux?
```

**William Fitchet**
**January 15, 2019**

Page 53

```
 1        A.      Yes, it does.

 2        Q.      Does it appear to have been issued on

 3   August 24, 2010?

 4        A.      Yes, sir.

 5        Q.      Does this order memorialize Officer

 6   Hervieux's medical evacuation for and

 7   reassignment to Fort Drum for further medical

 8   care?

 9                MS. deSOUSA:  Objection.

10                THE WITNESS:  It does mention

11        that, yes.

12                BY MR. RYAN:

13        Q.      Do you have any idea how or when this

14   document was provided to the Springfield Police

15   Department?

16        A.      I do not.  I do not.

17        Q.      And reviewing this document now, does

18   it refresh your recollection in any way as to

19   whether or not you became aware that Officer

20   Hervieux suffered serious injury during his

21   deployment in Afghanistan?

22        A.      I don't recall, sir.

23        Q.      Would there have been anybody at the

24   department who served in sort of a liaison
```

**William Fitchet**
**January 15, 2019**

Page 54

1   capacity between officers who were doing --

2   serving their country, like Officer Hervieux, in

3   the Springfield Police Department?

4        A.     Well, certainly his commanding

5   officer would become aware of -- of when he was

6   returning to duty and things of that nature.

7        Q.     Were there any protocols in place for

8   officers who were coming back from deployments

9   in combat zones?

10        A.     Try to institute with the Veterans

11   some counseling.  It was not precise.  And I

12   think we relied on the military to handle that

13   aspect of reintegrating someone into the

14   civilian life and whatever medical or counseling

15   they might need.  But I remember attempting to

16   work with the Veterans group, but it never

17   really gelled, it never really got off the

18   ground.

19        Q.     And when you say you relied on the

20   armed forces to kind of take on this

21   reintegration role, would there be documentation

22   that the department would seek or receive from

23   the Veterans Administration pertaining to

24   returning officers and their medical conditions?

**William Fitchet**
**January 15, 2019**

Page 55

1      A.      There could be.  There certainly

2   could be.  Generally, the officer himself would

3   submit reports of that nature to make us aware

4   if there was some problems or medical issues.

5      Q.      If I could turn your attention to

6   what has previously been marked as Plaintiff's

7   61 behind Tab J.  Is this another order from the

8   United States Army?

9      A.      It appears to be.  Yes, sir.

10     Q.      Is this one dated February 17, 2011?

11     A.      Yes, sir.

12     Q.      And so this would have been about six

13  months after the prior order from August 2010?

14     A.      Yes, sir.

15     Q.      And does this order indicate a

16  purpose to permit Officer Hervieux to complete

17  medical care and treatment?

18          I direct your attention to the bottom

19  of -- towards the bottom of the second

20  paragraph.

21     A.      Yes.

22     Q.      Did you or anyone at the Springfield

23  Police Department receive any documentation

24  indicating what sort of treatment Officer

William Fitchet
January 15, 2019

Page 56

1    Hervieux received during the six months between

2    the first and the second order?

3        A.    I do not recall.  I'm not certain,

4    sir.

5        Q.    If I could direct your attention to

6    what's been previously marked as Plaintiff's 62

7    behind Tab K.  Is this a third Army order dated

8    October 18, 2011?

9        A.    Yes, sir.

10       Q.    So this would have been about eight

11   months after the second order in February 2011?

12       A.    Yes, sir.

13       Q.    And about 14 months after the first

14   order in August 2010?

15       A.    Yes, sir.

16       Q.    Does this third order indicate

17   Officer Hervieux was released from active duty

18   effective December 31, 2011?

19       A.    Yes, it does.

20       Q.    Does the order also indicate that

21   Officer Hervieux remained eligible for

22   transitional healthcare under 10 United States

23   code Section 1145?

24       A.    Yes, it does.

William Fitchet
January 15, 2019

Page 57

1      Q.      Does it indicate he was eligible for

2  this transitional healthcare until June 28,

3  2012?

4      A.      Yes, sir.

5      Q.      Do you have any idea why Officer

6  Hervieux qualified for this benefit?

7      A.      I don't.

8      Q.      Did you or anyone at the Springfield

9  Police Department receive any documentation

10  indicating what sort of treatment Officer

11  Hervieux received during the eight months

12  between the second and third orders from the

13  Army?

14      A.      I can't be certain, sir.  I don't

15  really recall.

16      Q.      Now, if I could direct your attention

17  to what's been previously been marked as

18  Plaintiff's Exhibit 63 behind Tab L.  Is this an

19  order you issued on October 26, 2011?

20      A.      Yes, sir.

21      Q.      Did it indicate that Officer Hervieux

22  would be returning to full duty on October 30,

23  2011?

24      A.      Yes.

**William Fitchet**
**January 15, 2019**

Page 58

1      Q.      Does the order indicate that Officer

2   Hervieux is to receive four days of in-service

3   training before returning to his regular

4   assignment?

5      A.      Yes.  From November 1st to

6   November 4th.

7      Q.      Do you have any recollection as to

8   what sort of in-service training Officer

9   Hervieux was slated to receive?

10     A.      It would be a guess, sir.  I don't

11   know specifically.  I would hazard a guess.

12          MS. deSOUSA:  So I'm going to

13      object.

14          BY MR. RYAN:

15     Q.      Well, based on your experience as a

16   commissioner for the Springfield Police

17   Department, what would you infer that the

18   training, that in-service training Officer

19   Hervieux would have received returning from a

20   military deployment?

21     A.      Probably was the full in-service

22   complement of firearms qualification, first aid

23   qualification, and updates on criminal law and

24   things of that nature.

**William Fitchet**
**January 15, 2019**

Page 59

1     Q.    Would there have been any sort of

2  physical or mental examination of Officer

3  Hervieux to determine whether he was fit to

4  return to duty?

5     A.    I don't believe there would be.  No,

6  sir.

7     Q.    Did you or anyone else at the

8  Springfield department receive any documentation

9  from the Army declaring him fit to perform the

10  duties of a police officer?

11     A.    Not certain, sir.

12     Q.    And at the time that you issued this

13  order, is it your testimony that you are

14  uncertain whether you are aware that he just

15  received 14 months of intensive medical

16  treatment?

17       MS. deSOUSA:  Objection.  And for

18    the record, there's nothing in front of

19    Commissioner Fitchet that supports that

20    question.

21       Go ahead.

22       THE WITNESS:  You're asking me to

23    recall something that's seven or eight

24    years old.  I just don't recall it, sir.

**William Fitchet**
**January 15, 2019**

Page 60

```
 1              BY MR. RYAN:

 2      Q.      Okay.  Prior to issuing this order

 3   pertaining to Officer Hervieux's return to duty,

 4   did you or any other supervisory officer at the

 5   Springfield Police Department know that he had

 6   suffered a traumatic brain injury?

 7              MS. deSOUSA:  Objection.

 8              THE WITNESS:  I am unaware of

 9       that, sir.

10              BY MR. RYAN:

11      Q.      When you cleared Officer Hervieux to

12   return to duty, is that something that would

13   have been relevant had you known about that

14   diagnosis he'd received?

15              MS. deSOUSA:  Objection.

16              THE WITNESS:  I would say it

17       would be relevant, yes, sir.

18              BY MR. RYAN:

19      Q.      Why would it be something you would

20   have wanted to know?

21              MS. deSOUSA:  Objection.

22              THE WITNESS:  Because if he had

23       suffered a traumatic brain injury, I

24       would have wanted to know because it
```

**William Fitchet**
**January 15, 2019**

Page 61

```
 1        might affect his performance of duty,

 2        his decision making, his ability to

 3        perform his duties as a Springfield

 4        police officer.

 5               BY MR. RYAN:

 6        Q.      As you sit here today do you have any

 7   knowledge as to whether any supervisor of

 8   Officer Hervieux was aware of his -- this

 9   condition when he returned to the force in 2011?

10               MS. deSOUSA:  Objection.

11               THE WITNESS:  Not that I am aware

12        of.

13               BY MR. RYAN:

14        Q.      As you testified earlier about these

15   steps that I think your words were "never

16   gelled" with respect to working with the VA to

17   reintegrate officers.  Did you have any general

18   concerns about officers returning from combat

19   deployments reintegrating to the police force?

20               MS. deSOUSA:  Objection.

21               THE WITNESS:  Yes, I did.

22               BY MR. RYAN:

23        Q.      And what were those concerns?

24        A.      That they might have some experiences
```

**William Fitchet**
**January 15, 2019**

Page 62

```
1    that might affect them and affect their

2    performance of duty and just general concerns

3    returning from a combat tour of duty.

4         Q.    Is it fair to say that the work of a

5    soldier and the work of a police officer are in

6    some ways similar?

7              MS. deSOUSA:  Objection.

8              THE WITNESS:  I think they're

9         dramatically different, to tell you the

10        truth, sir.

11             BY MR. RYAN:

12        Q.    Okay.  Now, we previously looked at a

13   document that said Officer Hervieux was eligible

14   to receive transitional care from the Army until

15   June 28, 2012.  I'd like to talk about something

16   that happened six days before that.

17             And if I could direct your attention

18   to what's behind Tab M previously marked as

19   Plaintiff's 65.

20             MS. deSOUSA:  And for the record,

21        my continuing objection to this line of

22        questioning relative to this IIU

23        investigation.

24             BY MR. RYAN:
```

William Fitchet
January 15, 2019

Page 63

```
 1        Q.      Is this another special report
 2   addressed to you?
 3        A.      Yes, sir, it is.
 4        Q.      And if you look at the very last
 5   page, was the author of this report Sergeant
 6   Pelchar again?
 7        A.      Yes, sir.
 8        Q.      What was the date of this report?
 9        A.      October 1, 2012.
10        Q.      Now, was Sergeant Pelchar's
11   investigation conducted in response to a citizen
12   complaint filed by an individual referred to as
13   WM or Mr. M?
14        A.      Yes, sir.
15        Q.      And I'm going to represent to you
16   that this man's name was William Motley.  Can we
17   agree to refer to him as Mr. Motley?
18        A.      Yes, sir.
19        Q.      If I can draw your attention to the
20   second paragraph of the summary on Page 1.  Does
21   it appear that this incident took place in a
22   parking lot outside a bar at the Basketball Hall
23   of Fame?
24        A.      Yes, it does.
```

William Fitchet
January 15, 2019

Page 64

1      Q.      In Paragraph 3 of that summary, did

2    Mr. Motley accuse a police officer of pushing

3    him against a Navigator and banging his head

4    against the glass three or four times?

5      A.      Yes, sir.

6      Q.      Now, at the bottom of Page 1 is there

7    an account from an individual referred to as

8    Mr. G?

9      A.      Yes, sir.

10     Q.      If you want to just take a moment to

11   refamiliarize with the text.  I was wondering if

12   we can call Mr. G the friend in this case.  Does

13   he appear to be a friend of Mr. Motley?

14     A.      That's fine, sir.

15     Q.      If you look at the very last word on

16   Page 1 and the first two lines on Page 2, did

17   the friend say that, when the police arrived, an

18   officer began smashing Mr. Motley's head against

19   the rear window of the Navigator?

20     A.      Yes, sir, it does.

21     Q.      Directing your attention to the

22   bottom of the page, is there an account from an

23   individual referred to as Ms. MM or Ms. M?

24     A.      Yes, there is.

**William Fitchet**
**January 15, 2019**

Page 65

```
 1        Q.      Now, did Ms. M accuse Mr. Motley and
 2    the friend of being very drunk?
 3        A.      Yes, sir.
 4        Q.      Did she accuse Mr. Motley and the
 5    friend of harassing her and grabbing her ass?
 6        A.      That's what it says, sir.
 7        Q.      Directing your attention to the first
 8    full paragraph at the top of Page 3, did Ms. M
 9    say that when the parties met up outside,
10    Mr. Motley smacked one of her female friends in
11    the face?
12        A.      Yes, it says that.
13        Q.      And according to Ms. M, is this when
14    the police arrived?
15        A.      Yes, sir, it does.
16        Q.      Now, in the next paragraph does Ms. M
17    say what happened when Mr. Motley tried to
18    explain to the officer his side of the story?
19        A.      Yes, it does say that.
20        Q.      Did Ms. M claim that the next thing
21    she saw was the officer pushing Mr. Motley up
22    against the back of the Navigator and banging
23    his head against the rear window?
24        A.      Yes, sir, that's what it says.
```

William Fitchet
January 15, 2019

Page 66

1      Q.      Before taking Mr. Motley to the

2  ground, did Ms. M accuse one of the officers of

3  punching Mr. Motley in the head several times?

4      A.      Yes, sir, it does.

5      Q.      Now, finally, in the middle of the

6  page of the report -- of that page of the

7  report, is there another account from another

8  woman referred to as Ms. M?

9      A.      It appears to be, yes, sir.

10     Q.      I'd like to direct your attention to

11  the last paragraph of Page 3.  Could you read

12  the two sentences that begin with the words,

13  Ms. M stated that a small white officer?

14     A.      [As read] Ms. M stated that a small

15  white officer, Officer Thomas Hervieux, began

16  punching Mr. M in the head.  And every time he

17  did, Mr. M's head would hit the Navigator's back

18  window.  Ms. M stated that Mr. M did not resist,

19  but stood there and allowed Officer Hervieux to

20  punch him about five times.

21     Q.      I'd like to now draw your attention

22  to the last page of Sergeant Pelchar's report.

23          Does this page contain Officer

24  Hervieux's statement regarding this allegation

William Fitchet
January 15, 2019

Page 67

1    of excessive force?

2         A.    Yes, it does.

3         Q.    Did Officer Hervieux admit to

4    punching Mr. Motley in the head with a closed

5    fist?

6         A.    He does admit to it, yes.

7         Q.    Did Officer Hervieux maintain he was

8    justified in using this force?

9         A.    He appears to, yes.

10        Q.    Now, I'd like to skip ahead and talk

11   a little bit about the use of force policy at

12   the Springfield Police Department.

13             If you could look behind Tab N,

14   what's previously been marked Plaintiff's

15   Exhibit No. 75.  Do you recognize this document?

16        A.    Yes, sir.  It's a general order, yes.

17        Q.    Now, is this general order, was this

18   actually issued by the individual who became the

19   commissioner after you retired?

20        A.    It would appear so, yes.

21        Q.    If you could just take a minute to

22   review the document.  I realize we're dealing

23   with an order that was issued in 2015.  But is

24   this a continuation of what the policy was when

William Fitchet
January 15, 2019

Page 68

1    you were commissioner?

2        A.      There might be some differences in

3    it.  So I'm not sure exactly what the exact

4    differences are because I don't have the two to

5    compare.

6        Q.      Sure.  Going off of this document,

7    and as I ask you questions, if there's anything

8    that strikes you as not the department's policy

9    when you were commissioner, please let me know.

10           But if I could draw your attention to

11   Roman numeral 7 on Page 2 of the document.  Do

12   you see the heading that says "progression of

13   force"?

14       A.      Yes, I do.

15       Q.      It states that, any tactic an officer

16   uses must be objectively reasonable as to the

17   officer's risk assessment and the subject's

18   action.

19           Was that the policy that was in place

20   when you were commissioner?

21       A.      I'm not sure where you're reading

22   that, sir, under 7.  Can you tell me where

23   exactly that is?

24       Q.      Sure.  So on the bottom of page --

William Fitchet
January 15, 2019

1  A.  You're talking about 7?

2  Q.  Subsection B, it says -- let's see --

3 if a tactic is used that is not listed, it must

4 be objectively reasonable as it relates to the

5 officer's risk assessment and the subject's

6 action.

7  A.  Okay.  That's different from what you

8 had said though.  Yes, sir, that's what it says.

9 Yes.

10  Q.  At the end of the day, an officer's

11 use of force has to be objectively reasonable;

12 is that accurate?

13  A.  Yes, I agree with you.

14  Q.  And objective reasonableness depends

15 on the officer assessing the risk beforehand,

16 correct?

17  A.  Yes, sir.

18  Q.  And that largely depends on whether

19 or not the -- well, the actions that are being

20 taken by the individual, the subject that the

21 officer's encountering, correct?

22  A.  Yes.  And other surrounding

23 circumstances that might intervene.

24  Q.  Sure.  Like if it was in a big crowd

**William Fitchet**
**January 15, 2019**

Page 70

1   or something like that?

2       A.      Right.  Yes, sir.  Correct.

3       Q.      **Now, this policy describes, in this**

4   **progression of force, different kinds of**

5   **subjects, is that fair to say, starting with the**

6   **compliant subject?**

7       A.      I'm trying to follow exactly on this

8   particular document --

9       Q.      **Yeah.**

10      A.      -- where you're going.  And it's

11  probably in here but I don't know if it's under

12  that section.

13      Q.      **Sure.  So Section 8, the use of force**

14  **model level one, the compliant subject.  Do you**

15  **see that at the bottom of Page 2?**

16      A.      Okay.  Yes.

17      Q.      **And if you flip ahead to Page 3 you**

18  **will see Level 2, the resistive, parens --**

19      A.      Yeah.  Okay.  You're jumping ahead.

20  Okay.  Yes.

21      Q.      **Yes.  So I guess what I want to go**

22  **over is when an officer is dealing with somebody**

23  **they determine to be a compliant subject,**

24  **they're permitted to use what are called**

William Fitchet
January 15, 2019

Page 71

1    cooperative controls, correct?

2         A.    Yes.  Verbalization skills and things

3    of that nature, yes.

4         Q.    And the next level covers what I just

5    referred to as the passively resistant subject,

6    correct?

7         A.    Yes.  On Page 3.

8         Q.    Yes.

9         A.    Yes.

10        Q.    And this is somebody that isn't using

11   any physical energy to resist but is definitely

12   being confrontational; is that a fair

13   description of the passively resistant subject?

14        A.    Yes.  Noncompliance, basically, yes.

15        Q.    And at this level the policy permits

16   what are called contact controls, correct?

17        A.    Yes.  Yes, sir.

18        Q.    This would include things like an

19   elbow grasp?

20        A.    Yes.

21        Q.    And the third level concerns an

22   actively resistant subject; is that correct?

23        A.    Yes, sir.

24        Q.    Now, this is somebody who isn't yet

**William Fitchet**
**January 15, 2019**

Page 72

1    attacking the officer but they are being

2    physically defiant; is that how the policy

3    describes an actively resistant subject?

4         A.    Well, yes.  Basically the threat

5    intensity has increased considerably, yes.

6         Q.    With the increase in the threat

7    intensity, the policy authorizes what are called

8    compliance techniques, correct?

9         A.    Yes.

10        Q.    This would include things like wrist

11   blocks?

12        A.    Yes, sir.

13        Q.    Arm bars?

14        A.    Yes, sir.

15        Q.    Even OC spray, correct?

16        A.    Yes.

17        Q.    And now the fourth level concerns the

18   assaultive subject; is that correct?

19        A.    Yes, sir.

20        Q.    And this is somebody who must be

21   stopped and controlled to prevent -- protect the

22   physical wellbeing of the officer or another

23   person, correct?

24        A.    Yes, sir.

William Fitchet
January 15, 2019

Page 73

1        Q.      At this level the policy authorizes

2    what are known as defensive tactics, correct?

3        A.      Yes, sir.

4        Q.      This would include baton strikes?

5        A.      Yes.

6        Q.      Punches?

7        A.      Yes.

8        Q.      Kicks?

9        A.      If need be, yes.

10       Q.      Ground fighting techniques, correct?

11       A.      Yes.

12       Q.      Now, under this policy, in order to

13   punch a subject in the head or slam a subject's

14   head into the SUV, would the subject have to be

15   at the assaultive level?

16       A.      According to this policy, yes.

17       Q.      And if the subject was not offering

18   any physical resistance, punching or slamming

19   subject's head into a hard object would

20   definitely violate this policy, correct?

21       A.      Yes.

22       Q.      So I'd like to now return to this

23   incident outside the Hall of Fame parking lot.

24               Fair to say that this was another

William Fitchet
January 15, 2019

Page 74

```
 1   case where there was a material conflict in the

 2   evidence?

 3       A.      Yes.  Could you refer to that tab

 4   again, please?

 5       Q.      Sure.  That would be --

 6               MS. deSOUSA:  M.

 7               MR. RYAN:  Thank you.  M.

 8               THE WITNESS:  M.

 9               BY MR. RYAN:

10       Q.      And this is Mr. Motley's case where

11   he accused Officer Hervieux of slamming his head

12   into the back of the Navigator, correct?

13       A.      Yes, sir.

14       Q.      Now, there were other individuals

15   besides Mr. Motley who made this allegation,

16   correct?

17       A.      Yes.

18       Q.      And Officer Hervieux said that

19   Mr. Motley was engaged in assaultive behavior,

20   and, therefore, the punch he threw was justified

21   under the policy, correct?

22       A.      Yes.

23       Q.      And Officer Hervieux denied that he

24   ever slammed Mr. Motley's head into the
```

William Fitchet
January 15, 2019

Page 75

```
 1    Navigator, correct?
 2        A.    I believe so, yes.
 3        Q.    Now, at this point, eventually you
 4    were in a position of having to decide whether
 5    or not to order a hearing in this case, correct?
 6        A.    Yes.
 7        Q.    And after, when you came to make that
 8    decision, you ultimately decided that the proper
 9    finding for the charges against Officer Hervieux
10    were exonerated; is that correct?
11              Again, I can refer you to Tab T.  And
12    this is Special Order 12-092.
13        A.    Yes.
14        Q.    So this means that a preponderance of
15    the evidence showed that Hervieux's alleged
16    conduct did occur but did not violate the
17    policies, procedures, practices, orders, or
18    training of the Springfield Police Department;
19    is that correct?
20        A.    Yes.
21        Q.    And this exoneration of Officer
22    Hervieux came on July 16, 2012?
23        A.    I believe so.  Yes, sir.
24        Q.    And that would have been about six
```

**William Fitchet**
**January 15, 2019**

Page 76

 1   **months before the incident on Daytona Street**

 2   **giving rise to this lawsuit, correct?**

 3        A.     Yes.

 4             MR. RYAN:  Now, we are at 11:30,

 5        would anybody like a short break?

 6             MS. deSOUSA:  Sure.

 7             MR. RYAN:  Okay.  Maybe take five

 8        or ten minutes.

 9             THE VIDEOGRAPHER:  This is the

10        videographer.  We are off the record on

11        January 15th at 11:27 a.m.

12

13             (Recess taken)

14

15             THE VIDEOGRAPHER:  This is the

16        videographer.  We are now back on the

17        record on January 15, 2019 at 11:49 a.m.

18             BY MR. RYAN:

19        Q.     **All right.  So Commissioner Fitchet,**

20   **if I could ask you to take a look at what's**

21   **behind Tab R, at what has previously been marked**

22   **as Plaintiff's Exhibit 66.**

23             **Does this appear to be a three-page**

24   **document?**

William Fitchet
January 15, 2019

Page 77

1     A.     Yes, sir.

2            MS. deSOUSA:  Note my continuing

3     objection to any and all inquiry into

4     this document.

5            BY MR. RYAN:

6     Q.     And is the date on the first page

7     November 7, 2012?

8     A.     Yes.

9     Q.     And so this would have been about two

10    and a half months before the incident on Daytona

11    Street?

12    A.     Yes, sir.

13    Q.     Is this paperwork related to an

14    accident that Officer Hervieux had in August of

15    2012?

16           MS. deSOUSA:  Objection.

17           THE WITNESS:  Yes, sir.

18           BY MR. RYAN:

19    Q.     Does this paperwork indicate that

20    Officer Hervieux was disabled from August 23rd

21    to November 13, 2012?

22           And I just direct your attention to

23    the middle of Page 2, dates absent following

24    accident, date disability began, date return to

William Fitchet
January 15, 2019

Page 78

1    work.

2        A.      August 23rd to November 13th, is that

3    what you said, sir?

4        Q.      **Yes.**

5        A.      Yes.

6        Q.      **Sitting here today do you have any**

7    **recollection as to the circumstances surrounding**

8    **this accident?**

9        A.      No, sir, I don't.

10       Q.      **Do you know whether Officer Hervieux**

11   **aggravated a preexisting injury?**

12           MS. deSOUSA:  Objection.

13           THE WITNESS:  I'm not certain,

14       sir.

15           BY MR. RYAN:

16       Q.      **Do you know whether he suffered any**

17   **new injuries?**

18       A.      I would have to review reports that

19   he would have submitted to be certain, sir.

20       Q.      **Do you know whether a doctor declared**

21   **him fit to return to duty in November of 2012?**

22       A.      It would be an assumption, but I

23   don't know for certain.

24           MS. deSOUSA:  I'm going to

**William Fitchet**
**January 15, 2019**

 1     object.

 2           THE WITNESS:  I don't know for

 3     certain.  I'd have to look at the

 4     paperwork, sir.

 5           BY MR. RYAN:

 6     Q.     Okay.  Now, I want to move on in a

 7     second here to the disciplinary history of

 8     Officer Daniel McKay.  But I want to discuss

 9     briefly some other allegations that were made

10     against Officer Hervieux and discuss how they

11     were resolved.

12           If you can again go to Tab T in your

13     binder.  Now, we previously discussed excessive

14     force allegations with special order numbers

15     08-072, 08-072A, and 12-092 and 02-196; is that

16     correct?  First four are right there at the top.

17     A.     Would it be 169 rather than -- I

18     think I have 169.

19     Q.     Yeah.  I think I might have misspoke.

20     02-169, yes.

21           So that would have been the Cotto,

22     Tosoni, Lopez and Motley cases; is that correct?

23     A.     Yes.

24     Q.     If you look in that document you have

William Fitchet
January 15, 2019

Page 80

1   right there in the sixth column in with the

2   heading "nature of complaint."  Do you see that

3   at the top?

4       A.    Yes.

5       Q.    I'd like to very briefly discuss

6   other occasions where complaints were made

7   against Officer Hervieux described as, quote,

8   physical, slash, hands.

9           MS. deSOUSA:  I'm going to object

10          to this entire line of questioning and

11          note for the record that there's no

12          foundation for who created this, when,

13          or whether or not Mr. Fitchet has any

14          familiarity with that.  Further, my

15          ongoing objection to use of prior IIU

16          complaints with regard to this officer.

17          BY MR. RYAN:

18      Q.    Now, on August 15, 2007, did a man

19   named Conrad Dixon say officers struck him in

20   the face, detained him in the back of a cruiser

21   for no reason, officers refused to return his

22   money, his mother's wallet, and his father's

23   rental keys to him?

24          MS. deSOUSA:  Okay.  Objection.

**William Fitchet**
**January 15, 2019**

Page 81

```
1        Are you asking him did that happen or
2        does this document say that?
3             BY MR. RYAN:
4        Q.    Does this document indicate that an
5    allegation of that sort happened?  I'm not
6    asking you whether it happened.  I'm just asking
7    does the document indicate that that allegation
8    was made?
9        A.    Yes.  Yes.
10       Q.    And does the document indicate that
11   the complaint against Officer Hervieux was not
12   sustained?
13       A.    Yes.
14       Q.    On April 17, 2006, did a man named
15   Luis Saccamando allege that officers assaulted
16   him causing serious physical injuries?
17            MS. deSOUSA:  Again, are you
18       asking him does the document say that,
19       or does he have knowledge that Luis
20       Saccamando is alleging that?
21            BY MR. RYAN:
22       Q.    I'm representing to you this document
23   provided by the Springfield Police Department in
24   discovery indicates that an allegation made by a
```

William Fitchet
January 15, 2019

Page 82

1  man named Luis Saccamando was that officers

2  assaulted him causing serious personal injury.

3      A.     It does state that, yes, sir.

4      Q.     And does this document indicate that

5  this complaint against Officer Hervieux ended

6  with a finding of exonerated?

7      A.     Yes, sir.

8      Q.     On March 14, 2009, does this document

9  indicate that a man named David Wilson claimed

10  that he and his friend were picked up, quote,

11  because they were black, officer threw him to

12  the ground and punched him two times and broke

13  his nose?

14      A.     The allegation, I believe, was

15  against Officer Fay in this particular incident.

16  But it does say that.

17      Q.     Is it your recollection that Officer

18  Hervieux was Officer Fay's partner that night?

19      A.     Yes.

20      Q.     Was there an allegation -- did

21  Officer Hervieux, in the course of this

22  incident, acknowledge taking another suspect off

23  his feet as he -- as this incident involving

24  Officer Fay was going on?

William Fitchet
January 15, 2019

Page 83

1      A.      I'd have to review to be sure.  I'm

2   not exactly sure, sir, if that happened.  It's

3   possible, but I don't -- I know Officer Fay was

4   the one that the allegation was made against

5   regarding this person Wilson.  It's possible

6   that what you said happened, but I don't really

7   recall that.

8      Q.      Okay.  And in any event, this was --

9   this incident became a part of this prior IIU

10  history for Officer Hervieux as well as Officer

11  Fay, correct?

12     A.      Yes, sir, it did.

13     Q.      And that was another finding that was

14  not sustained, correct?

15     A.      Yes, sir.

16     Q.      On January 3, 2012, did Captain

17  Cheetham order an investigation into injuries

18  sustained by a prisoner named Keon Mercer?

19     A.      Yes, he did.

20     Q.      And were these allegations against

21  Officer Hervieux not sustained?

22     A.      That's correct.

23     Q.      In summary, prior to this incident on

24  Daytona Street, was Officer Hervieux accused of

**William Fitchet**
**January 15, 2019**

Page 84

1    excessive force approximately eight times?

2         A.     There were either eight complaints or

3    initiated investigations by the police

4    department regarding force issues.  Whether it

5    was excessive, would -- it was conflicting

6    testimony whether it was excessive.

7         Q.     Sure.  And to your knowledge did any

8    of these incidents result in a hearing at the

9    hearing board?

10        A.     I don't think so, sir.

11        Q.     And to your knowledge, did Officer

12   Hervieux ever receive any sort of discipline

13   related to his use of force as a police officer?

14        A.     I'd have to review his entire file.

15   According to these, no.  But he could have for

16   previous cases or subsequent cases.  I would

17   have to review his file to be sure.

18        Q.     Okay.  Now, if I could draw your

19   attention to what's previously been marked as

20   Tab U in your book.

21        A.     U, yes.

22        Q.     I will represent to you that these

23   nine pages are the entirety of Officer Daniel

24   McKay's personnel file.  If you could take a

William Fitchet
January 15, 2019

1   second to just briefly review those nine pages.

2        A.      The following nine pages?

3        Q.      Yes.  The question I'm going to be

4   asking you is whether or not there are any

5   performance evaluations contained in Officer

6   McKay's personnel file.

7        A.      [Witness reviewing document].

8        Q.      Are there any performance evaluations

9   in his personnel file?

10       A.      There's none here, sir.  I don't know

11  if there's any in his personnel file.  I'd have

12  to look at his personnel file.

13       Q.      Well, if I were to represent to you

14  that those nine pages are his personnel file,

15  would you agree that there are no performance

16  evaluations in those nine pages?

17       A.      There are none, no, sir.

18       Q.      Okay.  Now, if I could direct your

19  attention to what's behind Tab V.

20               Is this another special report

21  directed to you as commissioner?

22       A.      Yes, sir.

23       Q.      And --

24               MS. deSOUSA:  For the record, I

William Fitchet
January 15, 2019

Page 86

```
1        have a continuing objection to any and

2        all inquiries with regard to this IIU

3        investigation.

4             BY MR. RYAN:

5        Q.     Drawing your attention to the first

6   paragraph of the report, did this investigation

7   begin when a female referred to as TS lodged a

8   citizen's complaint?

9        A.     Yes.

10       Q.     Did TS allege that while leaving a

11  nightclub she witnessed a Hispanic male

12  handcuffed on the ground being abused by five to

13  seven uniformed officers?

14       A.     That's her allegation, yes.

15       Q.     Did Ms. TS indicate that she took out

16  her camera and began to take photographs?

17       A.     Yes.

18       Q.     Did Ms. TS state that an Officer

19  D. McKay drove the suspect's vehicle into the

20  nearby driveway recklessly, he existed the

21  vehicle, walked over to the suspect who was

22  being escorted by two other officers, slapped

23  him and punched the suspect in the face and

24  struck him in the groin area with a knee?
```

William Fitchet
January 15, 2019

Page 87

1     A.     That's what this says, yes, sir.

2     Q.     Did Ms. TS state that when McKay

3  noticed she was taking photographs, he

4  approached her and said, quote, give me this

5  fucking camera, end quote, and snatched it out

6  of her hand?

7     A.     That's what this document says, yes,

8  sir.

9     Q.     When her camera was finally returned

10  later that night at the police station, did

11  Ms. TS allege that the glass was shattered, the

12  case was heavily scratched, and the batteries

13  and memory card had been removed?

14     A.     Yes.  There's an allegation of that,

15  yes, sir.

16     Q.     Now, if I could direct your attention

17  to the bottom of Page 10 of the special report.

18     A.     Page 10?

19     Q.     Yes, please.  Is this where Officer

20  McKay's response to those allegations can be

21  found?

22     A.     Yes.

23     Q.     And if you could direct your

24  attention to the second paragraph on the top of

William Fitchet
January 15, 2019

Page 88

1   Page 11, did Officer McKay claim that he seized

2   Ms. T's camera because her photography was,

3   quote, inciting the crowd?

4       A.     Yes.

5       Q.     And the fourth paragraph on Page 11,

6   did Officer McKay claim that he temporarily,

7   quote, placed the camera and -- there's some

8   ellipses here.

9              So he placed the camera, essentially,

10  on the trunk of the cruiser or a cruiser?

11      A.     Yes.

12      Q.     And did Officer McKay say that

13  another officer moved the cruiser, causing the

14  camera to fall to the ground?

15      A.     Yes.

16      Q.     In the last paragraph of Page 11, did

17  Officer McKay deny using the excessive force

18  described by Ms. TS?

19      A.     Officer McKay said that Mr. S was the

20  subject that was placed under arrest, was never

21  -- I think what he's saying is he was never near

22  or handcuffed him at that time.

23      Q.     Okay.

24      A.     And at no point did he observe any

William Fitchet
January 15, 2019

Page 89

1    officers punch, slap, or knee Mr. S in the groin

2    area.

3        Q.    Now, after you received this special

4    report from IIU, did you decide to issue Officer

5    McKay a charge letter?

6        A.    If you could refer me.

7        Q.    Sure.  I think we have Officer

8    McKay's conduct history behind Tab CC.  I'm

9    sorry.  CC, not C.

10            This would have been special order

11   09-243.

12       A.    Yes.

13       Q.    And based on Ms. TS's allegations,

14   could Officer McKay have been charged with

15   violating a number of department policies and

16   procedures?

17       A.    Yes.

18       Q.    Could he have been charged with

19   violating a rule that directs police officers in

20   arresting a person, no more force shall be used

21   than is absolutely necessary?

22            MS. deSOUSA:  Objection.

23            THE WITNESS:  Well, I'd have to

24       read the charge letter.  But I ...

**William Fitchet**
**January 15, 2019**

Page 90

```
 1            BY MR. RYAN:
 2       Q.    Well, let me ask you this, do you
 3   know what he was charged with?
 4       A.    I'd have to review it, sir.  I'm sure
 5   the charge letter is in here, is it?
 6       Q.    I'll represent to you I've never seen
 7   the charge letter.
 8       A.    Oh.  Well, apparently there was a
 9   charge letter issued and there was a hearing and
10   some charges were sustained.
11       Q.    Do you know what charges were brought
12   against him?
13       A.    I'd have to review the charge letter
14   to be sure, sir.
15       Q.    Sure.  Does it sometimes happen that
16   charges are brought against an officer and he'll
17   admit responsibility for one charge and then the
18   other charges, the department won't go forward
19   on?
20       A.    Not usually.  Usually they will go
21   forward on all the charges.  And the hearings
22   officer will make a determination on what is
23   sustained and what might not be sustained.
24       Q.    And following the decision that some
```

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

**William Fitchet**
**January 15, 2019**

Page 91

```
 1    of the charges were sustained in this case, does

 2    it indicate that Officer McKay received a letter

 3    of reprimand?

 4        A.    Yes, it does.

 5        Q.    And do you have any idea where that

 6    letter of reprimand is?

 7        A.    I don't know where it is right now,

 8    no, sir.

 9        Q.    I'll represent to you neither do I,

10    that it wasn't a part of Officer McKay's

11    personnel file.

12            MS. deSOUSA:  I'm going to

13        object.

14            THE WITNESS:  They have a right

15        to have reprimands removed from the file

16        after one year.  It's possible it could

17        be removed.  I don't know.  But I think

18        that was a collective bargaining

19        agreement that the union presented to

20        our collective bargaining unit.  And

21        there might be some disagreement about

22        it.  I think they have to petition the

23        commissioner.  I think they think they

24        can just make a demand that it be
```

William Fitchet
January 15, 2019

1      removed.

2              BY MR. RYAN:

3      Q.      And when it's removed, does the

4  person who issued the letter, in this case, you,

5  do you still maintain a copy of the letter, or

6  is it kind of erased from all existence?

7      A.      The intent is -- the intent is to

8  erase it so it does not prejudice the officer

9  for promotions or things of that nature.

10     Q.      Okay.

11     A.      So I don't think I would retain it,

12 to tell you the truth.

13     Q.      If I could draw your attention back

14 to Tab Y.

15     A.      Yes, sir.

16     Q.      Is this another special report dated

17 December 27, 2011?

18             MS. deSOUSA:  Note my continuing

19        objection to this, any questions

20        regarding this IIU investigation.

21             THE WITNESS:  The date is

22        December 27, 2011.

23             BY MR. RYAN:

24     Q.      And was this special report addressed

William Fitchet
January 15, 2019

Page 93

1    to you?

2        A.    Yes, sir.

3        Q.    And was this Special Order No. 11148

4    and Citizen Complaint No. 11-39?

5        A.    Yes, sir.

6        Q.    And drawing your attention to the

7    summary section of the report, did this

8    investigation begin when the IIU became aware of

9    a video that had been posted on You Tube?

10       A.    Yes.

11       Q.    Does the report indicate this video

12   is 1 minute and 27 seconds long?

13       A.    Yes.

14       Q.    And does it indicate that it shows

15   Officer McKay and two other patrolmen surrounded

16   by a large crowd?

17       A.    Yes.

18       Q.    Does the report state that on the

19   video Officer Raymond Sierra can be seen

20   spraying OC at an unknown female?

21       A.    Yes.

22       Q.    Does the report say that Officer

23   McKay can be seen pushing the female away?

24       A.    Yes.

William Fitchet
January 15, 2019

Page 94

1    Q.    Drawing your attention to the last

2    line of the third paragraph, does the IIU report

3    state, quote, the video should be seen in its

4    entirety?

5    A.    Yes.

6    Q.    Upon receiving this report, did you

7    watch the video?

8    A.    I don't recall watching it.

9    Q.    At this time I'm going to show you

10   video.

11         MS. deSOUSA:  Objection.

12         BY MR. RYAN:

13   Q.    And the first question I'm going to

14   have is whether you have -- if this video is

15   something you've previously seen.

16

17         [Video being played].

18

19         BY MR. RYAN:

20   Q.    Now, having just watched that video,

21   have you seen that video before?

22   A.    I don't recall seeing it, sir.

23   Q.    So this -- when you received this

24   report saying that the video should be viewed in

William Fitchet
January 15, 2019

Page 95

1    its entirety, did you direct that somebody else

2    should watch this video?

3        A.    I think I became aware that IIU

4    investigators reviewed it.

5        Q.    And after their review, the report

6    they submitted to you said that the video should

7    be watched in its entirety, correct?

8        A.    Yes.

9        Q.    So I guess my question is at that

10   point did anybody else watch the video?

11       A.    You're asking me to recall something

12   that's eight years old, seven or eight years

13   old, so I want to be careful in my answer, sir.

14   But I think it probably would have been referred

15   to the citizens review board and they would have

16   reviewed it.  That might be what he meant when

17   he said it should be reviewed in its entirety.

18   But I don't recall.  I'm not certain.  I don't

19   recall.

20       Q.    Okay.  So we previously talked about

21   a general order that you issued in March of 2010

22   saying all IIU cases will be viewed by the

23   community police hearing board.  Do you recall

24   that order?

William Fitchet
January 15, 2019

Page 96

1       A.      Yes.

2       Q.      And I'm going to ask if you can turn

3   to Exhibit Tab AA, Plaintiff's Exhibit No. 78.

4   This is the community police hearing board's

5   annual report for 2011.  Does it indicate it was

6   published on May 11, 2012?

7       A.      Yes, sir.

8               MS. deSOUSA:  And I have objected

9       to the admission of this document.

10              BY MR. RYAN:

11      Q.      And if you look at the report, is

12  Appendix 1 to this 17-page spreadsheet -- excuse

13  me.  Is Exhibit 1 to this report a 17-page

14  spreadsheet containing what CPH data on all 160

15  IIU cases the CPHB reviewed?

16      A.      What page are you referring to

17  exactly, sir?

18      Q.      It's Appendix 1.

19      A.      Here?

20      Q.      Yes.  It's towards the end of the

21  report.  You will see a spreadsheet.  It's like

22  an Excel spreadsheet.  And I will represent it's

23  15 or so pages in.  Yes.  That.

24      A.      Okay.

**William Fitchet**
**January 15, 2019**

1    Q.    So if you look at the heading in the

2    fifth column in, does it say "AO number"?

3    A.    Yes.

4    Q.    Is that for administrative order

5    number?

6    A.    Yes.

7    Q.    Or is that where special order

8    numbers would also fall under that

9    administrative order number category?

10   A.    Well, no.  It would be --

11   administrative order number, that would be the

12   number that was issued.

13   Q.    Right.

14   A.    And it would fall under that

15   category.

16   Q.    Okay.  If you look at CC number, is

17   that citizen complaint number?

18   A.    Yes.

19   Q.    And now, we talked earlier about this

20   case with the video had a Citizen Complaint

21   number of 11-39.  I will represent to you that

22   none of the 160 cases reviewed by the CPHB in

23   2011 had that number.  And I invite you, if you

24   want, to see if I'm correct about that.

William Fitchet
January 15, 2019

Page 98

1    A.    Well, I'd have to look through the

2    pages here to make sure.  What was it again?

3    1139?

4        Q.    1139.

5        A.    I don't see it, sir.

6        Q.    So if you could -- based on that,

7    does it appear that the CPHB did not review this

8    IIU investigation for Citizen Complaint 11-39?

9        A.    It appears it's not documented here

10   if they did.

11       Q.    All right.  Now, if you could go to,

12   again, to Tab CC.  I'm sorry.  CC.

13       A.    CC.

14       Q.    The last one.  I know we have a lot

15   of paper here.

16       A.    Yes, sir.

17       Q.    If you look at Special Order 11-148,

18   this anonymous citizen complained of 11-39

19   resulted in a finding of exonerated; is that

20   correct?

21       A.    Yes.

22       Q.    And that's a decision that you made?

23       A.    Well, ultimately, I would have made

24   it.

William Fitchet
January 15, 2019

Page 99

1      Q.      And but as you sit here today, you

2  have no recollection of ever seeing that video

3  before?

4      A.      No, I don't.  I don't.  It's possible

5  I did, but I don't have a recollection of it.

6  Don't recall it.

7      Q.      Based on what you saw in the video,

8  does it appear that the force that Officer McKay

9  used was appropriate?

10             MS. deSOUSA:  Objection.

11             THE WITNESS:  Are you sure that

12         was Officer McKay in the video?  I

13         thought it was Officer Sierra in the

14         video.

15             BY MR. RYAN:

16     Q.      Officer Sierra did the spray and

17  Officer McKay did the push.  Did Officer McKay's

18  push appear to be an appropriate use of force?

19     A.      I saw what I thought was some hands

20  by that woman reaching towards him.  I don't

21  know what it was.  It was very quick.  The video

22  wasn't perfect.  But it didn't seem to be

23  extremely excessive.  He definitely used his

24  hands.  I thought it was -- I didn't realize it

William Fitchet
January 15, 2019

Page 100

1   was McKay.  I thought I was looking at Officer

2   Sierra, to tell you the truth.

3        Q.      Okay.

4        A.      But it didn't appear to be extremely

5   excessive.

6        Q.      **Now, if I could direct your attention**

7   **back to Tab BB in this.**

8        A.      BB.

9        Q.      **It has previously been marked as**

10  **Plaintiff's Exhibit 39.  Is this another special**

11  **report directed to you as commissioner?**

12       A.      Yes.

13       Q.      **Date November 8, 2012?**

14       A.      Yes, sir.

15               MS. deSOUSA:  Note my continuing

16           objection to any questions relative to

17           this IIU investigation.

18               BY MR. RYAN:

19       Q.      **Drawing your attention to the summary**

20  **section on Page 1, was the complainant in this**

21  **case referred to as a woman named Ms. SM?**

22       A.      Yes.

23       Q.      **According to the last sentence of the**

24  **first paragraph of her statement, did she claim**

William Fitchet
January 15, 2019

1    that she called the police to report some

2    misbehavior by a next-door neighbor?

3         A.    Yes.

4         Q.    According to the next paragraph, when

5    Officer McKay and his partner arrived, did

6    Ms. SM allege that officers -- that she told

7    officers her side of the incident and returned

8    to her apartment?

9         A.    Yes.

10        Q.    Did Ms. SM tell investigators that,

11   quote, a short time later, the white male

12   officer, Officer Daniel McKay, entered her

13   apartment without permission and told her she

14   was under arrest?

15        A.    Yes.  That's what it says, yes.

16        Q.    Right.  According to Ms. SM, Officer

17   McKay was, quote, rough with her.  And when she

18   was brought out of the cruiser he shoved her

19   against the cruiser trying to get her inside and

20   she banged her head on the cruiser.  Is that

21   what she alleged?

22        A.    Yes.

23        Q.    And according to the first sentence

24   in the last paragraph of this page, did Ms. SM

William Fitchet
January 15, 2019

Page 102

1    acknowledge that she subsequently began yelling

2    in the back of the cruiser?

3        A.    Yes, she did say that.  Yes.

4        Q.    Did she say that this prompted

5    Officer McKay and his partner to stop the car

6    and to strike her and mace her?

7        A.    Yes.  It says, jabbing her with a

8    stick and sprayed with mace.

9        Q.    Now, if I can draw your attention to

10   Pages 15 and 16 of this special report, do these

11   pages contain Officer McKay's response to the

12   allegations?

13       A.    Yes, they do.

14       Q.    Does the first paragraph of Officer

15   McKay's statement indicate that he entered

16   Ms. SM's apartment without permission to place

17   her under arrest?

18       A.    Yes.

19       Q.    And at the top of Page 16, did

20   Officer McKay acknowledge stopping his cruiser

21   to deal with Ms. SM?

22       A.    Yes.

23       Q.    Did Officer McKay admit that his

24   partner punched their handcuffed prisoner in the

**William Fitchet**
**January 15, 2019**

Page 103

1    right side of her face?

2        A.    Yes.

3        Q.    And did Officer McKay also admit that

4    he subsequently sprayed OC in the face of their

5    handcuffed female prisoner?

6        A.    Yes.

7        Q.    Now, after receiving this IIU report,

8    is this another case that resulted in a finding

9    of not sustained against Officer McKay?  And

10   feel free to refer to Tab CC.  I'm sorry.  CC,

11   not C.  At the very end.  Yup.  This would be

12   special order 12-103.

13       A.    Yes.  It indicates not sustained,

14   sir.

15       Q.    Does it appear there was a hearing in

16   this case?

17       A.    I'd have to check, sir.

18       Q.    Now, again, if you could stick on Tab

19   CC for just a second.  I want to just talk about

20   one -- very briefly, one last occasion in 2010.

21   I'm sorry, Tab CC, the very last one, the

22   summary.

23           In 2010, did Captain Cheetham order

24   an investigation into Officer McKay's police

**William Fitchet**
**January 15, 2019**

Page 104

1   **work based on his review of a prisoner injury**

2   **report?**

3           MS. deSOUSA:  Objection.

4           THE WITNESS:  You're referring me

5       to this page right here, sir?

6           BY MR. RYAN:

7       **Q.    Yes.  If you look at the allegations.**

8   **Was there an occasion in 2010 where Captain**

9   **Cheetham ordered an investigation based on a**

10  **review of a prisoner injury report?**

11      A.    Yes, there was.

12          MS. deSOUSA:  Objection.  Are you

13      saying is that what is on this record;

14      is that what this record says?

15          MR. RYAN:  That's what the record

16      says.

17          MS. deSOUSA:  Do you want to look

18      at the record?

19          MR. RYAN:  Sure.

20          [As read]  Captain Cheetham

21      reported prisoner with injuries,

22      disposition exonerating, exonerated.

23          MS. deSOUSA:  There is nothing

24      saying a prisoner injury report.

William Fitchet
January 15, 2019

Page 105

```
 1              BY MR. RYAN:
 2      Q.      Let me rephrase that.
 3              Could you read what that notation on
 4   that document says with respect to Captain
 5   Cheetham?
 6      A.      [As read]  Captain Cheetham reported
 7   prisoner with injuries.
 8      Q.      And that's what launched another
 9   investigation with respect to Officer McKay?
10              MS. deSOUSA:  Objection.  And
11          note my continuing objection to any
12          questions regarding this incident.
13              THE WITNESS:  I'd have to look at
14          special order 10150 to be certain.  But
15          that's what this would indicate to me.
16              BY MR. RYAN:
17      Q.      Right.  And I'd like to just finish
18   up by returning to Tab AA, what's previously
19   been marked as Plaintiff's Exhibit No. 78.
20              MR. RYAN:  While you're getting
21          there I'd like to offer as actual
22          exhibits these four IIU reports that we
23          discussed in detail.  I know you object
24          to them but these are the four that I
```

**William Fitchet**
**January 15, 2019**

1    would be seeking to introduce.  They're

2    dated June 13, 2018, February 18, 2010,

3    December 27, 2011, and October 1, 2012.

4         MS. deSOUSA:  So my -- I do

5    object to them.  I filed a written

6    objection.  And my suggestion is that

7    you've protected the record and we allow

8    the judge to rule on it.

9         MR. RYAN:  That's fine.  So I

10   won't formally introduce these at this

11   time and we will await a ruling from the

12   Court.

13        MS. deSOUSA:  Thank you.

14        BY MR. RYAN:

15   Q.    So this document here, this annual

16   report from the community police hearing board,

17   we agree was published about eight months before

18   the incident on Daytona Street?

19   A.    Yes.

20   Q.    And if I could turn your attention to

21   Page 8 of that report.  Is this a section

22   entitled CPHB recommendations?

23   A.    Yes.

24   Q.    And if you could take a look at the

William Fitchet
January 15, 2019

Page 107

1    final bullet point at the bottom of Page 9.  The

2    next page over, Page 9.  Yes.

3            What was the last thing that the CPHB

4    recommended in May of 2012?

5       A.    Are you referring to the one that

6    starts on eight and goes to nine?

7       Q.    No.  The very last bullet point on

8    Page 9.

9            MS. deSOUSA:  Objection.

10           BY MR. RYAN:

11      Q.    And if you read the -- I'm sorry.  It

12   starts with a bullet point and then there's some

13   text afterwards.  But I'm mostly interested in

14   what the bullet point down on the bottom there

15   says.

16      A.    About the cameras?

17      Q.    Yes.

18      A.    [As read]  Recommends police

19   department expand the use of video cameras in

20   cruisers.  The CPHB recommends that the police

21   department expand the use of video cameras in

22   cruisers.  Contends that the cameras would

23   assist the City in protecting the patrol

24   officers from assaults and unfounded allegations

**William Fitchet**
**January 15, 2019**

Page 108

1    of police misconduct.  The video cameras may

2    also provide protection to civilians from police

3    misconduct.

4            According to a report of the

5    International Association of Chiefs of Police

6    studying the use of in-car cameras, 97 percent

7    of the citizens pool across the U.S. support the

8    use of in-car cameras for law enforcement.

9    While law enforcement views the acquisition of

10   camera technology as a means to demonstrate

11   their professionalism and increase officer

12   safety, the public views cameras as a means to

13   guard against abuse.  Despite the difference in

14   opinions, both the public and the police have

15   shown support to use the technology making the

16   acquisition and implementation of an in-car

17   camera program a win-win proposition for all.

18           According to IACP report, in

19   93 percent of the time a complaint is filed

20   regarding police misconduct and there is video

21   evidence available, the officer is exonerated.

22   See IACP's report on in-car cameras, 2004.

23       Q.     **Now, following this recommendation,**

24   **did the Springfield Police Department install**

William Fitchet
January 15, 2019

1   any additional video cameras in any cruisers?

2       A.      There was that test program that was

3   instituted, I'm going guess around 2012.  And

4   there's some collective bargaining agreements of

5   which I'm not really privy to right now

6   regarding installation of cameras and body

7   cameras.  I'm not really certain where that

8   stands right now, sir.

9       Q.      You testified before, just a second

10  ago, that the recommendation was to expand the

11  use of cruiser cameras.  So that pilot program

12  in that one particular cruiser, had that already

13  gotten off the ground by the time these

14  recommendations were made?

15      A.      I'd have to -- I'm not sure.  I'd

16  have to look at the dates to be sure if that had

17  started or not.  That was in the collective

18  bargaining agreement.

19      Q.      Right.  And from the eight months

20  from that recommendation to the incident at

21  Daytona Street, did the department install, on

22  any sort of widespread basis, video cameras in

23  any cruisers?

24      A.      Not that I'm aware of.

**William Fitchet**
**January 15, 2019**

Page 110

1       MR. RYAN:  Okay.  If I could just

2    have one second.

3       Ms. LeBoeuf reminded me just a

4    second ago that when you watched the

5    video that you hadn't seen before, that

6    there is sound to it that didn't come

7    through on the viewing that we had

8    before.  I'm going to just note that for

9    the record, that at this time, given the

10   fact that you hadn't seen the video

11   before, I'm not going to ask to replay

12   it.  If you want to replay it, by all

13   means, but at this time I have no

14   further questions for the witness.

15       THE VIDEOGRAPHER:  All in

16   agreement to go off the record?

17       MR. RYAN:  Sure.

18       THE VIDEOGRAPHER:  This is the

19   videographer.  We are now off the record

20   on January 15, 2019 at 12:34 p.m.

21

22       (Recess taken)

23

24       THE VIDEOGRAPHER:  We are now

William Fitchet
January 15, 2019

Page 111

1      back on the record on January 15, 2019

2      at 1:19 p.m.   This is a continuation of

3      the deposition of William Fitchet in the

4      matter of Lee Hutchins, Sr. versus

5      Daniel J. McKay, et al.

6

7

8    EXAMINATION BY MS. deSOUSA:

9

10      Q.      Commissioner Fitchet, I'm going to be

11   asking you some questions about the testimony

12   that you just gave in response to Attorney

13   Ryan's questions.   And in doing so I'm going to

14   be referring to the same documents that he did.

15           And for the record, my use of these

16   documents doesn't waive my objection to them,

17   but it is being done to protect the record.

18           So to start out with, Commissioner

19   Fitchet, I'm going to be discussing with you the

20   IIU investigation which carries the special

21   order No. 08-072 and 08-072A, which is included

22   in your three-ring binder at Tab B.

23           And to refresh your recollection,

24   this is the incident in which a Ms. T -- and I

William Fitchet
January 15, 2019

Page 112

1    apologize, I didn't write down the real names,

2    but Attorney Ryan knew -- Ms. T complained that

3    she was -- said she fell down stairs -- that

4    officers threw her down a flight of stairs

5    during an arrest.

6            Do you recall answering questions

7    about that episode?

8        A.    Yes, I do.

9        Q.    And in answer to Attorney Ryan's

10   questions, you went through some specific

11   statements that were given by various people,

12   the complainant, as well as some other people

13   who were attending the party that evening.

14           Do you recall that?

15       A.    Yes, counsel.

16       Q.    And but what you didn't go through

17   was the rest of that report, which involves

18   statements from lots and lots of officers who

19   responded to the scene; is that a fair

20   statement?

21       A.    Yes, it is.

22       Q.    And, in fact, Commissioner Fitchet,

23   doesn't this report bear out that the situation

24   that the officers responded to that night on the

William Fitchet
January 15, 2019

Page 113

1    north end of Main Street required the assistance

2    of multiple police cars; is that correct?

3        A.    Yes.

4        Q.    It wasn't simply one man who was

5    being arrested and then Ms. T interfering with

6    that; is that correct?

7        A.    That's correct.

8        Q.    And Ms. T states that she removed the

9    baton from the officer's hand.  Were you aware

10   of her making that admission?

11       A.    Yes.

12       Q.    And at the point that Ms. T removed

13   the baton from the officer's hands, had she

14   committed a crime?

15       A.    Yes.

16       Q.    And that would be interfering with a

17   lawful arrest; is that correct?

18       A.    Yes.  And perhaps -- perhaps assault

19   and battery on a police officer.

20       Q.    And are you aware that the officers

21   that responded to the scene were concerned

22   because more and more bystanders were coming in

23   response to the loud voices and the commotion

24   going on in the apartment?

**William Fitchet**
**January 15, 2019**

Page 114

1      A.      Yes.  It was a large disturbance.

2      Q.      **Why would officers be concerned about**

3  **bystanders coming into the situation?**

4      A.      For the very reason of interfering

5  with the arrest and with their duties, like

6  Ms. Tosoni did, and multiple fighting breaking

7  out.  And they had their hands full trying to

8  handle this disturbance.  They didn't need any

9  more people adding to the confusion.

10      Q.      **And at the Springfield Police**

11  **Department when someone is booked, booked in**

12  **after an arrest, there is usually, barring some**

13  **sort of mechanical failure, a booking video**

14  **available; is that correct?**

15      A.      Yes.

16      Q.      **And that video isn't just a video**

17  **during the booking procedure, there's also**

18  **audio; is that correct?**

19      A.      Yes.

20      Q.      **And in this case the booking video**

21  **was available and it was reviewed by the**

22  **officers charged with doing this investigation;**

23  **is that correct?**

24      A.      Yes.

William Fitchet
January 15, 2019

Page 115

1      Q.      And did you find it noteworthy that

2   in the booking video Ms. -- is it Tosoni?

3      A.      Tosoni.

4      Q.      -- Ms. Tosoni does not say she was

5   thrown down a flight of stairs?

6      A.      Correct.

7      Q.      In fact, she says they threw me to

8   the ground; is that correct?

9      A.      Yes.

10      Q.      And that was in her own words, that

11   was what was taken from the videotape, correct?

12      A.      Yes.

13      Q.      And the officers who were involved

14   that night, none of them said that Ms. Tosoni

15   was thrown down a flight of stairs; is that

16   correct?

17      A.      They did not.

18      Q.      In fact, there is a description of a

19   crowded hallway in which the officers are

20   attempting to remove Ms. Tosoni, she's at the

21   time under arrest and handcuffed, and another

22   officer or officers is attempting to subdue

23   another person who is being placed under arrest;

24   isn't that correct?

William Fitchet
January 15, 2019

Page 116

1        A.      Yes.

2        Q.      And it was a crowded and small area,

3    correct?

4        A.      Yes.

5        Q.      And one officer handed off Ms. Tosoni

6    to another officer to assist her in getting down

7    the stairs, and that's when she tripped,

8    according to the officers; is that correct?

9        A.      Yes.

10       Q.      And she doesn't trip down a flight of

11   stairs, the officers say she tripped or stumbled

12   down three or four stairs and hit her head

13   against the wall; is that correct?

14       A.      With the pavement, I think, yes.

15       Q.      And so it certainly isn't a situation

16   where there's verification that she was thrown

17   down a flight of stairs, correct?

18       A.      That's correct.

19       Q.      And all of those facts would have

20   been considered as well as the statements from

21   the folks who were at the party in making a

22   determination of what the next steps should be;

23   isn't that correct?

24       A.      Yes.

William Fitchet
January 15, 2019

Page 117

1      Q.      And is it significant or would it be

2   significant that the party goers who give

3   statements all state that they were drinking at

4   the time of the event?

5      A.      Yes.

6      Q.      And in your experience, sir, do

7   people under the influence of alcohol make

8   reliable witnesses?

9      A.      Not necessarily, no.

10     Q.      So an issue came up, Commissioner, in

11  answer to questions posed to you by Attorney

12  Ryan, and a distinction was drawn relative to

13  the police commission and at that time the chief

14  executive officer of the police department was

15  the police chief, and then by the time you

16  became the chief officer, you were referred to

17  as a police commissioner, correct?

18     A.      Yes.

19     Q.      And can you explain briefly to the

20  jury what that change from a police commission

21  and a chief to being police commissioner

22  entailed?

23     A.      It was a significant change in the

24  authority of the chief executive of the police

**William Fitchet**
**January 15, 2019**

Page 118

```
 1    department.  When the police commissioner --
 2    when the police commission was in effect, it was
 3    a five-member civilian commission.  They handled
 4    hirings, firings, promotions, budget, and a
 5    litany of other administrative duties, injured
 6    on duty, investigations, review internal affairs
 7    investigations.
 8            When that commission was dissolved,
 9    all that authority and power went to the police
10    commissioner.  Police commissioner did the
11    budget, the hiring, the firing, promotions,
12    discipline, and all the administrative functions
13    that was done by a five-member police
14    commission.  So it was a very significant
15    change.  And it was a heady job.  It was very,
16    very heady job that was evolving, even as the
17    assignment was made.
18            The control board was in effect in
19    Springfield at that time.  They worked closely
20    with the mayor.  But the changes were
21    significant.
22        Q.    So there's a couple things I'm going
23    to unpack on that, Commissioner.
24            So you refer to a control board.  And
```

William Fitchet
January 15, 2019

Page 119

1    for folks not from Springfield, could you

2    explain what you're referring to there?

3         A.    It was determined that Springfield

4    was insolvent.  They were going to go bankrupt.

5    And state legislature and the governor appointed

6    a control board that would handle the

7    administration of the City of Springfield

8    regarding the finances, and, in fact, a lot of

9    the administrative functions of the departments

10   within the police department.  It was a very

11   powerful board.  And they worked closely with

12   the mayor and with the city counsel.  But they

13   were really the authority in Springfield.

14            And I think under Mayor Ryan they had

15   a good working relationship, I believe, and did

16   their best to try to put Springfield back on

17   track financially and eventually accomplished

18   that.

19            When Mayor Sarno was elected, the

20   control board was still in effect and he worked

21   with them and eventually they were phased out

22   and we went back to representative government

23   with the mayor and with the city counsel.

24        Q.    Okay.  And the change from the

William Fitchet
January 15, 2019

Page 120

1  five-member civilian police commission to the

2  police commissioner occurred during the time

3  that the control board essentially was in charge

4  of the day-to-day operation of the city,

5  correct?

6      A.    Yes.

7      Q.    That was as a result of

8  recommendations from outside consultants; isn't

9  that correct?

10     A.    Yes, I believe it was.

11     Q.    And the five-person civilian control

12 board, they were volunteers; isn't that correct?

13     A.    The civilian commission?  Do you mean

14 the control board or commission?

15     Q.    I said control board, and thank you

16 for correcting me, I meant the police

17 commission.

18     A.    Yes, they were volunteers.  Yes.

19     Q.    So that was a lot of work to ask five

20 civilian volunteers to do; isn't that correct?

21     A.    All unpaid, yes.

22     Q.    So you answered some questions in

23 regard -- in response to questions posed to you

24 by Attorney Ryan that during times when you were

**William Fitchet**
**January 15, 2019**

1   a deputy chief or captain, you weren't

2   necessarily responsible for the IIU reviews and

3   recommendations, and is that because you were

4   speaking to the fact that at the time the

5   five-person police commission was still charged

6   with that responsibility?

7        A.     Yes.  I was trying to emphasize that

8   the police commission had the authority to hire,

9   fire, and discipline.  And as a deputy chief I

10  did review, but I didn't feel empowered to

11  discipline anyone.  I didn't have the authority

12  really to discipline anyone; the police

13  commission had that authority.

14       Q.     Now, you went over another complaint

15  that involved Mr. Officer Hervieux and that is

16  at Tab E.  And this is the incident with the

17  gentleman who was in a cell and Officer Hervieux

18  was one of the booking officers that night.

19            Does that comport with your knowledge

20  of that incident?

21       A.     Yes.

22       Q.     Now, first, before we get into any

23  more on this, if Officer Hervieux were assigned

24  to the booking area that night, would he be a

William Fitchet
January 15, 2019

Page 122

1   uniformed officer?

2        A.     Yes.

3        Q.     And so if the victim or alleged

4   victim stated that five ununiformed officers

5   came into his cell and beat him, would that

6   indicate to you that that would not have been

7   Officer Hervieux?

8        A.     Officer Hervieux would have been in

9   uniform.

10       Q.     Fair enough.  And it's true, is it

11  not, that the alleged victim, Mr. C, had been

12  arrested that night as a result of a violent

13  domestic incident involving both his then

14  girlfriend and his girlfriend's sister; isn't

15  that correct?

16       A.     Yes.

17       Q.     And he was put in the cell, and at

18  least according to Officer Hervieux and other

19  officers that were there that night, he came to

20  Mr. -- to Officer Hervieux's attention because

21  he was acting in a way that indicated that he

22  might be attempting self-harm, that he was

23  ripping his shirt up and attempting to hurt

24  himself with that; isn't that correct?

William Fitchet
January 15, 2019

Page 123

1    A.    Yes.

2    Q.    **And when officers become concerned**

3    **that a prisoner is or may be suicidal, did the**

4    **police department at that time have available to**

5    **them a special area that they could put the**

6    **prisoners?**

7    A.    They would put the prisoner in a cell

8    and then post the cell with an officer.  And

9    that would be a special cell that was near the

10   booking desk so it could be observed by other

11   officers as well.

12   Q.    **And, in fact, that was what the**

13   **officers stated they were attempting to do,**

14   **correct, they were attempting to move Mr. C to a**

15   **--  to that designated cell for his own**

16   **protection, correct?**

17   A.    Yes.  Referred to as a Q-5 cell.

18   Q.    **During the time he was being moved,**

19   **he became assaultive and combative; isn't that**

20   **correct?**

21   A.    Yes, ma'am.

22   Q.    **And then another officer, in**

23   **responding to that -- I'm sorry.  Strike that.**

24        **That Mr. C began biting another**

**Catuogno Court Reporting - A Service of InfraWare**
**Springfield, MA  Worcester, MA  Boston, MA  Providence, RI**

William Fitchet
January 15, 2019

Page 124

1    officer who was attempting to assist in the

2    transfer of Mr. C to the suicide watch cell,

3    correct?

4       A.    Yes.

5       Q.    And it was then that the other

6    officer struck him with a closed fist, correct?

7       A.    Yes.

8       Q.    And then following that he required

9    medical treatment and that was all documented,

10   correct?

11      A.    Yes, it was.

12      Q.    Now, in addition to talking to the

13   purported victim and to the officers that night,

14   as part of their investigation, the

15   investigating officers for the IIU reached out

16   to at least two other men who were being held in

17   cells that evening; is that correct?

18      A.    Yes.

19      Q.    And they also agreed that Mr. C was

20   causing a commotion, yelling, and was otherwise

21   acting out while in the cell, correct?

22      A.    Correct.

23      Q.    And would their testimony be

24   persuasive in that they sort of have no dog in

William Fitchet
January 15, 2019

Page 125

1    the fight?

2        A.     I would say that they just probably

3    gave their observations and testimony to the

4    investigators.

5        Q.     **And would all of those facts have**

6    **contributed to the determination of the**

7    **disposition in this matter?**

8        A.     All of that would have contributed,

9    yes.

10       Q.     **And to be fair, this is a 28 or 29**

11   **page report, and between Attorney Ryan and I**

12   **we've just sort of skimmed through it; is that**

13   **true?**

14       A.     Yes.  That's a very comprehensive

15   report.

16       Q.     **Fair enough.  Now I'm going to ask**

17   **that we flip to Tab K, which is one of the**

18   **documents from the -- from Officer Hervieux's**

19   **service in the Army that was referred to by**

20   **Attorney Ryan.**

21              **But before we get into that document,**

22   **Commissioner, are you, yourself, a veteran?**

23       A.     Yes.

24       Q.     **And when did you serve?**

William Fitchet
January 15, 2019

```
 1      A.      1969, 1970, 1971.

 2      Q.      And in what branch?

 3      A.      United States Marine Corps.

 4      Q.      Were you deployed?

 5      A.      Yes.

 6      Q.      And that was during the Vietnam War?

 7      A.      Yes.

 8      Q.      So you're a combat veteran?

 9      A.      A Vietnam veteran, yes.

10      Q.      So having said that, do you consider

11   yourself having any particular expertise in

12   reading or interpreting Army records from 2011?

13      A.      No.

14      Q.      And turning to Tab K, which you went

15   over with Mr. Ryan, the document that was

16   provided to the Springfield Police Department

17   says, you are released from active duty not by

18   reason of physical disability.

19              Did I ready that correctly?

20      A.      Yes.

21      Q.      So there was nothing in this form

22   that would have indicated to you that at least

23   by October of 2011, he was being separated from

24   the military service because of any physical
```

William Fitchet
January 15, 2019

Page 127

1   harm or disability, correct?

2        A.     Correct.

3        Q.     And you were also asked some

4   questions, a series of questions by Attorney

5   Ryan relative to a possibility that

6   Mr. Hervieux, Officer Hervieux may have had a

7   head injury; do you recall those questions?

8        A.     Yes, I do.

9        Q.     And so you don't have any medical

10  training; is that true?  Well, I suppose you do.

11  I'm sorry.  Strike that.

12              You're not trained as a neurologist;

13  is that correct.

14       A.     No, I'm not.

15       Q.     Or have any training in neurology?

16       A.     No.

17       Q.     And as we sit here and as you sat

18  there answering Attorney Ryan's questions, do

19  you have any knowledge of what a traumatic brain

20  injury or TBI, what does that encompass; do you

21  know?

22       A.     I'm not an expert on that, no.

23       Q.     And is it true that that would

24  include a concussion?

William Fitchet
January 15, 2019

1      A.      I suppose it could.

2      Q.      And lots of people have concussions;

3  we can agree on that, correct?

4      A.      Yes.

5      Q.      And, in fact, I guess most folks who

6  played football end up with some level of a

7  concussion; isn't that correct?

8      A.      Yes.

9      Q.      And you have no reason to believe

10 that somebody who has a traumatic brain injury

11 is unfit to serve as a Springfield Police

12 Officer; is that correct?

13     A.      I have no expertise on the field, no.

14     Q.      And you also stated that it would be,

15 in your opinion, beneficial to have officers

16 returning from active duty to have services

17 available to them to the extent that they may

18 have battle-related issues including

19 post-traumatic stress disorder; is that correct?

20     A.      Yes.

21     Q.      And which is commonly referred to as

22 PTSD, correct?

23     A.      Yes.

24     Q.      And you are not an expert in PTSD,

William Fitchet
January 15, 2019

Page 129

1   are you?

2      A.      No.

3      Q.      And you haven't had any training in

4   treatment for PTSD, correct?

5      A.      No.

6      Q.      And unless there was reason for the

7   Springfield Police Department to believe that

8   PTSD, or for that matter, any other medical

9   condition was interfering with an officer's

10  ability to perform his job, you wouldn't have

11  any right to inquire about whether or not an

12  officer had that diagnosis; isn't that correct?

13     A.      I believe it would be protected.

14     Q.      Sure.  And you are trained or you

15  were trained in your position as commissioner

16  about the laws protecting people's privacy for

17  their medical information?

18     A.      Yes.

19     Q.      And you would at least consider that

20  to be protected information that you had no

21  right to inquire about, correct?

22     A.      I didn't think I personally had a

23  right to inquire, no.

24     Q.      Okay.  And it's not uncommon for

**William Fitchet**
**January 15, 2019**

Page 130

1    officers to have PTSD; is that also true?

2        A.    That is true.

3        Q.    And so would it also be your opinion,

4    sir, that police officers, in general, should

5    have access to counseling and services for PTSD

6    should they or their medical providers deem that

7    necessary?

8        A.    Yes.

9        Q.    Okay.  I'm now going to ask that we

10   talk about the level of force policy that you

11   talked about on direct exam with Attorney Ryan

12   which is located at Tab N.  And that's I guess a

13   five-page policy; is that correct?

14       A.    Yes.

15       Q.    And the escalation of force that is

16   discussed in Roman numeral 8 on Page 2 and

17   continuing through Pages 3, 4, and 5, that is --

18   although this policy, I guess, was written down

19   in 2015, that escalation of force has been well

20   known to police officers for a substantial

21   period of time; isn't that correct?

22       A.    Yes.

23       Q.    And, in fact, it is part of officers'

24   training and in the academy before they are

William Fitchet
January 15, 2019

Page 131

1   sworn in as police officers on the escalation of

2   force; isn't that correct?

3      A.     Yes.

4      Q.     And the touchstone of all force,

5   whether it fits neatly into one of these

6   categories or not, is reasonableness under the

7   circumstances, correct?

8      A.     Reasonable force, yes.

9      Q.     And the paramount concern of officers

10  when they are in a situation where force is

11  required is safety of the person that they're

12  attempting to subdue, the safety of themselves,

13  and the safety of the general public; isn't that

14  correct?

15     A.     Yes.

16     Q.     And officers are trained, are they

17  not, to use enough force to neutralize that

18  threat?

19     A.     Correct.

20     Q.     And I just wanted to make one other

21  point.  They use very specific examples, so if

22  we look at Level C, which is on Page 4, and they

23  say compliance techniques, baton control

24  techniques, et cetera, it's introduced as

William Fitchet
January 15, 2019

1    included but not limited to; is that correct?

2        A.    Yes.

3        Q.    So this is a good example of the

4    kinds of things that they're suggesting, but

5    they're not saying these are the only types of

6    force that would be appropriate; isn't that

7    correct?

8        A.    Yes.  There are several types, yes.

9        Q.    Okay.  So now if we could,

10   Commissioner, how long -- can you refresh my

11   recollection on what dates you were the

12   commissioner?

13       A.    I became an acting commissioner on

14   July 1, 2005.  I reverted back to deputy chief

15   of police in March of 2006.  Then I became

16   acting police commissioner again January 2008

17   and was permanently assigned police commissioner

18   in April of 2008 until my retirement, which

19   would have been May 31, 2014.

20       Q.    Okay.  Thank you.

21             And during that time, Commissioner,

22   did you have an opportunity to review cases

23   where citizens were complaining of excessive

24   force or unreasonable force on behalf of our

William Fitchet
January 15, 2019

Page 133

1    officers?

2         A.     Yes.

3         Q.     **And was it relatively often?**

4         A.     It was fairly frequent, yes.

5         Q.     **And in that role, did you ever**

6    **discipline officers for that?**

7         A.     Yes, I did.

8         Q.     **And did that discipline ever rise to**

9    **a level of firing them?**

10        A.     Yes.

11        Q.     **And I'm not asking for an exact**

12   **number, but can you give me a sense or can you**

13   **remember how many officers were actually fired**

14   **on your watch for incidents arising from**

15   **complaints of excessive force?**

16        A.     I can remember Officer Mendes was

17   fired for excessive force, Officer Feliciano was

18   fired for excessive force, Officer Asher was

19   fired for excessive force.  I can remember three

20   other officers that received significant

21   disciplinary action, not firing but suspensions:

22   Lieutenant Bobianski received significant

23   suspension.  Officer Truoiolo received a

24   significant suspension.  I think that was

William Fitchet
January 15, 2019

Page 134

1    flipped by civil service or an arbitrator,

2    however.  And Officer Sedergren received

3    significant suspension for excessive force.

4            And there were other officers that

5    have received reprimands, maybe one or two days

6    suspensions.  I don't recall all of them.  Those

7    ones are -- I can recall pretty significantly

8    because they were so serious, the violations

9    were so serious.

10   **Q.      And it's true, Commissioner, that**

11   **other members of the Springfield Police**

12   **Department, the officers under you, they were**

13   **also well aware that officers were discharged as**

14   **a result of complaints for excessive force?**

15           MR. RYAN:  I'd object.

16           You can, obviously, answer.

17           THE WITNESS:  They would be

18      aware, yes.

19           BY MS. deSOUSA:

20   **Q.      Okay.  Now I'd like to look at the**

21   **two IIU records of Officer McKay that you went**

22   **over with Attorney Ryan.  And one is located at**

23   **Tab V.**

24           **And so this is a very lengthy IIU**

William Fitchet
January 15, 2019

Page 135

1    report, isn't it?  It's 37 pages long, correct?

2         A.    Yes.  That's correct.  It might be

3    38.  No.  I'm sorry.  It's 37.  Yes.  37.

4         Q.    And this is the matter that involved

5    a woman who reported that she had seen what she

6    believed to be excessive force and that she had

7    taken cell phone video of it and that an officer

8    later identified as Officer McKay took her phone

9    away from her; do you recall that?

10        A.    Yes, I do.

11        Q.    Okay.  And in response to your review

12   of this with Attorney Ryan, Attorney Ryan

13   suggested that based upon this report, I guess,

14   that Officer McKay might have received

15   discipline for excessive force; do you recall

16   that question from Mr. Ryan?

17        A.    Yes.

18        Q.    But -- and again, this is a lengthy

19   investigation, but it's true, is it not, that

20   although the woman whose phone was taken

21   believed that there was excessive force, the

22   alleged victim did not cooperate with this

23   investigation; isn't that correct?

24        A.    Yes.

William Fitchet
January 15, 2019

Page 136

1      Q.     And other officers that were on the

2  scene that night did not -- their testimony did

3  not comport with that of Ms. TS's observations

4  with regard to Officer McKay's interaction of

5  the victim with excessive force, correct?

6      A.     Correct.

7      Q.     And so this incident occurred outside

8  of a nightclub in downtown Springfield, correct?

9      A.     That's correct.

10     Q.     And that area of town, at least at

11 the time, was commonly referred to as the

12 entertainment district, correct?

13     A.     Yes.

14     Q.     And there were several, relatively --

15 just a couple of blocks, several large

16 nightclubs that held hundreds of patrons in a

17 relatively small geographic area, correct?

18     A.     Yes.

19     Q.     And were you aware at the time,

20 Commissioner, of some incidents that had

21 occurred at the entertainment district outside

22 of these various nightclubs at or around closing

23 time?

24     A.     Many, many incidents, yes.

William Fitchet
January 15, 2019

Page 137

1    Q.    In fact, there was significant public

2  safety concerns at that time in the city because

3  of the violent incidents that were breaking out

4  outside the nightclubs at closing time, correct?

5    A.    That's correct.

6    Q.    And the night that this episode

7  involving this woman's phone occurred, there

8  were multiple complaints that night of fighting

9  and potential violence in the crowd outside of

10  the Skyplex that night; isn't that correct?

11    A.    Yes.

12    Q.    And, in fact, it's true, is it not,

13  that at least one gun was recovered during the

14  investigation of the events that led to police

15  down there that night?

16    A.    A Smith and Wesson weapon was

17  recovered, 9 millimeter handgun.

18    Q.    And there was a lot of people in that

19  area who had been drinking, civilians who had

20  been drinking and who were milling about and

21  there were fights breaking out, correct?

22    A.    Yes.

23    Q.    And there were multiple arrests made

24  that night, correct?

**William Fitchet**
**January 15, 2019**

Page 138

```
 1      A.      Multiple disturbances with subsequent
 2   arrests made, yes.
 3      Q.      And we could go through and count it,
 4   I guess, but it's fair to say, is it not, that
 5   there were, you know, multiple officers on the
 6   scene?
 7      A.      Many officers were deployed in that
 8   area, yes.
 9      Q.      And the ultimate determination on
10   this case related only to the removal of this
11   woman's cell phone, which was subsequently
12   damaged, because that was the only part of this
13   complaint that was really substantiated,
14   correct?
15      A.      Yes.
16      Q.      And Officer McKay was disciplined as
17   a result of that?
18      A.      Yes.
19      Q.      So then the other -- I keep
20   forgetting what Tab it's at.  Just give me one
21   moment.  M.  Tab M.  Just give me one moment,
22   please.  I'm sorry.  That's not -- we've already
23   reviewed that one.
24              That's the one involving Officer
```

William Fitchet
January 15, 2019

Page 139

```
 1   Hervieux, Tab Y.

 2        A.     Y?

 3        Q.     Y.   This incident is the one that you

 4   watched the video on.   Do you recall that?

 5        A.     Yes.

 6        Q.     Now, this incident also grew out of

 7   -- strike that.

 8               This incident also occurred after

 9   closing time in the entertainment district;

10   isn't that correct?

11        A.     Yes.

12        Q.     In fact, you can see one of the

13   nightclubs, Adolfo's, in the background, can you

14   not?

15        A.     Yes.

16        Q.     And it's a very short snippet of that

17   evening, but the videotape shows a lot of people

18   milling about, correct?

19        A.     Yes.

20        Q.     And you started to answer Attorney

21   Ryan's question about reviewing that, and you

22   said you thought you saw someone's arm going in.

23   Do you recall saying that?

24        A.     Yes.
```

William Fitchet
January 15, 2019

Page 140

1    Q.      And can you tell the jury what did

2    you mean by that, you saw someone's arm going

3    in?

4    A.      It was very quick.  And I didn't

5    study the video.  I only saw it that one time.

6    But it looked like a woman's arm reached towards

7    the officer and that the officer's response was

8    to push her away.  That's what it looked to me

9    initially.

10    Q.      Okay.

11    A.      But I'd like to study it again to be

12    sure.

13    Q.      And there's a large crowd milling

14    about and somebody puts their arm out towards an

15    officer, would pushing them away be considered a

16    reasonable response?

17    A.      I think so.

18    Q.      And from that video -- I'm not sure

19    if you could tell or not -- but were you able to

20    see that a different officer than the one who

21    pushed did a short burst of OC spray?

22    A.      I know that's what it says.  I didn't

23    really -- I couldn't really tell in the video.

24    I couldn't be sure.

William Fitchet
January 15, 2019

Page 141

```
 1        Q.      Fair enough.  But that is what

 2   they -- you anticipated my next question.

 3               That is what the IIU investigation

 4   determined, correct?

 5        A.      Yes.

 6        Q.      And so this was exonerated because

 7   the officers acted appropriately, correct?

 8        A.      Yes.  And I think for some other

 9   reasons too, that we didn't have a particular

10   complainant come forward that we could

11   interview; we had a You Tube video.

12        Q.      And it was also a relatively short

13   shot of what I'm guessing was a much longer

14   event, correct?

15        A.      Yes.

16               MS. deSOUSA:  That's all I have.

17

18

19   CONTINUED EXAMINATION BY MR. RYAN:

20

21        Q.      So briefly, Commissioner, I think you

22   testified with respect to this incident with Ms.

23   Tosoni.  Incidentally, is Ms. Tosoni the

24   daughter of a Springfield Police Officer?
```

William Fitchet
January 15, 2019

Page 142

1        A.      I believe it's Tosoni.

2        Q.      **Tosoni.**

3        A.      And if it is, I believe she is.   I

4    believe so.

5        Q.      **Now, you testified that when she**

6    **grabbed an officer's nightstick, she had**

7    **committed at least the crime of resisting arrest**

8    **or possibly assault and battery on a police**

9    **officer?**

10       A.      Possibly.   It's possible.

11       Q.      **Would you agree with me that an**

12   **individual has a legal right to resist an arrest**

13   **if the officer who's effectuating the arrest is**

14   **using excessive force?**

15       A.      Yes.

16       Q.      **Now, you testified with respect to**

17   **the Cotto case about the interviews that were**

18   **conducted with some of the other people that**

19   **were in custody; do you recall that?**

20       A.      Yes.

21       Q.      **And I believe you or Ms. deSousa, I**

22   **apologize, said that these were individuals who**

23   **didn't necessarily have a dog in the fight; do**

24   **you recall that?**

William Fitchet
January 15, 2019

Page 143

```
 1        A.      Yes, I do.

 2        Q.      If you could turn to Tab E in your

 3   book on Page 4.  At the bottom of the page does

 4   it appear that there was an individual, Mr. RT,

 5   who was in Cell M12 at the time?

 6        A.      Yes, sir.

 7        Q.      And when he was interviewed, did he

 8   indicate that he heard a guy yelling that the

 9   police were beating him up?

10        A.      Yes.

11        Q.      And did Mr. T say that it sounded

12   like, quote, they were putting it on him pretty

13   bad, end quote.

14        A.      Yes.

15        Q.      And if you flip ahead to the next

16   page, the fourth interview down, there's an

17   indication of a Mr. SR.  And in the second

18   paragraph did he indicate that he, quote, heard

19   a man yelling for them to stop?

20        A.      That's Paragraph 4; is that correct?

21        Q.      I'm going to say it's the second

22   paragraph.  It's the fourth person who's

23   interviewed, Mr. SR of Springfield, Mass during

24   a telephone interview.
```

William Fitchet
January 15, 2019

Page 144

```
 1      A.      You said FR, Foxtrot, Romeo?

 2      Q.      SR.  Sorry.

 3      A.      Oh, SR.  I see that, yes.  Yes, I see

 4   it.

 5      Q.      He said that he never saw the police

 6   hitting anyone, but he heard a man yelling for

 7   stop and stated that he knows they, quote,

 8   whooped him; do you see that?

 9      A.      Yes.

10      Q.      Now, you testified that you're not a

11   neurologist, correct?

12      A.      No, I'm not.

13      Q.      And you have no particular expertise

14   in traumatic brain injuries, correct?

15      A.      That's correct.

16      Q.      If you had known that one of your

17   officers returning from a deployment in a combat

18   zone came back with a traumatic brain injury,

19   would you have consulted with an expert in that

20   field to determine whether or not this

21   individual was -- might pose some risk to either

22   himself or the citizens that he was there to

23   protect and serve?

24              MS. deSOUSA:  Objection.
```

William Fitchet
January 15, 2019

```
                                                   Page 145
 1                THE WITNESS:  Yes, I would.
 2                MR. RYAN:  Okay.  Let me just
 3        have a minute.
 4                I don't have any further
 5        questions.  Thank you, Commissioner.
 6                THE WITNESS:  Yes, sir.
 7                MS. deSOUSA:  I have two.
 8
 9
10      CONTINUED EXAMINATION BY MS. deSOUSA:
11
12        Q.     Attorney Ryan drew your attention to
13      Tab E, Page 4.  And he read to you part of what
14      Mr. RT allegedly told -- or reportedly told the
15      IIU.
16                Mr. RT also states in -- or this
17      record reflects that he stated he never
18      personally saw the beating, correct?
19        A.     That's correct.
20        Q.     He also never saw anyone brought to
21      another cell, correct?
22        A.     Correct.
23        Q.     And he also says that the next day
24      when he was speaking with other prisoners, he
```

William Fitchet
January 15, 2019

Page 146

```
 1    stated that, quote, the little Spanish dude with

 2    the black eye said nothing, close quote.  And

 3    Mr. T then further stated that a couple of

 4    other, quote, Spanish dudes, close quote, said

 5    that the guy was fighting with the police so

 6    they had to beat him up; isn't that correct?

 7        A.     Yes.

 8        Q.     And turning to the next page,

 9    Mr. Ryan brought your attention to the statement

10    of a Mr. SR.  And the -- and he read part of

11    that to you or had you refer to part of it.

12             The person conducting the

13    investigation also noted, did they not, Mr. R

14    appeared to be playing to an audience on his

15    side of the telephone receiver.  He would laugh

16    and make side comments while voices could be

17    heard in the background.  He stated that he did

18    not want to get involved and refused to make a

19    statement.  He further stated that he is, quote,

20    too humble, close quote, for that; isn't that

21    correct?

22        A.     Yes.

23        Q.     And also the investigator made note

24    of the fact that the cell that Mr. R occupied
```

William Fitchet
January 15, 2019

Page 147

1    would have had no view of the cell that Mr. C

2    was in; isn't that correct?

3         A.     Yes.

4              MS. deSOUSA:  That's all I have.

5              THE VIDEOGRAPHER:  All in

6         agreement to go off the record?

7              MR. RYAN:  Yes.

8              THE VIDEOGRAPHER:  This is the

9         videographer.  We are now off the record

10        on January 15, 2019 at 2:06 p.m.

11

12             (Deposition concluded at 2:06 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

**William Fitchet**
**January 15, 2019**

Page 148

1    I, LISA A. REGENSBURGER, a Notary Public in

2    and for the Commonwealth of Massachusetts, do

3    hereby certify that WILLIAM J. FITCHET, whom was

4    satisfactorily identified, came before me on

5    January 15, 2019, at Springfield City Hall, 36

6    Court Street, Springfield, Massachusetts and was

7    by me duly sworn to testify to the truth and

8    nothing but the truth as to his knowledge

9    touching and concerning the matters in

10   controversy in this case; that he was thereupon

11   examined upon his oath and said examination

12   reduced to writing by me; and that the statement

13   is a true record of the testimony given by the

14   witness, to the best of my knowledge and

15   ability.

16    I further certify that I am not a relative or

17   employee of counsel/attorney for any of the

18   parties, nor a relative or employee of such

19   parties, nor am I financially interested in the

20   outcome of the action.

21    WITNESS MY HAND this 17th day of January, 2019.

22   Lisa A. Regensburger   My Commission expires:

23   Notary Public            March 30, 2023

24   Lisa Regensburger

**William Fitchet**
**January 15, 2019**

Page 149

1   Today's date:          January 17, 2019

2   To:                    Lisa C. deSousa, Esq.

3   Copied to:             Luke Ryan, Esq.

4   From:                  Lisa A. Regensburger

5   Deposition of:         William J. Fitchet

6   Taken:                 January 15, 2019

7   Action:                Hutchins v McKay, et als

8

9       Enclosed is a copy of the deposition of

10  William J. Fitchet.  Pursuant to the Rules of

11  Civil Procedure, Mr. Fitchet has thirty days to

12  sign the deposition from today's date.

13      Please have Mr. Fitchet sign the enclosed

14  signature page.  If there are any errors, please

15  have him mark the page, line, and error on the

16  enclosed correction sheet.  He should not mark

17  the transcript itself.  This addendum should be

18  forwarded to all interested parties.

19      Thank you for your cooperation in this

20  matter.

21

22

23

24

**William Fitchet**
**January 15, 2019**

```
                                              Page 150

 1                 U.S. DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4                    No. 16-CV-30008

 5

 6

 7   ******************************************

 8   LEE HUTCHINS, SR.,

 9            Plaintiff

10      vs.

11

12   DANIEL J. McKAY, et als,

13            Defendants

14   ******************************************

15

16      I, William J. Fitchet, do hereby certify,

17   under the pains and penalties of perjury, that

18   the foregoing testimony is true and accurate, to

19   the best of my knowledge and belief.

20      WITNESS MY HAND, this    day of    , 2019.

21

22            _____

23                 William J. Fitchet

24   las
```

**William Fitchet**
**January 15, 2019**

Page 151

1                         CORRECTION SHEET

2     DEPONENT: William J. Fitchet

3     CASE: Hutchins v McKay, et als

4     DATE TAKEN: January 15, 2019

5     *************************************************

6     PAGE /LINE /CHANGE OR CORRECTION AND REASON

7     _____/_____/_____

8     _____/_____/_____

9     _____/_____/_____

10    _____/_____/_____

11    _____/_____/_____

12    _____/_____/_____

13    _____/_____/_____

14    _____/_____/_____

15    _____/_____/_____

16    _____/_____/_____

17    _____/_____/_____

18    _____/_____/_____

19    _____/_____/_____

20    _____/_____/_____

21    _____/_____/_____

22    _____/_____/_____

23    _____/_____/_____

24    _____/_____/_____