IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


```
* * * * * * * * * * * *    16CV30008-NMG
LEE HUTCHINS              *
                          *
VS.                       *    JANUARY 24, 2019
                          *    9:16 A.M.
DANIEL McKAY, et al       *
                          *
* * * * * * * * * * * *    BOSTON, MA
```


BEFORE THE HONORABLE NATHANIEL M. GORTON

DISTRICT JUDGE

(Jury Trial - Day 3)


**APPEARANCES**:


FOR THE PLAINTIFF:      LUKE F. RYAN, ESQ.
                        SAMANTHA LEBOEUF, ESQ.
                        DAVID P. HOOSE, ESQ.
                        Sasson, Turnbull & Hoose
                        100 Main Street
                        Third Floor
                        Northampton, MA  01060


FOR THE DEFENDANTS,
McKAY AND HERVIEUX:     KEVIN B. COYLE, ESQ.
                        935 Main Street
                        Springfield, MA  01103

FOR THE DEFENDANT,
ROMERO:                 KATHLEEN E. SHEEHAN, ESQ.
                        Keyes & Donnellan
                        293 Bridge Street, Suite 600
                        Springfield, MA  01103

**APPEARANCES** (Cont'd):

FOR THE DEFENDANT,       LISA C. deSOUSA, ESQ.
CITY OF SPRINGFIELD:     JEREMY SAINT LAURENT, ESQ.
                         City of Springfield
                         36 Court Street
                         Springfield, MA  01103

                         Debra D. Lajoie, RPR-FCRR-CRI-RMR
Court Reporter:          One Courthouse Way
                         Boston, MA  02210


             Proceeding reported and produced
              by computer-aided stenography

1                              <u>I N D E X</u>

2       <u>PLAINTIFF WITNESS</u>                           <u>PAGE</u>

3       <u>Lee Hutchins</u>
        Continued Direct Examination by Mr. Ryan          13
4       Cross-examination by Ms. deSousa                   36
        Cross-examination by Ms. Sheehan                   66
5       Redirect Examination by Mr. Ryan                   87
        Recross Examination by Ms. deSousa                 91
6       Recross Examination by Ms. Sheehan                 91

7

8                          <u>E X H I B I T S</u>

9

        <u>NUMBER</u>                      <u>FOR ID</u>     <u>IN FULL</u>
10
        78 and 79                                          12
11      80                                                 30
        125 and 126                                        34
12      25 and 27                                          90
        147-152                                            94
13

14

15

16

17

18

19

20

21

22

23

24

25

1    24 JANUARY 2019 -- 9:16 A.M.

2              (The jury is present for the following)

3          THE COURT:  Good morning, Jurors.  Welcome back.

4    We're ready to resume.  Mr. Hutchins will re-take the

5    witness stand, please.

6          MR. RYAN:  Your Honor, two things.  One, I think

7    Ms. deSousa and Ms. Sheehan are not present at the

8    moment.

9          THE COURT:  Are they expected?

10         MR. COYLE:  They're in the hallway, Your Honor.

11   We sent somebody out for them.  We didn't realize you

12   were coming on the bench right now.

13         MR. RYAN:  And, second, Your Honor, having

14   spoken to defense counsel, I think, by agreement, we're

15   going to interrupt Mr. Hutchins' testimony to introduce

16   the video testimony of William Fitchet.

17         THE COURT:  All right.  Then, Jurors, sometimes

18   this happens where it is more convenient to interrupt

19   somebody's testimony midstream, so we're going to have

20   the Plaintiff's presentation of a video deposition; is

21   that correct, Mr. Ryan?

22         MR. RYAN:  That's correct, Your Honor.

23         THE COURT:  And then after that is done, we'll

24   resume with Mr. Hutchins' testimony.  You may be

25   seated.

1           Anything else that needs to come to my attention

2   before we proceed?

3           MR. RYAN:  Just, I think, as Your Honor's well

4   aware, that the video I think has -- had some

5   extraneous things removed.  I just ask that the --

6   nobody draw any inferences or conclusions from the

7   video presentation that's just been slightly edited

8   to --

9           THE COURT:  Yes.  Some of the matters that

10   occurred during this deposition have been deleted by

11   order of the Court, so there'll be some interruptions,

12   as you'll see.  Don't worry about that at all.

13           You may proceed, Mr. Ryan.

14           MR. RYAN:  Thank you.

15           (Video played)

16           THE COURT:  We need to stop the tape for a

17   moment.

18           MS. deSOUSA:  Could we have a brief recess,

19   Your Honor?

20           THE COURT:  Yeah, we'll take a brief recess.

21   I'm going to stay on the bench.  You know, we'll be

22   here for five minutes.

23           (Recess, 9:40 a.m.)

24           (Resumes, 9:48 a.m.)

25           MS. deSOUSA:  Your Honor, could I be heard at

1    sidebar for a moment?

2           THE COURT:  Yes.

3           (Discussion at sidebar)

4           THE COURT:  Ms. deSousa?

5           MS. deSOUSA:  Attorney Sheehan has called her

6    doctor and is having a prescription called in on an

7    emergency basis to the CVS near here.  The Courtroom's

8    very dry, and it's exacerbating it.  There's no reason

9    for her to be present during this.  It was my

10   deposition, so with the Court's permission, I'd like to

11   get some of her things together, bring them out to her,

12   and have her excused from sitting in the courtroom

13   during the transcript.

14          THE COURT:  For the rest of the day or just for

15   this?

16          MS. deSOUSA:  No.  She's going to resume.  She

17   has the next witness.

18          THE COURT:  Just during the playing of the

19   deposition?

20          MS. deSOUSA:  Yeah, so maybe she can get a

21   little more control over it.

22          THE COURT:  Do you need a couple of minutes to

23   get her stuff together?

24          MS. deSOUSA:  I have to get her stuff together.

25   And we've made a mess over there, and it'll take me a

1     minute to straighten it out.

2              (End of discussion at sidebar)

3              THE COURT:  Jurors, Attorney Sheehan does need

4     to take a short break and get some medication.  It is

5     not necessary for her to be here during the playing of

6     this deposition, so she has been excused, and

7     Ms. deSousa's just gathering her stuff together so that

8     she can recover outside of the Courtroom.

9              So we will proceed with the playing of the

10    deposition, and Ms. Sheehan hopefully will be back

11    after the end of it.

12             MS. deSOUSA:  Thank you, Your Honor.

13             THE COURT:  All right.  We are ready to resume

14    the playing of the deposition of Commissioner Fitchet.

15             (Video played)

16             THE COURT:  Mr. Ryan, will you stop it.

17             How much, approximately, longer on the tape?

18             MR. RYAN:  I think, Your Honor, we're at 1:49.

19    I think we're about -- six or seven minutes.

20             THE COURT:  Well, we've been going at it long

21    enough.  We're going to take a morning recess now.

22    We'll be in recess for 15 minutes.  We're almost

23    through the videotape, and then we'll resume with the

24    testimony of Mr. Hutchins.

25             So we'll be in recess for 15 minutes, Jurors.

1      THE CLERK:  All rise for the jury.

2      (The jury is not present for the following)

3      THE COURT:  So I understand, just a few more

4  minutes of the video.

5      And then Mr. Hutchins will return to his direct

6  examination for about -- approximately how much longer?

7      MR. RYAN:  I estimated at, I think yesterday, 30

8  to 45 minutes.

9      THE COURT:  30 to 45?

10      MR. RYAN:  Yes.

11      THE COURT:  And as of now, the cross is

12  approximately how long?

13      MS. deSOUSA:  Your Honor, I think I, on behalf

14  of the City, would have about a half an hour, and

15  Attorney Sheehan I think also had about a half an hour.

16  Hopefully she will -- she's going to be doing the

17  medical portion, so it might be slightly less than

18  that, but that's where I think we are.

19      THE COURT:  So that's just under two hours

20  perhaps?

21      MS. deSOUSA:  That sounds about right,

22  Your Honor.

23      THE COURT:  And then the Plaintiff will rest?

24      MR. RYAN:  Yes, Your Honor.

25      THE COURT:  And, once again, the approximate

1    length of the Defendant's case as of now?

2         MS. deSOUSA:  I apologize, Your Honor.

3    Attorney Sheehan had that all written down, and I don't

4    have it off the top of my head.

5         THE COURT:  Well, in other words, tomorrow and a

6    good portion of Monday, but then the Defendants will be

7    able to rest?

8         MS. deSOUSA:  Yes, Your Honor.

9         THE COURT:  Okay.  What I'm going to do is I'm

10    going to ask the jury to stay on today for a little

11    extra time, maybe till 1:30, whatever it takes to

12    finish the Plaintiff's case, hopefully at or before

13    1:30, and then we will not have an afternoon session

14    after that.

15         So this next session will be an extended

16    session.  If we need to take a short break at any

17    point, we will, but we won't have a lunch break.

18    Following the end of that, I will dismiss them for the

19    day and with the information that what they need to

20    hear now is the Defendants' case, and that will be

21    completed sometime on Monday.  That's what I'm going to

22    tell the jury.

23         MS. deSOUSA:  Yes, it should be absolutely done

24    by Monday, Your Honor.

25         THE COURT:  Okay.

1      MS. deSOUSA:  Your Honor, I don't know if this

2   is the appropriate time to bring it to your attention,

3   but I do intend to file a motion at the conclusion of

4   the Plaintiff's case, and I believe Attorney Coyle will

5   be on behalf of the Officers as well.  And --

6      THE COURT:  You are of course free to do that,

7   but I am going to take them under advisement and inform

8   the Defendants to put on a case.  I'll tell you that

9   now.  So you can submit the motions.

10      MS. deSOUSA:  Thank you, Your Honor.

11      THE COURT:  I presume that will be opposed.

12      I will take them under advisement, but I will

13   not rule on them now.  And I will instruct the

14   Defendants to put on a case.

15      MS. deSOUSA:  And you do not want to have

16   argument now, Your Honor?

17      THE COURT:  I don't want to have argument now.

18      MS. deSOUSA:  Thank you, Your Honor.

19      THE COURT:  Okay.  Anything else before we

20   recess?  If not, we'll be in recess for 15 minutes.

21      THE CLERK:  All rise.

22      (Recess, 11:19 a.m.)

23      (Resumes, 11:36 a.m.)

24      THE CLERK:  All rise for the jury.

25      (The jury is present for the following)

1          THE CLERK:  Thank you.  You may be seated.

2          THE COURT:  Good morning again, Jurors.  I have

3    something to talk to you about.  We have just a little

4    bit longer on the video, and then we will return with

5    Mr. Hutchins' direct and cross-examination.  And after

6    that, the Plaintiff will have reached the end of their

7    part of the case, and I'm hopeful that they will be

8    able to rest.

9          However, it's going to take a little bit longer

10   than 1:00.  So what I'm going to ask you to do is we're

11   going to go perhaps till 1:30 today, but then we are

12   going to recess for the day.  There will be no further

13   afternoon session.

14         But we cannot probably be able to finish all at

15   1:00.  I'm hopeful that we'll be able to finish by

16   1:30.  If anybody needs a short break for any reason,

17   of course we can take a short break.  But I'm going to

18   try to do that to get you out of here a little bit

19   earlier and get to a natural breaking point until

20   tomorrow.

21         So, with that, the Plaintiff will continue with

22   the playing of the video deposition of Commissioner

23   Fitchet.

24         (Video played)

25         MS. deSOUSA:  Your Honor, I'm just going to go

1    and get Attorney Sheehan.

2         THE COURT:  Yes.  So that's the end of the

3    videotape?

4         MR. RYAN:  Yes, Your Honor.

5         Your Honor, at this time, the Plaintiff would

6    move to admit Exhibits 78 and 79, the annual reports of

7    the Community Police Hearing Board for 2011 and

8    Exhibit 79 being 2012 and 2013.

9         THE COURT:  The second one is two reports?

10        MR. RYAN:  It's called an annual report, but

11   it's for two years, 2012 to 2013.

12        THE COURT:  So Exhibits 78 and 79 will be

13   admitted.

14        (Exhibit Nos. 78 and 79 were admitted in full)

15        MR. RYAN:  At this time -- and we'll of course

16   wait for Ms. Sheehan -- I'd ask that Mr. Hutchins

17   return to the witness stand.

18        THE COURT:  Yes, he may return to the witness

19   stand.  You may be seated, unless you would prefer to

20   be standing, Mr. Hutchins.

21        MS. deSOUSA:  Attorney Sheehan's on her way in,

22   Your Honor.

23        THE COURT:  Good morning again, Mr. Hutchins.

24   You are reminded that you remain under oath.

25        And you may proceed with direct examination,

1    Mr. Ryan.

2         MR. RYAN:  Thank you, Your Honor.

3         **CONTINUED DIRECT EXAMINATION BY MR. RYAN**

4    **Q.**   Good morning, Mr. Hutchins.

5    **A.**   Good morning.

6    **Q.**   And if you could just make sure to speak into the

7    microphone.

8    **A.**   Yes, sir.

9    **Q.**   Great.  I want to pick up right where we left off

10   yesterday afternoon and ask you:  At some point after

11   midnight on what was then Sunday morning, January 20th,

12   2013, did your stepson Tyshon knock on your bedroom

13   door?

14   **A.**   Yes, sir.

15   **Q.**   And what did Tyshon tell you?

16   **A.**   He had informed me that the Police were at the

17   door.

18   **Q.**   And how were you dressed at that time?

19   **A.**   I was in my nightclothes.  I had a white T-shirt

20   and red sweatpants.

21   **Q.**   Were you lying down in your bedroom?

22   **A.**   Yes.  I actually was asleep.

23   **Q.**   Now, when Tyshon told you this, what did you do?

24   **A.**   It took me a few, you know, because I had to deal

25   with issues.  I had to get out of the bed, and when I

1    got out of the bed, I went directly to the door.

2    **Q.**   And would that be the kitchen door that goes down

3    those set of stairs we saw?

4    **A.**   That is correct.

5    **Q.**   And when you opened that door, what did you find?

6    **A.**   Well, right through the door I could see that the

7    Officers were standing there.

8    **Q.**   And when you opened the door, could you tell the

9    jury what your interaction with the Police Officers

10   consisted of?

11   **A.**   The Officer had explained to me that he was there

12   to retrieve my grandson.  The mother was here, and she

13   wanted her son.

14   **Q.**   And did you cooperate with the Police?

15   **A.**   Yes.  I had told them they were upstairs, he's up

16   there with his father, and I'll go get him.

17   **Q.**   Were you surprised to see the Police standing

18   there?

19   **A.**   Yes, I was very surprised.

20   **Q.**   Now, did you go upstairs to go get your grandson?

21   **A.**   Yes, I did.

22   **Q.**   And being after midnight and him being two years

23   old, was he asleep?

24   **A.**   Yes, him and his father was asleep.

25   **Q.**   And when you went into -- did they share a bedroom

1    at that time?

2    **A.**    Yes.

3    **Q.**    And when you went in and got -- started to get

4    Ivan ready to bring him down, did your son Lee wake up?

5    **A.**    When I went up, I had informed Lee that the Police

6    were downstairs and they wanted Ivan.

7    **Q.**    And how did your son Lee react?

8    **A.**    Lee jumped up out of the bed and bolted out the

9    door downstairs.

10    **Q.**    Now, did you pick up Ivan at that point?

11    **A.**    Yes, I had grabbed Ivan, and his bag was right

12    there.  And Ivan had mostly woke up because, you know,

13    he heard me and his father.  And so I didn't carry

14    Ivan, Ivan walked with me, and then we went down to the

15    living room.

16    **Q.**    And when you got Ivan to the living room, did you

17    put him down on your couch in the living room?

18    **A.**    He got onto the sofa.

19    **Q.**    And by this point when you got downstairs, had

20    your son Keith shown up in the kitchen?

21    **A.**    When I had got down to the living room, Keith and

22    the Officers were in the kitchen having an altercation,

23    and Lee was in the kitchen as well.

24    **Q.**    And when you say that they were having an

25    altercation, was this a verbal or a physical

1    altercation?

2    **A.**    A verbal.

3    **Q.**    And is it fair to say that your son Keith was

4    pretty heated in that verbal altercation?

5    **A.**    Yes, he was very loud.

6    **Q.**    And any idea approximately how long he and the

7    Officers -- he had been very loud with the Officers?

8    **A.**    I don't know what time, from the time I went up to

9    the third floor to the time I came back down, that

10    Keith had came up.  I wasn't sure.

11    **Q.**    Now, at any point, did you see your son Lee go

12    downstairs?

13    **A.**    Yes.  Lee, immediately after I had seen him, he

14    went to go towards the front door, but he ended up

15    seeing that the front egress was blocked, so he shot

16    down the back doorway where I had seen Keith come up.

17    **Q.**    And did either of the Officers follow him out the

18    back?

19    **A.**    Yes, there was an Officer that ran through and

20    followed Lee.

21    **Q.**    Do you remember whether that was Officer Romero or

22    Officer McKay?

23    **A.**    Romero.

24    **Q.**    Now, at some point or another, did you eventually

25    make your way down to the front porch?

1    **A.**   Yes, I did.

2    **Q.**   And once you got on the front porch, could you

3    tell the jury what was going on, on your front porch?

4    **A.**   When I got down the front to the porch, Keith was

5    out there having another argument with an Officer that

6    was down on the lower -- on the ground, and that

7    Officer was explaining to Keith, either you shut up or

8    I'm going to take -- you're going to go jail.

9    **Q.**   And when he was having this argument with Keith,

10   were you able to make any observations about what was

11   going on with Lee?

12   **A.**   At that time I had seen Lee struggling with an

13   Officer, and the Officer had moved Lee over towards the

14   cruiser and started hitting Lee.

15   **Q.**   Now, at that time did you have a particular focus

16   on either of your two sons?

17   **A.**   Well, my focus was basically on keeping Keith from

18   going down and interacting and to follow the Officer's

19   command that he was telling him to shut up or go

20   inside.

21   **Q.**   And in an attempt to help him follow the Officer's

22   command, what did you tell Keith?

23   **A.**   I kept telling Keith, "Come on.  Let's go, go

24   inside.  Did you hear him saying he's going to arrest

25   you?"  At that time I got Keith to the door, and Keith

1    looked back and --

2    **Q.**   And when you got Keith to the door -- when you

3    said he looked back, were you able to see what

4    observations he made at that time?

5    **A.**   Well, when Keith had got by me -- and when Keith

6    just leaped down all of the stairway right down to -- I

7    guess because the Officer had Lee over at the vehicle

8    and was swinging and hitting Lee in his ankles -- well,

9    his leg parts with a baton.

10   **Q.**   And did you try to restrain, physically restrain

11   Keith before he did this?

12   **A.**   I might have got Keith to the door, and like I

13   said, he had gotten loose from me and --

14   **Q.**   And when Keith launched off the porch, did -- at

15   that point, did he enter the fray, so to speak?

16   **A.**   Yes.

17   **Q.**   And when he did, did you see what happened with

18   Officer McKay?

19   **A.**   He came behind Keith.  Keith had leaped down all

20   of the stairs and went towards Lee and the Officer at

21   the vehicle that were tussling.  And when Keith got

22   over there, Officer McKay came, and he fell, and when

23   he fell, Keith fell.

24   **Q.**   And I want to just back up for a second.

25        You described what you saw, while your focus was

1    on Keith, about what was happening between Lee and

2    Officer Romero.

3         Is it possible that there was a struggle that

4    happened before you made observations?

5    **A.**   I believe there was something that happened before

6    I got down there.

7    **Q.**   So it's entirely possible that, before that, your

8    son Keith could have punched Officer Romero; is that

9    fair to say?

10   **A.**   Yes.

11   **Q.**   Now, you just testified that Officer McKay slipped

12   and fell.  And what did this result in ultimately in

13   terms of who was struggling with who?

14   **A.**   Well, when Keith went down, Officer McKay came

15   behind him, and I guess that's when he fell, and he

16   forced them to fall in back of the cruiser.  And at

17   that time, I couldn't super-jump and follow Keith, so I

18   easily went down, and as I went down, they were in back

19   of the cruiser struggling, having a tussle.

20   **Q.**   And in terms of Keith, Officer McKay and Officer

21   Romero, how were their bodies situated when you were

22   able to get down and make better observation?

23   **A.**   I believe it was Officer McKay on the bottom,

24   Keith and then Officer Romero -- Romero?

25   **Q.**   Yes.

1    Now, when you went down, what was your intention

2  as you went down the steps and got closer to what was

3  happening between the three of them?

4  **A.**   Well, they fell to the back.  I actually made it

5  around to the other side in the street and was

6  observing the tussle.

7  **Q.**   And what, if anything, were you hoping to

8  accomplish as you came closer to this pile?

9  **A.**   That they would just get them in custody and end

10  the situation.

11  **Q.**   And what, if anything, did you say to the Police

12  Officers who were there with your son?

13  **A.**   Well, as I was coming around the cruiser, I could

14  see that the officer on the bottom is swinging and he's

15  swinging.  So as I approached, I said "If you stop

16  swinging" -- because I believe it was Officer Romero on

17  top trying to grab Keith, and he couldn't grab Keith

18  because the Officer McKay actually on the bottom was

19  swinging his baton and hitting Keith and his partner.

20  **Q.**   And so what -- could you just repeat what you were

21  saying to the Officers as this was happening?

22  **A.**   I was explaining, "If you stop swinging, your

23  partner can get him."  And I must have asked them to

24  stop swinging at least four to five times.

25  **Q.**   And after -- did it appear that anybody was paying

1    attention to what you were saying in terms of stop

2    swinging?

3    **A.**    No, sir.

4    **Q.**    And at some point, did you make a decision to grab

5    hold of that baton?

6    **A.**    Yes, after a while and I seen he kept hitting his

7    partner and his partner wasn't able to grab Keith at

8    that time, that's when I made a decision to grab his

9    baton.

10   **Q.**    And when you did, what effect did that have on

11   what was happening between Keith and the Officers?

12   **A.**    Well, the Officer's who baton -- Officer McKay had

13   said to me, "Either let go, or I'll mace you."  By the

14   time I could let go, I was maced.

15   **Q.**    And before he said that, were you able to make any

16   observations whether by stopping the baton, if it

17   helped Officer Romero with Keith?

18   **A.**    Yes, it did.  I believe it did help him get Keith.

19   **Q.**    Now, did you ever take full control of Officer

20   McKay's baton?

21   **A.**    No, sir.

22   **Q.**    Did you ever take full control of any Officer's

23   baton?

24   **A.**    No, sir.

25   **Q.**    And I think you just told the jury that what

1    happened that preceded you getting maced.

2           Can you tell the jury what getting maced feels

3    like.

4    **A.**   That is something I hope none of you ever have to

5    experience.  It's a blinding, burning, irritating

6    sensation that you -- it's just out of your control.  I

7    mean, it burns like if somebody threw hot water in your

8    face.

9    **Q.**   And did it affect your breathing at all?

10   **A.**   Yes, it did.  I was short of wind.

11   **Q.**   And after you got sprayed, where did you go?

12   **A.**   Somehow I -- I know I backed up, and I was rubbing

13   my face.  And I ended up making it to the bottom of my

14   stairs.

15          MR. RYAN:  Your Honor, may I approach the

16   witness?

17          THE COURT:  Yes.

18   **Q.**   Mr. Hutchins, I'm going to ask you to stand up for

19   a second.

20   **A.**   Yes.

21          MR. RYAN:  May the witness step off the podium

22   for a second?

23          THE COURT:  Yes, he may.

24   **Q.**   Mr. Hutchins, I'd like you to assume that we're in

25   the moment that you've brought us to, as your having

1    been sprayed back by your porch.  Could you demonstrate

2    what you felt and where you felt it on your body at

3    that time.

4    **A.**   I'm facing this way (indicating).  I'm rubbing my

5    face because it's irritating and burning.

6    **Q.**   I'm you.

7    **A.**   I felt something come this way, and then it came

8    this way (indicating).

9    **Q.**   Okay.  If you could just step back down.  Thank

10   you.

11          Now, when you felt those two strikes, what did

12   it cause you to do?

13   **A.**   It caused me to go straight down to the ground.

14   **Q.**   And when you did that -- let me ask you this:

15   When you went straight down to the ground, what's the

16   next thing that happened to you?

17   **A.**   An Officer was grabbing me and putting me in

18   handcuffs.

19   **Q.**   And when the handcuffs were placed on you, how did

20   that feel?

21   **A.**   It was so tight.  I actually still have a scar

22   around my wrist from the cuffs.  He just had them in --

23   it felt like the circulation in my hands were as well,

24   like, hurting.  It was just pain in my wrists.

25   **Q.**   And approximately how long, if you could estimate,

1    was it before you were removed from the -- right in

2    front of your steps and put in a Police cruiser?

3    **A.**    It may have been five to ten minutes.

4    **Q.**    I'm sorry.  Could you just --

5    **A.**    Five to ten minutes.

6    **Q.**    And what was the weather like that night?

7    **A.**    It was cold.  I don't know if it had rained or if

8    it was from the snow melting.

9    **Q.**    And how did you feel being on the ground in the

10   cold for five or ten minutes?

11   **A.**    Freezing.

12   **Q.**    Now, did you eventually return to the Police

13   station?

14   **A.**    Eventually they ended up -- I thought I was going

15   to be released.

16   **Q.**    And did an Officer give you some indication that

17   that -- what was going to happen?

18   **A.**    Yes.  After he had cuffed me, he had stated that,

19   as soon as they got the situation de-escalated, they

20   would let me go.

21   **Q.**    And having been sprayed, do you know who -- which

22   Officer said that to you?

23   **A.**    No, sir.

24   **Q.**    Okay.  Now, did you eventually make it to

25   130 Pearl Street where the police station is?

1    **A.**   Yes, they picked me up and put me in the back of

2    the cruiser.

3    **Q.**   And when you got there, did you go through a

4    booking process?

5    **A.**   Yes.

6    **Q.**   And during that booking process, did you express

7    any concerns for your son Lee's mental health?

8    **A.**   Yes, I did.

9    **Q.**   And as his father, were you aware that he had some

10   mental health challenges in the past?

11   **A.**   Yes.

12   **Q.**   Now, did you tell the booking Officer that

13   Little Lee needed some psychiatric attention?

14   **A.**   Yes, I did.

15   **Q.**   And did you ask for medical attention for

16   yourself?

17   **A.**   Yes, I did.

18   **Q.**   Now, do you recall what you were told about

19   getting medical attention?

20   **A.**   Yes.

21   **Q.**   Could you explain to the jury what you were told?

22   **A.**   Prior to them bringing me in, I was explaining to

23   them, "I have back issues."  I needed, you know,

24   medical attention.

25           And he says, "Well, if we take you to the

1    hospital now, you're going to have to come back later,

2    and then you're going to have to do it all over.  Where

3    if you stay here now, your son has enough to bail you

4    out and you can go straight to the emergency room."

5    **Q.**   And, so, did you decide not to ask the Police to

6    bring you to the hospital?

7    **A.**   Yes.

8    **Q.**   Now, during your booking process, do you recall

9    being -- having an Officer read what you were being

10   charged with?

11   **A.**   Yes, he finally told me what I was being charged

12   with.

13   **Q.**   And how did you react when you were told what you

14   were being charged with?

15   **A.**   I was overwhelmed.  I'm like "Where did this

16   happen?  Assault and battery, are you kidding me?"

17   **Q.**   Now, at some point during this process, did the

18   booking Officer ask you if you were hearing voices

19   other than his?

20   **A.**   Yes.

21   **Q.**   And did you say that you were hearing voices other

22   than his?

23   **A.**   Yes, I did.

24   **Q.**   And where were those voices coming from?

25   **A.**   People who I guess were in the cells or coming in

1    as well still.

2    **Q.**    Did you hear any voices inside your head?

3    **A.**    No, sir.

4    **Q.**    Now, you were asked -- were you asked about any

5    recent deaths in the family?

6    **A.**    Yes, I was.

7    **Q.**    And had somebody died fairly recently?

8    **A.**    Yes.

9    **Q.**    And who was that?

10   **A.**    I lost my mother.

11   **Q.**    And was that some months ago?

12   **A.**    Yes, it was.

13   **Q.**    And at some point, was there a questions posed to

14   you about whether there was any alcohol use that day?

15   **A.**    Yes.

16   **Q.**    And did you use any alcohol that day?

17   **A.**    No, sir.

18   **Q.**    Did your sons use any alcohol that day?

19   **A.**    Yes, they did.

20   **Q.**    And at some point, were you asked whether you were

21   seeking psychiatric care?

22   **A.**    Yes.

23   **Q.**    And were you seeking psychiatric care?

24   **A.**    Yes.

25   **Q.**    Was that for you, or was that for your son?

1    **A.**    For me.

2    **Q.**    Now, you were asked, had you ever attempted

3    suicide before; do you recall that?

4    **A.**    Yes, sir.

5    **Q.**    And what did you tell them when they asked you

6    about any prior suicide attempt?

7    **A.**    Yes.   In my younger age, I tried to commit

8    suicide.

9    **Q.**    And when you testified yesterday about this

10   experience of losing three older siblings in a fire,

11   was that a source of depression for you as a young

12   adult?

13   **A.**    Yes.   Yes, it has been.

14   **Q.**    And was that during the period of time where you

15   made an attempt on your life?

16   **A.**    Yes, it is.

17   **Q.**    And when you were asked that question about

18   whether you attempted suicide before, did you want to

19   be truthful with the Officers?

20   **A.**    Yes, I did.

21   **Q.**    Is that why you told them that the answer to that

22   question was yes?

23   **A.**    Yes, I did.

24   **Q.**    Now, I'd like to talk a little bit about the court

25   process.   Were you arraigned on -- a couple of days

1  later on January 22nd, 2013?  Does that sound right?

2  **A.**   Yes.  I believe it was the 23rd because

3  Martin Luther King day was the day I got released,

4  and then the next day, yeah, that's 23rd.

5         MR. RYAN:  May I approach the witness,

6  Your Honor?

7         THE COURT:  Yes.

8  **Q.**   Mr. Hutchins, I'm showing you a document.  Is this

9  a criminal docket for you reflecting these criminal

10  charges that you faced in this case?

11  **A.**   Yes, it is.

12  **Q.**   And I think you said a second ago that you thought

13  the date was actually January 23rd when I said 22nd.

14  Does it indicate that was in fact the 23rd when you

15  were arraigned?

16  **A.**   Yes, it is.

17  **Q.**   Now, Mr. Hutchins, did this case go to trial in

18  September of 2014?  Does that sound right?

19  **A.**   Yes.

20  **Q.**   And between your arraignment and your trial, did

21  you have to appear in Court for a number of pretrial

22  conferences?

23  **A.**   Yeah, it was a few times.  I believe it was six or

24  seven times.

25  **Q.**   Okay.  And this docket here, does this appear to

1    be a Court-certified docket reflecting this criminal

2    case against you?

3    **A.**   Yes, sir.

4         MR. RYAN:  Your Honor, at this time, I'd move to

5    have this admitted as Exhibit 80.

6         THE COURT:  Can you describe it, please, again?

7         MR. RYAN:  It is Criminal Docket 1323, CR000323.

8         THE COURT:  All right.  It will be admitted as

9    Exhibit 80.

10        (Exhibit No. 80 was admitted in full)

11   **Q.**   Now, Mr. Hutchins, during the time that this was a

12   pending criminal case against you, did you make regular

13   visits to the Baystate Health Center for adult

14   medicine?

15   **A.**   Yes, I did.

16   **Q.**   And I think you testified yesterday that was where

17   you received primary care?

18   **A.**   That is correct.

19   **Q.**   I'm going to just -- I'm not going to go through

20   each of these records with you, but I'm showing --

21        MR. RYAN:  I'm sorry.  Ms. Lima, if I could

22   impose upon you to --

23   **Q.**   And I'm showing you Exhibit 18.  This is from the

24   Baystate High Street Health Center --

25   **A.**   Yes.

1    **Q.**   -- from January 28th, 2013?

2    **A.**   Yes.

3    **Q.**   And Exhibit 19, is this from the same place,

4    May 28th, 2013?

5    **A.**   Yes.

6    **Q.**   And Exhibit 20, again, from February 19th, 2014?

7    **A.**   That is correct.

8    **Q.**   And March 5th, 2014 --

9    **A.**   That is correct.

10   **Q.**   -- Exhibit 21?

11        Exhibit 22 for July 10th, 2014?

12   **A.**   That is correct.

13   **Q.**   And, finally, for August 19th, 2014, Exhibit 23?

14   **A.**   That is correct.

15   **Q.**   Mr. Hutchins, during these times that you went to

16   your primary care, did you talk at times about the

17   impact, the emotional impact that this Court proceeding

18   had on you?

19   **A.**   Yes, I have talked to my primary.

20   **Q.**   And were some of those comments reflected in these

21   records that I just showed you?

22   **A.**   That is correct.

23        MR. RYAN:  At this point, I'd move to admit

24   these next exhibits.

25        MS. deSOUSA:  Objection, Your Honor.

1          THE COURT:  We did go over this yesterday.

2     We'll talk later about -- they can go in, but I think

3     they need to be redacted.

4          MR. RYAN:  I agree.

5          THE COURT:  Okay.  So they won't go in

6     unredacted?

7          MR. RYAN:  Correct.

8          THE COURT:  Okay.

9     **Q.**   Now, I want to just go back to your experience of

10    this -- being a Defendant at a criminal trial in

11    September of 2014.

12         Could you tell the jurors what that was like in

13    terms of just the emotional impact of that experience

14    to you?

15    **A.**   Well, it was very scary due to the fact that I

16    never experienced anything like that, and I was being

17    charged for something I know I didn't do.

18    **Q.**   And did you have any concerns about what might

19    happen to you if you were found guilty of what you were

20    being charged with?

21    **A.**   I was scared of going to jail.

22    **Q.**   And why were you scared of going to jail?

23    **A.**   I ain't never been to jail.

24    **Q.**   And did you have any concerns about what it would

25    be like in jail with your physical health?

1    **A.**    Yes, sir.

2    **Q.**    Now, at the conclusion of the criminal trial, were

3    you alerted that the jury had a verdict?

4    **A.**    Yes, sir.

5    **Q.**    And the time it took from learning there was a

6    verdict to the time that the verdict was read, what was

7    that like for you?

8    **A.**    It was overwhelming, very scary.  I couldn't -- I

9    was scared to look at Police.

10   **Q.**    Now, were you found not guilty of all the charges

11   that you faced?

12   **A.**    Yes.  That was like a new day of my life when they

13   told me that I was not guilty.

14   **Q.**    Now, I have some other medical records, again, all

15   from the place where you received primary care.

16           And, again, I don't want to go through all of

17   them, but I do want to just ask you about what

18   physically your last several years has been like in

19   terms of whether or not you've received any treatment

20   for injuries you suffered as a result of this incident?

21           MS. deSOUSA:  Objection.

22           THE COURT:  Yeah, that's too broad a question.

23   Sustained.

24   **Q.**    Mr. Hutchins, have you received any medical

25   treatment as a result of injuries you suffered on

1    January 20th, 2013?

2    **A.**   Yes, sir.

3         MS. deSOUSA:  Objection.

4         THE COURT:  Overruled.

5    **Q.**   And what sorts of treatment have you received for

6    injuries you suffered?

7    **A.**   Every two and a half or three months, I have to

8    get trigger shots.

9    **Q.**   And where do those trigger shots happen on your

10   body?

11   **A.**   They're actually in each of my arms.

12        MR. RYAN:  Now, I have as Plaintiff's

13   Exhibit 125 and 126 -- and I don't want to publish them

14   to the jury for reasons previously discussed, but at

15   this time, I'd move to admit them as records reflecting

16   the trigger shots just referred to by the Plaintiff.

17        THE COURT:  And what's the difference between

18   the two?  The dates?

19        MR. RYAN:  The dates for -- the date for 125 is

20   the discharge date of 10/9/17, and the discharge date

21   for 126 is 1/19/2018.

22        THE COURT:  They will be admitted but subject to

23   redaction before they are shown to the jury.

24        (Exhibit Nos. 125 and 126 were admitted in full)

25   **Q.**   Now, Mr. Hutchins, I want to put up on the

1    presenter what's been previously admitted and marked as

2    Plaintiff's Exhibit 94-A.

3         THE COURT:  There's no Plaintiff exhibits;

4    they're just exhibits.

5         MR. RYAN:  I apologize, Your Honor.

6  **Q.**   Exhibit 94-A and Exhibit 94-B.

7         Did you, Mr. Hutchins, create these two items?

8  **A.**   Yes, I did.

9  **Q.**   And what are these two items?

10 **A.**   We call them our native medicine, which one is a

11   choker, and one is a medicine bag.

12 **Q.**   And did you make these objects before or after the

13   incident involving the Police Officers on Daytona

14   Street?

15 **A.**   Before.

16 **Q.**   Since the incident, have you been able to make --

17   create anything like this?

18 **A.**   No, sir.

19 **Q.**   And why not?

20 **A.**   My nerves in my hands.

21 **Q.**   Now, since this incident, Mr. Hutchins, do you

22   periodically see, just in your comings and going,

23   Police cruisers?

24 **A.**   Yes, I do.

25 **Q.**   And do you sometimes see uniformed Police

1    Officers?

2    **A.**   Yes, I do.

3    **Q.**   And how does that make you feel?

4    **A.**   I'm paranoid of the Police.

5    **Q.**   And prior to this incident, what sort of

6    relationship did you have with the Police?

7    **A.**   My uncle actually is an ex- -- retired Officer

8    from the City of Springfield, and I have a few friends

9    that I know on a first-name basis that are Officers.

10       MR. RYAN:  Okay.  If I could just have a minute,

11   Your Honor?

12       THE COURT:  Yes.

13       (Pause)

14       MR. RYAN:  Nothing further at this time.

15       THE COURT:  Cross-examination, Ms. deSousa?

16       MS. deSOUSA:  Thank you, Your Honor.

17           <u>**CROSS-EXAMINATION BY MS. deSOUSA**</u>

18   **Q.**   Good afternoon, Mr. Hutchins.

19   **A.**   Good afternoon.

20       THE COURT:  Ms. deSousa, you're cross-examining

21   on behalf of whom?

22       MS. deSOUSA:  The City.

23   **Q.**   Mr. Hutchins, I'd like to start by having you

24   go back to the night of the incident, which was

25   January 20th; correct?

1   **A.**   Correct.

2   **Q.**   And can you review for us who was in your house at

3   the time that the Police first showed up that night?

4   **A.**   To my knowledge, it was my son Lee, Jr., my

5   grandson Ivan, my son Demetrius, my daughter Alia, I

6   believe her boyfriend Adrian might have been over that

7   night; my stepson Tyshon, and Keisha Green.

8   **Q.**   And who is Keisha Green?

9   **A.**   Tyshon's girlfriend.

10  **Q.**   Was Sandra there?

11  **A.**   Yes.  Yes, she was in the same room as I was.

12  **Q.**   Okay.  And was Keith there?

13  **A.**   Yes, Keith was in the basement, him and Sonya.

14  **Q.**   And Sonya was his girlfriend?

15  **A.**   Yes, ma'am.

16  **Q.**   Anybody else?

17  **A.**   Not that I can recall, ma'am.

18  **Q.**   And there was previous testimony about you and

19  your sons having gone to a bar to pick up Sonya earlier

20  that day; is that correct?

21  **A.**   That is correct.

22  **Q.**   And to the best of your recollection, what time

23  did you and your two sons return to Daytona Street

24  after getting Sonya?

25  **A.**   It had to be about 10:30 to 11:00.

1    **Q.**    And where was Ivan?

2    **A.**    Ivan was either in his aunt's room -- I'm not

3    exactly sure because I wasn't there when he was there,

4    but he was at my house.

5    **Q.**    He was at your house?

6    **A.**    Yes, ma'am.

7    **Q.**    But his dad, Lee, Sr., was with you; correct?

8    **A.**    Correct.

9    **Q.**    How long had Ivan been visiting?

10   **A.**    Ivan visited every day.

11   **Q.**    That day.

12   **A.**    That day?  I'm not exactly sure, ma'am.

13   **Q.**    Okay.  And -- at any rate, at 10:30 or 11:00 when

14   you came home, I believe your testimony was that you

15   immediately went to your room; is that correct?

16   **A.**    That is correct.

17   **Q.**    And you fell asleep pretty quickly?

18   **A.**    Well, I actually took my meds, and then I went to

19   sleep.

20   **Q.**    And what type of medication were you taking at

21   that time?

22   **A.**    There's so many, ma'am, I don't know off the

23   top -- I know I was doing pain meds, I was dealing with

24   depression, anxiety, low blood pressure, insulin.

25   **Q.**    Okay.  And so let's sort of look at those one at a

1     time.

2          You were taking diabetes medication at the time?

3     **A.**   That is correct.

4     **Q.**   And at that time, were you taking oral tablets, or

5     were you using injectable insulin?

6     **A.**   At that time, it was injectable insulin.

7     **Q.**   And you were taking some medication for

8     depression?

9     **A.**   Yes, ma'am.

10    **Q.**   And were you taking those daily?

11    **A.**   Yes, ma'am.

12    **Q.**   And you were taking some anti-anxiety medication?

13    **A.**   Yes, ma'am.

14    **Q.**   And that was a separate medication for the

15    depression?

16    **A.**   Yes.

17    **Q.**   And did you take one medication for depression or

18    more than one?

19    **A.**   I'm sorry.  Can you rephrase that?

20    **Q.**   Did you have, like, one prescription for

21    depression, or did they have you using a combination of

22    medications to treat your depression?

23    **A.**   A combination of medications.

24    **Q.**   So you were on more than one anti-depressant?

25    **A.**   Well, actually, yes, because one was Strazinol,

1     which was to help me sleep.

2     **Q.**    And same question with regard to anti-anxiety.

3     Were you, that night, January 20th, just taking one

4     medication for anxiety, or were you on more than one?

5     **A.**    That night, actually, it was one.

6     **Q.**    And you took some pain medication when you got

7     home; correct?

8     **A.**    Correct.

9     **Q.**    And was that a prescription pain medicine?

10    **A.**    Yes, it is.

11    **Q.**    And, again, were you taking one type of pain

12    medication, or were you taking more than one?

13    **A.**    More than one.

14    **Q.**    And did you take more than one type of pain

15    medication between 10:30 or 11:00 when you got home

16    before you went to bed that night?

17    **A.**    No, ma'am.  That night it was only one pain

18    medication.

19    **Q.**    You took one pain medicine that night?

20    **A.**    That's correct.

21    **Q.**    So then you fell asleep.

22          And in answer to Mr. Ryan's questions, you said

23    that the next thing that you recall is that you were

24    woken up; is that fair to say?

25    **A.**    Yes, it is.

1    **Q.**    Mr. Hutchins, if you would feel more comfortable

2    standing, you know, please do so.

3    **A.**    Thank you.

4    **Q.**    And I believe you said Tyshon had woken you up;

5    correct?

6    **A.**    Correct.

7    **Q.**    And when you first got up, who else was awake, to

8    your knowledge, on the second floor of the house?

9    **A.**    It was just Tyshon that I seen.

10   **Q.**    Okay.  And you went out into your kitchen, and you

11   found two Police Officers standing in the doorway?

12   **A.**    That is correct.

13   **Q.**    And they had not entered your kitchen; is that

14   correct?

15   **A.**    Correct.  They were standing at the door at the

16   top of the stairs.

17   **Q.**    And you told them that you were going to go

18   upstairs and you'd be right back; is that correct?

19   **A.**    That's correct.  I told them I would go up there

20   and get Lee -- well, inform Lee and get Ivan.

21   **Q.**    Okay.  And from the time you said that and went up

22   the stairs until when you returned down that same set

23   of stairs with Ivan, how long a time would you say had

24   elapsed?

25   **A.**    Maybe about 15, 20 minutes, give or take.

1   Q.   So you think you were upstairs for about

2   20 minutes?

3   A.   15.

4   Q.   Okay.  And you woke Lee, Jr., up?

5   A.   That is correct.

6   Q.   And what did you say to him?

7   A.   I told him that the Police were downstairs for

8   Ivan.

9   Q.   And how long after you went up the stairs did you

10  tell him that?

11  A.   As soon as I got up the stairs, made it down the

12  hall to his room, the first thing I informed him of is

13  that the Police were here for Ivan.

14  Q.   And where was Ivan?

15  A.   Ivan was in the bed with him.

16  Q.   With Lee?

17  A.   Yes, ma'am.

18  Q.   And then what did Lee, Jr., do?

19  A.   He woke up and went out the door, his bedroom

20  door.

21  Q.   So how long a period of time would you say elapsed

22  between when you told him the Police were there and he

23  left the bedroom?

24  A.   I'm sorry.  Can you rephrase that?

25  Q.   From the time you went in and said, "Lee, the

1    Police are here for Ivan," until when he walked out the

2    bedroom door, how long a time had elapsed?

3    **A.**   Not much.  I mean, it was spontaneous.

4    **Q.**   So was it less than two minutes?

5    **A.**   I'd say a little longer than two minutes.  Three

6    or four.

7    **Q.**   Three or four minutes?

8    **A.**   Correct.

9    **Q.**   And then you stayed upstairs with Ivan for another

10   ten minutes?

11   **A.**   No.

12   **Q.**   So does that change how long you believe you were

13   upstairs?

14   **A.**   Well, I was just upstairs long enough to inform

15   Lee that the Police were here for Ivan and to grab

16   Ivan -- Ivan actually had woke up when he heard me

17   talking to his dad -- and us to walk down to the living

18   room.

19   **Q.**   Okay.  And during the time you were on the second

20   floor -- I'm sorry, strike that -- the third floor, did

21   you see your daughter?

22   **A.**   No, ma'am.

23   **Q.**   Who else was sleeping on the third floor?

24   **A.**   My son Demetrius.

25   **Q.**   And did you see Demetrius?

1    **A.**    No, ma'am.

2    **Q.**    And you went back down to the kitchen?

3    **A.**    Correct.

4    **Q.**    And when you got to the kitchen, you've testified

5    that your son Keith was there; correct?

6    **A.**    Correct.

7    **Q.**    And Lee, Jr., was already there?

8    **A.**    Correct.

9    **Q.**    And you heard him -- what did you hear him say?

10   **A.**    He said something in the frame of, Fuck that

11   bitch -- excuse my language, but, Fuck that bitch, and

12   he shot out the back door.

13   **Q.**    And did that happen as soon as you entered the

14   kitchen with Ivan?

15   **A.**    Well, it was -- I didn't actually even make it

16   into the kitchen.  I was still coming down the stairs,

17   and I could see directly in the kitchen.  And that's

18   where Keith and Lee and the Officers were standing at

19   the door, and that's when Lee made that comment and

20   went out the back door.

21   **Q.**    Okay.  And did you hear Keith say anything at that

22   time?

23   **A.**    And Keith was still yelling, Get out, get out, get

24   the F out, get the F out.

25   **Q.**    And then one of the Officers, I believe you

1    indicated it was Officer Romero, went across your

2    kitchen and went down the back stairway after Lee;

3    correct?

4    A.    Correct.

5    Q.    And then, by then you were fully in the kitchen?

6    A.    Yes, ma'am.

7    Q.    And where did Ivan go?

8    A.    Ivan was on the couch.

9    Q.    In a different room?

10   A.    No.  The couch is right here -- well, they're

11   connected.

12   Q.    Okay.  So an open concept?

13   A.    Yes, ma'am.

14   Q.    And so Ivan was on the couch, and you placed

15   him on the couch?

16   A.    He actually went around and sat up there like a

17   normal day of him coming downstairs and going to sit on

18   the couch.

19   Q.    He was two at the time?

20   A.    Ivan was -- yes.

21   Q.    And who else was in the kitchen at that time?

22   A.    The Officers, Keith, Lee --

23   Q.    Well, Lee had left; right?  He went out the back

24   door?  Officer Romero went after him; right?

25   A.    Correct.

1    **Q.**    And who's left?

2    **A.**    Keith and the Officers and me.  One Officer ended

3    up going down the front stairs.

4    **Q.**    That was the Officer that was left after Officer

5    Romero left?

6    **A.**    And then there was one other officer left in the

7    kitchen.  When the Officer went down before Keith and

8    then Keith went, there was an Officer left in the

9    kitchen.

10   **Q.**    So your memory is there were three Officers there?

11   **A.**    One that went down the back, the two that were at

12   the door -- no.  There was three at the door, according

13   to my knowledge, because one went after him, and then

14   Officer Romero is the one who went behind Lee.

15           There was two other Officers -- no.  Actually,

16   that's the same Officer that went down that was arguing

17   with Keith downstairs that I'm thinking was still up in

18   the kitchen, but he was downstairs arguing with Keith

19   when I went down.

20   **Q.**    Okay.  So I'm sorry.  I think I'm just getting a

21   little confused here.

22   **A.**    Yes, ma'am.

23   **Q.**    So when you came down -- when you went to the

24   kitchen door, you saw two Officers; correct?

25   **A.**    Correct.

1    **Q.**   And one of them was Officer Romero; can we agree

2    on that?

3    **A.**   Yes, we can.

4    **Q.**   And was the other one Officer McKay?

5    **A.**   Yes, it was.

6    **Q.**   Okay.  So when you went upstairs, you were

7    upstairs for some period of time, Lee, Jr., came down

8    first; correct?

9    **A.**   Correct.

10   **Q.**   You weren't all the way down the stairs when you

11   heard Lee say that he was going to go out and F that B

12   up?

13   **A.**   I was just at the landing to the living room.

14   **Q.**   And you saw Officer Romero cross your kitchen and

15   go out the same door that he had just left; correct?

16   **A.**   Behind Lee, correct.

17   **Q.**   So now how many people are left in the kitchen?

18   **A.**   Keith and another officer.

19   **Q.**   Just one other Officer?

20   **A.**   Correct.

21   **Q.**   And Keith -- who went down the front stairs first?

22   **A.**   An officer went, and then another Officer went

23   down the front, and then Keith went down.

24   **Q.**   So are you saying another Officer besides

25   Officer McKay?

1    **A.**    No.  It was Officer McKay.

2    **Q.**    Okay.  So --

3    **A.**    That other Officer went down.  When Lee bolted,

4    then Keith went down, then the Officer went behind

5    Keith, and when he went, then that's when Ivan was

6    placed on the -- well, Ivan got on the sofa.

7    **Q.**    Sure.

8    **A.**    And then I went down.

9    **Q.**    Okay.  And did Tyshon go down?

10   **A.**    No, ma'am.  I didn't see him at that time.

11   **Q.**    Okay.  Was anybody else there?

12   **A.**    When we got downstairs, it was me and Keith, the

13   Officer, which I believe was McKay, and Lee and another

14   Officer, which I believe is Romero.

15   **Q.**    Where was Keisha Green?

16   **A.**    I don't know where she was at the time.  She might

17   have been up in Alia's room or -- or she might have

18   been on the front porch because upstairs we do have

19   another front porch.  She might have been out there

20   with Tyshon at that time because Tyshon went even in --

21   I didn't see Tyshon after he came and woke me up,

22   ma'am.

23   **Q.**    Okay.  Sir, do you recall testifying at a

24   deposition in this matter?

25   **A.**    Yes, I do.

1    **Q.**    And at that time, Attorney Sheehan asked you a

2    series of questions?

3    **A.**    Yes, ma'am.

4    **Q.**    And that was at the City Hall, at the City Law

5    Department?

6    **A.**    That is correct.

7    **Q.**    And that was in November of 2016, was it not?

8    **A.**    Yes.

9    **Q.**    And so it was a little bit over two years ago;

10   correct?

11   **A.**    Correct.

12   **Q.**    And would you say that your memory of the events

13   was clearer in November of 2016 than it is now?

14   **A.**    Yes.

15   **Q.**    Okay.  And did you testify at that deposition,

16   sir, that, when you came back down into the kitchen, in

17   addition to Officers Romero and McKay, that a female

18   Officer had now appeared?  Do you recall testifying to

19   that?

20   **A.**    You are correct, yes, ma'am.

21   **Q.**    And did you also testify that when Keith ran out

22   the back door, that you went past McKay and the female

23   Officer and that you were the first one down the stairs

24   after Keith?

25   **A.**    Now that you refresh my memory, you are correct,

1    ma'am.

2    **Q.**   Okay.  And so as we sit here today, sir, having

3    had your memory refreshed, do you recall there being a

4    third Officer present?

5    **A.**   Yes, ma'am.

6    **Q.**   And you believe that to be Officer -- you believe

7    that to be a female Officer; correct?

8    **A.**   Correct.

9    **Q.**   And so you went down the stairs after your son

10   Keith, and you testified that when you -- in response

11   to Mr. Ryan's questions, that when you got down onto

12   the porch -- pardon me -- Keith was already arguing

13   with Officer McKay; is that correct?

14   **A.**   That is correct.

15   **Q.**   But that couldn't have been correct because now

16   you remember that Officer McKay came down the stairs

17   after you; isn't that right?

18   **A.**   No, ma'am.  I had gotten my order mixed up, ma'am.

19   **Q.**   You had gotten your order mixed up in November of

20   2016 --

21   **A.**   No.

22   **Q.**   -- or did you get your order mixed up today?

23   **A.**   Today, ma'am.

24   **Q.**   Today?

25   **A.**   Yes, ma'am.

1      MS. deSOUSA:  Your Honor, I'd like to use a

2  chalk that's a blow-up of some photos with this witness

3  of the scene.  May I approach and set that up?

4      THE COURT:  Yes, you may.

5      (Pause)

6  **Q.**   Mr. Hutchins, I'm going to be asking you some

7  questions about where folks were placed during that

8  evening in question.  And you see that I've placed one

9  photo on the easel?

10  **A.**   Yes.

11  **Q.**   And does that depict your house?

12  **A.**   Yes, it does.

13  **Q.**   And you'll see that I've leaned another one --

14  Mr. Hutchins, I leaned another view up against counsel

15  table.  Do you see that?

16  **A.**   Yes, ma'am.

17  **Q.**   And if in answering my questions you feel that the

18  other photograph would better depict it, would you let

19  me know that?

20  **A.**   They're both fine.

21  **Q.**   Okay.  And does the photo that's on the easel in

22  fact fairly and accurately depict the layout of your

23  house and the street on January 20th, 2013?

24  **A.**   Yes, ma'am.

25  **Q.**   Okay.  So what I'd like to do, Mr. Hutchins, if

1    you can -- would you be able to step off the stand and

2    point to the picture for me?

3          (Witness complies)

4    Q.   Yes, thank you.

5          So you came out on to the front porch that we

6    can see there; correct?

7    A.   That is correct.

8    Q.   And using either that photo or the other,

9    whichever works better, can you tell me, where was the

10   cruiser?

11   A.   The cruiser actually was where this vehicle is,

12   ma'am.

13   Q.   And I think it's blue?

14   A.   Yes, ma'am.

15   Q.   And so it was parked directly in front of your

16   house?

17   A.   Yes.

18   Q.   And did you see the vehicle that Ms. Montero had

19   arrived in?

20   A.   No, ma'am.

21   Q.   You never saw it that evening?

22   A.   No.

23   Q.   When you came out the steps, you -- and we've

24   determined now that you came out onto the front porch

25   before Officer McKay.  Was Vanessa Montero standing on

1    the porch?

2    **A.**   No, she wasn't.  I did not see Vanessa that night.

3    **Q.**   You didn't see Vanessa Montero at all that night?

4    **A.**   No, ma'am.

5    **Q.**   At the time, were you familiar with her sister,

6    Catherine Robles?

7    **A.**   Yes, I do know Catherine.

8    **Q.**   And did you see Catherine?

9    **A.**   No, ma'am.

10   **Q.**   So when you came out onto the porch, sir, did you

11   see your son, Lee, Jr.?

12   **A.**   Yes, I did.

13   **Q.**   And please reference the photo.  Can you tell us,

14   where was he?

15   **A.**   Lee at that time was over in this area, and him

16   and the Officer ended up coming over to this area where

17   the cruiser was.

18   **Q.**   And was it to the front of the cruiser?

19   **A.**   No.  To the side of the cruiser.

20   **Q.**   Okay.  And was it the side that faced the street?

21   **A.**   I'm sorry?

22   **Q.**   The side of the cruiser that was facing the

23   street, that was closest --

24   **A.**   That would have been the passenger's side, ma'am.

25   **Q.**   Okay.  And what did you observe happening between

1    Officer Romero and Lee, Jr., when you came out on the

2    porch?

3    **A.**   Well, my main focus was on Keith because Keith was

4    on the porch.  Lee and the other Officer went down

5    about here (indicating) struggling, and he ended up

6    forcing Lee over that way by a chokehold.

7    **Q.**   So, again, now you're saying Keith was on the

8    porch?

9    **A.**   That is correct.

10   **Q.**   But Keith came onto the porch after you; right?

11   **A.**   No.  Keith was before me.  Keith went down before

12   me.

13   **Q.**   Okay.  And so Keith was there?

14   **A.**   Yes.

15   **Q.**   And you were -- what were you doing with him?

16   **A.**   Then I was trying to stop Keith because he was

17   arguing with the officer that was down there that I

18   believe was Officer McKay, and Keith and me were on

19   this porch, and Keith and them were having words.

20   **Q.**   So had Officer McKay come down by then and walked

21   past you?

22   **A.**   I believe so.  When I actually was -- no,

23   because -- I don't know how that occurred, ma'am.  I

24   can't remember that -- exact how the Officer ended up

25   at the bottom of the stairs and him and Keith were

1    having an altercation.  I don't know if I got McKay and

2    another Officer mixed up, but Keith and the Officer

3    that were down here were having words.  And he was

4    instructing Keith to go back inside or he was going to

5    take him to jail.

6    **Q.**   And where was the female Officer?

7    **A.**   At that time, I didn't see a female Officer.

8    **Q.**   And where was Ivan?

9    **A.**   Ivan was upstairs --

10   **Q.**   And how many cruisers did you --

11   **A.**   -- to my knowledge.  I believe he was -- yeah, he

12   was still upstairs because I never seen Ivan when he

13   came downstairs.

14   **Q.**   Okay.  How many cruisers were outside?

15   **A.**   To my knowledge, what I had seen and I can

16   remember, was there was a cruiser here, then another

17   cruiser about over here (indicating).

18   **Q.**   When you first came on the porch, you saw two

19   cruisers?

20   **A.**   I believe it was two.

21   **Q.**   And did they have their lights on?

22   **A.**   No, ma'am.

23   **Q.**   Okay.  And when you say that Lee was -- I'm sorry.

24   Strike that.

25        When you say that Keith and the Officers were

1  having an altercation, Keith was standing on the porch?

2  **A.**   Yes, he was.

3  **Q.**   And where was the Officer?

4  **A.**   The Officer was down at the foot of the stairs,

5  down here (indicating), giving him the demand.

6  **Q.**   And there's a sidewalk there; correct?

7  **A.**   Yes, it is.

8  **Q.**   So how many steps?  Two or three steps that lead

9  up to your porch?

10  **A.**   Yeah, it's -- it's, like, four or five.

11  **Q.**   So Keith was standing above the Officer, and there

12  was three or four steps in between he and the officer?

13  **A.**   Yes, ma'am.

14  **Q.**   And the Officer told him to go back inside?

15  **A.**   They were shouting, and Keith was yelling at him,

16  "Well, tell him to stop hitting my brother.  Tell him

17  to stop hitting my brother."  And he's like, "Either

18  you shut up, or I'm going to take you to jail."  So

19  that's what him and Keith were arguing about.

20  **Q.**   And you didn't see any other Officer outside at

21  that time?

22  **A.**   Only it was that Officer and the Officer dealing

23  with Lee.

24  **Q.**   Okay.  And then I believe your testimony was that

25  you were encouraging Keith to in fact go back inside;

1    is that correct?

2    **A.**    That is correct.

3    **Q.**    And at some point, you convinced him, and at least

4    your sense was that he was starting to move in that

5    direction?

6    **A.**    Yes.  I had gotten Keith turned around, and we

7    made it to the door.

8    **Q.**    And were you physically in contact with Keith at

9    that time?

10   **A.**    Yes, because we were -- he was in front of me, and

11   Keith moved me out of the way.  Keith ended up moving

12   me out of the way this way, and Keith came this way and

13   jumped down those stairs.

14   **Q.**    Okay.  But before he turned back around, were

15   you -- you know, did you have your arm on him, sort of

16   shepherding him toward the door?

17   **A.**    He was going, he was going, Keith was going, and

18   then I guess that's when Keith looked back and seen

19   that the Officer that had informed him to go in.  I

20   guess he ended up over there with Lee --

21   **Q.**    I don't want you to guess.  Just what you

22   observed, sir.

23   **A.**    I believe he ended up over there with Lee because

24   Keith said, F that, and that's when Keith broke away

25   from me and jumped down the stairs.

1    **Q.**   Okay.  So you're using the term "broke away."  So

2    were you holding him in some level?

3    **A.**   I wasn't holding him, but he moved me out of the

4    way so he could go down.

5    **Q.**   Okay.  And what did you do at that point?

6    **A.**   At that point, I was -- I came and I eased my way

7    down the stairs.  At that time, the Officers -- Lee and

8    the Officers were here, and Keith.  Keith and the

9    Officers had fell in the back of the cruiser.

10          At that time, I made my way around the

11    cruiser -- and, actually, it would have been, like,

12    this part because I was in -- the cruiser seemed like

13    it was more -- well, in the picture it seems shorter,

14    but I made it around the cruiser to stand in the street

15    and observe the Officers and Keith in a big pile.

16    **Q.**   And was Lee, Jr., still in the pile at that point?

17    **A.**   I don't know what happened.  No, Lee wasn't in

18    that pile.

19    **Q.**   And you don't recall where he went?

20    **A.**   I have no idea, ma'am.

21    **Q.**   You don't know where Vanessa was?

22    **A.**   No.

23    **Q.**   And you didn't see Ivan?

24    **A.**   No.

25    **Q.**   And so you've testified at that time that you

1   decided you would try to assist in some way by -- and

2   you grabbed, I believe you said, the tip of the baton?

3   **A.**   Well, when I got there, the Officer was laying,

4   and he was swinging.  And as he was swinging, I was

5   like, "If you stop, your partner could get him.  If you

6   stop, your partner could get him.  Stop swinging," and

7   "Keith, just stay.  Just relax."

8          Then the Officer kept swinging.  I said, "If you

9   stop, he could get him.  You're hitting your partner."

10  So at that time, that's when I grabbed the baton, the

11  tip of -- well, he had the baton, and I had the tip of

12  the baton.

13  **Q.**   Okay.  And that was the officer that was on the

14  bottom of the pile?

15  **A.**   That is correct.

16  **Q.**   And is that Officer McKay?

17  **A.**   Yes.

18  **Q.**   So was it McKay, Keith --

19  **A.**   Keith and --

20  **Q.**   -- and Officer Romero?

21  **A.**   Romero.

22  **Q.**   And -- so you grabbed on to -- you grabbed ahold

23  of the end or the tip of the baton, and what happened?

24  **A.**   Then he had said, "If you don't let go, I'll mace

25  you."  By the time I could release, I got maced.

1  **Q.**   And was Officer McKay in full swing when you

2  grabbed it?

3  **A.**   Yes, he was getting ready to hit someone again.

4  **Q.**   So you had a pretty substantial hold on it to stop

5  the swing?

6  **A.**   I actually was able to grab it as he was in the

7  motion of the swing again.  I was able to hold it and

8  stop it.  And then that's when he said "Either you let

9  go, or I'm going to mace you."

10       And he maced me before I could let go.

11  **Q.**   I see.  And -- okay.  So I don't think I'm going

12  to need that anymore, sir.  You're certainly welcome to

13  keep standing if it's more comfortable for you, but I

14  would -- you might want to go up closer to the

15  microphone.

16  **A.**   Okay.

17  **Q.**   So at that point, I believe you situated yourself

18  kind of in the middle of the street, or at least in the

19  street on the other side of the cruiser when you get

20  sprayed; is that correct?

21  **A.**   I was in the middle of the street when I got

22  sprayed, yes.

23  **Q.**   And then you testified that you were having

24  difficulty seeing, and it was burning terribly?

25  **A.**   Correct.

1    **Q.**    And -- but somehow or another you ended up going

2    back towards your porch?

3    **A.**    Correct, ma'am.  I had made it out of the middle

4    of the street, around to the bottom of the stairs.

5    **Q.**    And who did you encounter, if anyone, from your

6    family during that time?

7    **A.**    I was blind.  I didn't encounter anyone.  But I do

8    recall I was rubbing my face, and I'm being told that

9    "If you stop rubbing your face, it'll go away.  It will

10   be easier."

11   **Q.**    And was that by a female Officer?

12   **A.**    Yes, it was.

13   **Q.**    So you were standing and talking to a female

14   Officer, and she was saying rubbing your eyes basically

15   makes the effects worse?

16   **A.**    That is correct.

17   **Q.**    And that's when you felt yourself get hit; is that

18   correct?

19   **A.**    That is correct.

20   **Q.**    And you were in the Courtroom, sir, when your son

21   Demetrius testified, were you not?

22   **A.**    Yes, I was.

23   **Q.**    And do you recall hearing Demetrius' testimony

24   that you were -- that you had your hands up, and you

25   were saying, "I give up .  I give up?"  Do you recall

1    that testimony?

2         MR. RYAN:  I'm going to object to that.  I don't

3    think that was the testimony.

4         THE COURT:  Well, he can say if he remembers it

5    or not.

6    **A.**   I don't recall that, ma'am.

7    **Q.**   Do you recall Demetrius saying that you had your

8    arms up?

9    **A.**   Oh, yes, during the testimony, yes, but I don't

10   recall that night of having my hands up other than

11   rubbing my face.

12   **Q.**   Okay.  So at least that part of his impression or

13   memory of that night was different from yours?

14   **A.**   I would guess because I don't know when he's seen

15   that, but I never recall having my hands up or -- other

16   than rubbing my face.

17   **Q.**   Okay.  And you testified, sir, that, you know,

18   once you figured out that you had been arrested that

19   night, that it caused you some pretty significant

20   anxiety and concerns, fear; is that correct?

21   **A.**   That is correct.

22   **Q.**   And so from the time you got arrested, which would

23   have been January 20th of 2013, until you were

24   exonerated by the jury in September of 2014, you were

25   experiencing that level of anxiety about having these

1    criminal charges pending; is that a fair statement?

2    **A.**   No, ma'am.  It eased out, and then it seemed like

3    the anxiety and things, whenever I was informed that

4    court was coming up, my anxiety was like, Wow, I gotta

5    go through this again, I gotta go through this again.

6    **Q.**   And so -- and you prepared for your criminal

7    trial, did you not?

8    **A.**   I'm sorry?

9    **Q.**   You were preparing yourself for your own criminal

10   trial, were you not?

11   **A.**   Yes, ma'am.

12   **Q.**   And in addition to yourself testifying at the

13   trial, you had some family members testify at the

14   trial, did you not?

15   **A.**   No family members.

16   **Q.**   Did Tyshon testify at your criminal trial, sir?

17   **A.**   No, ma'am.

18   **Q.**   Okay.  And so no family members testified at your

19   criminal trial?

20   **A.**   No, ma'am.

21   **Q.**   And do you recall in this case, sir, answering

22   some interrogatories --

23   **A.**   Yes.

24   **Q.**   -- written questions that were posed by the City?

25   **A.**   Yes, ma'am.

1    **Q.**    And --

2              MS. deSOUSA:  Just one moment, Your Honor.

3              THE COURT:  Yes.

4              (Pause)

5    **Q.**    And you were asked in those interrogatories to

6    identify to the best of your ability, in Question No. 6

7    of the interrogatories that were sent to you from the

8    City of Springfield, to identify all persons who saw or

9    heard or claim to have seen or heard or any other

10   person who claims to have knowledge of events or

11   happenings which occurred at the time of or at the

12   scene at the incident alleged in the complaint or of

13   the events leading up to or immediately after the said

14   incident or the condition of any parties during the

15   24-hour period prior to the incident.

16             Do you recall being asked a question along those

17   lines?

18   **A.**    Yes, ma'am.

19   **Q.**    And do you recall that, in answering it, you said

20   "We haven't decided who we're going to call as

21   witnesses, but look at our initial disclosure"?

22             Do you recall saying that in those answers to

23   interrogatories?

24   **A.**    No, ma'am.

25             MS. deSOUSA:  May I approach, Your Honor?

1      THE COURT:  Yes.

2   **Q.**   So I'm going to show you this document.  I'm going

3   to ask you to read to yourself Interrogatory No. 6 and

4   the answer to Interrogatory No. 6, which is on the same

5   page, and then I'll have a question for you.

6          Have you read that, sir?

7   **A.**   Yes, I have read it.

8   **Q.**   And having read that, does that refresh your

9   recollection about how you answered that question?

10  **A.**   No, ma'am.

11  **Q.**   I'm going to show you Page 10 of the

12  interrogatories, sir.  Is this your signature?

13  **A.**   Yes, it is.

14  **Q.**   And you signed your signature under the words

15  "Sworn under the pains and penalties of perjury;" is

16  that correct?

17  **A.**   That is correct.

18  **Q.**   And you'll agree with me, sir, that the written

19  answer says what I said it said, doesn't it?

20  **A.**   Yes.

21  **Q.**   And it's true, is it not, sir, that in the initial

22  disclosures that you've referred us to, there is no

23  listing of Demetrius Faust as a witness to those

24  events?

25  **A.**   I never said he was.

1    **Q.**   Were you in the Courtroom when he swore under oath

2    that he did witness them?

3    **A.**   That Demetrius witnessed them?

4    **Q.**   Yes.

5    **A.**   Yes, but I never said he did.  And I never said

6    that -- I don't even know what Demetrius saw or heard

7    until we were here in Court.

8            MS. deSOUSA:  Just one moment, Your Honor.

9            (Pause)

10            MS. deSOUSA:  Thank you, Mr. Hutchins.  I have

11    no further questions for you.

12            THE COURT:  Ms. Sheehan.

13            MS. SHEEHAN:  Yes, Your Honor.  Thank you.

14            THE COURT:  And you are cross-examining on

15    behalf of which Defendants, Ms. Sheehan?

16            MS. SHEEHAN:  I will be cross-examining,

17    Your Honor, on behalf of the named individual

18    Defendants.

19            <u>CROSS-EXAMINATION BY MS. SHEEHAN</u>

20    **Q.**   Good morning, Mr. Hutchins.

21    **A.**   Good afternoon, ma'am.

22    **Q.**   I'm sorry.  You're right.  It is -- my first

23    mistake today.

24            Let's talk a little bit about the damages that

25    you're claiming in this case.

1          As I understand it, you're claiming that your

2     arms -- arm spasms; is that correct?

3     **A.**    That is correct.

4     **Q.**    And other than those arm spasms, are you claiming

5     any other physical deficiencies as a result of this

6     incident?

7     **A.**    No, ma'am.

8     **Q.**    And I believe that your deposition was taken in

9     this case; is that correct?

10    **A.**    Yes, it was.

11    **Q.**    And at that deposition, which was held on -- I

12    think we've already referenced to it -- November 18th,

13    2016, I asked you a number of questions; is that right?

14    **A.**    That is correct.

15    **Q.**    And you were represented by your counsel; isn't

16    that correct?

17    **A.**    That is correct.

18    **Q.**    And during that deposition, I asked you whether or

19    not -- what your injuries were, and if you could --

20         MS. SHEEHAN:   Reference for counsel, it's

21    Page 117, Lines 17 through 21.

22    **Q.**    You informed me that your only injuries in this

23    case were in regard to your arms -- correct? -- arm

24    spasms?

25    **A.**    Correct.

1    **Q.**    No injuries to your shoulder --

2    **A.**    No.

3    **Q.**    -- that you were claiming?

4         No injuries to your back; isn't that correct?

5    **A.**    No.  I had had previous existing.

6    **Q.**    Right.  But you didn't claim any exacerbation of

7    that; isn't that correct?  You didn't claim it got

8    worse as a result of that; isn't that right?

9    **A.**    The night of the incident, it had increased, but

10   when we had the deposition, the question I believe you

11   had asked me was what was I claiming happened that

12   night in general, which was me getting struck in the

13   arms, and it limits my ability to raise my arms.

14   **Q.**    Correct.  And then on Page 118, Lines 1 through 8,

15   you informed me that you had told your PCP, or your

16   primary care physician --

17   **A.**    That's correct.

18   **Q.**    -- if I'm reading correctly.  And you see him

19   every two weeks, and you told him that right after you

20   were struck; isn't that correct?

21   **A.**    Correct.

22   **Q.**    And so the first time you saw your -- so let's go

23   back for a minute.  This incident occurred on the 20th

24   of January, 2013 ; correct?

25   **A.**    Correct.

1    **Q.**   And the first time you went to your PCP was on

2    January 28th, 2013; isn't that correct?

3    **A.**   That's correct.

4    **Q.**   So you never went to any emergency room in the

5    City of Springfield, either at Mercy Hospital or

6    Baystate Medical Center in regard to any injuries you

7    claim you received from this incident; isn't that

8    correct?

9    **A.**   That is correct.

10   **Q.**   And not only did you not go to any emergency room,

11   but you didn't go to any other physician.  You didn't

12   go to your PCP until January 28th, eight days after the

13   incident; isn't that correct?

14   **A.**   That is correct.

15        MS. SHEEHAN:  If I may approach the witness,

16   Your Honor?

17        THE COURT:  Yes.

18   **Q.**   Mr. Hutchins, there's no mic.  If you can't hear

19   me, just tell me.

20        Mr. Hutchins, when you went to your PCP, as you

21   always do when you go to your PCP, someone asks you,

22   What's wrong with you, why are you here today, or a

23   question along that line; isn't that correct?

24   **A.**   That is correct.

25   **Q.**   And you answer that question; isn't that correct?

1    **A.**    That is correct.

2    **Q.**    And then you answer it and they write down what

3    you say and then you move on and they do an

4    examination; isn't that correct?

5    **A.**    That is correct.

6    **Q.**    So I'm showing you a record that's on the

7    left-hand side entitled "Baystate Health" -- strike

8    that -- Baystate High Street Health Clinic Adult;"

9    isn't that correct?

10   **A.**    That is correct.

11   **Q.**    And your name is on the right-hand side,

12   Lee Hutchins; correct?

13   **A.**    That is correct.

14   **Q.**    With the right date of birth, so we know this

15   isn't Junior; correct?  This is you; correct?

16   **A.**    Where are you saying is the date of birth at,

17   ma'am?

18   **Q.**    Well, I see a discharge date.  I don't see a date

19   of birth, but my memory is your counsel said you went

20   on 1/28/2013 for the first time-- is that correct? --

21   after this incident?

22   **A.**    Yes, ma'am, that was one of my appointments.

23   **Q.**    And actually it has, under 1/28/2013 as the date

24   of the visit, "Reason for visit," and it says,

25   "Follow-Up D.M."; correct?

1    **A.**   Correct.

2    **Q.**   And then comma, "Back pain;" isn't that correct?

3    **A.**   That is correct.

4    **Q.**   And so this really, on 1/28/13, wasn't a visit to

5    go to your PCP to tell them what happened on the 20th;

6    it was a regularly scheduled visit to follow up -- if

7    I'm correct, "D.M." means diabetes; is that correct?

8    **A.**   I'm not sure, ma'am.

9    **Q.**   It was a regular visit for you to follow up on

10   your diabetes and your back pain -- isn't that

11   right? -- according to --

12   **A.**   I understand the back pain, but I don't understand

13   what the D.M. is, ma'am.

14   **Q.**   Okay.  Why don't we go a little further, and I

15   think we have a discussion of diabetes here.  There it

16   is.

17        If you'd look on Page 3, it says, "Diabetes

18   mellitus"?

19   **A.**   Yes, it does.

20   **Q.**   So that would be the abbreviation for diabetes --

21   is that right? -- D.M.?

22   **A.**   Yes, I believe that's what that would be.

23   **Q.**   And they did a pain system assessment, according

24   to the record; isn't that correct?

25   **A.**   That is correct.

1    **Q.**    And it said, "A detailed pain assessment;" isn't

2    that correct?

3    **A.**    Correct.

4    **Q.**    And the pain assessment, according to the record,

5    says, "Patient stated response," and the only complaint

6    of pain, according to the record on 1/28/2013, was

7    back; isn't that correct?

8    **A.**    That is correct.

9    **Q.**    There's nothing in there about any arm pain; isn't

10   that correct?

11   **A.**    No, ma'am.

12   **Q.**    There's nothing in there about arm spasms; isn't

13   that correct?

14   **A.**    No, ma'am, because that was a follow-up for my

15   back.

16   **Q.**    Perhaps I heard your testimony wrong, but my

17   memory of your testimony was -- and I'll go back to

18   your deposition.  Why don't I do that.

19   **A.**    But that follow-up, ma'am, I believe was for my

20   back, not for other issues, which I did have a

21   follow-up, and at that time I did get reevaluated on my

22   back.

23   **Q.**    Mr. Hutchins, let me just take a look at your

24   deposition testimony, and I'll give you a copy of it.

25   **A.**    Yes, ma'am.

1    **Q.**    If we look at Page 118, Lines 1 through 8 --

2            MS. SHEEHAN:  May I approach the witness,

3    Your Honor?

4            THE COURT:  Yes.

5    **Q.**    -- if I read this incorrectly, just correct me.  I

6    believe the question was -- the question I asked you,

7    "When did you first start getting spasms in your arms?"

8            Your answer:  "It was right after, right after I

9    had been struck, and I was seeing my primary care

10   doctor every two weeks, and through that I was

11   explaining to him -- he was informed of the whole

12   situation of that.  So to today, I still take spasm

13   medicines for that symptom."

14   **A.**    Correct.

15   **Q.**    So on the date back in November, you told me that

16   he was informed of the whole situation --

17   **A.**    That is correct.

18   **Q.**    -- right after the incident; correct?

19   **A.**    Correct.

20   **Q.**    And he just didn't record it in his record; is

21   that right?

22   **A.**    Well, I believe that was a follow-up visit on my

23   back evaluation.

24   **Q.**    Is it your testimony, Mr. Hutchins, that you told

25   your physician --

1    **A.**    Yes, I did.

2    **Q.**    -- that you had arm spasms as a result of an

3    incident with the Police on 1/20/13, and that he simply

4    didn't record it in this record on 1/28/13?

5    **A.**    That is correct, ma'am.

6    **Q.**    And you went to see your physician again --

7    **A.**    Correct.

8    **Q.**    -- after 1/28; isn't that correct?

9    **A.**    Yes, it is.

10         MS. SHEEHAN:  If I could have a minute,

11   Your Honor?

12         THE COURT:  Yes.

13         (Pause)

14   **Q.**    And I believe, according to the medical records,

15   the next time you saw him was on May 28th, 2013.

16         MS. SHEEHAN:  May I approach the witness,

17   Your Honor?

18         THE COURT:  Yes.

19   **Q.**    And, again, on the left-hand column, it says

20   "Baystate High Street Health Center Adult;" isn't that

21   correct?

22   **A.**    Correct.

23   **Q.**    And then it has your name; correct?

24   **A.**    Correct.

25   **Q.**    And the date is 5/28/13; is that correct?

1    **A.**    That is correct.

2    **Q.**    And, again, on this particular record for 5/28/13,

3    which would be about five months after the incident, it

4    says, "Reason for visit:  HCM;" is that correct?

5    **A.**    Yes, it does.

6    **Q.**    Okay.  It doesn't say anything there about

7    complaints of any arm pain, does it, or any spasms in

8    your arms, does it?

9    **A.**    Can you help me -- what is HCM?

10        MS. SHEEHAN:  Your Honor, I beg your indulgence

11    there.

12        THE COURT:  Just move on.

13        MS. SHEEHAN:  I can't answer the questions.

14        THE COURT:  Move on.

15        MS. SHEEHAN:  Okay.

16    **Q.**    And they also did, on 5/28/13, a pain system

17    assessment; correct --

18    **A.**    Correct.

19    **Q.**    -- according to the record?  And according to the

20    record, they did a detailed pain assessment; correct?

21    **A.**    Yes.

22    **Q.**    And, again, they asked you what your pain was;

23    correct?

24    **A.**    Correct.

25    **Q.**    And according to the record on 5/28/13, you said

1    "Back and both leg pain;" correct?

2    **A.**   Correct.

3    **Q.**   You didn't say anything about any arm pain, any

4    arm spasms or anything, according to the 5/28/13

5    Baystate High Street Health Center record; isn't that

6    correct?

7    **A.**   Correct.

8    **Q.**   So that would be the second visit?

9    **A.**   Yes.

10   **Q.**   And, again, is it your testimony that you told

11   your PCP that you were suffering from arm pain --

12   **A.**   Yes, ma'am.

13   **Q.**   -- arm spasms, but he or she failed to put it in

14   the record again?

15   **A.**   Yes, ma'am.  And it's been numerous occasions when

16   I informed my primary care of the situation of my arms,

17   and I did have therapy.

18   **Q.**   Okay.  On 6/11/13, you returned to your PCP; isn't

19   that correct?

20   **A.**   That is correct.

21         MS. SHEEHAN:  May I approach the witness,

22   Your Honor?

23         THE COURT:  Yes.

24   **Q.**   Mr. Hutchins, so this would be five months after

25   the accident -- correct? --

1    **A.**    Correct.

2    **Q.**    -- or the incident?

3          And you see Baystate High Street Health Center

4    again; correct?

5    **A.**    Yes, correct.

6    **Q.**    And your name?

7    **A.**    Correct.

8    **Q.**    And the discharge date is 6/11/13; correct?

9    **A.**    Yes, correct.

10   **Q.**    And, again, there's a reason for the visit, and

11   the reason given is D.M.  I'm going to suggest to you

12   that that's diabetes.

13   **A.**    All right.

14   **Q.**    And, again, they did a pain system assessment, and

15   again, according to the record, it says,

16   "Patient-stated response," and the patient-stated

17   response is "back pain;" is that correct?

18   **A.**    That is correct.

19   **Q.**    All right.  There's nowhere in this record of any

20   notation of any arm pain, arm spasms, an incident with

21   the Police at all, is there?

22   **A.**    No, ma'am.

23   **Q.**    And just -- not to repeat myself, but is it your

24   testimony that, once again, the physician failed to

25   note your complaints of arm spasm or arm pain?

1    **A.**    That is correct.

2    **Q.**    So that would be the third time they didn't?

3    **A.**    Yes, ma'am.

4    **Q.**    All right.  Let's go to the next time you went to

5    see your PCP, which is February 19th, 2014.

6            MS. SHEEHAN:  May I approach the witness,

7    Your Honor?

8            THE COURT:  Yes.

9    **Q.**    And, again, this is -- it's a Baystate High Street

10   Health Center Adult Clinic; correct?

11   **A.**    Correct.

12   **Q.**    And that's your name, again, and there's the date,

13   2/19/14?

14   **A.**    Correct.

15   **Q.**    Okay.  So now we're almost a year after the

16   incident; correct?

17   **A.**    That is correct.

18   **Q.**    And it says "Reason for visit;" correct?

19   **A.**    Uh-huh (affirmative).

20   **Q.**    And it says "FU," which I'm going to suggest to

21   you means follow-up, "D.M., diabetes, labs HCM;" is

22   that correct, what it says?

23   **A.**    That's correct what that says.

24   **Q.**    And, again, looking at the February 19th, 2019,

25   record, there is a history of the present illness;

1    correct?  It says "History of present illness"?

2    A.    Yes, ma'am.

3    Q.    And it also says what you're here for -- right? --

4    your D.M.I., if you will?  Is that right, D.M.I.?

5    A.    Yes, it does.

6    Q.    And if we -- I'm not going to read the whole

7    thing, but why don't you read it to yourself.  Do you

8    see anything there that says anything about any arm

9    pain, arm spasms, arm issues?

10   A.    No, ma'am.

11   Q.    I'll give you the whole record from 2/11 -- strike

12   that -- 2/19/14 and ask you if you can find anywhere

13   there that there's notation --

14   A.    There won't be because my doctor's main concern

15   was my diabetes.

16   Q.    Okay.  So when you made any complaints about --

17   A.    That's correct.

18   Q.    -- pain, they --

19   A.    They gave me more medication.

20   Q.    Okay.  And when they asked you for your pain

21   assessment, and it says, "Patient's stated response" on

22   2/19/14, and it says, "Back and shoulders," they just

23   failed once again --

24   A.    Correct, ma'am.

25   Q.    -- to record that you had arm problems or arm pain

1    or arm spasms?

2    **A.**    Can I respond?

3    **Q.**    Yes or no, does this record suggest --

4    **A.**    Yes, and it states shoulders.

5    **Q.**    So this time you told them back and shoulders; is

6    that correct?

7    **A.**    And it wasn't shoulders; it was arms, ma'am, and

8    they had me go to physical therapy for my shoulders,

9    determining through the physical therapy that it's not

10   my shoulders that's my problem; it's my muscles.  When

11   I make any flexes with my muscles, I get spasms.  It

12   wasn't my shoulders.

13   **Q.**    Mr. Hutchins --

14   **A.**    But through the therapy -- yes, ma'am.

15   **Q.**    Is there any indication in any of the records that

16   I've read to you that you told -- strike that -- that

17   the record reflects that you told them you had arm

18   pain?

19   **A.**    The only one is when they indicate shoulders,

20   ma'am.

21   **Q.**    Let's go to the next one.  That's 3/5/14.  That's

22   the next time you actually went to see your PCP; is

23   that correct?

24   **A.**    That might be, yes.

25        MS. SHEEHAN:  And may I approach the witness,

1     Your Honor?

2          THE COURT:  Yes.

3     **Q.**   So, again, I'm showing you a record that's

4     entitled "Baystate High Street Health Center Adult;"

5     correct?

6     **A.**   Correct.

7     **Q.**   And your name's on it; is that correct?

8     **A.**   Correct.

9     **Q.**   And the discharge date is 3/5/14; correct?

10    **A.**   That's correct.

11    **Q.**   And the reason for the visit this time is

12    depression, D.M., and pain -- correct? -- according to

13    the record?

14    **A.**   That is correct.

15    **Q.**   And, again, there's a detailed pain assessment --

16    correct? --

17    **A.**   That is correct.

18    **Q.**   -- according to the record anyway?

19          And the response from you, according to the

20    record, in regard to your pain assessment, is back

21    pain; is that right?

22    **A.**   That is correct.

23    **Q.**   And at this point, you're also making complaints,

24    according to the record anyway, in regard to frequent

25    anxiety, and it states, "Upcoming court case."  That

1    would be your criminal case; is that right?

2    A.    That had to have been, yes, ma'am.

3    Q.    And it also says, "Financial difficulties;"

4    correct?

5    A.    Yes.

6    Q.    Doesn't it say that?

7    A.    Yes, it does.

8    Q.    And so it's fair to say that there were a number

9    of stressors in your life; isn't that right?

10   A.    That's correct.

11   Q.    And one of them was financial issues as well as

12   your upcoming court case; correct?

13   A.    That is correct.

14   Q.    And is there any notation in that regard on 3/5/14

15   of any arm pain, according to the record?

16   A.    No, ma'am.

17   Q.    Now, you returned to the doctor, your doctor, on

18   three -- I'm sorry, I apologize -- 3/19/14, so that

19   would be about two weeks later; is that correct?

20   A.    Yes, ma'am.

21        MS. SHEEHAN:   May I approach the witness,

22   Your Honor?

23        THE COURT:   Yes.

24   Q.    And this says, again, Baystate High Street Health

25   Center Adult, and your name is there; correct?

1    **A.**    That is correct.

2    **Q.**    And it has a discharge date of 3/19/14; correct?

3    **A.**    That is correct.

4    **Q.**    And, again, there's a notation here as to -- there

5    isn't actually one as to the reason for the visit, but

6    there's a pain assessment; correct?

7    **A.**    That is correct.

8    **Q.**    And, again, this says, "Patient-stated response;"

9    correct?

10    **A.**    Correct.

11    **Q.**    And in this one, they have "back, left shoulder

12    and arm;" isn't that correct?

13    **A.**    That's correct.

14    **Q.**    So all those other times, they just failed to put

15    it down until March 19th, 2014; is that right?

16    **A.**    That's correct.

17    **Q.**    That's the first time they got your record

18    correct; is that right?  Is that what your testimony

19    is?

20    **A.**    But according to that, ma'am, that's only one

21    shoulder.  I was treated at physical therapy for two

22    shoulders, which wasn't my problem.  My issues and my

23    pain was in my arms, not my shoulders.

24    **Q.**    Mr. Hutchins, I don't want to belabor this.

25    **A.**    Yes.

1    **Q.**    But is it your testimony --

2    **A.**    Yes.

3    **Q.**    -- that all the other times they failed to do it?

4    **A.**    Yes, ma'am.

5    **Q.**    But they finally got it right a year and about

6    three or four -- three months later?  They finally

7    captured the word "arm" that you had been telling them

8    all along for a year?

9    **A.**    That is correct.

10    **Q.**    Now, I think you had -- you testified that this

11    particular incident caused you some emotional distress;

12    isn't that correct?

13    **A.**    Yes, ma'am.

14    **Q.**    And, Mr. Hutchins, you had been seeing a therapist

15    prior to that?

16    **A.**    Yes.

17    **Q.**    And you had been seeing a therapist since 2008, at

18    least; is that correct?

19    **A.**    Yes, ma'am.

20    **Q.**    And you had some issues with your interpersonal

21    relationships -- is that fair to say? -- along with

22    anxiety and depression, prior to this incident?

23    **A.**    Yes, ma'am.

24    **Q.**    Now -- and you had some depression after the

25    incident; correct?

1    **A.**    That is correct.

2    **Q.**    And part of that you attribute to this Court case;

3    is that correct?

4    **A.**    Yes, ma'am.

5    **Q.**    And part of that is contributing by -- it is

6    contributed to by some issues within the family; isn't

7    that correct?

8    **A.**    I'm sorry?

9    **Q.**    Part of your depression that you've treated for

10    after this incident relates to issues within your

11    family; isn't that correct?

12    **A.**    Not within my family, but what happened throughout

13    my life and my family; not my in general family now.

14    What I experienced and what I have been going through

15    in my life, ma'am, that is what me and the doctor have

16    talked about, just like with my arm situation.  I don't

17    understand the terminology they put on the paper, but

18    yes.

19    **Q.**    Okay.  So when one of the records say you have

20    some issues caring for your teenage son, that's

21    incorrect; is that right?

22    **A.**    That is incorrect.  My teenage son?  Which one?

23    **Q.**    I'll get that record in a minute.

24    **A.**    I would appreciate it.

25    **Q.**    And you also had an issue because your daughter

1   was being sued even though she had been spit upon;

2   isn't that correct?

3   **A.**   Oh, yes, ma'am.  That is my stepdaugter we are

4   talking about that doesn't live in my household.

5   **Q.**   And there was also an issue in regard to an

6   assault charge involving one of your daughters, too;

7   isn't that correct?

8   **A.**   No.  That was my kids' mother, Sandra.

9   **Q.**   She had an assault charge?

10  **A.**   Yes.  And she was being sued, and they were trying

11  to sue me as well.

12  **Q.**   And that was causing you some stress; isn't that

13  fair to say?

14  **A.**   Yes.  Yes, ma'am.

15  **Q.**   And financial considerations were also causing you

16  stress?

17  **A.**   Well, the woman was suing me for $150,000.  You

18  would have stress.

19       MS. SHEEHAN:  If I could have a minute,

20  Your Honor?

21       (Pause)

22  **Q.**   Now, if I could just a minute -- for just a

23  minute, Mr. Hutchins --

24  **A.**   Yes.

25  **Q.**   -- I believe you also had a stressor in regard to

1  your -- one of your son's activities by reporting

2  somebody to the DA; is that right?

3  **A.**   That is correct.

4  **Q.**   And, as a matter of fact, that caused you such

5  anxiety for your own safety and the safety of your

6  family that you moved out of your house for some period

7  of time; is that correct?

8  **A.**   That is correct.

9  **Q.**   And then you moved back in; is that right?

10  **A.**   That is correct.

11        MS. SHEEHAN:  That's all I have.  Thank you.

12        THE COURT:  Redirect?  Mr. Ryan.

13        MR. RYAN:  May I approach the witness?

14        THE COURT:  Yes.

15        <u>**REDIRECT EXAMINATION BY MR. RYAN**</u>

16  **Q.**   Mr. Hutchins, Ms. Sheehan asked you some questions

17  about your deposition that you gave back on

18  November 18th, 2016, and I think she started up here at

19  the top on Page 118 and asked you some questions down

20  to right around here, Line 8.

21        Did Ms. Sheehan asked you, "When you say your

22  primary care physician was informed of the whole

23  situation, what are you referring to?"  What's the

24  answer that you gave from Lines 12 here to through 15?

25  **A.**   "I told him I've been hit by an Officer in my arms

1      with a baton, and I have been using my regular meds to

2      manage the pain, but I just keep getting" --

3      **Q.**   And --

4      **A.**   "It feels like a frog, the sensation of a frog."

5      **Q.**   Is that like a frog jumping in your arms or --

6      **A.**   No.  It's when -- I describe it because when we

7      were kids, you used to walk by your buddy and give him

8      the knuckle that gives him a frog.  That's the

9      sensation I deal with in my arms.

10     **Q.**   Now, prior to that, disclosing that sensation, did

11     you indicate that you were using initially your regular

12     pain medication that you already had to deal with this

13     pain that you had?

14     **A.**   Yes.  I had previously talked to my primary care

15     of the doses that I was taking for that pain.

16     **Q.**   And so for this first period of time, were you --

17     until a few visits down the road, were you attempting

18     to use your regular pain medication to deal with the

19     injuries that you suffered?

20     **A.**   Yes.

21     **Q.**   Now, I'd like to show you a -- what's been marked

22     as Exhibit 25.  Is this from Baystate Health Center,

23     November 13th, 2014?

24     **A.**   Yes, sir.

25     **Q.**   And does it indicate that you had pain with

1    increased movement in both shoulders since trauma which

2    occurred the year before?

3    **A.**   Yes, it does.

4    **Q.**   And does it say that, "Has not been using any

5    other medication or therapy for the pain"?

6    **A.**   Yes, it does.

7    **Q.**   "And also complains of numbness and weakness in

8    the hands and fingers since the incident"?

9    **A.**   Yes, it does.

10   **Q.**   Now, Mr. Hutchins, if I could show you what's been

11   marked as Exhibit 27 from Baystate Medical Center,

12   August 20th, 2015.  At the very bottom where it says,

13   "Arm pain," does it indicate, "Was hit in arms in 2013.

14   Since then, he reports pain, lack of strength in his

15   arms"?

16   **A.**   Yes, it does.

17   **Q.**   Now, Mr. Hutchins, were these reports that you

18   made of an ongoing injury that just wasn't seeming to

19   get any better?

20   **A.**   No, sir.

21   **Q.**   Maybe that's a poor question.

22   **A.**   Yeah.

23   **Q.**   Did you continue over the years to tell the

24   doctors that this problem with your hands and arms was

25   not getting any better?

1    **A.**   Yes, sir.

2         MR. RYAN:  At this time, I'd ask to admit

3    Exhibits 25 and 27.

4         THE COURT:  They will be admitted, as redacted.

5         (Exhibit Nos. 25 and 27 were admitted in full)

6    **Q.**   And we didn't spend a whole lot of time going

7    through Exhibit 18 here -- actually, I'm going to wait

8    to do a redaction on Exhibit 18.

9         Mr. Hutchins, Ms. deSousa asked you some

10   questions about the order that people went down the

11   front stairs of your house on this occasion.  Do you

12   remember those questions?

13   **A.**   Yes, sir.

14   **Q.**   And I think you've testified that you may have

15   been mistaken in your recollection as to the order of

16   who went down and when.  Is that basically what

17   happened about a half an hour ago?

18   **A.**   That's fair to say.

19   **Q.**   And when you -- during that portion of the getting

20   down the stairs, had anybody been hit before then?

21   **A.**   Not to my knowledge.

22   **Q.**   Had you witnessed either of your sons in a

23   physical altercation with the Police at that point?

24   **A.**   No, sir.

25   **Q.**   Do you have any doubt about what you testified to

1   in terms of what you witnessed from the porch of your

2   residence out into the street culminating with getting

3   pepper-sprayed and being hit by a baton?

4   **A.**   No, I do not.

5        MR. RYAN:  If I can just have a moment?

6        THE COURT:  Yes.

7        (Pause)

8        MR. RYAN:  No further questions.

9        THE COURT:  Recross, Ms. deSousa?

10       MS. deSOUSA:  A quick one, Your Honor.

11           **RECROSS EXAMINATION BY MS. deSOUSA**

12   **Q.**   It's fair to say, Mr. Hutchins, that at the time

13   you were going down those front stairs, you had just

14   heard your son Lee, Jr., threaten physical harm to the

15   mother of his child, the mother of your grandson, in

16   front of two armed Police Officers?  Isn't that true?

17   **A.**   Yes.

18       MS. deSOUSA:  I have nothing further.

19       THE COURT:  Anything, Ms. Sheehan?

20       MS. SHEEHAN:  Just one, one question,

21   Your Honor.

22       THE COURT:  Okay.  Yes.

23           **RECROSS EXAMINATION BY MS. SHEEHAN**

24   **Q.**   Mr. Hutchins, isn't it fair to say that you never

25   told me at your deposition and specifically denied you

1    had any issues with your shoulders as a result of this?

2    **A.**   I wasn't asked.  I only answered the questions

3    that were asked.

4          MS. SHEEHAN:  May I approach the witness,

5    Your Honor?

6          THE COURT:  Yes.

7          MS. SHEEHAN:  On Page 117, Lines 22 to 24.

8    **Q.**   If I read this incorrectly, tell me.

9    **A.**   Yes.

10   **Q.**   Question:  "Do you have any shoulder injuries,

11   shoulder injuries as a result of this incident?"

12   **A.**   No.

13   **Q.**   Answer:  "No."

14          That was your answer; correct?

15   **A.**   Correct.

16   **Q.**   And that was given under oath at your deposition?

17   **A.**   Yes, it was.

18   **Q.**   You were represented by counsel; is that correct?

19   **A.**   Yes, ma'am.  And I still don't have shoulder

20   issues.

21          MS. SHEEHAN:  Your Honor, if I could, I would

22   request that, subject to issues with redaction, that I

23   be able to introduce into evidence the Baystate High

24   Street Health Center Adult records for 1/28/13,

25   3/19/14, 6/11 -- 5/28/13, 6/11/13, 2/19/14, 3/5/14 and

1    3/19/14.

2          MR. RYAN:  If I could just see copies of what

3    counsel intends to introduce?

4          THE COURT:  Yes.  Subject to redaction, they

5    will be admitted.  What are the next numbers in

6    sequence for exhibit numbers?

7          MS. SHEEHAN:  I've been advised that it's 146.

8          THE COURT:  So starting with 146, and how many

9    documents do we have?

10         MS. SHEEHAN:  146 -- starting with 147,

11   Your Honor.

12         THE COURT:  We'll start with 147.

13         MS. SHEEHAN:  And I believe we have six

14   documents, Your Honor.

15         THE COURT:  Why don't you give me the dates.

16   147 will be what date?

17         MS. SHEEHAN:  1/28/13.

18         THE COURT:  Yes.  And 148 will be?

19         MS. SHEEHAN:  5/28/13.

20         149 --

21         THE COURT:  149 will be?

22         MS. SHEEHAN:  6/11/13.

23         THE COURT:  Exhibit 150 will be --

24         MS. SHEEHAN:  2/19/14.

25         THE COURT:  151?

1          MS. SHEEHAN:  3/5/14.

2          THE COURT:  152?

3          MS. SHEEHAN:  3/19/14.

4          THE COURT:  And that's it?

5          MS. SHEEHAN:  That's it, Your Honor.  Thank you.

6          THE COURT:  All right.  They will be admitted,

7     subject to redaction.

8          (Exhibit Nos. 147-152 were admitted in full)

9          THE COURT:  You're through with your

10    cross-examination?

11         MS. SHEEHAN:  I am, Your Honor.

12         THE COURT:  Thank you, Mr. Hutchins.  You may

13    step down.

14         Mr. Ryan?

15         MR. RYAN:  Your Honor, the Plaintiff would rest.

16         THE COURT:  All right.  Plaintiff rests.

17         We are going to recess at this stage, Jurors, as

18    I said we would.  It happens to be just about 1:30 when

19    I thought we would.  That doesn't usually happen.

20    We're lucky.

21         But now I am not going to have an afternoon

22    session.  I have other business that I need to attend

23    to, and we'll ask you to come back at 9:00 a.m.

24    tomorrow morning.  It is my best estimate -- but again,

25    there's no guarantees in jury trials -- that we will

1    have a full day tomorrow and a full day Monday, and

2    that the case will be -- the evidence will be completed

3    sometime on Monday, and I'm going to then ask you to

4    come back on Tuesday morning, at which time you will

5    hear closing arguments and my charge to you on the law,

6    and I am hopeful that sometime late morning next

7    Tuesday, the case will be submitted to your hands for

8    deliberation.

9            That's my plan.  That's the best estimate.  We

10   may not meet it, but that's what I believe will happen.

11           Continue to keep in mind my instructions about

12   not talking about this case.  As we get closer to the

13   end, it is more important that you acknowledge my

14   instructions and not try to be influenced by anything

15   that occurs outside this Courtroom.

16           It is very important that you honor those

17   instructions.

18           Please leave your notebooks in the jury room,

19   and I'll see you back here tomorrow morning at 9:00

20   a.m.   Have a pleasant rest of the day.

21           THE CLERK:  All rise for the jury.

22           (The jury is not present for the following.)

23           THE COURT:  All right.  Please be seated,

24   counsel.

25           I will briefly hear counsel, Plaintiff having

1    rested.  Ms. deSousa?

2            MS. deSOUSA:   Thank you, Your Honor.

3            Your Honor, I do have a short memorandum to

4    submit to the Court.  At this time, the City of

5    Springfield moves, under Rule 50, for judgment as a

6    matter of law on the counts directed against it, which

7    deals with -- Count III, Your Honor, which deals with

8    the municipal liability under the *Monell -- Monell* and

9    its progeny.

10           I would suggest to the Court that there is not

11   sufficient credible evidence in front of this jury from

12   which this jury could determine that there was a

13   policy, practice or procedure in place in the City of

14   Springfield that would support a finding that that

15   policy exhibited a deliberate indifference of the City

16   to its citizens.

17           In the complaint, the Plaintiff indicated that

18   they were proceeding under a theory of a failure to

19   train and/or failure to discipline.  I don't believe

20   there's any evidence at all that's been submitted to

21   the Court relative to the training provided to the

22   Officers, so I think the issue then becomes failure to

23   discipline.

24           As noted at the outset, Your Honor, there is no

25   expert here to assist the jury in determining what is

1   the minimally acceptable level of review and

2   disciplinary practices for a busy urban police

3   department to have.

4        And I would suggest that, in and of itself,

5   under this type of a claim would be fatal to their

6   ability to present a prima facie case, especially with

7   a heightened standard of deliberate indifference.

8        But here I don't even think the Court needs to

9   rely upon the lack of expert witness.  There just was

10  insufficient evidence that the jury could use any

11  common knowledge or experience to support a finding

12  that the policies and practices of the City were

13  deficient to a level that would support deliberate

14  indifference.

15       In fact, what this jury has heard is that

16  Officers who were involved in -- who were on the force

17  for more than ten years each had a relatively small

18  number of complaints, that those complaints were

19  investigated.  You've also heard the testimony of

20  Commissioner Fitchet who testified that over the course

21  of his time with the City, that the process of

22  discipline and review of citizens' complaints has

23  evolved.

24       Prior to this incident, the City was -- the

25  Police Chief had no ability to discipline or fire

1    Officers.  That was handled by a volunteer Civilian

2    Control Board -- I'm sorry, strike that, I keep doing

3    that -- a volunteer civilian Police commission.  A

4    control board came into the City in or about 2004, and

5    they took over the day to day running of the City, and

6    under their watch, they changed that process.  And

7    Commissioner Fitchet testified, and the evidence has

8    borne out that since the change occurred in about 2005,

9    that the process has continued to evolve.

10         And instead of relying on a completely volunteer

11   board, the power to manage the workforce vests in the

12   Police Commissioner, who's the Executive Officer of the

13   City.

14         But we also have a fully independent community

15   members, Citizens Police Hearing Board, and they meet

16   regularly and they review all complaints.

17         They can have hearings, if necessary, but they

18   are there to act as a second set of eyes and review and

19   give their advice and their sense of the matter to the

20   Police Commissioner who is ultimately responsible.

21         Commissioner Fitchet, who, at all times material

22   to this case, was the Chief Executive Officer of the

23   City of Springfield Police Department, testified that

24   it was his practice uniformly to rely upon and follow

25   the recommendations of the Citizens Hearing Board.  The

1    name of that has changed a couple of times, but its

2    essential functions have remained the same.

3         This isn't a case where there is no process for

4    discipline, nor is there anything in this record to

5    suggest that the discipline that is bestowed upon the

6    Officers is a sham.  In fact, Officer Fitchet testified

7    that he has fired people for excessive force and that

8    other Officers have had significant suspensions without

9    pay.  So this isn't a sham or toothless process.

10   Officers know they start in the training academy being

11   told of their obligations to not use excessive force.

12   They understand and were able to articulate its

13   reasonableness under the circumstances.  That's

14   reinforced throughout their entire career, and they

15   know that they will be subjected to discipline if they

16   violate that policy.

17        And, finally, and perhaps most troubling, there

18   is not a scintilla of evidence, even if, for whatever

19   reason, this jury was inclined to say, I don't think

20   that's adequate to have for this level of review.  I

21   don't know what they would base that on, but even if

22   they did, there is no evidence whatsoever in this

23   record that would allow a jury to determine that

24   there's a causal connection between that disciplinary

25   system and the events of January 20th, 2013.

1          And of course, before anybody ever got to that

2     *Monell* issue, there would have to be a finding that the

3     Officers had in fact had committed a Constitutional

4     tort that night.  For purposes of this argument, I

5     guess I'm assuming that that has happened.  I don't

6     think the evidence would support that either, but

7     you're going to hear from Attorney Coyle on that issue.

8          So for all of those reasons, Your Honor, I

9     really believe that this is the unusual case where we

10    should be granted judgment as a matter of law at the

11    close of the Plaintiff's evidence.

12          Thank you.

13          THE COURT:  Are you going to reduce that to

14    writing?

15          MS. deSOUSA:  I have, Your Honor.

16          THE COURT:  And with a memorandum, or just the

17    motion is in writing?

18          MS. deSOUSA:  A memorandum.  I mean, it's not

19    the lengthiest one I've ever written, but I think it

20    captures what I've just said.

21          THE COURT:  I'll hear the Plaintiffs in response

22    briefly.

23          MR. RYAN:  Your Honor, the evidence is clear

24    that, with respect to 12 prior instances of citizen

25    complaints against Officers McKay and Hervieux, the

1    City had a custom of rejecting complaints any time

2    there was a material conflict in the evidence.

3    Commissioner Fitchet testified that material conflicts

4    in the evidence were to be expected in practically

5    every case where a citizen made a complaint.

6         The evidence in the 12 cases indicates that

7    these were colorable claims.  In some cases, citizens

8    were seriously injured; others, Officers made damning

9    admissions, offered questionable explanations or had

10   their misconduct captured on film or they destroyed the

11   photographic evidence.

12        Now, I don't think this is an unusual case -- or

13   is the unusual case that Ms. deSousa just referred to

14   by any stretch.  I think it would be hard to think of a

15   custom more demonstrative of deliberate indifference to

16   the rights of citizens than to have one where their

17   complaints would be automatically rejected any time an

18   Officer denied using excessive force.

19        As for whether this custom was a direct cause or

20   moving force of the alleged Constitutional violations,

21   I think a reasonable juror could easily conclude that,

22   in the months preceding this incident on Daytona

23   Street, you had Officer Hervieux who, after racking up

24   a half a dozen "not sustained" had a complaint in

25   July of 2012 where it was resolved where there had been

1   an allegation of excessive force, and the Commissioner

2   found that that -- the preponderance of the evidence

3   showed that his alleged conduct did occur but that it

4   didn't violate the protocols of the Springfield Police

5   Department.  I think the communication that's

6   effectively given to this Officer is:  Anything goes.

7           Same for Officer McKay.  That video that was

8   shown to the jury that Commissioner Fitchet indicated,

9   after getting a memorandum, a special report to him,

10  this video should be watched in its entirety.  He

11  exonerated Officer McKay, and in that case, the

12  evidence was clear that this was one where they didn't

13  even give it to the Citizen Review Board.  So I don't

14  think you can lay everything at the door here of the

15  Citizen Review Board when it's not getting a case of

16  compelling evidence of an Officer using excessive

17  force.

18          I would also note, Your Honor, that I think that

19  a *Monell* claim is not simply a failure to discipline;

20  there's a failure to supervise component of that, and I

21  think the evidence with respect to Officer Hervieux and

22  Officer Fitchet, his serious medical conditions that he

23  came back from his tour of duty with indicates that the

24  Commissioner said, "Yeah, I would have liked to have

25  known that one of these people that I was issuing a

1    return-to-duty order had had this traumatic brain

2    injury, but I didn't know."

3           And Officer Hervieux was quite clear that he

4    didn't tell anybody about it.

5           So to have, as Commissioner Fitchet acknowledged

6    throughout his testimony, serious concerns with combat

7    veterans coming back and reintegrating and being able

8    to do this very different job of a Police Officer and

9    yet to have no mechanisms in place to make sure that

10   these Officers aren't bringing the war back home, so to

11   speak, I think goes to a compelling second way in which

12   the City is liable for what happened to Mr. Hutchins

13   back on January 20th, 2013.

14          So I'd ask the Court to deny this motion.

15          THE COURT:  Thank you.  The motion is denied

16   without prejudice.  The matter will go to the jury.

17   We'll be in recess until --

18          MR. COYLE:  Your Honor, I have a motion on

19   behalf of the individual Officers.

20          THE COURT:  You may file such a motion, and I

21   will consider that.

22          MS. deSOUSA:  Thank you, Your Honor.

23          THE COURT:  Does the Plaintiff have anything in

24   writing in response to these motions?  Mr. Ryan.

25          MR. RYAN:  I just received Ms. deSousa's.  We'll

1    respond in writing as soon as we get something.

2          THE COURT:  And I'll consider it when I get

3    that.

4          MR. RYAN:  Thank you very much, Your Honor.

5          THE COURT:  All right.  We're in recess until

6    9:00 tomorrow morning.

7          THE CLERK:  All rise.

8          (Adjourned, 1:42 p.m.)

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9          I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes in the

12   above-entitled case.

13

14

15

16

17

18              /s/ Debra D. Lajoie

19

20

21

22

23          3/5/19

24

25