1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4
      * * * * * * * * * * * *    16CV30008-NMG
5     LEE HUTCHINS              *
                                *
6     VS.                       *  JANUARY 29, 2019
                                *  9:27 A.M.
7     DANIEL McKAY, et al       *
                                *
8     * * * * * * * * * * * *    BOSTON, MA

9

10         BEFORE THE HONORABLE NATHANIEL M. GORTON

11                    DISTRICT JUDGE

12                 (Jury Trial - Day 6)

13

14    **APPEARANCES**:

15

      FOR THE PLAINTIFF:      LUKE F. RYAN, ESQ.
16                            SAMANTHA LEBOEUF, ESQ.
                              DAVID P. HOOSE, ESQ.
17                            Sasson, Turnbull & Hoose
                              100 Main Street
18                            Third Floor
                              Northampton, MA  01060
19

20    FOR THE DEFENDANTS,
      McKAY AND HERVIEUX:     KEVIN B. COYLE, ESQ.
21                            935 Main Street
                              Springfield, MA  01103
22

      FOR THE DEFENDANT,
23    ROMERO:                 KATHLEEN E. SHEEHAN, ESQ.
                              Keyes & Donnellan
24                            293 Bridge Street, Suite 600
                              Springfield, MA  01103
25

1        **APPEARANCES** (Cont'd):

2     FOR THE DEFENDANT,      LISA C. deSOUSA, ESQ.
       CITY OF SPRINGFIELD:    JEREMY SAINT LAURENT, ESQ.
3                              City of Springfield
                               36 Court Street
4                              Springfield, MA  01103

5                              Debra D. Lajoie, RPR-FCRR-CRI-RMR
       Court Reporter:         One Courthouse Way
6                              Boston, MA  02210

7

8                  Proceeding reported and produced
                    by computer-aided stenography

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    29 JANUARY 2019 -- 9:27 A.M.

2              THE CLERK:  All rise.

3              (The jury is not present for the following)

4              THE CLERK:  Thank you.  You may be seated.

5    Court is now in session.

6              THE COURT:  Good morning, Counsel.  I just

7    wanted to see you briefly before we call the jury for

8    closing arguments.

9              With respect to one item on the verdict form,

10   because the -- at least in the Court's opinion, the

11   excessive force count and the assault and battery count

12   are interchangeable or equivalent, I would like it

13   understood, in order to avoid an inconsistent jury

14   verdict, that however the jury answers Questions 2 and

15   2A, those answers will be deemed to be the answers for

16   3 and 3A, regardless of what the jury does.

17             MR. RYAN:  We don't have any problem with that.

18             THE COURT:  Mr. Ryan.

19             MS. deSOUSA:  We have no objection to that.

20             THE COURT:  All right.  So what I could do is

21   re-do the verdict form and say, "If you answer 2A yes,

22   go to 3.  If you answer no, skip 3."  But it's going to

23   mean a lot of work now, and then we have to jiggle some

24   of the other instructions.  So I think it's easier to

25   do it this way.  So that's why I called it to your

1    attention.

2         And just for the record, both sides do agree

3    with the verdict form in its present form; am I

4    correct, Mr. Ryan?

5         MR. RYAN:  Yes, Your Honor.  Just a response

6    regarding prejudgment interest that I --

7         THE COURT:  Well, that, as you have pointed out,

8    is a matter for the Court to determine.

9         MR. RYAN:  Correct.

10        MS. deSOUSA:  Defendants are satisfied,

11   Your Honor.

12        THE COURT:  All right.  Thank you.  Then we'll

13   proceed with closing arguments.  Call the jury.

14        MR. HOOSE:  Judge, if I could just ask your

15   indulgence.  We have -- Mr. Hutchins has some family

16   coming --

17        THE COURT:  My Deputy's told me about that, and

18   you can have, you know, a half a minute or so between.

19        MR. HOOSE:  That's all I need.

20        THE COURT:  But no announcements about who's

21   going to be here.

22        MR. HOOSE:  No, no.  I just didn't want them to

23   interrupt the Defendants' closing.

24        THE COURT:  That's fine.  Yes.

25        (Pause)

1    THE CLERK:  All rise for the jury.

2    (The jury is present for the following)

3    THE CLERK:  Thank you.  You may be seated.

4    THE COURT:  Good morning, Jurors.  Welcome back.

5    We are now ready for closing arguments.  And by

6    tradition, in civil cases, the Defendants argue first,

7    followed by the Plaintiffs.

8    In this case, the Defendants' closing arguments

9    is going to be split.  Mr. Coyle will be arguing on

10   behalf of the individual Defendants, Mr. Hervieux and

11   McKay.  And then Mr. Saint Laurent will be arguing on

12   behalf of the City and the Defendant Romero.

13   So, with that, Mr. Coyle may make closing

14   arguments for the Defendants, Hervieux and McKay.

15   MR. COYLE:  And Romero, Your Honor.

16   THE COURT:  And Romero, all right.

17   MR. COYLE:  Thank you, Your Honor.

18   Good morning.  You've been here a week, you've

19   listened to witnesses, you haven't yet seen, but you'll

20   be given the opportunity to view a number of documents

21   that are relevant to this case, and then you will

22   finally be able to talk to your fellow jurors about

23   this case and give your thoughts and listen to the

24   thoughts of each other.

25   This is a very important function, as the Court

1    has reminded you several times, very important to the

2    parties in this case, very important to the Plaintiff,

3    Mr. Hutchins, and it's also very important to these

4    Officers, Officer Hervieux, Officer McKay and

5    Officer Romero.

6              You may remember that when I spoke to you at the

7    beginning of this trial, I asked you to keep your eyes

8    open, keep your ears open and keep your mind open.  And

9    with your ears, you heard the testimony.  Pretty soon

10   with your eyes you'll be able to see these various

11   exhibits, which are both documents, paper documents and

12   also there's some short videos, which have already been

13   shown to you.  And I hope your mind has been kept open

14   so that you could wait for all of the evidence to come

15   in before you began to draw conclusions or make

16   judgments about what actually happened on January 20th,

17   six years ago -- over six years ago, in 1913 -- 2013.

18   I'm oriented towards the 20th century, unfortunately.

19             On that date, as you know, there was a call for

20   service that was received by the Springfield Police

21   Department, and that call came from Vanessa Montero.

22   And she called to seek assistance and to have someone

23   make sure that nothing would go wrong when she went to

24   retrieve her child Ivan from Lee Hutchins, Jr.  So she

25   called the Police Department, explained what she

1    needed, and the Police Department dispatched two

2    Officers, Officer McKay and Officer Romero, to meet

3    Ms. Montero to take -- to allow this to go forward.

4           And you've heard testimony that this is not an

5    unusual assignment for these Officers.  Maybe in your

6    own experience you've known people that have had

7    domestic issues, and oftentimes the Police are sent

8    just to make sure that there isn't any problem.

9    Presence of Police Officers usually deters violence

10   even if the people involved might have had the

11   potential to be violent.

12          So, in this case, initially the Officers didn't

13   connect with Ms. Montero.  They went to the address, I

14   believe it was the CVS on Belmont in Springfield,

15   couldn't find her.  A short time later, when they

16   actually were responding to another call at the Dunkin'

17   Donuts across the street, Ms. Montero presented

18   herself, and then they realized, Okay, this is the

19   person that we were supposed to meet.  And she told

20   them where they were going, and they followed her to

21   the location on Daytona Street in Springfield.

22          And as you've heard, it was the intention of

23   Ms. Montero to retrieve her child Ivan from his father,

24   Lee, Jr.  She obviously had reasons to be concerned

25   about whether or not this would be done peacefully.

1  You've heard testimony about the fact that there were

2  some text messages at which Lee, Jr., had said, If

3  you're going to come for Ivan, you'd better bring the

4  Police.  That's a threat.  There's no other way to

5  interpret that.  Whether it was an idle threat or not,

6  no one could know at the time.  It turned out not to

7  be.

8        But at that time, the Officers and Ms. Montero

9  went to the front door of 53 Daytona Street, rang the

10  bell, and it was answered by Tyshon Faust who came down

11  the stairs.  They asked him or told him why they were

12  there, and the young man went back up the stairs saying

13  that he would take care of it.  At some point, the

14  Officers were told that Ivan would be brought down for

15  the Officers and Ms. Montero to effect the transfer.

16        The Officers waited there for a considerable

17  amount of time.  No one showed up longer than seemed

18  would be necessary to prepare a child, put a coat on

19  him or whatever was necessary to be done, so they began

20  to wonder what was going on and wanted to find out.

21        Now, you heard testimony also that these

22  Officers are familiar with this type of building.  It's

23  a very common building in this area of Springfield,

24  multi-family dwelling.  They're familiar with the

25  format of there being a first-floor apartment and then

1    a stairway going up to a second floor where it breaks

2    down oftentimes into two additional units, one on the

3    second floor and one on the third floor.  And that was

4    what they thought they were dealing with at that time.

5          So after getting no response for a considerable

6    period of time, they went up the stairs to knock on

7    what they thought was the entrance to the second-floor

8    apartment.

9          Now, we know now that in fact the second and the

10   third floor of this particular building were actually a

11   single unit, but these Officers didn't know that, and

12   that was a reasonable thought on their part based on

13   their experience in dealing with these types of

14   structures.

15        But, in any case, they went to the top of the

16   stairs, a small landing, and they knocked on the door.

17   The door was opened, and they could see into the

18   apartment, and they had a conversation with Lee, Sr.,

19   and Lee, Sr., raised no objection to their presence,

20   made no statement or in any way indicated that they

21   were in a place that was inappropriate for them to be,

22   that they had crossed some line.

23        So they had a conversation, which was civil,

24   which was productive.  Lee, Sr., said, "Yeah, we'll go

25   get Ivan.  He's upstairs on the third floor with his

1    father."  And efforts were made to send someone up

2    there and make sure that Ivan was prepared and dressed

3    for the cold, and everybody waited there for a while

4    expecting that Ivan would come down the stairs, you

5    know, given back to his mother and that would be the

6    end of the assignment.

7         Unfortunately, that's not the way it went.

8    Lee, Jr., became enraged when he found out that indeed

9    Vanessa had brought the Police, as he had asked her to

10   or said would be necessary, was enraged that she had

11   brought the Police.  And he came down the stairs, saw

12   the Police standing at the door, and we all know what

13   he said at that point, F that bitch -- or, I'm going to

14   F that bitch up, and ran down the back stairs.

15        The Officers understood, Wait a minute, this

16   isn't right.  They went down the front stairs to see

17   what was going on, and when they arrived downstairs,

18   they saw Lee, Jr., confronting Ms. Montero in a rage,

19   pushed her, and clearly this was a situation that was

20   going to go from bad to worse.  This is a good example

21   of Police work and how domestic situations can go from

22   zero to a hundred instantly, and they never know when

23   it's going to happen.  99 percent of the time these

24   things go -- something like this would go through

25   without a hitch, but not this time.

1          So, in response to that, Officer Romero went

2     over and intervened to try to prevent Lee, Jr., from

3     assaulting Vanessa Montero.  And you heard her

4     testimony, Vanessa, who now of course is reconciled

5     with Lee, Jr., and has been living with him for the

6     last five years, certainly is inclined to be favorable

7     towards his interests.  First she said he grabbed him

8     by the shoulder.  When it was pointed out that she had

9     testified previously that she said he -- that Officer

10    Romero took his hand, she acknowledged that.

11         In any case, Officer Romero was trying to

12    protect Vanessa Montero, and that's why he intervened

13    at that point.  Lee, Jr., responded by punching Officer

14    Romero in the face, and from that point on, things

15    turned very violent.  A struggle ensued between Officer

16    Romero and Lee, Jr.  Officer McKay, seeing this, went

17    to assist.  We've all heard that Keith Hutchins had

18    also run down the front stairs.  He became involved in

19    this fight.  To use his own words that he spoke to you

20    here, "I was outrageous," and indeed he was.

21         Here were these Officers trying to simply keep

22    the peace and help someone retrieve their child, and

23    when there as no apparent issue as to her right to do

24    that, and all of a sudden now they're rolling around on

25    the ground with two young strong men involved in a

1    dangerous physical altercation.

2         And I do want to reiterate that there was no

3    issue of custody in this case.  The issue wasn't that

4    Lee, Jr., was saying, It's my night or it's my turn or

5    I have a greater right to custody of this child than

6    Vanessa; it was just anger, pure anger because she had

7    the nerve to bring the Police with her to retrieve the

8    child.  There was never any mention made, no assertion

9    made that Lee, Jr., had some right to keep the child

10   and Vanessa didn't.  This was all about anger, it was

11   all about control, it was all about he does what he

12   wants and she can't have the child back.

13        So there they are in the street fighting.  The

14   Officers told you they took out their batons.  They

15   were striking these individuals.  It was a desperate

16   fight.  One of the things you have to realize, when

17   Officers get into a struggle, they can't lose this

18   struggle because, if they're overpowered, they're

19   totally at the mercy of the people who overpower them.

20   They have a gun, they have weapons on their person,

21   which they cannot allow to fall into the hands of the

22   other person, especially someone as enraged as Lee,

23   Jr., or as outrageous as Keith.

24        So this fight went on.  You heard that initially

25   one of the Officers managed to get a radio transmission

1   out of "send cars."  And that was very brief, stopped

2   by the intensity of the fight.  Another Officer managed

3   to get out "Daytona Street" so that other police

4   Officers had the opportunity to come to their

5   assistance.  There was a period of time when they knew

6   there was a fight going on by these radio transmissions

7   but didn't know where to go.

8          So after the "Daytona Street" transmission was

9   made, the other cars started to arrive.  You know that

10  Officer Goodrow and Officer Hervieux approached from

11  the Belmont Avenue end on Daytona Street.  Officer

12  Brantley approached from the Sumner Avenue end of

13  Daytona Street.  And as Officer Goodrow pulled around

14  the corner onto Daytona Street, Officer Hervieux told

15  you he could see in the middle of the road this big

16  fight going on.

17         Officer Goodrow was driving the car.  He told

18  you how he had to bring the car to a halt in a way that

19  was safe.  And they get out of the car to try to assist

20  the Officers who were involved in the fight.

21         Officer Hervieux was the first one out of the

22  car, and he told you that what he observed was Lee,

23  Sr., Mr. Hutchins, with a baton in his hand swinging

24  down at the Officers who were involved on the ground

25  with Lee, Jr., and Keith.  And he saw him swing that

1    and strike the Officers on the ground.  He wasn't

2    exactly sure who he struck, but he went to intervene.

3    Mr. Lee Hutchins, Sr., at that point in time started to

4    depart quickly, and Officer Hervieux went to intercept

5    him.

6         Now, you've also heard testimony that

7    Officer McKay, in the middle of this altercation,

8    felt blows being struck on him from behind.  And when

9    he turned around, that's when he saw Lee, Sr., behind

10   him, and there was no one else around.  He knew that

11   Lee, Sr., was the one -- or believed it, because there

12   was no one else there who could have been delivering

13   these blows.  And he sprayed him with OC, or what's --

14   pepper spray, oleo-capsicum resin, OC, pepper spray,

15   and that seemed to have the effect.

16        Now, Officer Hervieux didn't know he had been

17   sprayed.  It looked to Officer Hervieux like this was

18   somebody who was intervening, attacking Police

19   Officers, and when the cavalry arrived, he's getting

20   out of town.  It doesn't really matter what the

21   circumstances were of Mr. Hutchins departing the scene.

22   Officer Hervieux had seen him striking these Officers

23   with his hands and his stick, and he went to intercept

24   him.

25        And when he went over, he met him somewhere on

1    the sidewalk area.  There's a video that you've seen,

2    and you'll have the opportunity to see when you

3    deliberate, that shows Mr. Lee Hutchins, Sr., on the

4    ground, which is where he was placed in handcuffs.

5            And you heard Officer Hervieux testify that

6    Mr. Hutchins was holding that nightstick, he actually

7    had it over his head, not clear exactly what his intent

8    was by doing that.  There are other witnesses that

9    indicated that Mr. -- I believe Demetrius Faust

10   indicated that Mr. Hutchins had his hands over his

11   head.  I don't believe he confirmed that he had the

12   stick in his hand when he did that, but he clearly had

13   his hands over his head.

14           And as Officer Hervieux approached him, he told

15   him to drop the stick several times.  It never

16   happened.  He didn't drop the stick, so Officer

17   Hervieux felt that this was a threat to him.  He was

18   going to place him in custody.  So he gave him a single

19   jab, two-handed jab with his issued baton.  And that

20   seemed to have the desired effect.  Mr. Hutchins went

21   down, and he was handcuffed at that point without

22   further incident.

23           You'll see that the chaos and melee went on for

24   some time after Mr. Hutchins was handcuffed because, in

25   the video you have, he's clearly laying on the ground

1   while the Police are still dealing with his sons.  You

2   can see them in the background, and I invite you to

3   take a look at that.

4          Now, we know there's another version of this.

5   Mr. Hutchins would have you believe that he was the

6   peace-maker, that he had intervened in this fight

7   because his sons were improperly being struck with

8   batons.

9          Now, you heard Lieutenant Charest come in here,

10  the Director of the Training Academy, who went through

11  the use-of-force continuum, which is a document you'll

12  have to see when you retire to deliberate.  And he

13  explained it's somewhat technical -- I always find it

14  interesting that you have this technical chart, and

15  when you go to this level, you go to that level,

16  remembering that when you're out on the street, you're

17  making these decisions instantly, you don't have the

18  Director of the Academy there telling you what to do or

19  you don't have time to pull out your chart.

20         But by all accounts, anyone who is fighting with

21  an assaultive person, or an assaultive subject is the

22  term that's used for a person who's actively assaulting

23  the Police Officers, and that term would apply to all

24  three of the Hutchins, Keith, Lee, Jr., and Lee, Sr.,

25  at that point in time.

1          Even Mr. Hutchins' account of his intensity, he

2     admitted to you and acknowledged that he grabbed the

3     baton.  Now, he denies getting possession of it, but he

4     acknowledged that he grabbed it.  Certainly that was an

5     assault on these Police Officers who were at that time

6     defending themselves and trying to do their job to

7     arrest Lee, Jr., and Keith.

8          Now, he would have you believe that he was the

9     peace-maker, but here he was, by his own account,

10    trying to disarm a Police officer who was in a

11    desperate fight for his own safety and to try to do his

12    job of arresting Keith and Lee, Jr.  That's not

13    acceptable, that's a crime, and he ultimately was

14    charged with the crime.

15         He thought that he had the right to intervene at

16    that point in time.  Even if the Plaintiff's evidence

17    in this case is just mistaken.  He did not.  Lee, Jr.,

18    you heard Keith in here, "My conduct was outrageous.

19    He did acknowledge what he did.  He pleaded guilty to

20    it, as you know.  He was committing a crime, and the

21    Officers were trying to arrest him.  There was no

22    justification for Lee, Sr., to try intervene and

23    prevent them from doing that, especially when he was

24    jeopardizing their safety.

25         But he did more than that.  He actively

1   assaulted the Police Officers himself, and he did that

2   because he was trying to help his sons out, I guess.

3   Whatever his motive, it was not within the law, and it

4   was unlawful.

5        The three were arrested of course and taken to

6   the Police station and processed.  There is in the

7   evidence -- I believe it's -- I forget or I can't

8   reference, but you'll see that there was a report done

9   by Sergeant Hottin.  Remember Sergeant Hottin, retired

10  Police officer who apparently hasn't shaved since he

11  retired.  Sergeant Hottin did a 42-page report on this

12  incident and clearly interviewed and gathered every bit

13  of evidence that he could find in this regard.

14       And one of the things that's in his report is a

15  transcript of the interaction or the colloquy between

16  Mr. Hutchins and the booking Sergeant, Sergeant Howard.

17  And you heard Mr. Hutchins testify that he had nothing

18  to drink.  Remember the testimony about them going to

19  that bar, spending the afternoon there and not getting

20  home until 11:00?  He said he never had a drink.  If

21  you look at that colloquy between Sergeant Howard at

22  the booking desk and Mr. Hutchins, he asked him, "Did

23  you have any alcohol today?"  He said, "Yes."

24       So we don't know how much he had, but perhaps he

25  was affected by the alcohol.  By his own testimony, we

1    know that Mr. Hutchins took a cocktail of medications,

2    some of them seemingly significant altercations -- or

3    I'm sorry -- medications that might have affected his

4    judgment or his perception at that point in time.

5         But, in any case, he was processed.  And, as you

6    know, that as part of the process, he requested medical

7    attention.  He never specifically articulated any

8    injury.  He never said, you know, My -- anything in

9    particular was injured, but he did request medical

10   treatment.  And you can see from the colloquy that the

11   sergeant basically explained to him that, It's your

12   choice, you can either go to the hospital now, go to

13   the ER, have medical attention now, but that will delay

14   your release because the Clerk of Courts comes here at

15   certain times to bail people out, and it's your choice.

16   Do you want to stay here and be bailed out sooner, or

17   do you want to go to the ER and get bailed out later?

18        Mr. Hutchins chose to be bailed out sooner.  He

19   was bailed out -- I believe it was Keith who had a fair

20   amount of cash on him and had enough to bail out the

21   three family members.

22        But what's significant about that is that

23   Mr. Hutchins did not then go for medical treatment.  In

24   fact, there are medical records in evidence, and what

25   you'll see, you'll see evidence that Mr. Hutchins

1    suffered a significant injury back I believe it was in

2    2004 while working and that this followed him with

3    other -- with health problems, a bad back or whatever.

4         But -- and Mr. Hutchins had regular treatment,

5    but as far as the injury he claims to have suffered on

6    January 20th of 2013, he never went for treatment for

7    that injury on that night, and he never went for

8    treatments for that injury thereafter.

9         He did go to the doctor's office, to his

10   regularly scheduled visit on the 28th.  Now, this would

11   be a week after the incident.  The record of that is

12   here.  You heard Attorney Sheehan review that with him.

13   He never mentioned that he suffered any injury whatever

14   during his encounter with the Police.

15        And that's not just an omission by the doctor.

16   If you look at that form, I believe it's in evidence as

17   Exhibit -- I think it's actually in evidence twice --

18   as Exhibit 18 and as 147.  Not only does he not make

19   any claim of injury as a result of the encounter with

20   the Police, but he actually talks about the encounter

21   because one of the things he's talking to the doctor

22   about is the stress that he's feeling and depression

23   and things like that, and he says, "Yes, my sons got

24   into an altercation last week, and that's another point

25   of depression or point of stress that I'm dealing

1   with."  So he even mentioned this incident without ever

2   mentioning that he suffered any injury during it.  If

3   you recall his testimony, I believe it was that he was

4   struck from behind two times, and he re-enacted it,

5   that he was struck twice with these batons, with his

6   baseball bat type swings.

7       Now, also in evidence there are photographs that

8   were taken at the Police Department of injuries that

9   were suffered by Keith Hutchins, and the Police do

10  that, they take injuries if they're made aware of them.

11  And you'll see sometimes Police work is ugly.  These

12  batons can hurt.  They can leave a fairly distinctive

13  mark on a person when you're struck by a baton.  You'll

14  see in the photographs of Keith Hutchins one of those

15  marks.  It's a long mark.  It's the shape of the baton.

16  And the Police will record and categorize -- or catalog

17  such an injury if it occurs.

18      Mr. Hutchins never told the Police that he had

19  been struck by a baton that night, never claimed to

20  suffer any injury as a baton strike.  He never took any

21  photographs himself.  Now, wouldn't you think that, if

22  he thought that he had been mistreated by the Police

23  and that this was going to be an issue, that he would

24  have had some family member take photographs of his

25  injury?  There's no photographs that were taken at

1    home.  There's nothing other than his allegation that

2    he made here to you.

3         And I submit to you that, just based on that

4    alone, you could conclude that his account of these two

5    baseball bat swings at him just aren't true.  It's much

6    more consistent with the version that was given by

7    Officer Hervieux, that it was just a jab, it was just

8    to push him back and have him go to the ground, which

9    is exactly what happened.

10        The medical records continue on.  There's a

11   series of visits to the PCP through into -- well into

12   2014, never a mention of -- he's talking about his back

13   hurts, his chronic back problems, never a mention that

14   something that happened in this altercation back in

15   January of 2013 had anything to do with his injuries.

16   That doesn't show up in his medical records until well

17   into 2014.

18        Now, we know that he went to trial and that he

19   was acquitted of the criminal charges that were brought

20   against him.  And whether that's a coincidence, that

21   around the same time he started talking about an injury

22   almost two years after the fact that related back to

23   his original arrest date, is for you to decide.  Or is

24   that something that he, at that point in time, began to

25   concoct so that he would have the basis of a civil

1    claim?

2         We know that one of the things that Mr. Hutchins

3    was dealing with was financial difficulties.  You'll

4    see references to that in the records as he's talking

5    about his depression and the stress that he feels that

6    he's under.  Did he decide that, because he got a

7    favorable result from the criminal trial, that he was

8    then going to solve his financial difficulties here by

9    making a civil claim, claiming an injury that he had

10   never recorded in any way or had never mentioned to his

11   physician?  Because that's really why we're here.

12   We're here to determine whether or not you will award

13   money damages to Mr. Hutchins, whether you're going to

14   find these Officers and the City of Springfield liable

15   for some injury, which was never reported at the time,

16   that happened on January 20th of 2013.

17        The internal investigation, I encourage you to

18   read it and spend some time with it because you'll see

19   how thorough it was, how Sergeant Hottin made every

20   effort to develop any evidence that would shed light on

21   what had happened during this encounter.  And I think

22   you'll find information in there that will help you

23   reach your conclusions and make a decision in this

24   case.

25        I'd like to talk to you about the specific

1   claims that are being made for which money damages are

2   being requested.  First is an unlawful entry into the

3   home, and I believe the Court will instruct you to the

4   effect that, if these Officers had a good-faith belief

5   or misunderstanding and thought that that stairway was

6   part of a common hallway when they entered it, that

7   that would not be an unlawful entry.  But if they knew

8   that they were entering the premises, the apartment

9   unit of Mr. Hutchins, then it would.

10          I urge you to remember their testimony, that

11   they're familiar with this.  Very often these types of

12   entryways lead up to a hallway where there's doors

13   going up to the third floor for one apartment as well

14   as the second floor for an apartment.

15          I know that the Plaintiff has made mention of

16   how many mailboxes there were.  I would also ask you to

17   bear in mind that they're going there at midnight, in

18   the dark, for the purpose -- seemingly simple purpose

19   of supervising a transfer of a child.  They weren't

20   paying attention to how many mailboxes or how many

21   doorbells there were when they went there.

22          They're also accused of using excessive force,

23   and this gets back to the issues that I've been

24   addressing previously.  What is more likely, that he

25   suffered an injury, as he described it, with two

1    baseball bat swings to his arms or shoulders or a

2    single jab, two-handed, by Officer Hervieux?

3         Now, I submit to you that his explanation or his

4    description of what happened would have produced

5    dramatic injuries, which would have been recorded by

6    the Police Department and certainly by himself and

7    certainly by an immediate doctor's visit and certainly

8    by a visit that was already scheduled for a week later.

9    None of that happened.

10        These Officers are also charged with malicious

11   prosecution -- or liability is asserted because they're

12   claiming that this was a malicious prosecution and an

13   abuse of process, in essence, that these false facts

14   that are being presented for the purpose of obscuring

15   their own misconduct.  The Court will give you more

16   specific instructions on these particular charges.  But

17   I submit to you that the evidence is overwhelming that

18   Lee, Sr., engaged in the conduct that the Police have

19   alleged, and he was prosecuted because he committed the

20   crimes, not to cover up any misconduct.

21        Now, the Court will instruct you on burdens of

22   proof.  It is the Plaintiff's burden to prove by a

23   preponderance of the evidence that their version of

24   events is more likely true than not.  The Court will

25   give you instructions on that.  The Court will also

1      tell you that you are the weighers of the evidence.

2      You can credit any testimony you've heard, you can

3      discredit any testimony you've heard, you can believe

4      everybody, you can believe nobody, you can take pieces

5      from what people say.  It's up to you to decide what

6      happened that day and decide what facts are relevant to

7      the claims that are made here.

8           And I want to thank you on behalf of the

9      Officers for the attention you've given.  We've seen

10     you here paying attention and being concerned about

11     what happened, as you should be.  And we're confident

12     that when you consider all the evidence and speak to

13     each other, you'll find that these Officers were doing

14     their job, doing an incredible job for which the City

15     of Springfield should be proud of them, and you'll find

16     that the Defendant has failed to prove the claims that

17     he has alleged, and you'll find for the Defendants in

18     this case.

19          Thank you very much.

20          THE COURT:  All right.  Then, for the City of

21     Springfield, Mr. Saint Laurent will do the closing

22     argument.

23          MR. SAINT LAURENT:  Thank you, Your Honor.

24          Good morning, Ladies and Gentlemen of the jury.

25          I promised at the beginning of this trial that

1    the City of Springfield would demonstrate that the

2    systems and procedures in place to investigate, deter

3    and punish officer misconduct was sufficient,

4    exhaustive and effective.  And over the course of the

5    last week, we have done exactly that.

6         Though you need not ever reach the question,

7    because the evidence presented during this trial

8    demonstrates that the actions of the Officers were

9    entirely justified, on the verdict slip there will be a

10   question that asks whether the policies and procedures

11   of the City of Springfield are deliberately indifferent

12   to the civil rights of its citizens and whether that

13   indifference led to Officers Hervieux and McKay using

14   excessive force on January 20th, 2013.

15        The question regarding the City of Springfield's

16   customs and policies for disciplining and supervising

17   its Officers only becomes relevant if you find that the

18   Officers violated Mr. Hutchins, Sr.'s Constitutional

19   rights by subjecting him to excessive force.

20        You have listened to testimony from several

21   witnesses, including the video deposition of former --

22   long-term former Commissioner William Fitchet; head of

23   the internal investigations unit, Lieutenant Norman

24   Charest; and former IIU investigator, Sergeant Richard

25   Hottin.  All three gentlemen explained to you the

1   process used by the Department for investigating Police

2   Officers accused of misconduct by citizens and the

3   procedures followed to discipline Officers who are

4   found to have violated the City of Springfield Police

5   Department's policies, practices, orders and

6   procedures.

7        You heard the details of the Department's

8   exhaustive multi-step investigatory process.  You heard

9   all three gentlemen consistently testify how, once a

10  citizen's complaint is received, it is forwarded and

11  investigated by the City of Springfield's Internal

12  Investigations Unit.

13       You heard testimony from Lieutenant Charest that

14  to further the Department's commitment to assuring that

15  the independence and integrity of the Internal

16  Investigations Unit, the Unit is housed outside of the

17  building that the rest of the Police Department is

18  stationed in.  You heard about and got to examine the

19  work of the Special Agent assigned to the IIU

20  Department, the Officers charged with investigating --

21  interviewing witnesses and investigating complaints.

22       I urge you to look at those IIU reports, the

23  ones that are located in your jury book and those

24  admitted into evidence.  You will notice the

25  thoroughness, completeness and extensiveness of the IIU

1    Officer's work.  You will see documentation showing the

2    Sergeants reach out to the complainant, any person

3    referenced in the complaint, neighbors that may have

4    seen the reported incident, and any other individual

5    they believe may reasonably have information concerning

6    the complaint.

7         After careful review of the IIU report that will

8    be in your possession during deliberation, you will see

9    that even, as in this case, when the Hutchins chose not

10   to participate in the investigation after filing the

11   complaint, the investigating Officers complete a

12   thorough and extensive investigation.

13        The witnesses told you that, after the

14   completion of the investigation, the Sergeants compile

15   a report, and that report is reviewed by a supervisor

16   assigned to the IIU.  You heard former Sergeant Hottin

17   state that the purpose of his investigation in this

18   matter, and every other investigation he conducted

19   during his two-year stint with the Springfield Police

20   Department IIU, Investigation Unit, was to conduct a

21   thorough investigation.

22        The report was a compilation of what Sergeant

23   Hottin referred to as data.  The report contained no

24   conclusions, no recommendations to either exonerate the

25   Officers or find in favor of the complainant.  And you

1    heard former Sergeant Hottin testify that at no time

2    during his tenure with the IIU Department did any

3    officer or supervisor pressure him to lean one way or

4    another in his reporting.

5         Lieutenant Charest, who is currently assigned to

6    the IIU, detailed how, after the Officers complete

7    their reports, he is charged with reviewing the report

8    for completeness and ensuring that the Officers' work

9    is thorough and that no further witnesses should be

10   interviewed.

11        The City of Springfield dedicates three

12   full-time Sergeants and a Lieutenant or Captain to the

13   Investigation Unit.  The completed, approved and

14   finalized report is then brought to members of the City

15   of Springfield's Community Police Hearing Board, which

16   is comprised of Mayor-appointed Springfield residents

17   who are active in the community.  You heard Sergeant

18   Hottin explain how the investigating Officers are

19   present during the Board's deliberation and that they

20   are present when the Board determines what

21   recommendations to make to the Commissioner's office.

22        The Board members have the opportunity to talk

23   to the reporting Officers, to the investigating

24   Officers, ask additional questions and also that

25   additional interviews be conducted.  However, if the

1    Board is satisfied with the compilation of reports

2    presented to them at the review process, they are asked

3    to make a recommendation to the Commissioner regarding

4    the disposition of the case.  The Board may find that

5    the charges are either unfounded, meaning that there's

6    no evidence to support the complainant's allegations;

7    sustained, meaning that the complainant's allegations

8    are supported by sufficient evidence to determine that

9    the incident did occur as alleged and the Officers are

10   guilty of misconduct; exonerated, meaning the Board

11   determines that, after reviewing the reports and

12   listening to the evidence presented, that the Officers

13   did not violate any policies or procedures; or not

14   sustained, meaning there were insufficient facts in the

15   IIU report and the recitation of the incident by the

16   complainant and witnesses to make a determination

17   whether any misconduct occurred.

18          If we could just pause for a minute and focus on

19   that last finding, the finding of not sustained.

20   Plaintiff's counsel has made a big fuss about the

21   finding of not sustained and how it is improper.  The

22   words "material inconsistencies" were repeated again

23   and again over the last seven days.  But when those

24   words are examined within the IIU process and the CPHB

25   review, you will find that those words are far less

1   elusive and much more logical to the process.

2          You must remember that the IIU Officers take

3   comprehensive, lengthy and complete statements from all

4   complainant's witnesses and the Officers accused of

5   misconduct.  I again urge you to read the reports that

6   will accompany you back into the deliberation room.  It

7   is logical, fair and appropriate for the Board to make

8   a recommendation to the Commissioner based on the

9   reports that were authored by those interviewed and the

10  data collected by the investigators.

11         Plaintiff contends that the CPHB process is

12  flawed and a sham because the Board is able to proceed

13  and make recommendations without holding another

14  hearing.  Plaintiff urges that this prevents the

15  complainant from having their day in court.  After

16  review of the IIU reports, you will find that this is

17  far from the truth.  The interviewers contact and

18  interview the same witnesses that would have appeared

19  before the Board for a hearing.  The complainant and

20  any witnesses are invited to write complete and

21  comprehensive reports about the events that they allege

22  constitute misconduct by the Officers.

23         The complainants are allowed to explain fully

24  and completely their side of the story in the same way

25  that the Officers are asked to complete their side of

1    the story; that is, by the reports that are written to

2    the IIU.  Those very same reports are then reviewed by

3    the Board members.  If the CPHB determines that some or

4    all of the charges should be sustained, the Board then

5    makes a recommendation to the Commissioner's office for

6    a course of discipline.  You heard former Commissioner

7    Fitchet testify how much deference was and is given to

8    a CPHB recommendation and how he only does not follow

9    the recommendation if it constitutes a gross

10   miscarriage of justice, a very high standard.

11       I once again urge you to review the exhibits

12   admitted, examine the CPHB's yearly summaries from

13   2011, 2012 and 2013 and note the amount of cases that

14   the volunteer Board members of the CPHB take the time

15   to review on a yearly basis.  Note the amount of calls

16   for service, the amount of complaints filed and the

17   percentage of the complaints that result in hearings

18   and the percentage of complaints that go before the

19   Board through the review process.

20       Plaintiff has offered as evidence several red

21   herrings, the biggest one being the theory that somehow

22   the Department has failed to assure the safety of the

23   public by not singling out Officers returning from

24   active duty prior to returning to Police service and

25   subjecting them to additional mental and physical

1    screenings.  Without drawing any connection to harm

2    alleged or the Department's disciplinary and

3    supervisory processes, Plaintiff asks that you

4    determine that the SPD should again screen Officers

5    despite the military's advanced screening process.  I

6    urge you to focus on the relevant evidence and not to

7    be distracted by fringe or trivial information

8    presented during this trial.

9         Shortly you are going to be asked to leave this

10   Courtroom and to enter the deliberation room where you

11   will again be able to closely examine your notes and

12   all the evidence presented during this trial.  I ask

13   again that you pay special attention to the depth of

14   the investigation conducted by the IIU Officers.  I ask

15   that you evaluate the process, note its fairness, its

16   thorough necessary and its impartiality and how

17   effective it is at getting the complete story before

18   the CPHB Review Board.

19        And most importantly I ask that, after

20   evaluating all the evidence presented concerning the

21   City of Springfield's disciplinary system, you find

22   that not only were the actions of the Springfield

23   Officers justified in this situation, you find that the

24   City of Springfield's Department's procedures and

25   policies are exhaustive and effective and designed to

1    deter and punish officer misconduct and that the

2    Plaintiff has failed to present any evidence that the

3    Springfield Police Department has shown deliberate

4    indifference to the Constitutional rights of the City

5    of Springfield residents.

6         Thank you.

7         THE COURT:  All right.  Then, for the Plaintiff,

8    Mr. Hoose.

9         MR. RYAN:  Yes, Your Honor.

10        THE COURT:  You may have a minute to gather your

11   papers.

12        MR. HOOSE:  Good morning, Ladies and Gentlemen.

13   May it please the Court, Mr. Foreman.

14        I want to begin as many lawyers begin when

15   talking to a jury by thanking you for your service.  It

16   sounds trite, it sounds corny, but I can tell you that

17   I think every lawyer who says it, and I'm one of them,

18   really means it.  These cases, as you can tell, go on

19   for years, and they don't get resolved unless there are

20   12 people willing to take the time to come and sit and

21   arbitrate what has become a serious dispute.

22        Now, I also want to begin by saying that I could

23   talk about this case probably for the rest of the day,

24   which I'm sure you're hoping I won't do, and you'll be

25   happy to know that Judge Gorton's not going to allow me

1  to do that.  Judges have an obligation to put time

2  limits on these things, and Judge Gorton has done so.

3  And the way I always explain this is it's the Judge's

4  obligation to put time limits; it's the attorneys'

5  obligation to complain about them.

6       So, without spending any more time on that, I

7  will just alert you to the fact that I may be talking

8  fast, so apologies to our Court Reporter to begin with.

9  And I'm still not going to be able to talk about

10  everything I'd like to talk about, and I'm still not

11  going to be able to respond to every point that

12  Mr. Coyle and Mr. Saint Laurent made.

13       The first thing I do want to talk about, though,

14  is something that you'll hear more about from the Judge

15  and that's burden of proof.  It is our burden of proof,

16  and it is a burden that we readily accept to establish

17  our claims by a fair preponderance of the evidence, and

18  the Judge will explain to you that that means simply

19  that it's more probable than not.

20       Now, I want to be clear, however, that, while we

21  have to establish our claims by that standard, that is

22  not the same as saying we have to establish every

23  single fact in this case by a fair preponderance of the

24  evidence because that's not the law, and it's

25  appropriate that I say that in a case like this where

1    there are so many extraneous details and extraneous

2    facts that you have heard over the past week.

3         I have no time nor any inclination to go through

4    every detail of every witness testimony that you heard

5    over the past week.  We could do that all morning, and

6    still we would find that there are differences between

7    what the witnesses claimed to have observed.  Some of

8    that can be explained very simply.  For example, if a

9    fight broke out in the middle of this jury box right

10   now, it would be reasonable to expect that somebody

11   sitting where Judge Gorton's sitting might have a

12   different perception of what happened than somebody

13   sitting in the rear corner where Mr. Hutchins is

14   sitting.  If a Marshal heard the commotion and came in

15   from outside 15 seconds after it had begun, his

16   perception might be different than that of someone who

17   saw it right from the beginning.

18        There are instances where it's reasonable to

19   expect people similarly situated to see the same thing.

20   If that -- using that example I just gave you, you

21   might expect that Ms. Lima and Judge Gorton, since

22   they're sitting so close to each other, would see

23   things similarly, just as Ms. Sheehan and Mr. Laurent

24   would because they're getting a similar view.  So some

25   things can be explained by positioning, by timing,

1    things like that; but there are many things in this

2    case that cannot be explained by that.

3         One of the biggest things that you're going to

4    have to do when you go into that jury deliberation room

5    is to assess credibility.  Credibility is something

6    that -- assessing credibility is something that you

7    probably do every day of your life.  You don't think

8    much about it, but you do it.

9         Now, I'm going to give you a list, and it's not

10   an exclusive list, but here are some of the ways that

11   we assess credibility in this trial and throughout your

12   lives:  Is there what I'm going to call internal

13   consistency with what a witness says?  In other words,

14   does a witness say the same thing over and over and

15   over again every time he's asked about the incident, or

16   does his story change over time?  Does it change by the

17   circumstances under which he's asked the same

18   questions?  Is there external consistency?  And when I

19   use the term "external consistency," I mean does the

20   witness's testimony match up with other witnesses who

21   had the same vantage point as them?  And, again,

22   harkening back to the example I just gave, you might

23   expect Ms. Lima to have the same testimony as

24   Judge Gorton for something that they viewed starting

25   at the same time.  If that doesn't match with other

1    witnesses, that's something you should consider as to

2    whether or not that witness is credible.

3         Another thing is:  Does the witness have a

4    history of credibility problems?  Is this someone who

5    is known and reputed to tell the truth, or is this

6    someone who has a difficult time telling the truth in

7    other documented circumstances?

8         And, lastly, a sort of catch-all problem is:

9    Does there -- well, before I get to that, one more that

10   I left out.  Is the witness's testimony corroborated by

11   some physical evidence, a document, an audio recording,

12   a video recording?  And, lastly, does the testimony

13   just jibe with your sense of common sense?

14        Now, later we're going to review the testimony

15   of some of the witnesses in this case to see how they

16   measure up in these areas.  I want to now talk about

17   the incident that brings us all here.  And I'm going to

18   make a statement that I think all of you will agree

19   with.  This is an incident that should never have

20   happened.  Why do you think that the Springfield Police

21   Department has Rule 15, Section 19?  And I think it's

22   up on the presenter now.  Why do you think it is

23   highlighted or -- not highlighted in the original but

24   is in capital letters in the original?  "Since, by

25   virtue of the appointment, a Police officer can act

1   officially in criminal matters only; he should not

2   render assistance in any civil case whatever," capital

3   letters.  Why do you think they enacted that

4   regulation?  Well, I'll submit to you, Ladies and

5   Gentlemen, it's exactly to avoid situations like this

6   that they shouldn't be involved in.

7          The only exception to that, if you read farther

8   down on your monitors, is where it is to prevent a

9   breach of peace or to suppress a disturbance actually

10  commenced.  Now, pay careful attention to what

11  Mr. Coyle and others have said to you all along.  They

12  just drop off the last part of that sentence.  Well,

13  they were there, they're just trying to prevent a

14  breach of peace.

15         Well, that's not what's permitted under the

16  rule.  What's permitted is to prevent a breach of peace

17  that's actually commenced.  There hadn't been a breach

18  of peace until the Police arrived.  They would have you

19  just ignore the last part of that sentence.

20         I ask you also, Ladies and Gentlemen, to look at

21  this incident through the lens of common sense and just

22  think about this from a basic human level.  It is after

23  midnight.  This is a two-year-old child.  What would we

24  expect a two-year-old child to be doing after midnight?

25  Now, some of you may have dealt with this problem of

1    transferring custody between husband and wife, but even

2    if you haven't, you can pretty much guess how this is

3    going to go.  Someone comes to your house to take

4    custody of your child after midnight without any

5    reason.  It is likely that that is not going to be

6    well-received.

7           And it's significant that the Defendants in this

8    case have to concede that they don't have a warrant,

9    they don't have any reason to believe that there's an

10   exigency, that there's an emergency, there's some

11   reason why this child has to be woken up at 12:00

12   midnight and taken from one parent to another.  They

13   were not aware that Ms. Montero had any right to that

14   child at that particular moment greater than the right

15   that the other parent had.  I mean, we'd be in a

16   different situation if she had a piece of paper that

17   said, Officer, this says here that I'm entitled to pick

18   up this child at midnight.  Well, that would be a

19   different situation.  She didn't have that, and they

20   never even asked for it.

21          Now, some of these Officers said, Well, you

22   know, we were just -- we just wanted to see what the

23   dad would say.  I mean, if the dad had said, No, I

24   don't want to give over the child, that would have been

25   it, we would have just called the supervisor and went

1      on our merry way.

2              Well, look, let's be real here.  Did they ever

3      give the dad in this case a chance to be heard?  Did

4      they say to Ms. Montero, Well, you want to go pick up

5      your child?  Well, call the dad.  We'll stay right

6      here.  Hand us the phone.  We want to hear what he has

7      to say.  Text him back.  We want to see what he says

8      when you tell him you're on your way with the Police.

9              No.  They apparently looked at texts.  Nobody

10     could remember what they said.  They agreed that there

11     was no indication that there was an emergency, that the

12     child was in any danger or anything like that.  No.

13     They went to 53 Daytona Street, walked up onto the

14     porch, knocked on the door and said, She's here to pick

15     up her child, to someone who they didn't even know who

16     it was and you now learned was not the father of the

17     child.

18             Now, I ask you this, Ladies and Gentlemen:  One

19     of the things you have to do is you have to put

20     yourself in the real world and not look at this as an

21     academic exercise.  It's a cold January night, you're

22     asleep in your bed, there's a knock at the door, and

23     two cops are there saying, while standing on your

24     porch, We're here to pick up the child.  That doesn't

25     sound like much of a choice, does it?  If that happened

1    to you, to any one of you, what you would probably do

2    is what our client, Lee Hutchins did, which is he went

3    "Okay," went upstairs and started getting his grandson

4    ready to be turned over to the Police.  He didn't ask

5    any questions.  He didn't give any lip back to the

6    Officers.

7         So, going to the home without trying to talk to

8    the dad beforehand I suggest to you is the first bad

9    decision of an evening of bad decisions.  There was no

10   breach of peace until they got there and started one.

11   They violated their own rules, and as I said, it was

12   bad Police work, the first of a series of bad

13   decisions.

14        Now, the second bad decision was actually

15   entering the home.  And that was not only a bad

16   decision; it was one that violated Lee Hutchins'

17   Constitutional rights.  The Fourth Amendment to the

18   United States Constitution protects everyone against

19   unreasonable entry into your home by the Police, and it

20   has done so since 1789.  A person's home really is his

21   or her castle.

22        And what was the reason for the Police Officers'

23   entry?  They admit they had no warrant, they had no

24   exigency, there was no danger that anyone was aware of.

25   There wasn't even any indication that their request was

1    not being complied with.  It was simply, You're not

2    moving fast enough.  They could have knocked again if

3    somebody not answered the first time, What's taking so

4    long?  Geez, you know, we're cold.  Come on, you know,

5    can you move it along a little bit.

6         They could have had Ms. Montero text the dad,

7    Are you bringing Ivan down?  They could have asked her,

8    Do you know someone?  Can you call someone up there to

9    find out what's -- they could have done many things.

10   They did none of them.  Instead, they marched into

11   Lee Hutchins' home and up the stairs.  And Ladies and

12   Gentlemen, the law is, when they crossed that

13   threshold, they violated the Fourth Amendment rights of

14   Lee Hutchins, and they had no right to do so.

15        Now, what about Mr. Coyle's claim that, Well,

16   you know, it was just a mistake, you know, they know

17   these houses, they thought it was just a multi-dwelling

18   building?  Really?  For 15 or 20 minutes, by their own

19   testimony, they stood out on that porch.  And what did

20   they see?  They saw two house numbers, 51 and 53.  They

21   saw two doors, 51 and 53.  They saw two mailboxes, one

22   for 51, one for 53.

23        They also claim that the door was open.  Now, if

24   the door was open, they could look right up those

25   stairs and see that it goes to only one unit at the top

1    of the stairs and that there is no other diverging path

2    off of those stairs.  And in addition to the

3    photographs that Attorney Leboeuf is putting up on your

4    presenter, you saw the video walk-through of that

5    stairway as a part of the evidence.

6         But even if you were to accept their claim that

7    this was just a mistake -- and by the way, it has to be

8    a reasonable mistake -- when they entered the kitchen,

9    the violation is clear.  And Ladies and Gentlemen, it

10   is abundantly clear that they did in fact enter the

11   kitchen.  It is far more probable than not that they

12   did so.

13        Why?  First, Lee Hutchins testified that when he

14   was standing in the kitchen, which everybody recalls,

15   talking with the Officers, that his son Lee came down,

16   and we all know what he said and the way he ran down

17   the back stairs, that he saw Romero cross the kitchen

18   and go down the back stairs.  Keith Hutchins said the

19   same thing, Talking, my brother comes down, Romero goes

20   across the kitchen, down the stairs after him.

21   Vanessa Montero, the very first witness in this case,

22   and I would suggest to you a very credible witness for

23   reasons that I will get to in a moment, she says Lee

24   came down the front stairs, went directly to the car.

25   I was on the porch.  I saw an officer come from the

1    back of the house, from the back stairs.  So it

2    corroborates what Keith and Lee say.

3         But let's just put all of that aside for a

4    moment.  Let's put all the witness testimony aside.

5    After Lee Hutchins, Jr., comes down the stairs and says

6    incredulously, That F'n bitch, I can't believe she came

7    here with the Police, and tears off down the stairs,

8    why in the world would these Officers allow Keith to

9    run down the front stairs?

10        And if they attempted to, and the two of them

11   are standing in that narrow stairwell, how could he

12   possibly have gotten around them and down the stairs?

13   He couldn't have.  You've seen the size of these guys.

14   These are big guys.  They know that the brother has

15   just made what would be interpreted as a threat.

16   They're not going to let his brother go right past them

17   down the stairs to get into the fray if they can stop

18   it.  But they couldn't.  Why?  Because they were

19   standing in the kitchen, so it was easy for Keith to

20   get down the stairs.  So, Ladies and Gentlemen, the

21   evidence of illegal entry is overwhelming, and you

22   should find for the Plaintiff on that count.

23        Now, I want to talk about the -- what I call the

24   rumble downstairs in the street.  And there are a lot

25   of details about who was doing what, where and when,

1    and most of them really don't matter for the claims

2    that you have to consider.  Maybe the Police were in

3    the wrong, but Lee and Keith -- Lee, Jr., and Keith

4    were in the wrong too, and I want to emphasize that we

5    bring no case for them.  This case is not about them.

6    Unlike their dad, they chose to verbally protest and

7    physically engage with the Police.  They got justice

8    from the court system when they pled guilty to the

9    charges that were against them.  That's what they

10   deserved.  They should have listened to their dad.

11        Now, I want to circle back to talk about Vanessa

12   for just a minute because, as I said, I think she's a

13   very credible witness even though in some sense, I

14   suppose, she's responsible for the whole incident.

15   She's credible because she said from that witness stand

16   that the physical stuff began when her boyfriend, the

17   man who is the father of her child and man who she

18   lives with to this day, punched Officer Romero in the

19   face without provocation.  She said that because it's

20   the truth.  She also told the truth when she said she

21   saw officer -- some officer come from around the back

22   of the house, obviously having come down the back

23   stairs.

24        She's also a credible witness because you'll see

25   in your exhibits -- and this is an exhibit that the

1    Defendants put in -- that she filled out an affidavit

2    at 1:45 a.m. on that night, literally within an hour of

3    having left the scene, to get a restraining order

4    against her boyfriend.  She filled out an affidavit,

5    signed under the pains and penalties of perjury.  You

6    can read that affidavit, and what you'll see in it is

7    contrary to what Officer McKay and Romero said.  She

8    said, "He never touched me, I never -- he came, and he

9    ran right to the car.  I was on the porch."

10        That corroborates what Keith said, "I never

11   shoved her.  I never even saw her."  And it

12   corroborates what our client said, "I came downstairs,

13   I didn't even see Vanessa."

14        So, at the moment when she's angry enough to

15   take a restraining order against her boyfriend and

16   writes that affidavit, she completely contradicts these

17   Officers on an important point.  Why is it an important

18   point?  Because of this:  It's the first lie about what

19   happened that evening.  At that point, as bad as Lee,

20   Jr., and Keith's behavior would become, at that point,

21   they hadn't done anything to be arrested for yet.

22        So enough about Lee, Jr., and Keith.  This is

23   about Lee Hutchins, Sr.  He is here to get justice for

24   the wrongs done to him, and we are here to represent

25   him, not Lee, Jr., not Keith, not Vanessa, nor anyone

1    else.  He got partial justice from the Springfield

2    District Court when they found him not guilty of the

3    bogus charges that were put against him.

4         And when you look at Lee Hutchins' involvement,

5    there's really a surprisingly small amount of conflict

6    in the evidence.  They say that initially, when the

7    Officers went upstairs, that he was very cooperative,

8    that he began getting Ivan ready.  That's really not in

9    dispute.  He doesn't even question the order to

10   relinquish his grandson; he just starts to comply.

11        Now, I want you to think about that for a

12   moment, pause and think about that because this is

13   undisputed testimony because it gives you tremendous

14   insight into the nature of Lee Hutchins.  It informs

15   and guides you as to who he is, what kind of person he

16   is and what kind of actions he took the rest of the

17   night.  He is a peaceful, law-abiding man.  He admits

18   that he came downstairs with others.

19        Judge, I assume you up want me to continue?

20        THE COURT:  Yes.

21        MR. HOOSE:  And what do the Police say about

22   Mr. Hutchins' involvement?  They say he was yelling

23   something, though none of them could say what.  Well,

24   he told you what he was yelling.  He was trying to get

25   his sons to stop.  "No, no, Lee, don't do that.  Keith,

1    no.  Stay on the porch."  Not one single Police officer

2    refuted that, not one single Police officer said, Nah,

3    he never said that.

4         He's alleged to be interfering in the arrest,

5    but not one single Police officer in their early

6    reports was able to describe exactly what he was doing

7    to interfere.  They say he was swinging his arms.  No

8    doubt he was gesticulating and trying to end this

9    nightmare that's unfolding in front of him.  He walked

10   over to the pile, he told McKay to stop swinging the

11   stick, "Stop swinging the stick because your partner is

12   getting hit along with my son, and he can't get the

13   cuffs on him."  He doesn't deny that he reached out

14   and, for a fleeting moment, had the tip of the baton in

15   his hand in an effort to get him to stop swinging into

16   the pile.  And there's no question, Ladies and

17   Gentlemen, that for his efforts, he got sprayed in the

18   face with the OC.

19        And according to this document, which is in

20   evidence, it had the desired effect, "The subject was

21   affected."  Mr. McKay checked that box.  The eyes are

22   burning, he's coughing, and at that moment, he is

23   turning around and walking towards his home.

24        Now, you are probably sick of me and others

25   referencing the many Police reports that were written

1    in connection with this case, so I promise you, I'm not

2    going to do it again.  But I will say this:  It is

3    undisputed that, on the night in question, no report

4    that was written by anyone says anything about Lee

5    Hutchins actually striking anyone with fists or a baton

6    or that he ever had a baton in his possession.

7         Now, everything changed in this altercation when

8    Thomas Hervieux arrived on the scene.  He arrived, got

9    out of his car, made a beeline, and cut Lee Hutchins to

10   the ground, a 53-year-old disabled man with his back to

11   him who had been sprayed in the eyes and was virtually

12   helpless.  He knocked him to the ground and handcuffed

13   him behind his back and left him to lie there.  And he

14   did it the exact way that his son Demetrius described

15   to you, with an X mark, even using words that you would

16   expect to come from a 14-year-old boy.  And as a

17   14-year-old boy, I would suggest to you, especially the

18   men, but all of you, you see something like that happen

19   to your father, you never forget that.  You never

20   forget the action that was taken to take your father to

21   the ground.

22        Now, the Defendants were good enough to offer

23   into evidence that beautiful multi-color continuum of

24   force chart.  And if you look at that, Hervieux knows

25   that he can't do that.  You can't knock someone down

1    from behind with a stick.  They all knew that.  They've

2    all been trained on that.  Once you knock him down and

3    you've got him cuffed and on the ground, what are you

4    going to do with him?  You gotta charge him.  You gotta

5    throw some charges on him.  So what do they throw on

6    him?  Just charge him with the same thing as his sons.

7    So he gets charged with two counts of assault and

8    battery on a Police officer, disorderly conduct, and

9    that's how the bogus charges begin for which a

10   Springfield District Court jury ultimately found him

11   not guilty.

12         And a month later, when there's an IIU complaint

13   filed, Hervieux again has to justify his use of that

14   level of force, so now his statement morphs from what

15   he said the night in his report, his prisoner-injury

16   report, which makes no reference to a baton.  Now, a

17   month later, his statement is essentially, Well, I

18   knocked him down, but that's because he was holding a

19   baton over his head, and I had to.

20         The other Officers really don't say anything

21   more at the IIU because they really can't say anything

22   more.  And also, make no mistake about it, for reasons

23   that I'm going to talk about in a few minutes, they're

24   not really worried about this at this point.  Why?

25   Because nothing ever happens with these complaints

1   anyway.

2           Now, 20 months later, there's a criminal trial,

3   and Lee Hutchins is on trial on charges of assault and

4   battery with a Police officer.  Now things start

5   changing.  Why?  Because these guys see, Hey, this

6   guy's serious.  He's not just going to plead guilty and

7   go away.  This guy's fighting this.  And they correctly

8   foresaw that, if Lee Hutchins were acquitted at that

9   criminal trial, they had a future vision of sitting in

10  a courtroom, just like they've been for a week now, as

11  Defendants in a Federal lawsuit.  So all of a sudden,

12  now people recall things they've never recalled before.

13          McKay and Romero really don't add much at the

14  criminal trial.  They still don't say they saw Lee

15  Hutchins hit them with fists or a club or anything.

16  They more or less invite the jury to speculate and say,

17  Well, we were getting hit, and there was this guy

18  standing, it must have been him, it had to have been

19  him.  That's, in a nutshell what they said at the

20  criminal trial.

21          Hervieux, however, has had a remarkable

22  increase in his memory.  He now recalls, 20 months

23  later, for the very first time, as he told Mr. Ryan,

24  that Lee Hutchins was standing over the pile raining

25  down blows with a baton, multiple batons -- multiple

1    strikes with the baton onto these Police Officers who

2    were just trying to do their job and that, as Hervieux

3    walked up, he just casually turned around and began

4    walking away.

5          Well, I would suggest to you, Ladies and

6    Gentlemen, that Officer Hervieux has a big problem with

7    the truth.  How do we know that?  Well, we talked

8    earlier about internal consistency.  Has he told the

9    same story over time?  Well, the answer clearly is no.

10   Each time it gets better for him.  Each time he gets

11   deeper into a problem, the more it changes to his

12   favor.

13         But there's no external consistency either.  Not

14   one person supports his version of what he claims

15   happens, not even his own partner.  And, by the way,

16   when he testified yesterday and tried to say, Oh, well,

17   he was driving the car, I mean, he was probably, you

18   know, looking at other things, well, how could you be

19   looking at other things when there's a pile of people

20   fighting in the street, number one?  And, number two,

21   that's not what he said anyway.  Goodrow didn't say,

22   you know, I was distracted.  I really didn't see

23   Mr. Hutchins.  No.  He said, I saw Mr. Hutchins.  He

24   was standing near the pile, not too near, not too far

25   away, though.  And he said that in his report, and he

1    said it at his testimony here at the trial.

2         He didn't say, I didn't see him.  He gave a

3    description of him standing nearby, and he said, Yeah,

4    he was standing nearby, and he appeared to be

5    interfering.  "Well, how was he interfering, Officer

6    Goodrow?

7         "I don't know.  I can't say."  And that's what

8    he said to you in this Courtroom, and it's what he said

9    in his report that he filed on January 20th or whatever

10   it was.

11        Now, I also suggested to you that you have to

12   look at a person's history.  Do they have a history of

13   telling the truth?  And I would suggest to you that

14   Officer Hervieux, whether it's from a TBI or from just

15   being a dishonest person, it really doesn't matter, he

16   is not a reliable, credible witness.  He repeatedly

17   tells lies.  I'm going to tick off just a few of them

18   from this trial.

19        He was asked whether he had -- in an

20   interrogatory, under oath, signed under the pains and

21   penalties of perjury, whether he had been sued before.

22   He listed one, the other one, Mr. Cioto, "Oh, I forgot.

23        "Well, have you ever been reprimanded?  Again,

24   asked under oath.  "Yeah, once for a barking dog.

25        "Well, didn't you get reprimanded for excessive

1     absenteeism?

2          "Oh, yeah, I forgot, but everybody got that,

3     everybody got that."  That was his explanation for

4     that.

5          And there were other ones during Mr. Ryan's

6     examination of him, small ones like, "Well, were you

7     ready to return to work when you got back to

8     Springfield?"

9          In the courtroom.  He said, "Yes."

10          Mr. Ryan pointed out, "Well, when I deposed you

11     and asked that question, you said no."

12          Whether he suffered from memory loss, he told

13     Mr. Ryan, "No, never had any problem with that."

14          Mr. Ryan again went through his deposition,

15     "Well, didn't you tell me something different at your

16     deposition?"

17          But perhaps the most illustrative one is the one

18     that we went through yesterday when he was on the

19     witness stand.  He was asked a simple question at his

20     deposition, "What did you do immediately upon

21     graduating high school?  What was your answer,

22     Officer Hervieux?"

23          "I said" -- under pains and penalties -- "I said

24     I joined the military.

25          "Well, that wasn't true, was it?

1          "Well, I did join the military.

2          "Yeah, but that's not question.  The question's

3     not whether you joined the military at some time; the

4     question was, What did you do immediately upon

5     graduating high school?

6          "Oh, all right."  He finally grudgingly

7     acknowledged that he went to community college.

8          And the fact that he went to community college,

9     it's not a big deal, but the point of it is is that he

10    didn't forget that he went to community college; he

11    deliberately did not answer that, and then he

12    volunteered why.  "I was a lousy student.  I didn't

13    really want to talk about it."

14         So, what does that tell you?  What it tells you

15    is this is a person who lies when he thinks it suits

16    his interests.  He didn't think it was in his interests

17    for anybody to know that he went to community college

18    and did well, so he just answered the question falsely.

19         Now, the evidence, Ladies and Gentlemen,

20    is overwhelming that, when Hervieux struck down

21    Lee Hutchins, a disabled man in a defenseless

22    position with his back to him, unthreatening in any

23    way, he violated his civil rights by using force to

24    take him -- excessive force to take him into custody.

25         Nobody forgets, no Police officer forgets that

1    he saw someone assaulting his fellow Officers,

2    certainly not Thomas Hervieux.  It's not in any report

3    because it simply never happened.  Now, why did he do

4    this?  And the answer I would say to that, Ladies and

5    Gentlemen, is:  Why not?  He's always gotten away with

6    it before.

7         And that brings us to our claim against the City

8    of Springfield.  Now, to get a judgment against the

9    City of Springfield, we have to show -- it's our burden

10   to show that there is a policy, practice or custom that

11   caused the violation of Constitutional rights.

12        And I'm going to simplify this for you.  The

13   City has put in volumes of paper and charts and stuff.

14   Meaningless, doesn't mean a thing.  There is no written

15   policy of course that says, We always believe the

16   Police officer, but I'll tell you something, Ladies and

17   Gentlemen, we got something pretty close to that.  It's

18   right up there on the presenter now, it's Exhibit 149,

19   it's the form that they use in assessing these

20   complaints.

21        And if you can blow that up.

22        Right there is the problem on the lines marked

23   "not sustained" and "exonerated."  And we'll get back

24   to those in a minute.

25        But let me be clear about one thing first:  You

1    heard Mr. Saint Laurent talk just a few minutes ago

2    about what a great job the Internal Investigation Unit

3    does.  No question about it.  We agree, they do a

4    terrific job.  But, as Sergeant Hottin said, All we do

5    is gather reports, we try to interview some people, we

6    don't make any recommendations, we don't draw any

7    conclusions; we just give it off to the CPHB.

8          Let me also be clear that we have no complaint

9    with the training that these Officers get from Officer

10   Charest or Lieutenant Charest.  I'm sure they're

11   trained.  They know what the law is.  All of these

12   written policies that the City has put into evidence,

13   they look great, but they're just paper.  That's all

14   they are.  This case is about what really happens, not

15   what is supposed to happen by the paper.  And the

16   problem is structural, and it's institutional, and it's

17   memorialized right there in Exhibit No. 149.

18         Commissioner Fitchet told you by a video

19   deposition that in almost every case there's a conflict

20   in the evidence, and that just makes sense.  But under

21   their rules, that means that there is no hearing, and

22   there's a finding of not sustained.  The 12 allegations

23   of excessive force that McKay and Hervieux have had

24   prove that.

25         So, in Officer Hervieux's very first complaint,

1    while he was still a probationary officer, for

2    excessive force -- this was the beating in the Police

3    station where the guy said he was -- his head was hit

4    against the toilet.  Mr. Coto, no one in the City ever

5    heard from Mr. Coto.  There was no hearing, and there

6    was no hearing because there was a material conflict in

7    the evidence, and because there's a material conflict

8    in the evidence, you can look right at the form, what

9    happens?  Not sustained.  Like Lee Hutchins, Mr. Coto

10   had to file a lawsuit against Mr. Hervieux.

11        No one ever heard from Ms. Tassone, the woman

12   who said she was thrown down the stairs by Officer

13   Hervieux.  Why?  Because Officer Hervieux said "She

14   tripped."  That's a material conflict in the evidence.

15   What do we do with a material conflict in the evidence?

16   No hearing, and not sustained.  Was Nicole Tassone a

17   credible witness?  Did anybody ever assess her

18   credibility?  No, because there was no hearing, and

19   nobody assessed Officer Hervieux's credibility either.

20   It was simply not sustained.

21        When Officer McKay stopped his cruiser, and he

22   and his partner got out of his cruiser, punched a woman

23   who was handcuffed in the back seat, and he then

24   sprayed her in the face, nothing ever happened.  There

25   was no hearing.  There was a conflict in the evidence.

1    There was no hearing.  It was not sustained.

2         When Thomas Hervieux, in the course of

3    investigating something down at the Basketball Hall of

4    Fame, punched somebody in the head five times, and you

5    may recall that his head was bouncing off the car each

6    time he punched him, who was not resisting --

7         MR. COYLE:  Objection, Your Honor.

8         THE COURT:  You need to wrap up.

9         MR. HOOSE:  I'm doing the best I can, Judge.

10        THE COURT:  A couple of more minutes.

11        MR. HOOSE:  How do these policies cause

12   Constitutional injury?

13        They cause Constitutional injury because

14   complaints like Coto's and Tassone's don't mean

15   anything because nothing ever happens.  It's condoned,

16   and it's, in a sense, approved by the City by their

17   unwillingness to hold anybody accountable.

18        And don't be fooled by the arguments that, Oh,

19   well, there are just thousands of arrests; these were

20   just a few complainers.  We don't know how many people

21   just don't bother filing.  That's the sad part of this.

22   Why would people file when it's so obvious that nothing

23   ever happens?  How many people don't do anything

24   because they're busy fighting bogus charges against

25   them, as Lee Hutchins was?

1          Now, Judge Gorton is telling me to wrap up, so I

2     want to jump ahead -- I'm going to have to eliminate

3     some more material -- and talk about damages in this

4     case.  I want to talk to you in practical terms about

5     what your verdict means when you find in the

6     Defendants' -- when you find in the Plaintiff's favor.

7     Let's be clear, nobody's going to jail, nobody's going

8     to lose their job.  The law doesn't permit that, and we

9     don't ask for it in any event.

10         We have a civil system of justice, and justice

11    is administered in a civil case by the award of money

12    damages, not just for physical injury but for emotional

13    injury, and that's what we ask for on behalf of Lee

14    Hutchins.  We ask you to compensate him for his

15    emotional distress, for the stress that he had to carry

16    around for 19 months while fighting baseless charges

17    indicated by these Officers, for the fear that he had

18    to live through, fear of being incarcerated for the

19    first time as a middle-aged disabled man.  We ask you

20    to compensate him for the emotional distress that he

21    has fought with to this day from -- to get justice for

22    the wrongs inflicted on him over six years ago.

23         We ask you to compensate him for the loss of the

24    small pleasures in life since he was struck down by

25    Officer Hervieux, for the loss of his ability to make

1    his native handy crafts, to work on his cars with his

2    sons, to participate in his family gatherings and to

3    simply pick up his grandchildren.  This is the stuff of

4    life, Ladies and Gentlemen, and his life has been

5    diminished by these Defendants' conduct.

6        And, lastly, we ask you to compensate him for

7    the violation of his civil rights, for the loss of the

8    sacred dignity that every citizen of this country has,

9    the right to be free from excessive force, to live in a

10   civilized society, and to be free from the law of the

11   jungle.  And, no, he wasn't in perfect health before

12   this.  Few people who have had the traumas in his life

13   would be.  The emotional damage caused by his -- the

14   death of his siblings, the injury caused by stepping

15   through a porch, a work-related injury.  It doesn't

16   constitute a defense to say, Well, you were injured

17   already.

18       So, Ladies and Gentlemen, I am -- as I said,

19   predicted at the beginning, I have much more to say, I

20   have much more that I would like to say, but I am

21   apparently out of time.

22       And I will just conclude by saying, in my

23   experience, many people grow when they are selected for

24   a jury.  Oh, my God, this is going to be such a

25   disruption for my life, and it oftentimes is.  But I

1    will suggest to you, Ladies and Gentlemen, that it is a

2    tremendous privilege to participate in a proceeding

3    like this because you have an opportunity to do

4    something that few people in life have the ability to

5    do.  You can correct a wrong.  You can do the right

6    thing here.  Despite the inconvenience you've all had

7    to deal with, you will look back on this one day with

8    the knowledge that you brought a little justice to a

9    man who had been wronged.

10          We all learn in law school that the word

11   "verdict" comes from the Latin words which means "speak

12   the truth."  And it's now time for you to go back into

13   the jury room and speak the truth for Lee Hutchins by

14   awarding him a generous but fair amount of monetary

15   damages.

16          Thank you for your attention.

17          THE COURT:  All right, Jurors.  We're going to

18   take a morning recess now before my charge to you.

19   It's going to be a shorter recess than usual, ten

20   minutes, and we'll be back for the charge.

21          THE CLERK:  All rise for the jury.

22          (The jury is not present for the following)

23          THE COURT:  All right, Counsel.  We're in recess

24   for ten minutes.

25          (Recess, 11:05 a.m.)

1          (Resumes, 11:16 a.m.)

2          (The jury is present for the following)

3          THE COURT:  Good morning again, Jurors.

4          You have now heard the evidence and the closing

5     arguments in this case.  It is now my duty to instruct

6     you on the law that you must follow and apply.

7          In any jury trial, there are in effect two

8     judges.  I'm one of the judges, and you collectively

9     are the other.  It's my duty to preside over the trial

10    and to determine what testimony and evidence is

11    relevant under the law for your consideration.  It is

12    also my duty at the end of the trial to instruct you on

13    the law applicable to this case.

14         You, as Jurors, are the judges of the facts, but

15    in determining what actually happened in this case;

16    that is, in reaching your decision about the facts, it

17    is your sworn duty to follow the law, as I am about to

18    define it for you.  And when I have finished you will

19    begin your discussions with one another, which we call

20    jury deliberations.

21         Now, to help you understand and remember these

22    instructions on the law, I will divide them into three

23    parts.  First, the general instructions intended to

24    guide you throughout your deliberations; second,

25    instructions about the claims and about the questions

1   that you will be asked to answer, as stated on the

2   verdict form, and about the law that you must apply in

3   considering these questions; and, third, some

4   additional general instructions about the procedures

5   that you are to follow during your deliberations.

6          These instructions are somewhat complicated, and

7   I ask you to pay very careful attention.  I need to

8   read them to you because I cannot commit to memory all

9   of the law about which I have to instruct you.  But I

10  will submit to you a written copy of this charge when

11  you go to the jury room.  I want to caution you right

12  away, however, not to dwell on any particular portion

13  of it, if you decide to review it at all, because you

14  must consider these instructions as a whole and not

15  just one individual particular instruction.  So I ask

16  you to do the best you can to stay with me.

17         Now, all of my instructions are about the law

18  you must apply.  I do not mean any of these

19  instructions to be understood by you as comments by me

20  on the facts or on the evidence in this case.  It is

21  your function to determine the facts.  Although the law

22  allows a Trial Judge in this Court to comment on the

23  evidence, I deliberately do not do so and instead leave

24  the fact-finding entirely in your hands.  You are the

25  sole and exclusive judges of the facts.

1    Fortunately, you do not need to resolve every

2    dispute of fact raised by the evidence.  In order to

3    know what fact disputes are important, you need to know

4    what rules of law to apply.  I've explained some of

5    those rules to you during the course of the trial, and

6    I will explain others to you now.

7    The lawyers were allowed to comment during their

8    arguments on some of these rules of law, but if what

9    they have said about the law differs in any way from my

10    instructions, you must be guided only by the

11    instructions on the law as I state them.  You must

12    follow all of the rules as I explain them to you.  A

13    single sentence or statement might not refer to an

14    exception or a qualification that I've stated elsewhere

15    in these instructions, so you must consider them all

16    together as a unit.

17    And even if you disagree with one or more of the

18    rules of law or don't understand the reasons for them,

19    you are bound to follow them.  This is a fundamental

20    part of our system of Government by law rather than by

21    the individual views of a judge or jurors who have the

22    responsibility for deciding a case.

23    If I make a mistake on instructing you in the

24    law, fair and even application of the law to this and

25    other cases is nevertheless assured because any mistake

1    I make on the law can be corrected on appeal.

2           In contrast, your decision on disputed facts is

3    final; that is, your findings on material disputed

4    facts are not subject to appeal.  You are the final and

5    exclusive judges of the facts.

6           In your fact-finding, you are not to be swayed

7    by bias, prejudice, sympathy or antagonism.  It is your

8    function to find the facts fairly and impartially on

9    the basis of the evidence.  And the evidence in this

10   case consists of all exhibits received into evidence,

11   all facts that may have been admitted or stipulated to

12   and all of the sworn testimony of the witnesses.

13          A stipulation means simply that the parties

14   accept the truth of a particular proposition or fact.

15   Since there is no disagreement, there is no need for

16   evidence apart from a stipulation.

17          Statements and arguments of counsel are not

18   evidence in the case.  Any evidence, including

19   witnesses' testimony ordered stricken by the Court,

20   must also be disregarded.  Anything you may have seen

21   or heard outside of this Courtroom is not evidence, and

22   you must disregard it entirely.  Your verdict must be

23   based solely on the evidence presented in this

24   Courtroom and in accordance with these instructions on

25   the law.

1       Now, also from the facts proved, you may draw

2   reasonable inferences about additional facts.  An

3   inference is a deduction or a conclusion.  An inference

4   is an additional finding that your experience, reason

5   and common sense lead you to draw from facts that you

6   find are proved by the evidence.  Any inference that

7   you draw from the facts proved must be a reasonable one

8   and not merely conjecture or guesswork.  You might

9   decide that you do not have a sufficient basis to

10  decide what inference to draw.  It is for you, as

11  judges of the facts, to decide whether the evidence

12  before you is or is not sufficient for you to draw an

13  inference.  Ultimately, in drawing inferences, you

14  should use your common sense.  If any reference by the

15  Court or by the lawyers to matters of evidence is

16  different from the way you remember the evidence, let

17  your collective memory control.

18      Now, two phrases often used in discussions about

19  evidence received at a trial are "direct evidence" and

20  "circumstantial evidence."  Testimony of a witness

21  showing first-hand observation of a fact by that

22  witness is direct evidence.  For example, the testimony

23  of an eyewitness just about what he or she saw is

24  direct evidence.

25      If the witness is permitted to go beyond what he

1    or she saw and permitted to state a conclusion or an

2    inference or an opinion, that part of the answer is not

3    direct evidence; instead, it's a kind of circumstantial

4    evidence.  Circumstantial evidence is proof of some

5    facts, including events and circumstances, on the basis

6    of which the jury may infer the existence or

7    non-existence of additional facts.

8         For example, let's suppose you've been in this

9    Courtroom for several hours and unable to look outside.

10   A man comes into the back of the Courtroom wearing a

11   wet raincoat and carrying a dripping umbrella.  You may

12   draw the inference from those circumstances that it is

13   raining outside.  That is what we call circumstantial

14   evidence, as opposed to direct evidence, which would be

15   the testimony of the man in the wet raincoat taking the

16   witness stand and telling you that it's raining

17   outside.

18        Direct and circumstantial evidence have equal

19   standing in the law; that is, with respect to what

20   weight shall be given to the evidence before you, the

21   law makes no distinction between direct or

22   circumstantial evidence.  No greater degree of

23   certainty is required of circumstantial evidence than

24   of direct evidence.  You are to consider all of the

25   evidence in the case and give each item of evidence the

1    weight you believe it deserves.

2           Now, at times during the trial you have heard

3    lawyers object to questions by the opposing lawyer or

4    to answers by witnesses.  It is a proper function for

5    lawyers to object.  In objecting, the lawyer is

6    requesting that I make a decision on a question of law.

7    Do not draw from the objections or from my rulings on

8    them any inferences about facts.  The objections and my

9    rulings relate only to legal questions I had to

10   determine.  They should not influence your thinking

11   about the facts.

12          When I sustained an objection to the question,

13   the witness was not allowed to answer.  Do not attempt

14   to guess what the answer might have been, and if you

15   heard an answer to a question before my ruling, you are

16   to disregard it.  In your deliberations, do not

17   consider or talk about any question to which I

18   sustained an objection or any answer or other statement

19   that I excluded or struck or told you not to consider.

20          Now, during the course of the trial, I may have

21   made comments to the lawyers or spoken to a witness

22   concerning a manner of his or her testifying.  Do not

23   assume from anything that I may have said that I have

24   an opinion concerning any of the issues in this case.

25   Except for these instructions to you on the law, you

1    should disregard anything I may have said during the

2    trial in arriving at your own findings as to the facts.

3         At the beginning of the trial, I instructed you

4    about taking notes.  I remind you that notes taken by

5    any juror are not evidence in this case and must not

6    take precedence over your independent recollection of

7    the evidence received in the case.  Notes are only an

8    aid to recollection and are not entitled to any greater

9    weight than actual recollection or the impression of

10   each juror as to what the evidence actually is.

11        Now, an important part of your job as jurors

12   will be deciding whether or to what extent you believe

13   what each witness had to say and how important that

14   testimony was.  You are the sole judges of the

15   credibility of the witnesses.  In deciding whether to

16   believe a witness or how much weight to give to that

17   witness's testimony, you may consider anything that

18   reasonably helps you to assess that testimony.  The

19   following are the kinds of questions you may want to

20   consider in evaluating a witness's credibility:  Did

21   the person seem honest?  Did he or she have some reason

22   not to tell the truth?  Did the witness have an

23   interest in the outcome of the case?  Did he or she

24   gain any personal advantage by testifying in this case?

25   Did the witness seem to have a good memory?  Did the

1  witness's testimony differ from his or her earlier

2  testimony or from the testimony of other witnesses?

3  Was the witness's testimony different on

4  cross-examination than on direct examination?  What was

5  the witness's manner while testifying?

6      These are some, but of course not all, of the

7  kinds of things that may help you decide how much

8  weight to give to what each witness had to say.

9      You may also consider any demonstrated bias,

10  prejudice or hostility of a witness in deciding what

11  weight to give to the testimony of that witness.

12      The mere number of witnesses or exhibits or the

13  length of testimony has no bearing on the weight that

14  you give to evidence or on whether you find that the

15  burden of proof has been met.  Weight does not mean

16  amount of evidence; weight means your judgment about

17  the credibility and the importance of evidence.

18      You may consider inconsistencies or differences

19  as you weigh the evidence, but you do not have to

20  discredit testimony merely because an inconsistency or

21  difference exists.  Two or more witnesses may see or

22  hear things differently.  Innocent misrecollection,

23  like failure of recollection, is a common experience.

24  In weighing the effects of any inconsistency or

25  difference, consider whether it concerns a matter of

1    importance or an unimportant detail and whether it

2    results from innocent error or intentional falsehood.

3         On the other hand, you're not required to accept

4    testimony merely because it is uncontradicted.  You may

5    decide, because of a witness's bearing and demeanor or

6    because of inherent improbability or for whatever

7    reason, that testimony is not worthy of belief.  You

8    may accept all of a witness's testimony or reject all

9    of it, or you may accept part and reject another part.

10        The testimony of a law enforcement officer

11   should be considered by you just as any other evidence

12   in this case.  And in evaluating his credibility, you

13   should use the same guidelines you apply to the

14   testimony of any witness.  You should not give greater

15   or lesser credence to the testimony of a witness merely

16   because he or she is a law enforcement officer.

17        You've heard evidence that, at some earlier

18   time, a witness has said or done something which

19   counsel argue is inconsistent with the witness's trial

20   testimony.  Evidence of a prior inconsistent statement

21   is not to be considered as affirmative evidence in

22   determining credibility; rather, it was placed before

23   you for the more limited purpose of helping you decide

24   whether or how much, if any, of that witness's trial

25   testimony to believe.  In making this determination,

1    you may consider whether the witness purposely made a

2    false statement or made an innocent mistake, whether

3    the inconsistency concerns an important fact or small

4    detail, whether the witness had an explanation for the

5    inconsistency and, if so, whether it appeals to your

6    common sense.

7           Now, as to all of the issues in this civil case,

8    the standard for defining the burden of proof is the

9    preponderance of the evidence standard.  To establish

10   something by a preponderance of the evidence means to

11   prove that it is more likely true than not true.  It

12   means that such evidence, when considered and compared

13   with the evidence opposed to it, has more convincing

14   force and produces in your mind the belief that what is

15   sought to be proved is more likely true than not true.

16          As I said at the beginning of the trial, to put

17   it differently, if you were to put the Plaintiff's and

18   the Defendants' evidence on the opposite sides of a

19   scale, the Plaintiff would have to make those scales

20   tip somewhat in his direction with respect to that

21   claim.  In determining whether any fact in issue has

22   been proved by a preponderance of the evidence in this

23   case, you may consider the testimony of all the

24   witnesses regardless of who may have called them and

25   all of the exhibits received into evidence regardless

1     of who may have introduced them.

2          The burden of proof has not been carried if,

3     after considering all of the evidence, you find that

4     you must speculate, guess or imagine that one or more

5     of the necessary facts is true.  As a reminder, the

6     burden of proof by a preponderance of the evidence

7     standard does not of course require proof to an

8     absolute certainty, nor is proof beyond a reasonable

9     doubt or by clear and convincing evidence required.

10          Now, in many cases, there is an element of

11     sympathy which surrounds the trial.  People involved in

12     the case may be deserving of sympathy in everyday life.

13     The Courtroom is not, however, a place for sympathy.

14     When you decide this case, you must do so on the basis

15     of the facts, as you find them, disregarding sympathy

16     and emotion.  You must consider the evidence in

17     accordance with the burden of proof I have just

18     described and the specific instructions that you will

19     hear from this point forward.

20          Now, in this case there are four Defendants, the

21     three individual Officers and the City of Springfield.

22     You are not to treat them as one entity.  When

23     considering the Plaintiff's claims, each of the

24     Defendants is entitled to your separate consideration.

25     Unless I instruct you otherwise, you should consider

1   every instruction given to apply separately and

2   individually to each of the Defendants.  You are not

3   required to find more than one Defendant liable in

4   order to find that the Plaintiff is entitled to damages

5   with respect a specific claim.  During my instructions,

6   I may refer to multiple Defendants simply as "the

7   Defendants."  I do this only for the sake of

8   convenience.  They are separate Defendants in this

9   case, and you must apply my instructions to them

10  separately.

11        Now, part two of these instructions.  In this

12  case, I will submit to you specific questions in the

13  form of what we call a verdict form.  First, I will

14  summarize the claims and explain how to apply the law

15  to those claims.  In just a minute, my Deputy Clerk

16  will distribute copies of the verdict form that you

17  will have in the jury room and that I will refer to

18  from time to time during the remainder of these

19  instructions.

20        The Plaintiff in this case, Mr. Lee Hutchins,

21  Sr., seeks to recover damages from the Defendants,

22  Officers Daniel McKay, Felix Romero, and Thomas

23  Hervieux, and the City of Springfield.  The Plaintiff

24  alleges that:  First, Officers McKay and Romero

25  violated his Federal Constitutional right by unlawfully

entering his residence; second, Officers McKay and
Hervieux violated his Federal Constitutional right by
using excessive force against him during his arrest;
third, Officers McKay and Hervieux committed assault
and battery against him; four, that all three
individual Officers committed an abuse of process
against him; and, five, that all three Officers
maliciously prosecuted him.

The Plaintiff further alleges that the City of
Springfield is liable for the Officers' use of
excessive force during his arrest because it had a
policy or custom of inadequately supervising or
disciplining its Officers.

I will now describe the law surrounding the
Plaintiff's specific claims.

Section 1983 of Title 42 of the United States
Code provides that any individual may seek redress by
way of money damages against any person who, under
color of state law, deprives that individual of any of
his Constitutional rights.  The statute states in
pertinent part, "Every person who, under color of state
statute, ordinance, regulation, custom or usage of any
state, subjects or causes to be subjected any citizen
of the United States or other person within the
jurisdiction thereof, to the deprivation of any rights,

1    privileges or immunities secured by the Constitution

2    and laws, shall be liable to the party injured,"

3    et cetera.

4         The Plaintiff alleges that the Defendants, while

5    acting under color of the authority of the Commonwealth

6    of Massachusetts, as members of the Springfield Police

7    Department, deprived him of certain rights guaranteed

8    by the United States Constitution.  Specifically, the

9    Plaintiff claims that the Defendants violated his

10   Constitutional rights under the Fourth Amendment by

11   unlawfully entering his residence and by using

12   excessive force during his arrest.

13        To prevail on his Federal civil rights claims

14   under Section 1983, the Plaintiff must prove each of

15   the following elements:  First, that the acts

16   complained of were committed by the Defendants while

17   acting under color of state law; that is, that Officers

18   McKay, Romero and Hervieux were acting in their

19   capacities as Police Officers and not in some other

20   capacity; second, that, in committing those acts, the

21   Defendant deprived the Plaintiff of rights, privileges

22   or immunities secured by the Constitution or laws of

23   the United States; and, third, that the Defendants'

24   actions were causally connected to the deprivation.

25        Now, with respect to the first element, there is

1   no dispute that the Officers in this case were acting

2   under color of law in their capacity as Police Officers

3   at the time of the incident, and you must find this

4   element has been proven.

5          As to the second element, the Plaintiff claims

6   that on January 20th, 2013, the Defendants violated his

7   rights secured by the Constitution of the United States

8   by unlawfully entering his residence and by using

9   excessive force during his arrest.

10         Both of those alleged violations are protected

11  against by the Fourth Amendment of the Constitution of

12  the United States, which provides that, "The right of

13  the people to be secure in their persons, houses,

14  papers and effects against unreasonable searches and

15  seizures shall not be violated, and no warrants shall

16  issue but upon probable cause."

17         I will now give more specific instructions with

18  respect to those claims, and I'm going to ask my Deputy

19  now to distribute the verdict forms.  And what we're

20  going to do when you get these forms is I'm going to go

21  over each question one by one, and after I go over one

22  of the questions, I'm going to ask you to put the form

23  down and we'll talk about that, and then we'll pick it

24  back up.  So we're not going to be concentrating on the

25  form while I'm giving my instructions.

1          The verdict form has the heading of the case,

2     and it says "We, the jury, unanimously find that..."

3     and then there's a subheading, "Claims against the

4     individual Officers," and the first Federal law claim,

5     "unlawful entry."

6          Question No. 1 says, "Has Plaintiff proved that

7     either Officer McKay or Officer Romero unlawfully

8     entered Plaintiff's residence?"  And there's a place

9     for you to answer that question yes or no with respect

10    to both of those Officers.

11         Then you'll see a bolded instruction after

12    Question 1, and it says, "If you answer Question 1 yes

13    with respect to either officer, proceed to Question 1A.

14    If you answer Question 1 no with respect to both

15    Officers, then you go to Question 2;" in other words,

16    you skip 1A.

17         Now, we're not going to turn the page for now,

18    and we're going to assume for the moment that you have

19    answered with respect to one of those Officers a yes,

20    so that you are going to get to 1A.  But we're going to

21    talk about 1 and 1A for now, and then we'll go back to

22    the form.  So if you'll put the form down, we're going

23    to talk about that for now.

24         Under the Fourth Amendment, Officers may not

25    enter a person's residence unless they have a warrant

1    or some exception to the warrant requirement applies.

2         Because in this case the Defendant Officers did

3    not have a warrant and no exception to the warrant

4    requirement applies, you must decide:  First, whether

5    the Officers made a reasonable mistake of fact in

6    entering the premises; and, second, whether either

7    officer entered the kitchen.

8         Under the Fourth Amendment, Officers are

9    entitled to reasonable mistakes of fact.  A tenant in

10   an apartment building has no reasonable expectation of

11   privacy in the common areas of the building, such as

12   hallways, and, thus, no Fourth Amendment claim arises

13   from entering into such areas by law enforcement

14   Officers.  A residence of a dwelling that is akin to a

15   traditional residence, however, has a reasonable

16   expectation of privacy throughout the interior of that

17   premises.

18        If you find that the Defendant Officers here

19   mistakenly but reasonably believed that the interior

20   staircase leading up to the second floor was a common

21   area and not a private area within the Plaintiff's

22   residence, there is no Fourth Amendment violation.  If

23   you find that the Officers' mistake in entering the

24   residence was unreasonable, their presence in the

25   stairway of the residence violated the Fourth

1     Amendment.  Finally, if you find that either officer

2     entered the kitchen without permission, you should find

3     unlawful entry.

4             So, now we're going to pick up the form and go

5     over to Page 2.  And Page 2 says, "Federal Law Claim:

6     Excessive Force," Question No. 2, "Has Plaintiff proved

7     that either Officer McKay or Officer Hervieux violated

8     Plaintiff's Constitutional rights by using excessive

9     force during Plaintiff's arrest on January 20th, 2013?"

10    And then there's a place to answer that question yes or

11    no with respect to Defendant McKay and with respect to

12    Defendant Hervieux.

13            Again, there's an instruction after that first

14    part of 2 that says, "If you answer Question 2 yes with

15    respect to either officer, proceed to Question 2A.  If

16    you answer Question 2 no with respect to both Officers,

17    then you proceed to Question 3, in other words, you

18    skip 2A.

19            Now, I'm going to ask you to put the form down

20    one more time.  We're going to talk about excessive

21    force.

22            The Fourth Amendment also protects persons from

23    being subjected to excessive force while being

24    arrested.  In other words, a law enforcement official

25    may employ only the amount of force reasonably

1    necessary under the circumstances to make the arrest.

2    In this case, Mr. Hutchins, Sr., claims that he was

3    subjected to excessive force in the course of his

4    arrest.

5          To determine whether the Defendants' acts caused

6    the Plaintiff to suffer the loss of a Federal right,

7    you must determine whether the amount of force used to

8    effect that arrest was that which a reasonable officer

9    would have employed in effecting the arrest under

10   similar circumstances.  In making that determination,

11   you may take into account such factors as the severity

12   of the crime at issue, whether the Plaintiff posed an

13   immediate threat to the safety of the Defendants or

14   others, whether the Plaintiff actively resisted arrest

15   or attempted to evade arrest by flight, and the

16   severity of any injury to him.

17         The reasonableness of a particular use of force

18   must be judged from the perspective of a reasonable

19   officer on the scene, rather than with 20/20 vision of

20   hindsight.  With respect to a claim of excessive force,

21   the standard of reasonableness at that moment applies.

22   Not every push or shove, even if it may later seem

23   unnecessary, violates the Constitution.  The

24   determination of reasonableness must allow for the fact

25   that Police Officers are often forced to make

1    split-second judgments in circumstances that are tense,

2    uncertain and rapidly evolving.

3         The actual state of mind of the Defendant then

4    under consideration at the time of the arrest is not

5    relevant.  Bad intentions on the part of an officer

6    will not establish a Constitutional violation if the

7    force used was objectively reasonable.  At the same

8    time, if the force used was unreasonable, you must hold

9    the officer liable for the Constitutional violation

10   even if you believe he had good intentions.

11   Ultimately, the force used in making an arrest is

12   unnecessary, unreasonable or excessively violent if the

13   officer exceeded that degree of force which a

14   reasonable and prudent law enforcement officer would

15   have thought reasonable under the same circumstances.

16        Now, in this case, you have heard evidence about

17   prior citizen complaints in which two of the three

18   named Officers were involved.  With respect to the

19   claim of excessive force and any other claim against

20   the individual Officers, the mere number of complaints

21   and the substance of the complaints may not be

22   considered at all with respect to the claims against

23   the individual Defendants.  You may only consider this

24   evidence when evaluating whether the City of

25   Springfield knew or should have known about an

1    officer's tendency to use excessive force.

2          Now we'll go back to the form.  In the middle of

3    Page 2 we have Paragraph 3 that says, "State law claim:

4    Assault and battery."  Question No. 3 says, "Has

5    Plaintiff proved that either Officer McKay or Officer

6    Hervieux committed assault and battery against

7    Plaintiff when arresting him?"  Again, a place to

8    answer that question yes or no with respect to

9    Defendant McKay and Defendant Hervieux.

10          An instruction after Question 3 says "If you

11   answer Question 3 yes with respect to either officer,

12   proceed to answer Question 3A.  If you answer

13   Question 3 no with respect to both Officers, proceed to

14   Question 4."  Now, just assuming for the moment that

15   you've answered Question 3A yes with respect to one or

16   both of the Officers, the second part of that question

17   says, "Has the Plaintiff proved that such assault and

18   battery against Plaintiff by either Officer McKay or

19   Officer Hervieux proximately caused the Plaintiff's

20   alleged damages?"  And there's a place for you to

21   answer that question yes or no.  We're going to talk

22   about proximate cause in a minute with respect to all

23   of these, but just keep in mind that that's a question

24   that's asked after each of the prior questions.

25          So if you'll put the form down, we're going to

1    talk about assault and battery for a moment.  Assault

2    and battery, as alleged in this case, is the

3    intentional and unjustified use of force upon the

4    person of another, however slight.  Whereas, here a

5    Plaintiff alleges both an excessive force claim and an

6    assault and battery claim against police officers, the

7    same standard applies to both claims.  Therefore, the

8    claim will be resolved in the same manner as you

9    resolve the Plaintiff's claim for the use of excessive

10   force.

11         So now back to the form.  And now we're going to

12   go to the top of Page 3 and Question No. 4, which

13   you'll see the title says "State Law Claim:  Abuse of

14   process."  And Question 4 says, "Has Plaintiff proved

15   that any of the individual Defendants listed below

16   sought criminal charges against him for an ulterior

17   purpose?"  And then there's a place to answer the

18   question yes for each of the three individual

19   Defendants, Officer McKay, Officer Romero and

20   Officer Hervieux.

21         Again, there's a question after that -- I mean,

22   an instruction after that that says "If you answer

23   Question 4 yes with respect to any officer, proceed to

24   Question 4A.  If you answer Question 4 no with respect

25   to all Officers, you proceed to Question 5" in other

1   words, you skip 4A.  And just for the record, if you

2   answer any part of 4 yes with respect to any of the

3   three Officers, 4A says, "Has Plaintiff proved that the

4   criminal charges against him initiated by any of the

5   Defendants listed below proximately caused Plaintiff's

6   alleged damages?"  And then there's a place to answer

7   that question yes or no with respect to each of the

8   Officers.

9        Again, I'm going to talk about proximate cause

10   in a moment, but if you'll put it down, we're going to

11   first talk about abuse of process.

12        Plaintiff alleges abuse of process on the

13   grounds that the Defendants caused criminal charges to

14   be filed against him.  The elements of abuse of process

15   claim are as follows:  First, that the Defendant or

16   Defendants used a civil or criminal process against the

17   Plaintiff; second, that the Defendant or Defendants,

18   had an ulterior or illegitimate purpose or motive; and,

19   third, that the Plaintiff suffered damage as a result.

20        A Plaintiff satisfies the first element by

21   showing that a Defendant caused criminal charges to be

22   brought against him or initiated a civil lawsuit

23   against him.

24        With respect to the second element, it is not

25   enough for the Plaintiff to show that a Defendant

1    brought the civil lawsuit or criminal charges to vex,

2    annoy or harass the Plaintiff.  Such a motive does not

3    alone suffice to show ulterior purpose.  Rather, the

4    ulterior purpose must be to gain some other advantage.

5    For instance, Massachusetts Courts have held that

6    filing a criminal complaint to collect a civil debt or

7    to convince someone to withdraw a civil action is a

8    form of abuse of process.

9         I will instruct you on the third element,

10   damages, in a few minutes because the same instruction

11   on damages applies to all of the claims asserted by the

12   Plaintiff against the Defendant.

13        Now, once again, back to the form.  We're going

14   to go to Question No. 5, which is toward the bottom of

15   Page 3, where it says, "State Law Claim:  Malicious

16   prosecution."  And question is:  Has Plaintiff proved

17   that any of the individual Defendants listed below

18   maliciously instituted criminal proceedings against him

19   with an improper motive and without probable cause?"

20   Again, a place to answer that question with respect to

21   each of the three individual Defendants yes or no.  The

22   instruction following the question says, "If you answer

23   Question 5 yes with respect to any officer, proceed to

24   Question 5A.  If you answer Question 5 no with respect

25   to all Officers, proceed to the instructions before

1      Question 6," in other words, you skip 5A.

2            For the moment, if you've answered one of the

3      parts of those questions yes, we turn over and read

4      Question 5A, which says, "Has Plaintiff proved that

5      such malicious prosecution against him instituted by

6      any of the Defendants listed below proximately caused

7      Plaintiff's alleged damages?"  Again, a place to answer

8      that question yes or no with respect to each of the

9      individual Defendants.

10           Now, please put the form down another time, and

11     we'll talk about malicious prosecution.

12           The Plaintiff alleges that the Plaintiff

13     maliciously prosecuted him by unlawfully causing the

14     initiation of criminal proceedings against him in State

15     Court.  To prevail on a claim of malicious prosecution,

16     the Plaintiff must prove each of the following elements

17     by a preponderance of the evidence:  First, the

18     Defendant or Defendants instituted a prior criminal or

19     civil proceeding against the Plaintiff; second, the

20     Defendant or Defendants acted without probable cause;

21     third, the Defendant or Defendants acted with an

22     improper purpose, such as malice; and, fourth, the

23     proceeding terminated in the Plaintiff's favor.

24           As to the first element, the Plaintiff must

25     prove that the Defendant or Defendants instituted a

1   criminal proceeding against the Plaintiff such as by

2   signing and swearing to a criminal complaint against

3   the Plaintiff.

4           As to the second element, the Plaintiff must

5   prove that the Defendant or Defendants instituted the

6   arrest and the subsequent criminal proceeding without

7   probable cause.  A Defendant could have probable cause

8   to institute a criminal proceeding if the facts known

9   to that person would have justified a reasonable person

10  in thinking that a crime had been committed.

11          The examination should be made of information

12  known to the Defendant at the time that he instituted

13  the complaint and whether it was reasonable for that

14  Defendant to have relied upon that information, given

15  its quality, quantity and availability of additional

16  information.

17          As to the third element, the Plaintiff must

18  prove that the Defendant instituted the criminal

19  proceeding with an improper motive, such as malice.  An

20  improper motive may be one of vexation, harassment or

21  annoyance, or it may be an attempt to achieve an

22  unlawful end for -- or a lawful end through an unlawful

23  means.  The term "malice" means any wrong or

24  unjustifiable motive.  You may infer malice from a lack

25  of probable cause.

1        As to the fourth element, there is no dispute

2    that the criminal proceeding against the Plaintiff in

3    State Court terminated in his favor because he was

4    acquitted of the criminal charge.  You must find this

5    element to have been proven.

6        Now I'm going to talk about causation, which

7    we've seen is an element of each one of those questions

8    that we went through the first time around.

9        If you find that the Defendant or Defendants

10    violated the Plaintiff's Federal Constitutional rights

11    or committed a tort against the Plaintiff under

12    Massachusetts law, then you must determine whether the

13    Defendant or Defendants' actions were the proximate

14    cause of the Plaintiff's alleged injuries.

15        Proximate cause means that there must be a

16    sufficient causal connection between the acts of the

17    Defendant then under consideration and any injury or

18    loss to the Plaintiff.  An injury or damage is

19    proximately caused by an act if you find from a

20    preponderance of the evidence in the case, that the act

21    was a substantial factor in bringing about or actually

22    causing the injury or damage and that the injury or

23    damage was either a direct result or a natural and

24    probable consequence of the act.  In order to recover

25    for an injury, the Plaintiff must show by a

1   preponderance of the evidence that the injury would not

2   have occurred but for the conduct of the Defendant then

3   under consideration.

4           There may of course be two or more causes of

5   injury or other damage.  Many factors or the conduct of

6   two or more persons may operate at the same time,

7   either individually or together, to cause an injury,

8   and each may be a proximate cause.

9           The Plaintiff cannot recover, however, if his

10  injuries were caused by a new or independent source of

11  injury which intervenes between the acts of the

12  Defendant then under consideration and the Plaintiff's

13  injuries and which produced a result that was not

14  reasonably foreseeable to that Defendant.  For example,

15  the Defendant then under consideration would not be

16  liable for damages which resulted from the Plaintiff's

17  own independent acts.  Another way of explaining the

18  meaning of proximate cause is this:  If the claimed

19  injury or other damage would have occurred anyway

20  regardless of that Defendant's conduct, then the

21  Defendant did not cause the particular injury or the

22  damage.

23          Now, we're going to go back to the form, and

24  just above the title of, Claim Against the City of

25  Cambridge, there is an instruction, which is important.

1    It says "If you answered Question 2A" -- that was back

2    on Page 2, and it had to do with excessive force -- if

3    you answered Question 2A yes with respect to either

4    Defendant McKay or Defendant Hervieux, then you proceed

5    to Question 6; in other words, you consider the claim

6    against the City of Springfield.

7         But if you've answered Question 2A no with

8    respect to both Defendants McKay and Hervieux, in other

9    words, you did not find excessive force that was the

10   proximate cause of injury to this Plaintiff with

11   respect to either of those two Defendants, then you do

12   not proceed to Question 6 but you go on to the

13   instructions before damages.  So, in other words, if

14   you've answered 2A yes with respect to either

15   Defendant, you consider the claim against the City of

16   Springfield.  If you answer those questions no, you do

17   not consider the claim against the City of Springfield.

18        Now, for the moment, assuming that you have

19   answered yes as to one or both of those Officers, the

20   Question 2A, then you would proceed to Question 6,

21   which says, "Claim Against the City of Springfield.

22   Has Plaintiff proved that the City of Springfield was

23   deliberately indifferent to the civil rights of its

24   citizens through a policy or custom of inadequately

25   supervising or disciplining its Officers?"  And there's

1    a place to simply answer that question yes or no.  And

2    then an instruction after that question says "If you

3    answer Question 6 yes, proceed to 6A.  If you answer

4    Question 6 no, you skip 6A and you go down to those

5    instructions that are just below it.

6         But assuming for the moment that you answer that

7    question yes, 6A would then ask you, "Has Plaintiff

8    proved that the City's offending policy or custom

9    caused either Officer McKay or Officer Hervieux, or

10    both, to use excessive force against the Plaintiff?"

11    And there's a place to answer that question yes or no.

12         And now, if you'll put the form down, we'll talk

13    about that claim against the City of Springfield.

14         Section 1983 of Title 42 of the United States

15    Code also provides that a municipality, meaning a city

16    or a town, can be held liable for the Constitutional

17    violations of its employees that are taken pursuant to

18    or caused by the policy or custom of that municipality.

19    If you find that the individual Officers did not use

20    excessive force on January 20th, 2013, there is no

21    claim against the City of Springfield.

22         Mr. Hutchins, Sr., alleges that the City of

23    Springfield violated his Constitutional right to be

24    free from excessive force as a result of the City's

25    maintenance of a policy or custom that failed to

1    supervise or discipline its Officers adequately.

2         While the City may not be liable merely because

3    it is the employer of the individual Defendants, you

4    may find that the City is liable if you find by a

5    preponderance of the evidence the following three

6    factors:  First, the excessive force by the individual

7    Officers was done in accordance with a policy or a

8    custom of the City of Springfield; second, the City's

9    policy or custom demonstrates a deliberate indifference

10   to the rights of its citizens; and, third, the policy

11   or custom was the moving force behind the deprivation

12   of the Plaintiff's civil rights.

13        Thus, Mr. Hutchins, Sr., must prove that the

14   City of Springfield caused the Constitutional violation

15   by demonstrating a causal link between the City's

16   policy or custom and the underlying use of excessive

17   force.

18        The phrase "policy" refers to practices or

19   decisions made by City officials or employees who are

20   responsible for developing the City's policy in the

21   subject area such that their decisions may fairly be

22   attributed to the City itself.  For example, an

23   official's decisions may be attributed to the City if

24   that official has the authority to make a final and

25   nonreviewable determination of policy with respect to

1    the action ordered.  The City's policy does not need to

2    be reduced to writing, nor does the policy need to be

3    adopted by the City's lawmakers for the City to be held

4    liable.

5         The phrase "custom" refers to persistent and

6    wide-spread disciplinary practices of officials that

7    are so well-settled as to constitute the force of law.

8    With respect to the phrase "deliberate indifference,"

9    the City may be held liable for actions that are either

10   intentional or reckless.  An act is intentional if it

11   is done knowingly; that is, if it is done voluntarily

12   and deliberately and not because of mistake, accident,

13   negligence or other innocent reason.  An act is

14   reckless if it is done in conscious disregard of its

15   known probable consequences.

16        Thus, in order to prevail, Mr. Hutchins, Sr.,

17   must prove by a preponderance of the evidence that the

18   City of Springfield, through its policy-makers, either

19   knew or should have known about a discriminatory policy

20   or custom and the consequences of such policy or custom

21   and did nothing to end the practice.  Proof that the

22   City's policy or custom was merely negligent with

23   respect to possible civil rights violation is not

24   sufficient.

25        With respect to the phrase "the moving force,"

1    Mr. Hutchins, Sr., must prove that there was an

2    affirmative link or close relation between the

3    Constitutional violation and the City of Springfield's

4    policy or customs.

5         Now I'm going to turn to the question of

6    damages, and the mere fact that I instruct you on

7    damages does not mean that you should find damages.

8    Also, the mere fact that I instruct you on a particular

9    kind of damages does not mean that you must find

10   damages of that kind.  I'm required to give you a

11   complete set of instructions on the law.  You are to

12   award damages only if you find that the Plaintiff has

13   proved any of his claims by a preponderance of the

14   evidence.  The burden is on the Plaintiff to prove

15   damages with as much definiteness and accuracy as the

16   circumstances will permit.

17        And now we're going to go back to the form.

18   We're on the bottom of Page 4, and there is what is

19   called "instruction on damages."  And it's in bold, and

20   you must follow it carefully.  It says, "If you answer

21   any part of Questions 1A, 2A, 3A, 4A or 5A," and you'll

22   recall that each of those questions has to do with the

23   substantive counts, and the Subpart A is gotten to only

24   if you've answered the first part of the question yes

25   and you get to Subpart A, which asks whether there was

1    causation, if you answer any one of those sub-As yes,

2    meaning you've said that there is not only a violation

3    but there was causation with respect to one or more of

4    the Officers, then you're going to go damages.

5        However, if you answer all of those questions

6    no, your deliberations are complete, and you don't get

7    to damages.

8        And I'll just finish up the instruction.  It

9    says, "If you answer any of part of Questions 1A, 2A,

10   3A, 4A or 5A yes, you proceed to Question 7;" that is,

11   damages with respect to the Defendant or Defendants as

12   to who you answered yes; otherwise, your deliberations

13   are complete.  In other words, if you have no yes

14   answers there, you're not going to go on to the damages

15   question.

16       But assuming for the moment that you do, turn

17   over to Page 5, and we're going to read these damages

18   questions.  7 says, "Enter below in words and in

19   numbers" -- and by that I mean like you're filling out

20   a personal check, you write out, you know, the number

21   in longhand and then you use the number, so that

22   there's no confusion.  "Enter below in words and in

23   numbers the amount of compensatory damages, if any, you

24   award to Plaintiff caused by the conduct of Defendants

25   McKay and/or Romero as to whom you have answered

1    Question 1A yes."  And you remember 1A had to do with

2    unlawful entry.

3         Then Question 8 says, "Enter below in words and

4    in numbers the amount of compensatory damages, if any,

5    you award to Plaintiff caused by the conduct of

6    Defendants McKay and/or Hervieux as to whom you have

7    answered Questions 2A or 3A yes."  You'll remember that

8    2A and 3A have to do with excessive force and assault

9    and battery.  And, again, of course it's asking for you

10   to write it out in words and in numbers.

11        Then Question No. 9 says "Enter below in words

12   and in numbers the amount of compensatory damages, if

13   any, you award to Plaintiff caused by the conduct of

14   Defendants McKay, Romero and/or Hervieux, as to whom

15   you have answered Questions 4A or 5A yes."  Remember,

16   4A is abuse of process.  5A is malicious prosecution.

17   They're lumped together.  So, if you have answered any

18   of those questions yes, then you would say something on

19   9.

20        And then, finally, Question No. 10 says, "If you

21   answer any part of Questions 1A, 2A, 3A, 4A or 5A yes

22   but you did not award Plaintiff compensatory damages,

23   do you award nominal damages to the Plaintiff for the

24   violations found?"  And there's a place for you to

25   answer that question yes or no.

1        So now we'll put the form down one last time.

2     We're going to talk about the subject of damages.

3        You should not award damages more than once for

4     the same injury.  For example, if a Plaintiff prevails

5     on more than one claim and establishes a particular

6     amount of damages, you cannot award that amount of

7     damages twice.  In other words, he is entitled to be

8     made whole again but not to recover more than his loss.

9     Of course, if different damages are attributed to

10    separate claims, then you may compensate the Plaintiff

11    in full for all of his damages.

12        If you find that the Plaintiff is entitled to a

13    verdict, you may award damages to compensate him

14    reasonably for the actual injuries that you find by a

15    preponderance of the evidence were caused by the

16    actions of the Defendant or Defendants.  These are

17    known as compensatory damages.

18        As with other elements of proof, the elements of

19    damages must not be based on conjecture, surmise or

20    speculation.  The object of damages allowed by law is

21    to award the equivalent in money to the injured

22    Plaintiff for actual past, present and future harm or

23    loss.

24        There are two kinds of compensatory damages:

25    Economic damages, which have adequate evidentiary

1    support such as lost wages or lost business profits;

2    and non-economic damages, such as pain and suffering,

3    which are more difficult to calculate.

4         Compensatory damages can, therefore, be awarded

5    to compensate for physical and mental harm, such as

6    physical injury, disability, pain and suffering, fear

7    and humiliation as well as any disability, mental

8    anguish or pain and suffering that the Plaintiff will

9    suffer in the future.

10        You must not, however, award duplicative or

11   overlapping amounts on the Plaintiff's different

12   claims.  You should not award damages more than once

13   for the same injury.

14        You should not include an award for attorneys'

15   fees.  Any amount you award to the Plaintiff will be

16   the maximum amount that he will ever be able to receive

17   from the Defendants now or in the future.

18        Bear in mind that recovery will not be barred

19   because there may be a lack of certainty in the

20   Plaintiff's proof of aspects of loss that, by their

21   very nature, are not susceptible to precise

22   calculation.

23        You are not, however, permitted to award

24   speculative damages.  Any ward of damages must be based

25   on evidence and on a finding by you that the Plaintiff

1    has convinced you by a preponderance of the evidence

2    that he has been injured as he claims to have been

3    injured.

4         Damages must be ascertainable by reference to

5    some definite standard, either of market value,

6    established experience or direct inference from known

7    circumstances.

8         A mathematical certainty in measuring damages is

9    not a prerequisite for recovery.  The determination of

10   damages is left to your judgment and estimation, as the

11   triers of fact.

12        It is a settled principle under Massachusetts

13   law that, when a Defendant's wrongful act causes

14   injury, he is liable for the full extent of the harm

15   caused by his wrongful act even if the injured party

16   had a pre-existing condition that made the consequences

17   of a wrongful act more severe than they would have been

18   for a normal victim.

19        If you return a verdict for the Plaintiff but

20   find that he has failed to prove that he has suffered

21   any actual or compensatory damages, then you may return

22   an award of nominal damages, meaning a trivial sum not

23   to exceed $1.  Nominal damages may be awarded when a

24   Plaintiff has been deprived by a Defendant of a

25   Constitutional right but has proved no real damage as a

1    result of the Constitutional deprivation.

2         And now my third and, you'll be glad to know, by

3    far the shortest section of my instructions to you.

4         When you go to the jury room to begin

5    considering the evidence in this case, the foreman,

6    Mr. L█, will assure that every juror is present during

7    all of your deliberations and that all the jurors, the

8    foreman included, will have an equal and full

9    opportunity to participate in your deliberations.

10        Once you are in the jury room, if you need to

11   communicate with me, the foreman will send a written

12   signed message to me.  If you do send a written message

13   to me, I will discuss it with the lawyers for both

14   sides before responding to you.  So please continue

15   your deliberations to the extent you are able during

16   the time it takes for me to respond to any question.

17   Do not stop your deliberations while you await a

18   response, and do not tell me how you stand, either

19   numerically or otherwise, on any issue before you until

20   after you have reached a verdict.

21        On matters touching simply on arrangements for

22   your meals, schedule and convenience, you are free to

23   communicate with the Marshal orally rather than in

24   writing.  You are not to communicate with anyone other

25   than me about the case, however, and then only in

1    writing.

2           Now, I have read to you what is called the

3    verdict form.  A verdict form is simply the written

4    notice of the decision you reach.  You will have the

5    original and copies of this form in the jury room, and

6    when you have reached your verdict, you will have your

7    foreman fill in, date and sign the original to state

8    the verdict upon which you agree.  You will then report

9    in writing to the Marshal that you have reached a

10   verdict, after which you will be invited to return with

11   your verdict to the courtroom.  Your verdict must be

12   unanimous; that is, you must be unanimous as to the

13   answer to each of the questions that you answer.

14          It is my practice, absent special circumstances,

15   to allow a jury to recess before dinner and begin

16   deliberations again in the morning of the next regular

17   court day.  In this case, that would be tomorrow,

18   Wednesday.

19          It is not quite time for you to start

20   deliberating.  I will have a sidebar conference with

21   counsel.  You can be at ease for a few minutes.  I will

22   then return with a brief final instruction to give to

23   you before you retire to deliberate.

24          And I will see counsel at sidebar.

25          (Discussion at sidebar)

1            THE COURT:  Counsel?

2            MR. RYAN:  Your Honor, the Plaintiff is

3    satisfied with the instructions.  With respect to the

4    verdict form, I actually apologize for not bringing

5    this to the Court's attention before.  As we look at

6    the instruction on damages, it would appear that there

7    was a missing question right at the beginning that has

8    really nothing to do with 6A.  6A has been omitted if

9    they were to find that the City of Springfield violated

10   his rights on proximate cause.

11            We think that the jury should be able to be

12   alerted that 6A is also is responsive to excessive

13   force for No. 8.  The City should be added as an

14   additional and/or Defendant in that the question, if

15   they answer yes to Questions 2A or 3A or 6A, that those

16   are all the --

17            THE COURT:  But they can't get to 6A unless

18   they've answered 2A yes, so I don't want to confuse

19   them by indicating that they can get to 6A without

20   having responded to 2A.

21            MR. RYAN:  I think it's clear from above, the

22   City of Springfield claim, that they don't go to 6

23   unless they've answered 2A yes with respect to one of

24   the Defendants.  I don't think there's any danger, but

25   I think the danger here is that, if they get to Page 8,

1    excessive force, they're not told that the award of

2    damages would include, if they would have found the

3    City violated Mr. Hutchins' Constitutional rights, the

4    City would be a party that would have to just list

5    McKay and Hervieux.

6         THE COURT:  Your position?

7         MS. deSOUSA:  Our position is, Your Honor, that

8    there are no additional damages as a result of a *Monell*

9    finding.  The damages only arise out of the excessive

10   force claim.  So it is a full and fair compensation for

11   any damages arising out of the excessive force.  There

12   is no additional finding of damages under excessive

13   force when, for collection purposes, for joint and

14   several liability purposes, by saying yes to 6A, the

15   City would also be financially responsible for those

16   damages.  That's the only addition of having the *Monell*

17   claim.

18        THE COURT:  Yeah.  Mr. Ryan, I don't think I

19   need to have the 6A in there.  They're going to get to

20   damages if they answer any one of those yes, any one of

21   the counts against the individuals yes, they're going

22   to get to damages.  And then they're going to be asked,

23   when they get to damages, to award for -- as a result

24   of the violations of the individuals, and I don't see

25   how there could be a problem.

1          In other words, if they -- you know, to pick the

2     hypothetical number of $100,000 you're talking about,

3     if they put $100,000 in here that results from the

4     excessive force, what more are they going to add if

5     they are -- you know, after I tell them they can

6     consider 6A above the City?

7          MR. RYAN:  I think that they're essentially --

8     it's important to know that their determination in 6A

9     has consequences in terms of damages against the City

10    of Springfield.  I think that this is left in such a

11    way that they can answer that there's no liability

12    against the City even if they're just -- it seems to be

13    kind of an academic exercise that they haven't -- they

14    checked a box, but assuming they do on 6A that they're

15    in fact liable, but now they're being told that they

16    can only consider damages against these two Officers.

17    So I think the danger is they fail to see --

18          THE COURT:  All right.  Okay.  And so maybe the

19    compromise position is to not change this because

20    they're going to get to the damages anyway, which -- if

21    I add it in here, "If you have answered Questions 2A,

22    3A" --

23          MR. RYAN:  Or 6A.

24          THE COURT:  -- or 6A, not and/or 6A.  6A; right?

25          MR. RYAN:  Yes.

1          THE COURT:  Any problem with that?

2          MS. deSOUSA:  You Honor, I don't think that

3     accurately -- those damages arise only from excessive

4     force.  There's no independent damages that arise

5     because they've found a *Monell* violation.  And I agree

6     with Attorney Ryan that it is somewhat of an academic

7     exercise, unless the damages exceed the amount that the

8     City would indemnify.  Then they could go beyond the

9     amount that we would indemnify individual Officers for

10    because the City itself is liable.  And so it really

11    has only to do with joint and several liability and

12    who's going to pay any damage amount; it has nothing to

13    do with additional -- you don't get an additional

14    damage from a *Monell* violation.

15         MR. RYAN:  I think the Court's instructed that

16    compensatory damages have a deterrent effect, and so I

17    think to exclude the City as one of the Defendants is

18    effectively negating that part of the Court's

19    instruction as to what compensatory damages are if

20    there's no way to include that in terms of recognizing

21    the City as a liable party in the questioning.

22         THE COURT:  Well, I think if they answer the

23    City questions yes, the City's going to be liable.

24         MS. deSOUSA:  That's correct.

25         THE COURT:  The City's going to be liable.  And

1    I don't know who pays, I don't know, and it's not

2    necessary for the jury to know who pays in that event.

3    But by answering 6 and 6A affirmatively, they have put

4    the City at liability, and then the recovery is based

5    upon the damages that have been proved result from the

6    actions of the individuals.  They're not proving that,

7    because the City had a bad policy, that they should

8    give him $200,000 instead of $100,000; right?

9         MR. HOOSE:  But, Judge, again, we're not saying

10    that they're entitled to a separate award of damages.

11    We're saying that the jury is entitled to know who is

12    responsible and who will pay those damages.  And that's

13    part -- that's why they have to be listed with

14    everybody else if they've been found liable.

15         THE COURT:  Well, I don't think --

16         MS. deSOUSA:  Your Honor --

17         MS. SHEEHAN:  The --

18         THE COURT:  Well, wait.  I can't have 14 people

19    talking here, but go ahead.  I'll let you --

20         MS. deSOUSA:  You go.

21         MS. SHEEHAN:  The jury's not entitled to know

22    who's going to pay the damages.  I mean, that's never

23    been a standard anywhere.  And, Your Honor, it's clear,

24    there's one award, the City's paying, we've covered

25    what those damages can be -- fall under.  That's the

1     end of this discussion.  I just I think this is

2     misleading, throwing 6A in there.

3            THE COURT:  Last word.

4            MR. RYAN:  I disagree.  I think, as I said

5     before, that the jury is going to throw compensatory

6     damages out as a deterrent effect.  That deterrent

7     effect is even more powerful when it comes to a city

8     than individual officers.

9            THE COURT:  All right.  Thank you, Counsel.

10    Withdraw, and I will -- if I don't call you back, it's

11    because I'm going to go with my original.  If I call

12    you back, we'll have a little further discussion, but

13    thank you.

14            MS. SHEEHAN:  Your Honor, if I could just add

15    one more thing --

16            THE COURT:  Yes.

17            MS. SHEEHAN:  -- and that's on the damages?  You

18    instructed on lost wages and lost earning capacity.  I

19    don't believe there's been any evidence of that.

20            THE COURT:  Well, I just said there was two

21    kinds of compensatory damages, one and the other.  I

22    didn't imply that there was going to be lost wages

23    here; I was just explaining what compensatory damages

24    was.  I don't think that's something that's going to

25    bother anybody; okay?

1      MR. COYLE:  Your Honor, I --

2      THE COURT:  Yes.  Wait a minute.

3      MR. COYLE:  Just state my objection for the

4  record on the lack of a community care-taking

5  instruction.

6      Also, on the issue of exigent circumstances, I

7  certainly do not suggest or I'm not arguing that there

8  were any exigent circumstances justifying the entry to

9  the hallway and whatever discussion took place at the

10  doorway.

11      I guess I did not understand that counsel was

12  going to argue that, if the jury would find that

13  Officer Romero went through the kitchen in pursuit of

14  Lee, Jr., that that would establish the illegal entry.

15  On that particular activity, I would say, if that's

16  going to be before the jury, then the exigent

17  circumstances instruction would be applicable only to

18  that portion.  We concede that entering into the

19  hallway and whatever discussion took place at the

20  entranceway would not be subject to an exigent

21  circumstances instruction.  But Romero, if he went

22  through -- he denies it of course -- but if he went

23  through, he would have had exigent circumstances,

24  Your Honor.

25      THE COURT:  Okay.  You've saved your appeal

1    rights, but I'm not going to change it now.  You had a

2    chance to do this yesterday.

3              MR. COYLE:  Thank you.

4              MS. deSOUSA:  Thank you, Your Honor.

5              (End of discussion at sidebar)

6              THE COURT:  All right.  Members of the jury, it

7    is now time for the case to be submitted to you.  You

8    may commence your deliberations.  All of you who are

9    the jury must be together at all times while you are

10   deliberating.

11             Whenever you need a recess for any purpose, your

12   foreman, Mr. L█, may declare a recess.  Do not discuss

13   the case during a recess in your deliberations.  All of

14   your discussion of the case should occur only while you

15   are all together and your foreman has indicated that

16   deliberations may proceed.  This should be your

17   procedure so that everyone on the jury will have an

18   equal opportunity to participate and to hear all of

19   what the other members of the jury have to say.

20             You may go to the jury room and commence jury

21   deliberations.

22             THE CLERK:  All rise for the jury.

23             (The jury is not present for the following)

24             THE COURT:  All right.  Be seated, Counsel.

25             I need you all to stay until my Deputy comes

1     back to make sure that all of the exhibits are in

2     proper form, and of course they do have an

3     opportunity -- or the ability to look at exhibits

4     electronically in the jury room, but I want you to make

5     sure that they're also going to have the written

6     documents in proper form.

7           Also, I need you to give her your cell phone

8     numbers and an ability to be reached at short notice

9     because, if we get a question from the jury, I'll want

10    to reassemble you within ten minutes.  So I believe

11    that they will be getting lunch right away, so this

12    might be a good time for you all to get lunch and then

13    be available if and when we get questions from the

14    jury.

15          Is there anything else that needs to come to my

16    attention before we recess?

17          MR. RYAN:  Yes, Your Honor.  In discussing just

18    before closings with counsel, it appears there may have

19    been some duplicative numbering on some of the last

20    exhibits.  So I think there's a way to work this out

21    where --

22          THE COURT:  Put As and Bs on them or --

23          MR. RYAN:  It's something to that effect, and

24    whatever we do, I think, if we could -- it may be

25    helpful to the jury to learn -- I know, for example,

1    Mr. Hoose referred to Exhibit 149 in his closing, and I

2    think that's one of the exhibits that may need to be

3    renumbered, so I don't know if the Court would want to

4    do anything other than send it back or send it back

5    with information about --

6         THE COURT:  Well, why don't you get together,

7    and I would assume if there are two 149s, we'll call

8    them 149 and 149A.

9         MR. RYAN:  Makes sense.

10        THE COURT:  And then we can just simply say in a

11   neutral statement that we'll send to the jury,

12   Exhibit 149 is umpty ump, Exhibit 149A is the other

13   document, just for your information; all right?

14        MR. RYAN:  Sounds like a practical way,

15   Your Honor.

16        THE COURT:  Hopefully, counsel can work that

17   out, but let me know through my Deputy if there's a

18   problem.

19        Anything else from Defendants?

20        MS. deSOUSA:  Nothing from Defendants,

21   Your Honor.

22        THE COURT:  We're in recess until further

23   notice.

24        MR. COYLE:  Your Honor, just for clarity, we

25   were having a discussion about some of these documents

1    being on a disk.  Is the disk going to be offered, or

2    is it going to be strictly the paper documents?

3           MS. SHEEHAN:  Except for the videos.  We know

4    the videos will go in on a disk.

5           MR. RYAN:  We will work this out with Ms. Lima

6    and defense counsel.  If there's a problem, we will let

7    you know.

8           THE COURT:  All right.  Thank you.

9           (Recess, 12:31 p.m.)

10          (Resumes, 1:40 p.m.)

11          (The jury is not present for the following)

12          THE COURT:  Good afternoon, Counsel.  We've had

13   a question from the jury.  I will read it for you and

14   then give you my proposed answer and listen to your

15   suggestions.

16          The question says -- and I will read it verbatim

17   and then give you my -- what I think are a couple of

18   minor changes.

19          "For Question 1A, does the question mean that

20   damaged was directly caused by Question 1, or does it

21   mean the entering ultimately led to the overall

22   incident and damages?"

23          I believe the author's meaning to say, For

24   Question 1A, does the question mean that damages were

25   directly caused by Question 1, or does it mean that the

1   entering ultimately led to the overall incident and

2   damages?

3           And the way I would propose to answer that is as

4   follows:  "If you find that either Defendant McKay or

5   Defendant Romero unlawfully entered the premises, as

6   that term is defined in my instructions to you, you

7   will consider Question 1A, which in turn asks whether

8   the unlawful entry itself caused any injury to the

9   Plaintiff.  You are reminded that, if you find

10  violations under any of the remaining questions, you

11  must determine whether those violations in turn caused

12  injury to the Plaintiff."

13          Mr. Ryan?

14          MR. RYAN:  If I could just have a moment?

15          THE COURT:  Yes.

16          (Pause)

17          MR. RYAN:  Your Honor, would it be possible just

18  to read again your proposed --

19          THE COURT:  You mean my proposal or the question

20  itself?

21          MR. RYAN:  Your proposed answer.  I think I

22  understand the question.

23          THE COURT:  Okay.  "If you find that either

24  Defendant McKay or Defendant Romero unlawfully entered

25  the premises, as that term is defined by my

1    instructions to you, you will consider Question 1A,

2    which in turn asks whether the unlawful entry itself

3    caused any injury to the Plaintiff.  You are reminded

4    that, if you find violations under any of the remaining

5    questions, you must determine whether those violations

6    in turn caused injury to the Plaintiff."

7         MR. RYAN:  Your Honor, I think that the only --

8    I think that the bedrock legal principle here is that,

9    when there's a violation of the law, that the

10   Defendants are liable for the natural and probable

11   consequences of their actions.  So I think that that

12   instruction is -- my concern is I think the -- with the

13   Court's proposed answer is that it may unduly restrict

14   the jury's consideration of what an unlawful entry, the

15   harm that it causes when I think that it's -- situating

16   in the facts of this case, that when people show up at

17   early morning hours and enter somebody's dwelling, the

18   harm can have a -- it becomes a proximate cause for

19   things beyond just the physical intrusion in that

20   particular moment.  So that's why I think --

21        THE COURT:  So are you telling me or suggesting

22   to me that, because there was an unlawful entry, they

23   can award the Plaintiff damages for his shoulder

24   injury?

25        MR. RYAN:  No, no, I'm not.  But I do think

1    that -- my concern is that an answer that might be

2    construed as itself limited to just the, you know,

3    annoyance or apprehension of seeing the Officers there

4    when I think that the -- what the jury, I'm gathering,

5    is getting at is whether or not their unlawful

6    presence, which inspired some commentary from one of

7    Mr. Hutchins' sons and created a tumultuous scene

8    there, is something that is compensable based on the

9    violation.  I think it probably is.

10        I don't think  that -- I think you're right with

11   the second part of your answer, that each claim in turn

12   has to be dealt with on its own basis, but I think that

13   the use of word "itself" may unduly restrict the jury

14   in terms of thinking about how to properly go about

15   answering the questions on the special verdict form.

16        THE COURT:  So that's a long way of saying you

17   want me to delete the word "itself"?

18        MR. RYAN:  I think that -- and instruct that the

19   Defendants are liable for the natural and probable

20   consequences of their action would be, from our

21   perspective, the right way to answer the question.

22        THE COURT:  Well, that would be supplementing my

23   earlier instructions that I carefully drafted over

24   which we spent a lot of time yesterday in the charge

25   conference; right?  Let me ask you -- give me what you

1      would answer.  I want the whole thing.

2             MR. RYAN:  "Ladies and Gentlemen of the Jury, a

3      Defendant is liable for the natural and probable

4      consequences of his actions if you find that the

5      Defendants McKay and/or Romero unlawfully entered the

6      premises, as that has been defined for you, then you

7      should consider what damages were a proximate cause of

8      that unlawful action."

9             THE COURT:  Ms. deSousa?

10            MS. deSOUSA:  Your Honor, I would disagree.  I

11     think that the proposal that Your Honor made is

12     satisfactory and is in keeping with the law and the

13     theories that this case has been tried upon.  The

14     evidence wouldn't support some expansion of that.

15            You know, the evidence that's gone in relative

16     to this is that, you know, Keith Hutchins testified in

17     front of this jury that, when he came in and saw the

18     Police Officers there, that he behaved in an outrageous

19     manner, and then the next thing that happened is the

20     other son comes out and threatens bodily harm to

21     someone and runs out the back door.  I mean, there's no

22     causal connection here between Lee Hutchins, Jr.,

23     running down -- running out another door and starting a

24     melee outside that would connect that with whether he

25     saw the Police when he got to the porch or in the

1       kitchen.  I mean, he wasn't offended that they were

2       standing -- if they were standing in the kitchen, that

3       wasn't the cause of any of this, and to suggest that it

4       is I think is going to misrepresent what the law is.

5       This isn't a case where police officers made an

6       unlawful entry and then seized evidence or otherwise --

7              THE COURT:  I thought we separated the three

8       matters out -- actually, yesterday we were just talking

9       about two, but it turned out we separated it out into

10      three separate damages questions because there was a

11      potential for injury as a result of each of the

12      violations, that they were separate from one another.

13      That's why we separated the damages questions, isn't

14      it?

15             MR. HOOSE:  Yes, but that shouldn't preclude the

16      jury from going where it seems like they want to go,

17      which is from finding, to use the vernacular that

18      they're using, that the whole thing was caused by their

19      unlawful entry, if that's what they're thinking,

20      assuming that there is proximate cause for the damages

21      that flow from that.

22             I think it's a jury question, that they can

23      determine what damages flowed from the entry, as long

24      as it meets the proximate cause standard.  And I think

25      that our concern is we don't want to see an answer that

1    restricts them from what they can consider as the

2    damages that flowed from that entry.

3         MR. COYLE:  Your Honor, I would reiterate the

4    comments you made.  We originally had essentially one

5    line for damages, and we split them out for exactly

6    this reason.  The jury should be capable of

7    understanding what consequences -- by using the word

8    "itself," you're isolating that particular issue of

9    liability, as it should be limited.

10        If they, down the road, reach an affirmative

11   response to any of the other questions, they'll

12   calculate damages in the same way.  It's just an

13   invitation for either duplicative damages or

14   inappropriately extended damages, to not isolate that

15   cause of action with the damages, Your Honor.

16        THE COURT:  I'm going to give it as proposed.

17        Call the jury.

18        (Pause)

19        THE CLERK:  All rise for the jury.

20        (The jury is present for the following)

21        THE CLERK:  Thank you.  You may be seated.

22        THE COURT:  Good afternoon, Jurors.

23        You have posed a question to me, and for the

24   record I will read it, and then I will say how I think

25   it should be amended slightly and then give you an

1    answer.

2         The question says, and I quote, "For Question

3    1A, does the question mean that damaged was directly

4    caused by Question 1, or does it mean the entering

5    ultimately led to the overall incident and damages?"

6    And it's signed by the foreman.

7         I'm interpreting it to say, "For Question 1A,

8    does the question mean that damages were directly

9    caused by Question 1, or does it mean the entering

10   ultimately led to the overall incident and damages?"

11        And I answer it as follows:  "If you find that

12   either the Defendant McKay or the Defendant Romero

13   unlawfully entered the premises, as that term is

14   defined in my instructions to you, you will consider

15   Question 1A, which in turn asks whether the unlawful

16   entry itself caused any injury to the Plaintiff.  You

17   are reminded that, if you find violations under any of

18   the remaining questions, you must determine whether

19   those violations in turn caused injury to the

20   Plaintiff."

21        Return to the jury room and continue your

22   deliberations.

23        THE CLERK:  All rise for the jury.

24        (The jury is not present for the following)

25        THE COURT:  We are in recess until further

1    notice.

2              (Recess, 1:55 p.m.)

3              (Resumes, 4:04 p.m.)

4              (The jury is not present for the following)

5              THE COURT:  Good afternoon again, Counsel.

6              I'm informed that our IT folks are not able to

7    resolve the electronic problem in the jury room and

8    that, therefore, Exhibit 89 is not available to the

9    jurors.  It is true that we could bring the jury back

10   into the Courtroom and, apparently, with the

11   Plaintiff's counsel's help, who played the

12   Exhibit originally, play it for the jury.

13             How long does it last, may I find out?

14             MR. RYAN:  Approximately one minute.

15             THE COURT:  I'm sorry?

16             MR. RYAN:  One minute.

17             THE COURT:  One minute?

18             Is there any objection to calling the jury back

19   and playing the one-minute video?

20             MS. deSOUSA:  No objection, Your Honor.

21             THE COURT:  What I expect I'll do is I'll play

22   it twice because there'll be always be somebody that

23   would like to see it one more time, but I'm not going

24   to play it six times.  I will play it once, and then I

25   will say, Okay, we're going to do it one more time.

1       Look carefully if you want to, but I will also tell

2       them there can be no comments, nobody will say anything

3       in terms of addressing what's going on.

4               Ms. Leboeuf will just simply start the video

5       where she started it before, play it through once, and

6       after it gets through, I'll say, "We're going to ask

7       her to do that one more time," she'll do it a second

8       time.  After that, I'll say, "You've now seen it.

9       Return to your deliberations."

10              But there'll be no oral comments by anybody; is

11      that understood?

12              MR. RYAN:  Understood.  Just so the Court knows

13      what's going to happen, the video itself about two

14      minutes and 15 seconds.  The jury saw the first minute,

15      and we'd propose doing the exact same, get to the

16      minute mark, stop --

17              THE COURT:  Yes.

18              MR. RYAN:  -- get it the beginning, no comment

19      of any kind.

20              THE COURT:  Yes, just exactly what we did at the

21      time of the trial.

22              MR. RYAN:  Okay.

23              THE COURT:  Any problem with that on the

24      Defendants' side?

25              MS. deSOUSA:  No problem, Your Honor.

1        THE COURT:  All right.  We'll call the jury in

2    to do that, and they'll have to of course deploy their

3    screens in the back row.

4        THE COURT:  There's no audio in this video at

5    all?

6        MR. RYAN:  There is no audio.  The volume on the

7    computer is turned down completely.

8        THE COURT:  Okay, that's fine.

9        (The jury is present for the following)

10        THE COURT:  Good afternoon, Jurors.

11        You've asked me about -- I'll just read it out,

12    what your question was.  You said, "Can we see the

13    post-arrest video Exhibit 89?  It is not loading on the

14    device in the jury room."

15        We made every attempt to try to make it work,

16    but it is not working.  So the only alternative is to

17    have you look at it here in the Courtroom.  What I'm

18    going to do is ask Plaintiff's counsel, Ms. Leboeuf,

19    who has played it originally, to play this video.  It

20    lasts about one minute.  You have your screens there,

21    so pull them out so that you can see your screens.

22        I'm going to play it about once through, and

23    then I'm going to ask Ms. Leboeuf to play it a second

24    time.  We're going to look at it twice, not any more

25    than twice, and then I'm going to ask you to return to

1    your deliberations.

2           So Ms. Leboeuf will please play that video now.

3           THE JUROR:  I'm sorry.

4           THE COURT:  Wait a minute.  We've got no screen

5    in the back.

6           (Pause)

7           THE COURT:  I'll ask Jurors 11 and 12 to move

8    down to the other screen.

9           All right.  Ms. Leboeuf, please play the video.

10          (Video played)

11          THE COURT:  All right.  We're going to play it

12   one more time through.

13          (Video played)

14          THE COURT:  All right.  That's the second time

15   through.  Jurors, I'll ask you to return to the jury

16   room and continue your deliberations.

17          THE CLERK:  All rise for the jury.

18          (The jury is not present for the following)

19          THE COURT:  All right.  We'll be in recess until

20   further notice.

21          (Recess, 4:14 p.m.)

22          (Resumes, 5:20 p.m.)

23          (The jury is present for the following)

24          THE COURT:  Good afternoon, Jurors.  It's 5:20,

25   and you've asked for leave to go home, and I'm going to

1    grant that request.  You've worked hard today, and I

2    don't want you to have to work late at night and decide

3    matters of this importance when you're tired.  So I'm

4    going to ask you to go home, come back tomorrow morning

5    refreshed at 9:00, we'll go back to work.

6           Again, I have to forewarn you about my

7    instructions.  Take my instructions that I gave you

8    last Friday, which you are already multiplied by three

9    or four -- right? -- and multiply it by five.  That's

10   how important it is that you not discuss anything about

11   what's been going on in that room.  It would be totally

12   inappropriate, and it might lead to a mistrial.  You

13   cannot talk about it.  You can certainly think about

14   it, and tomorrow morning you can go back with your

15   fellow jurors and talk all you want.

16          But it would be entirely inappropriate if you

17   tried to do any independent research or talk to

18   anybody.  Again, anybody who volunteers to you about

19   some matter that they think that they know about,

20   you're just to say, "I can't talk to you.  I'll talk to

21   you after it's all over," you can talk all you want,

22   but not tonight and not until this case is decided.

23          I'm going to ask each one of you tomorrow --

24   well, as a group, whether you've been able to honor my

25   instructions about not talking about this case or doing

1    any independent research.  I hope I have a showing of

2    12 hands and a unanimous showing that we can be sure

3    that you haven't done anything that would jeopardize

4    the integrity of this system.

5          So, thank you very much for your work.  Have a

6    pleasant evening.  Don't worry about this case until we

7    get back tomorrow morning, at which time we will

8    reconvene.  I will see you at 9:00 a.m. tomorrow

9    morning before you start deliberating.  Have a pleasant

10   rest of the day.

11         THE CLERK:  All rise for the jury.

12         (The jury is not present for the following)

13         THE COURT: All right.  Counsel, be seated.

14         I don't know if I have informed counsel -- I'm

15   not sure at one stage if I did -- I am leaving tomorrow

16   on judicial business at about 11:00 a.m.  I'm not going

17   to tell the jury that until when and if it becomes

18   necessary.  But I am going to try to arrange -- make

19   arrangements tonight to have another Judicial Officer

20   of this Court available to take a verdict and, if

21   necessary, to take questions.  Of course my law clerks

22   will be available, and I will be available by

23   telephone, at least part of the time, while I'm away.

24   But I am going to be leaving the area at about 11:00

25   tomorrow morning, just for your information.

1          Is there anything that needs to come to my

2      attention before we adjourn for the evening?

3          Mr. Ryan?

4          MR. RYAN:  No, Your Honor.

5          THE COURT:  Ms. deSousa?

6          MS. deSOUSA:  No, Your Honor.

7          THE COURT:  Have a pleasant evening.  I'll see

8      you tomorrow morning at 9:00 a.m.

9          THE CLERK:  All rise.

10          (Adjourned, 5:25 p.m.)

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9          I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10    hereby certify that the foregoing pages are a true and

11    accurate transcription of my stenographic notes in the

12    above-entitled case.

13

14

15

16

17

18              /s/ Debra D. Lajoie

19

20

21

22

23              3/6/19

24

25